**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DR. DENEAN ADAMS** | ) | No. 15C8144 |
| | ) | |
| **Plaintiff,** | ) | **Judge Sharon Johnson Coleman** |
| | ) | **Magistrate Judge Susan E. Cox** |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **BOARD OF EDUCATION HARVEY SCHOOL** | ) | |
| **SCHOOL DISTRICT 152, GLORIA JOHNSON** | ) | |
| **in her individual capacity, BETTY JOHNSON,** | ) | |
| **in her individual capacity, DR. KISHA** | ) | |
| **MCCASKILL, in her individual capacity,** | ) | |
| **JANET ROGERS, in her individual capacity,** | ) | |
| **TYRONE ROGERS, in his individual capacity,** | ) | **JURY TRIAL DEMANDED** |
| **LINDA HAWKINS, in her individual capacity,** | ) | |
| **FELECIA JOHNSON, in her individual** | ) | |
| **capacity,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Introduction/Procedural History**

Plaintiff's Second Amended Complaint (the "Complaint") avers three counts against

Defendants who were all members of the Board of Education Harvey School District 152 during

the relevant period pursuant to 42 U.S.C. § 1983 (RSOF **Exhibit T**). On March 19, 2018,

Defendants moved for summary judgment on all counts (the "Motion"). (RSOF **Exhibit Y**). On

May 11, 2018, the Court granted in part and denied in part Plaintiff's motion to compel

production of attorney-client privileged information and gave Defendants until May 18, 2018, to

produce information related to the subject of their advice-of-counsel defense. (RSOF **Exhibit Z**,

pg. 4). Plaintiff was given until June 1, 2018, to respond to the Motion.

1

**Plaintiff's speech, both in the police report and suit, relate to matters of public concern**.

Defendants contend that they are entitled to judgment on Counts I and III because the speech at issue was not a matter of public concern. The public concern test was articulated by the Supreme Court to balance the legitimate governmental interest of officials to avoid the disruption to governmental operations that would result if every dispute between a public employee and governmental entity over what an employee could or could not say escalated into a retaliation lawsuit. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 390-93 (2011) (discussing the purpose of the public concern test applicable to the free speech and petition clauses of the First Amendment). Therefore, only speech the employee makes as a citizen on a matter of public concern is protected by the First Amendment. *Id*. at 386.

Thus, for a §1983 First Amendment retaliation claim to survive summary judgment, the plaintiff-public employee must show that she engaged in protected speech, that the retaliatory acts were motivated by her speech, and if the first two steps are satisfied, the court must determine if the employer would have taken the same action if the plaintiff had not made the speech. *Houskins v. Sheahan*, 549 F.3d 480, 489-90 (7th Cir. 2008). The plaintiff bears the burden on elements 1 and 2 and upon making the threshold showing, the burden then shifts to the defendant. *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006). If the defendant proffers a legitimate reason for its actions, then the plaintiff must show that the proffered reason is pretextual and retaliatory intent was the real reason for the defendant's actions. *Id*. "A prima facie case supplemented by evidence of pretext is sufficient to show retaliation." Pretext may be shown by circumstantial evidence such as the timing of events or disparate treatment of similar individuals. *Id*.

2

Speech relates to a public concern when it informs the public on an issue that is important to the community, such as when the speech raises issues of discrimination or exposing potential misconduct by government officials. *Houskins*, 549 F.3d at 492 (speech informing public of potential misconduct by government agency or official is matter of public concern); *Yatvin v. Madison Metropolitan School Dist.*, 840 F.2d 412, 419 (7th Cir. 1988) (same for speech regarding school desegregation and gender discrimination). In contrast, speech motivated by a purely personal interest is characterized by the fact that it relates to the speaker's personal interest and does not raise issues that concern the community-at-large. *Kubiak v. City of Chicago*, 810 F.3d 476, 482-83 (7th Cir. 2016) (internal grievance aimed at improving working conditions and personal safety was not matter of public concern).

However, speech does not lose protection simply because the speaker has an interest in the subject matter. *Phelan v. Cook County*, 463 F.3d 773, 791 (7th Cir. 2006). And although the speaker's motivation is relevant; it is not dispositive. *Kubiak*, 810 F.3d at 484. Determination of whether speech relates to a matter of public concern is question of law that turns on the content, form and context in which it is made, with content being the most important factor. *Marshall v. Porter Cnty. Plan Com'n*, 32 F.3d 1215, 1219 (7th Cir. 1994).

Here, Plaintiff avers that in the spring of 2015 she informed Defendants that she wanted to hire a forensic auditor to investigate the District's finances. (RSOF ¶ 12). She was concerned about serious discrepancies with the expenditure of state and federal grant money and wanted an audit to identify the cause of the problems and potential solutions. *Id*. Defendants authorized Plaintiff to draft a request for proposal for the audit ("RFP"). (RSOF ¶ 13). On July 9, 2015, Plaintiff circulated a draft RFP to Defendants for their review. *Id*. Shortly after the RFP was

circulated, Tyrone Rogers called Plaintiff in a rage about the RFP. (RSOF 14). He shouted at

Plaintiff and said she was "itching for an ass-whooping!" *Id*.

The next day, Plaintiff informed Gloria Johnson, the Board president about the incident

with Rogers and indicated she was thinking of calling the police. (RSOF ¶ 47). Johnson said she

would immediately alert the Board about the incident. *Id*. However, before Plaintiff could call

the police, a Detective from the Harvey Police Department came to Plaintiff's office to interview

her about the incident. (RSOF 16). Plaintiff told the officer that Rogers had become enraged

when she sent out a draft proposal for an audit and called her on the phone and threatened she

was "itching for an ass-whooping!" *Id*. The Detective filled out an incident report stating that

Plaintiff had been verbally threatened. (RSOF ¶ 17).

On July 13, 2015, Plaintiff met with the Detective from the Harvey Police Department to

make a formal criminal complaint against Rogers. (RSOF **Exhibit A** ¶ 33). The Detective wrote

up a police department incident report recounting the following in relevant part:

Adams … informed [the officer] that Mr. Rogers, while speaking on the phone with him
On Thursday, 9 July 15, time unknown, stated to Dr. Adams "You itching for an ass whooping".
(sic) This was in response to a conversation about an audit of finance (sic) for the school District
of 152 including employees. Dr. Adams was informed by [the officer] that this would still have
to be brought up to the school board and that this wasn't criminal in nature at this time.

(RSOF **Exhibit Q**).

Plaintiff opted not to pursue the matter internally with the Board. (RSOF **Exhibit A** ¶¶ 34-35).

Instead, she filed a civil rights suit on September 16, 2015, alleging, *inter alia*, that Defendants

retaliated against her by rescinding a previously approved 1-year extension of her performance

contract without any due process. It was replaced by the Complaint on September 1, 2017,

which averred that Defendants engaged in further retaliatory conduct after Plaintiff filed the

original complaint, including refusing to renew her employment contract. (RSOF **Exhibit T**).

Defendants concede that Plaintiff was speaking as a citizen when she filed the police report and Complaint. (RSOF **Exhibit Y**, pg. 4). However, they contend that Plaintiff's speech in both instances is merely a personal grievance that does not relate to a matter of public concern. *Id*. at pg. 5. The public concern test applies to both the police report and Complaint to determine if the motivation for the speech is a matter of public concern. *Yatvin*, 840 F.2d at 419-20 (rejecting *per se rule* that all suits constitute protected speech and holding that the contents of complaint must be reviewed to determine if it asserts matters of public concern.) Therefore, the Court must look at the content of the speech, the form of the speech and the over-arching context to determine if it relates to a matter of public concern. *Marshall*, 32 F.3d at 1219.

### The Police Report

The police report states that Rogers threatened to attack Plaintiff after she circulated the proposal for an audit of the District's finances. (RSOF **Exhibit Q**). He was upset about the scope of the audit, which the report says "include[ed] employees." *Id*. The record shows that both Janet and Tyrone Rogers did not like the fact that Board members would be subject to the audit. (RSOF ¶ 59). Thus, the report raised the issue of the potential misuse of public funds by an elected official charged with overseeing the District's expenditure of millions in public money, and it conveyed that a government official abused a public employee with threats of violence because she wanted to conduct an audit to make sure that public money was being spent properly. (RSOF **Exhibit Q**). Potential financial malfeasance by a public official is quintessentially a matter of public concern. *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000) (citation omitted); *Martinez v. City of Opa-Locka, Florida*, 971 F.2d 708, 712 (11th Cir. 1992) (speech was matter of public concern where the statements involved public funds spent in violation of city law).

Thus, the instant case is only remotely similar to *Houskins*, which Defendants rely on. In *Houskins*, the plaintiff was physically assaulted by a co-worker when they got into an argument over a parking space. *Houskins*, 549 F.3d 483-84. The plaintiff immediately reported the incident to her supervisor and up through the chain of command, which she was required to do by sheriff's department regulations. *Id*. at 484. She also called the police and attempted to have the offender arrested for assault and battery. *Id*. The police reported stated that the offender had struck her in the face and left the scene. *Id*. at 492. Plaintiff subsequently filed a First Amendment retaliation claim after she said officials at the sheriff's department retaliated against her for filing an internal complaint and police report. *Id*. at 485.

The Seventh Circuit first determined that the internal report was not protected speech because it arose as a function of the plaintiff's job, because she was required to make the report under a department regulation. *Id*. at 491. Next, the Panel considered the police report and held that the plaintiff's speech was made as a private citizen. *Id*. However, the Panel concluded that the speech in the report was not a matter of public concern; rather, it was simply an effort to have the offender arrested for striking her. *Id*. at 491-92. The Panel noted that the police report did not contain any statements about wrongdoing at the sheriff's department or attempt to raise the issue of employee safety at the sheriff's department, or selective discipline for those with clout in the department. *Id*. at 492. It simply stated that the offender struck the plaintiff and left the scene. *Id*.

" … [S]tatements [were] not a matter of public concern where employee was not seeking to inform the public that government agency was not discharging its responsibilities and was not bringing to light actual or potential wrongdoing or breach of the public trust on part of a public official." *Id. citing Glass v. Dachel*, 2 F.3d 733, 741 (7th Cir. 1993).

6

The only similarity with the instant case and *Houskins* is that the Plaintiff filed a police report. Otherwise, Plaintiff chose to ignore the Detectives directive that she would have to pursue the issue with Rogers internally by filing a grievance with the Board. (RSOF **Exhibit A** ¶¶ 34-35). Instead, she filed a police report, which as the *Houskins* Panel held is the kind of petition citizens file every day in this country. *Houskins*, 549 F.3d at 491; (RSOF **Exhibit Q**). Further, unlike *Houskins*, the speech at issue here did not arise in the context of a personal dispute between co-workers over a private parking space. *Id*. at 483-84. Rather, Plaintiff filed the police report after she was threatened because she wanted an audit to determine if public funds had been fraudulently abused by government officials. The report clearly informs the public about potential misuse of public money and official misconduct by Rogers, who attempted to intimidate Plaintiff into dropping her request for an audit. (RSOF **Exhibit Q**). *cf. Nelson v. Country Club Hills Dist. 160*, 292 F.Supp.3d 792, 797-98 (N.D. Ill. 2017) (Coleman, J.) (police report made by principal as representative for school in order to carry out her job duties was not speech made as a citizen).

**The Complaint**

Defendants assert that Plaintiff "admitted that the lawsuit was filed for personal grievances she had with the Board." (RSOF **Exhibit Y**, pg. 6). "That alone should end the inquiry." *Id*. Plaintiff's "admission" that she filed a lawsuit to seek redress for what was done to her should come as no surprise, since it is a prerequisite under our jurisprudence (standing). Moreover, the right to petition the government for redress is a fundamental protection afforded by the First Amendment's speech and petition clauses. *Borough*, 564 U.S. at 382; *Houskins*, 549 F.3d at 491 *citing Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006). Defendants have not cited any authority for the proposition that only class action suits or those with multiple plaintiffs give

rise to protected speech. Further, Plaintiff's motive for suing, though relevant, is not dispositive. *Kubiak*, 810 F.3d at 484.

The public concern test centers not on her subjective reason for filing suit but on whether the content, form and context of her statements show that the statements are matters important to the community. *Marshall*, 32 F.3d at 1219. Requiring Plaintiff to have no interest in the litigation is not the *sine quo non* of the public concern test. *Phelan*, 463 F.3d at 790. (speech can still be matter of public concern even if the speaker has a stake in the subject matter). The Complaint is replete with allegations of cronyism, abuse of political clout for personal enrichment, neglect of the educational needs of impoverished students, potential financial fraud involving hundreds of thousands of dollars of federal and state funds, gross misconduct by a public official accused of threatening an employee for attempting to safeguard public funds, a custom and practice of Defendants using their position to punish anyone who criticizes their policies, a custom and practice of allowing Board members to threaten and intimidate employees, and a campaign of harassment aimed at punishing Plaintiff for blowing the whistle on all of the above in her suit. (ADD ¶ 25).

Thus, the instant case is readily distinguishable from *Yatvin* where the plaintiff did not even mention the First Amendment in her complaint and where the Seventh Circuit held: "The lawsuit does not seek . . . to correct unlawful practices [by government officials] or bring them to public attention." *Yatvin*, 840 F.2d at 420. Put another way, the speech at issue here is the type of expression that the First Amendment is intended to protect, because our democracy would be imperiled if such speech were chilled. *cf. Yatvin*, 840 F.2d at 419 (holding that retaliating against the plaintiff would not chill the type of speech protected by the First Amendment). Conversely, there is no legitimate governmental interest in precluding this type of speech. *Borough*, 564 U.S.

at 390-93 (public concern test is intended to protect legitimate governmental operations from unnecessary disruption).

This case is in stark contrast to *Yatvin* where the Panel held that the speech at issue added nothing to the public discourse. *Yatvin*, 840 F.2d at 419. Moreover, the form of Plaintiff's speech is a public forum. She specifically declined to file an internal complaint through the District's grievance process, and the context is that this is not an internal personnel matter, such as the failure to get a promotion, that has spilled over to the courts. Plaintiff has raised serious issues of public corruption and abuse of power that affect not only her, but all of the people of Harvey and taxpayers in this State.

**Plaintiff has satisfied the requirement of adducing evidence of retaliation.**

Plaintiff received only positive ratings in her performance evaluations in the two-years prior to July10, 2015, including her review in February 2015 where the Board assessed her progress on goals that had been set earlier in the academic year. (RSOF ¶ 59). In fact, in February 2015, in recognition of her success, the Board approached her about extending her contract by one-year, which she accepted. *Id*. Under the terms of her contract, the Board had to determine that Plaintiff had met the goals enumerated in her contract before the extension could be given. (RSOF ¶ 7). On February 23, 2015, the Board approved the one-year extension of the contract. (RSOF ¶ 59). And no performance issues were raised at the June 2015 retreat when Plaintiff presented a report on her progress on the goals. *Id*. In fact, a number of Board members complimented Plaintiff. *Id*.

Everything changed after Plaintiff made a police report on July 10, 2015 and July 13, 2015 against Tyrone Rogers for threatening her. Tyrone and Janet were strong opponents of individual Board members being audited and wanted to limit the scope of the audit. (RSOF ¶

59). Tyrone Rogers became enraged on July 9, 2015, when he saw the proposed audit scope included Board members and called Plaintiff and threatened her. *Id*. All of the Defendants except Linda Hawkins admit being aware of the police report made against Rogers between July 9, 2015 and July 13, 2015. *Id*. On July 22, 2015, Plaintiff was summoned into an executive session of the Board and told that there were several issues regarding her performance, and the Board was considering taking disciplinary action. (RSOF ¶ 59). She was also informed that the one-year extension of her contract that had been approved on February 23, 2015, was "ineffective." *Id*.

On August 17, 2015, Plaintiff again was summoned into a closed session and handed a document (Performance Directives) that listed several deficiencies in Plaintiff's performance that needed to be corrected to avoid further disciplinary action. *Id*. As a result of these issues, Plaintiff was told that the Board was rescinding the one-year extension, which it said was ineffective because the Board had not completed its evaluation of the requisite performance goals when it gave the extension. *Id*. the Board had never voted to rescind an extension after it was approved. *Id*. Plaintiff was shocked that no one had ever told her that the goals used in her performance evaluation and discussed at the District's retreats for several years were no longer valid. *Id*. All of the charges in the Performance Directives used to discipline Plaintiff were pretextual: **Echo**

Janet Rogers knew about the potential payment owed to Echo since May, but she did not raise the issue as a disciplinary matter against Plaintiff until July 10, 2015, which is the day after her husband Tyrone Rogers became aware that a call had been made to the Harvey Police Department saying Dr. Adams had filed a complaint against Tyrone Rogers. (RSOF ¶ 59). Janet Rogers nor Gloria Johnson, who both knew about the Echo issue, raised it at the June 2015

retreat. *Id*. Although, the Board Minutes of the July 22, 2015 Board meeting show that they believed other employees were negligent and should be disciplined for failing to alert the Board of the Echo payment issue, only Plaintiff was disciplined by the Board. *Id*.

Plaintiff's contract extension was rescinded because she did not inform the Board of a $175,000.00 payment owed to the Echo co-op until after the final report was issued in June 2015. (ADD ¶ 7). However, the District's business manager, Dr. Kevin Nohelty, was not disciplined for failing to inform the Board that he had withdrawn $3,800,000.00 from the District's reserve funds that same year without the Board's knowledge or approval. *Id*. The Board did not become aware that it was running a nearly $4 million deficit until Plaintiff reported it to them in November 2015. *Id*.

Moreover, a reasonable factfinder could determine that Plaintiff's decision to verify the information from Echo before raising the issue with the Board was reasonable under the circumstances, therefore, the decision to discipline her was retaliatory. (RSOF ¶ 59). This is especially true where her predecessor, Eric Kellogg, was not disciplined even though he failed to attend meetings at Echo for six months. (ADD ¶ 4)[1]. As a result, Kellogg failed to alert the District when Echo employees went on strike, which resulted in students being locked out of classes and the District paying for services that were not rendered. (ADD ¶ 4).

**Signing Imagine Contract**

Plaintiff was disciplined for signing a contract without prior Board approval, even though she had been authorized to do so and had signed certain contracts without approval in the past.

---

[1] A majority of the same Board members were on the Board during Kellogg's tenure. (RSOF ¶¶ 38-43).

(RSOF ¶ 59). Plaintiff was disciplined even though by signing the contract saved the District a significant amount of money. *Id*. However, Dr. Nohelty, the business manager, also signed a contract at the same time without prior approval in order to save money and was not disciplined. *Id*. Gloria Johnson, the Board president acknowledge that Plaintiff had previously had the authority to sign certain contracts, but she told Plaintiff that going forward any contracts over $5,000 must be pre-approved by Board. *Id*. Plaintiff fully complied with that instruction. *Id*.

**Changing summer school schedule**

Plaintiff was disciplined for not alerting the Board to changes in the summer school schedule prior to the July 22, 2015, Board meeting, which was after the changes to the schedule were implemented. *Id*. But, in fact, Plaintiff informed the Board of the changes to the schedule on multiple occasions prior to the July 1, 2015 start date for summer school. *Id*. Defendants' claim that Plaintiff was disciplined in August 2017 for making changes to the summer school schedule is belied by the fact that her predecessor, Eric Kellogg, was not disciplined even though he changed the entire school year calendar without notifying the Board, the Illinois State Board of Education and regional regulators. (ADD ¶ 1).

**Not spending enough time in District**

The District charged Plaintiff with not spending a sufficient amount of time in the District and coming in the office late and leaving early. (RSOF ¶ 59). However, Plaintiff was in salaried position, and there were no time keeping records documenting her arrival and departure in the office. *Id*. She denied the unsubstantiated charge. *Id*. Also, Tyrone Rogers claimed that Dr. Adams' came in late and left early throughout her tenure, but could not substantiate his claim when pressed. *Id*. He admitted that the bulk of Plaintiff's absences came after July 10, 2015, and when she was on medical leave due to stress related to Defendants' retaliatory actions. *Id*.

12

Defendants rescinded Plaintiff's contract extension and issued performance directives, in part, because Plaintiff allegedly did not spend enough time in the District. (ADD ¶ 6). However, Eric Kellogg exhausted his entire annual allotment of vacation and personal time within the first 6 months of the 2013-14 school year, for which he was never disciplined. In comparison, Plaintiff never exhausted her vacation and personal time for any year prior to 2015 when she was in treatment for stress related to Defendants' conduct. *Id.* And the record shows that most of Plaintiff's time outside the District was for professional workshops approved by the Board. *Id.*

At the September 21, 2015, Board meeting, Defendants' attorney informed them that Dr. Adams had filed the instant suit and that each of the Board members was named as an individual defendant. (RSOF ¶ 66). Defendants' response was to immediately instruct their attorney to draft a notice to remedy to be given to Plaintiff at a special Board meeting on October 19, 2015, (Rogers saying they did not want to discipline Plaintiff: "We just wanted her out."). *Id.* Thus, Defendants decided that they were going to nonrenew Plaintiff's contract before they even gave her the notice to remedy. *Id.* The notice to remedy was merely an effort to create a sham to cover-up that she was being fired because of the suit and the July 9, 2015 police report. *Id.* Additional evidence that the notice to remedy was a sham is shown by the fact that Plaintiff issued a rebuttal to all Board members on November 16, 2015, addressing each of the false charges, however, none of the Defendants even responded to the rebuttal. *Id.* Defendants' claim that Plaintiff was disciplined in the notice to remedy for delegating one of her subordinates to attend a meeting is belied by the fact that her predecessor, Eric Kellogg, was not disciplined for delegating, even though the Board's representative stated he literally allowed one of his subordinates to run the District. (ADD ¶ 2).

Likewise, for the assertion that Plaintiff was disciplined in the notice to remedy for failing to keep the Board informed on important matters is belied by the fact that her predecessor, Eric Kellogg, was not disciplined, even though his 2013 performance evaluation shows that he received unsatisfactory ratings for failing to keep the Board informed in a timely manner. (ADD ¶ 3). Kellogg was given a pay/benefits package worth more than $300,000.00, the same month as the evaluation comments were issued by the Board. *Id*. In sum, the allegations in the notice to remedy were false, and Defendants fabricated some of the charges by disciplining Plaintiff for doing things she had been authorized to do, such as delegating tasks to her staff or scheduling meetings. (ADD ¶ 17). Based on these groundless charges, Defendants voted to nonrenew Plaintiff's contract on December 21, 2015, one month after they issued the notice to remedy, and six months before her contract expired. (ADD ¶ 14). What ensued after Plaintiff filed suit was a campaign of harassment and retaliation, which is consistent with the way Defendants have used their position to punish other critics of their policies. (ADD ¶¶ 7-16, 28-30). *Massey*, 457 F.3d at 720 *citing DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) (campaign of harassment and retaliation that includes false allegations is actionable under the First Amendment).

Plaintiff respectfully submits that she has satisfied her burden of offering evidence upon which a reasonable juror could find that Defendants' proffered reasons for their conduct were lies. *Massey*, 457 F.3d at 717. Thus, the burden is on Defendants to show that they would have taken the same actions even if Plaintiff's speech had not occurred. *Id*. at 719 (this is usually a fact issue unless the defendant adduces unrebutted evidence that makes it impossible for a reasonable factfinder to rule for the plaintiff). Defendants have not met this burden. Defendants' affirmative defense that they had to rescind the contract extension rests on the

fallacy that their attorney suddenly discovered in July 2015 that the contract extension was invalid. (RSOF ¶ 56; ADD ¶¶ 19-24). At a minimum, Plaintiff has shown that there is a genuine factual issue regarding whether there were goals, as required by law, that they simply chose to disregard in order to retaliate against Plaintiff by revoking the extension. *Id*. Further, Plaintiff accepted the extension of her current contract, as is, and sought later to replace it with a new contract. (RSOF ¶ 45). The current contract had goals and indicators. (RSOF ¶ 7). Thus, *Hesbol* is distinguishable. *Hesbol v. Bd. of Edu. of Laraway Comm. Consolidated School Dist. 70-C*, 14 F.Supp.3d 1101,1106 (N.D. Ill. 2014) (no goals or indicators of performance in contract). Assuming *arguendo* that the extension was not valid, that would not vitiate Plaintiff's contract, only the one-year extension would not be valid. *Hostrop v. Bd. of Junior College Dist. No. 515*, 523 F.2d 569, 574 (7th Cir. 1975). Thus, the contract would be a sufficient property interest to sustain Plaintiff's due process claim. (ADD ¶ 27). This is especially true where there is a factual issue regarding whether Plaintiff met the requisite goals. *Hostrop*, 523 F.2d at 574 (property interest where there was a fact issue on whether contract was voidable for fraud). Plaintiff has shown sufficient evidence to sustain a property interest based on the District's policy and practice where a vote by the Board is all that is required to give an extension. (RSOF ¶ 8); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (citation omitted). Last, Defendants misread *Stagman v. Ryan*, 176 F.3d 986, 999-1000 (7th Cir. 1999), which only requires them to have knowledge of the speech, not that it is protected. (RSOF ¶¶ 59, 66).        Respectfully submitted,

Jerome M. Davis, Esq. ARDC# 6273828                  By: /s/ Jerome M. Davis, Esq.
9024 McIntosh Court Lakewood, IL 60014                Attorney for Dr. Denean Adams
847-606-6685
jeromed483@gmail.com