1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  DR. DENEAN ADAMS,           ) No. 15 C 8144
                         )
4               Plaintiff,    )
                         )
5         v.              )
                         )
6  BOARD OF EDUCATION HARVEY SCHOOL  ) October 29, 2018
  DISTRICT 152, GLORIA JOHNSON in her ) Chicago, Illinois
7  individual capacity, BETTY JOHNSON  ) 9:50 a.m.
  in her individual capacity,      )
8  DR. KISHA McCASKILL in her       )
  individual capacity, JANET ROGERS   )
9  in her individual capacity, TYRONE   )
  ROGERS in his individual capacity,  )
10  LINDA HAWKINS in her individual    )
  capacity, FELICIA JOHNSON in her    )
11  individual capacity,            )
                         )
12             Defendants.  ) Trial

13                  VOLUME 1
            TRANSCRIPT OF PROCEEDINGS
14  BEFORE THE HONORABLE SHARON JOHNSON COLEMAN, and a
                    jury
15

16  APPEARANCES:

17  For the Plaintiff:   MR. JEROME M. DAVIS, ESQ.
                   9024 McIntosh Court
18                  Lakewood, Illinois  60014

19  For the Defendants:  HAUSER IZZO PETRARCA GLEASON & STILLMAN
                   1415 West 22nd Street
20                  Suite 200
                   Oak Brook, Illinois  60523
21                  BY:  MR. CHRISTOPHER L. PETRARCA

22

23         TRACEY DANA McCULLOUGH, CSR, RPR
             Official Court Reporter
24         219 South Dearborn Street
                Room 1426
25          Chicago, Illinois  60604
              (312) 435-5570

1    APPEARANCES CONTINUED:

2                          LAW OFFICES OF JENNIFER K. SCHWENDENER LLC
                           5117B Main Street
3                          Suite 4
                           Downers Grove, Illinois  60515
4                          BY:  MS. JENNIFER K. SCHWENDENER

1          THE CLERK:  15 C 8144, Adams versus Board of

2  Education Harvey School District 152.

3          THE COURT:  All right.  Counsel, step up.  State your

4  names.

5          MR. DAVIS:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. DAVIS:  Jerome Davis on behalf of Dr. Denean

8  Adams.

9          MS. SCHWENDENER:  Good morning, Your Honor.  Jennifer

10  Schwendener on behalf of the defendants.

11          MR. PETRARCA:  Good morning, Your Honor.  Chris

12  Petrarca also on behalf of the defendants.

13          THE COURT:  All right.  Thank you.  And did I see

14  your other co-counsel here earlier or no?

15          MS. SCHWENDENER:  Yes, he was --

16          THE COURT:  Or a representative of Harvey?

17          MS. SCHWENDENER:  Yes.  Yes.  Another attorney from

18  our firm was here earlier.  He is not going to be trying the

19  case.

20          THE COURT:  Okay.  Because I was going to say I need

21  to have -- know if it's going to be three of you.  And that way

22  I'd need all the names.

23          All right.  So we are going to -- why don't you go

24  ahead and get the jury.

25          MR. DAVIS:  Before we get the jury, Your Honor --

1          THE COURT:  It's settled?

2          MR. DAVIS:  No.

3          THE COURT:  Oh, okay.  Well, then she can go and get

4 the jury.  We're going to talk.

5          MR. DAVIS:  Oh, okay.

6          THE COURT:  So she can -- let me run my courtroom.

7          MR. DAVIS:  I thought maybe you wanted to talk

8 outside the presence of the jury.

9          THE COURT:  They're not here.  They won't be here

10 for --

11          MR. DAVIS:  Okay.

12          THE COURT:  -- at least a half an hour.  That's why I

13 want her to go and get them.

14          MR. DAVIS:  Oh.  I'm sorry.

15          THE COURT:  Yes.  It takes a while.  It takes a

16 while.

17          MR. DAVIS:  Thank you.

18          THE COURT:  So if we start now, hopefully we'll be

19 seeing them about 10:20, 10:30.  So in the meantime let's talk.

20 So --

21          MR. DAVIS:  I had an amended witness list, Your

22 Honor.

23          THE COURT:  All right.

24          MR. DAVIS:  That I'm handing to counsel.  And we just

25 made a couple of changes to our witness list, Judge.  We

1    removed Theresa Cunningham the therapist, and we removed Dr.

2    Adams' mother as a witness.  Other than that, the witness list

3    is the same.

4               THE COURT:  Go ahead, Counsel.

5               MR. DAVIS:  So that's the only change there.  The

6    other issue, Judge, is as you know, we still have our pending

7    motion to reconsider.

8               THE COURT:  Denied.

9               MR. DAVIS:  Okay.

10              THE COURT:  I read it over.  And again, you can --

11   later on maybe something comes up in trial or something else,

12   but the Court, the Court believes that the Court's

13   interpretation and analysis is correct.  That she should not

14   get the -- the issue of the additional three-year contract

15   should not be part of the claimed damages.

16              MR. DAVIS:  So the series of other events that are

17   post the rescission, will we be able to present those to the

18   jury?

19              THE COURT:  Will you be able to present them to the

20   jury?

21              MR. DAVIS:  Yes.

22              THE COURT:  I'll go ahead and do the response.

23              MS. SCHWENDENER:  Your Honor, those -- the series of

24   disciplinary action, the notice to remedy, the search for a

25   superintendent, the nonrenewal of her contract, all related to

1    Count 3, which Your Honor previously dismissed by way of

2    summary judgment.  So Count 1 is very narrow.  It explicitly

3    pertains to the issue of whether the board retaliated against

4    plaintiff in response to her filing a police report as a result

5    of Mr. Rogers' alleged statement.  That's it.

6            The performance directives, I, I will agree that

7    those did come before the lawsuit.  And I think Count 1 does

8    reference the partial performance directives issued in August.

9    But anything beyond then -- the lawsuit was filed in September,

10   and, and anything beyond that notice of remedy, again,

11   nonrenewal of her contract, disciplinary actions that may have

12   happened at a December board meeting, the e-mails being

13   deactivated, the search for a new superintendent all happened

14   after she filed the lawsuit.  And those all pertain to Count 3,

15   which was previously dismissed.

16           THE COURT:  Reply.

17           MR. DAVIS:  Your Honor, you ruled that as a matter of

18   law Count 3 couldn't be sustained because you ruled that the

19   lawsuit was not, not -- didn't assert a matter of public

20   concern; and, therefore, the speech was not protected.  You

21   didn't, nor could you have ruled on any of the factual issues.

22   And we asserted, and you recognized them and, in fact, you

23   discussed them in your summary judgment opinion, a number of

24   factual issues that go to the issue of whether or not she was

25   retaliated against.  And those factual issues didn't end with

1    the rescission of the contract.  Those factual issues, in fact,

2    began with the rescission of the contract.

3              And we have presented to you evidence that, in fact,

4    the words verbatim of one of the defendants themselves telling

5    you that they embarked on August 18th on a, what he termed

6    progression, which was aimed at terminating my client from the

7    district, and that the rescission was only the opening salvo in

8    that process.  And so I think that what you ruled as a matter

9    of law regarding Count 3 didn't mean that those factual issues,

10   which are jury questions.  It's the jury's decision to decide

11   where her damages terminate or whether she has damages.  And

12   counsel is --

13             THE COURT:  Go ahead.

14             MR. DAVIS:  I'm sorry.  Counsel is trying to use the

15   pleadings to trample my client's cause of action into the

16   pleadings.  And clearly that's not permitted by the rules.

17             THE COURT:  All right.  Counsel -- Counsel, give me a

18   second.  I was trying to get someone to locate my trial file.

19   It looks like I'm going to have to locate it myself.  Give me a

20   second here.  All right.

21             MS. SCHWENDENER:  Sure.

22             THE COURT:  All right.  Give me a second.  All right.

23   I'll be right back.

24        (Short break taken.)

25             THE COURT:  Also I just realized that I don't think

1    an order got in until this morning that I had worked on on

2    Friday.  So I don't know if you want to check your phones.  It

3    was on your motion I believe to reconsider, Counsel.

4                MR. DAVIS:  Okay.

5                THE COURT:  Okay.  I want to go back to the witness

6    list.  All right.  Let me read through it real quick.  And

7    again, I'm assuming you have the defendants' objections to

8    this.  For some reason I thought we had gone through witness

9    lists.

10               MR. DAVIS:  You have, Judge.  I just didn't feel

11   comfortable changing or obliterating their language that was in

12   the joint pretrial.  But you've already ruled on some of these.

13               THE COURT:  Okay.  Again, I was --

14               MR. DAVIS:  Like Kellogg.  I just didn't again want

15   to change what they had written unilaterally.

16               THE COURT:  All right.  Just to make sure, I'll go

17   through the record real quick.  Dr. Denean Adams, Dr. Calvin

18   Gooch, Detective -- again, who -- Wright.  What's Wright's

19   first name?

20               MR. PETRARCA:  Robert.

21               THE COURT:  Robert.  Janet Rogers, Tyrone Rogers,

22   Eric Kellogg, Kevin Nohelty.  Is that the way you say it?

23               MR. DAVIS:  Yes, Judge.

24               THE COURT:  Sophia Jones hyphen Redmond.  Attorney

25   Izzo.  He was only in for possibly a limited reason, is that

1  correct?

2          MR. DAVIS:  That's correct, Judge.  And I talked to

3  counsel.  And rather than call him twice, I have one narrow

4  issue that I may want to --

5          THE COURT:  Excuse me.  Are there any witnesses in

6  the room?  Please step out.  All the witnesses, except for the

7  plaintiff herself.

8          MR. PETRARCA:  Judge, do the defendants -- the named

9  defendants have to step out as well?

10          THE COURT:  Not if they're a named defendant, no.  If

11  you're a named defendant, you should be on this side of the

12  room on the front bench.  Thank you.  All right.  Anybody else

13  in the room who is a witness, a witness?  All right.  Thank

14  you.  Go ahead, Counsel, as to Izzo.

15          MR. DAVIS:  Yes.  We were -- I'm considering

16  questioning him on a limited very narrow issue.

17          THE COURT:  Which we'll have to discuss anyway before

18  you do it.  I believe my statement was I will not refer to him

19  as Attorney John Izzo when I give just the names of the

20  possible witnesses.  I'll just say John M. Izzo, spell his

21  name, just to let them aware that this may be someone because

22  it's never put in terms of who the plaintiff -- who the defense

23  witnesses are, who the plaintiff's witnesses are.  These are

24  the people who may or may not be testifying, whose names may be

25  prominent in the materials.  And that will be all.  All right.

1    MR. DAVIS:  Right.

2    THE COURT:  We can get to the issue of whether or not

3 Mr. Izzo is going to testify or what he may testify for and

4 what way, we'll get to that when we get closer to his

5 testimony.  Maybe the night before if you know when you're

6 going to call him --

7    MR. DAVIS:  Right.

8    THE COURT:  -- or even that morning.  Okay?

9    MR. DAVIS:  Right.

10    THE COURT:  All right.  The rest of it's Gloria

11 Johnson, Betty Johnson, Dr. Kisha McCaskill, and Linda Hawkins,

12 Felicia Johnson.  Does that complete the list of possible

13 witnesses from the defense?

14    MR. DAVIS:  Yes, Your Honor.

15    THE COURT:  Does that complete the list of possible

16 witnesses from the -- I'm sorry, from the plaintiff.  Now from

17 the defense.

18    MS. SCHWENDENER:  Yes.  So from the defendants our

19 witness list has not changed, Your Honor.  We anticipate -- or

20 we will be calling John Izzo, Janet Rogers, Tyrone Rogers --

21    THE COURT:  Are they all on this list I just read?

22    MS. SCHWENDENER:  Yes, on the list.  Our witness list

23 hasn't changed, Your Honor.

24    THE COURT:  You have anybody new --

25    MS. SCHWENDENER:  No, Your Honor.

1      THE COURT:  -- that I haven't said today?

2      MS. SCHWENDENER:  No.

3      THE COURT:  All right.  Good.  All right.  I'm also

4  going to -- so there's no misunderstanding, I'm assuming that

5  all of these doctors are Ph.Ds and not medical doctors?  Is

6  that the correct assumption.?

7      MR. DAVIS:  Yes, Your Honor.

8      THE COURT:  All right.  Then I'll set that out so

9  there's no misunderstanding for any of the people who are on

10  the jury.  Just say any references to a doctor they are all

11  Ph.Ds.  Sometimes people will hear something and they'll think,

12  oh, I had a medical doctor or I had something else.  So I will

13  do that.  Again, we still expect this case to take no later

14  taken Friday, is that correct?

15      MR. DAVIS:  Yes, Judge.  My schedule today if Your

16  Honor agrees is to present Dr. Adams, but we're going to need

17  to have today and part of tomorrow or if not all of tomorrow to

18  get through Dr. Adams' testimony.  So --

19      THE COURT:  You expect Dr. Adams to be a day and a

20  half?

21      MR. DAVIS:  I do, Judge.

22      THE COURT:  Well, that's from you or for everybody?

23      MR. DAVIS:  That's from me, Judge.  What I plan to do

24  today is --

25      THE COURT:  Well, Counsel, I don't see how we're

1    getting through this case by Friday.

2            MR. DAVIS:  Well, the other witnesses are going to go

3    relatively quickly, Judge.

4            THE COURT:  As compared to Dr. Adams?

5            MR. DAVIS:  Yes.

6            THE COURT:  Well, that would be good.  But compared

7    to her, you're still only talking about two or three a day.

8            MR. DAVIS:  Well, Detective Wright is going to go 30

9    minutes or less.

10           THE COURT:  Again, you're talking about your

11   questioning.

12           MR. DAVIS:  Yes.  And I spoke with counsel going in

13   and asked them how much time they would need, and they

14   indicated that they didn't specify a particular amount.  They

15   indicated that they would just respond based on however much

16   time I took.  So remember --

17           THE COURT:  Okay.  Excuse me one second, Counsel.

18   That would mean if you take an hour -- I mean, a day and a

19   half, a day and an hour or two with your client, then let's

20   see.  That brings us to the end of Tuesday.  If they take a

21   time shorter of almost a day, that takes us to Wednesday

22   afternoon.  And after that you've got like six or seven

23   witnesses left.  That's Thursday, possibly Friday.  And you've

24   still got to do jury instruction conferences.  We still have to

25   make sure we have time for closing arguments.  I don't see this

1    as a Friday case.

2         MR. DAVIS:  I intend to take Detective Wright today,

3    and I intend to take Dr. Jones-Redmond on the 1st.  I intend to

4    take Nohelty and Kellogg on the 30th -- I'm sorry, the 31st.

5    And beyond that I just got Janet Rogers, Tyrone Rogers, and

6    Dr. -- and Calvin Gooch.  Janet Rogers and Tyrone Rogers are

7    probably going to be a day.

8         THE COURT:  And, you know, I, I judge a lot of the

9    cases based on my experience on these cases.

10        MR. DAVIS:  Well, I, I defer to your experience.

11        THE COURT:  But no, I don't know what -- you know

12   your case too, so it's a balancing act.  And that's why I try

13   to get buy in from everyone because I will say in front of the

14   jury this is how long this case is taking.  Do you agree,

15   plaintiff.  Do you agree, defense.  So everybody is all in this

16   together.  My problem -- my biggest problem with this case is

17   Monday I'm not here.  I'm at Arlington Cemetery.  So I won't be

18   able to take this case back up until Tuesday, but it sounds to

19   me like, and the best case scenario, based on your very

20   thorough plans, which don't seem to at all encompass much of

21   what they're going to do, this, you know -- and today you

22   wanted to put on Detective Wright too?

23        MR. DAVIS:  Yes.

24        THE COURT:  All right.  So he's first then I'm

25   assuming?

```
 1          MR. DAVIS:  No, Judge.  I wanted to --
 2          THE COURT:  You're going to interrupt her testimony?
 3          MR. DAVIS:  I want to conclude, reach a certain point
 4   where it's logical to then have him testify.  I want her to
 5   testify all the way up to the point of July 10th, the incident
 6   at issue, and then rest with her for the day and then bring
 7   Detective Wright in to talk about what happened on July 10th,
 8   and then conclude the testimony for today.  I don't want to put
 9   him on first talking about the incident of July 10th before my
10   client has testified.  I think it might confuse the jury.
11          THE COURT:  Well, I'm going to tell you, this will be
12   the first I've heard of this.  It's creative.  I don't think
13   there's any basis for me not to let it happen.  But when you
14   say juries are confused, I've never seen that in hundreds of
15   trials.  So I don't know if juries have been confused before.
16   I understand you have a certain method or flow that I think
17   that you want to get the testimony out.  The only problem is I
18   think I was very clear that the jury does not stay late on jury
19   selection day.  So you get an opening statement, a lot of it
20   depends on where we are, but I'm not keeping them later than
21   4:00 o'clock today.
22          My normal time is 9:45 to 4:45.  I can press it to 5.
23   I can bring them up at 9:15, 9:30, but -- and they get a lunch.
24   This is not without lunch.  So their very first day of jury
25   service I don't keep them late, so 4:00 o'clock is it.  And so
```

1  usually there's opening statements unless they're very short.

2  I don't know -- again, how long do we expect them to be?

3         MR. DAVIS:  Mine is going to be relatively short,

4  Judge.

5         THE COURT:  Which is?

6         MR. DAVIS:  10, 15 minutes.

7         THE COURT:  Okay.  That does -- so 15 minutes.  15

8  minutes will cover it for you too?

9         MS. SCHWENDENER:  About 15 minutes.

10         THE COURT:  All right.  15 minutes each side for

11  opening statements, that helps.  But depending on when we

12  start.  So you need to think of where you are in that.  You can

13  always switch that up, but do you have an objection to the way

14  he's talking about starting his case?  I just don't think

15  there's any basis for it.

16         MS. SCHWENDENER:  I've, I've never seen it before,

17  Your Honor, but I don't think I have a basis for an objection.

18         THE COURT:  No.  So but, but think about the timing.

19  That's the whole thing with the Court.  If you can't get to him

20  today and he's here today, then you may -- it may not work out

21  optimally.  So just keep that in mind.  And I'll go with the

22  flow.  Okay?

23         MR. DAVIS:  Thank you.

24         THE COURT:  All right.  So but also keep in mind

25  again, you know, that's a long -- and I don't think I have any

1    intervening issues.  Hold on.  I don't think there's a meeting

2    that's going to cut into this.  So again on Tuesday we should

3    have an all day 9:45, and I'll tell them to 5.  Give you all 15

4    minutes extra.  Wednesdays are a little difficult.  That's my

5    criminal day, and I can't get the marshals to get the

6    defendants in easily.  I'll try to do -- we'll try to get it at

7    9:30, but that's the earliest, and I've got six defendants that

8    day.  That will take me maybe about 15 minutes depending on

9    what we have to do, but that day we might not be able to start

10   until 10 on Wednesday.

11          And then on Thursday it will be about 9:45 or so

12   again.  I teach at 4.  We'll see what I can do about that.  And

13   then Friday again we have from 9:30 or so till the end of the

14   day.  I think I'm going to need to tell them we have an extra

15   day Tuesday the 6th just in case.  It's easier to tell them up

16   front then to go back and say, oh, we're sorry.  We thought

17   we'd be done and you have to stay another day.  So I think

18   that's the best thing.  The 7th I am too, too jammed up to be

19   able to continue that length.  So just look at your schedules

20   accordingly, but I will build in the 6th.

21          The 6th is if we have to do -- what would work just

22   fine if we get all of the evidence in on Friday and have them

23   come back on Tuesday the 6th, then that break works.  So

24   anybody have a problem with me telling them the 6th?  Any

25   problem with that?

1        MR. DAVIS:  No, Judge.

2        THE COURT:  None from the plaintiff.

3        MS. SCHWENDENER:  No, Your Honor.

4        THE COURT:  Okay.  Good.  That's going to right now

5    be your schedule to make sure we can get through everything,

6    and that Friday would even give us a chance to do -- make sure

7    we get jury instructions tight if we have to.  And if you're

8    saying we don't have a full day of testimony, well, that will

9    work because then we'll do the jury instruction conference, and

10   then tell them to come back on Tuesday.  Monday is

11   definitely -- I will not be in the city.  All right.  All

12   right.  Thank you.

13        Okay.  So any issues that I need to know about?

14        MR. DAVIS:  I have one issue, Your Honor.

15        THE COURT:  Go ahead.

16        MR. DAVIS:  Something came up at our pretrial

17   conference, and it's an area of concern.  I believe at one

18   point during the pretrial conference counsel indicated that the

19   jury would be told that they were to determine -- the ones to

20   determine whether my client had a property interest in the

21   contract extension.  And I believe the issue of whether she has

22   a property interest in the contract extension -- first of all,

23   I think it's settled.  As we've argued in our papers, they

24   voted lawfully to extend to contract.  They admitted that.  So

25   I think that admission alone resolves that issue.  She had more

1    than a mere expectancy.

2         But beyond that, I don't think the jury are the ones

3    to make a determination on a property interest.  I think that's

4    the province of the Court, and I just don't want that to come

5    out in her opening statement to the jury that they're going to

6    be asked to determine if my client had a property interest in

7    the contract extension.

8         THE COURT:  One second.  Response.

9         MS. SCHWENDENER:  Judge, this issue was addressed,

10   which is Count 2 of plaintiff's complaint, by way of summary

11   judgment, and the Court denied the motion for summary judgment

12   with regards to Count 2.  So I don't know how else -- I mean,

13   the jury is going to have to determine that issue.

14        THE COURT:  This is motion in limine No. 18?

15        MR. DAVIS:  No, Judge.

16        MS. SCHWENDENER:  No.

17        MR. DAVIS:  This is Count 2.

18        MS. SCHWENDENER:  This is Count 2.

19        MR. DAVIS:  The due process count of the complaint,

20   which survived summary judgment.  And I think where the

21   confusion is is they have an affirmative defense, and their

22   affirmative defense is there were no goals in the contract and,

23   therefore, the contract was invalid.  Ergo, because it wasn't

24   effective, maybe they're going to argue that they didn't have

25   to give her due process, et cetera.  That's an affirmative

1    defense.  You said in your ruling on summary judgment there

2    were factual issues vis-a-vis that affirmative defense.  The

3    jury has got to decide those are factual issues, of course.

4    But the legal issue of whether or not she has a property

5    interest is not a jury question.

6         The jury, sure, is going to decide whether or not

7    they accept their -- or whether they have proven their

8    affirmative defense.  I'm not arguing that.  I'm simply saying

9    telling the jury they've got to decide whether she has a

10   property interest in the extension is impermissible.

11             THE COURT:  Anything further?

12             MS. SCHWENDENER:  Just again, Judge, your ruling

13   indicated that Count 2 was -- there's factual questions

14   surrounding the due process, and it, it should go to the jury

15   because it has not been decided upon.  And, and we did file a

16   motion for summary judgment on that, which was denied.  And --

17             THE COURT:  Let me say, the Court agrees.  The

18   summary judgment was denied, and so that means it's a factual

19   question.  One of the concerns the Court has in this case is

20   that -- one of the concerns the Court has is that even in your

21   arguments to me you all are making a lot of things really

22   difficult.  And for you to start out telling the jury that

23   they're going to have a property right, I would assume that

24   would not -- that they have to decide that.  I would assume

25   that's not where you're going, but you tell me if.  But it

 1   sounds to me like both sides are melding issues that -- many

 2   concerns that should not be in front of a jury, at least not at

 3   the beginning of an opening statement where they don't get

 4   where they're going on this.  It's, it's an employment case.

 5            MR. DAVIS:  That's my position, Judge.

 6            THE COURT:  All right.  It's a discrimination case.

 7   And, you know, both sides make arguments that are really

 8   entangled and make this case much more difficult than it is.

 9   But what's your position?  You should be able to argue property

10   right issues in front of the jury?  I mean, I don't even know

11   where it's going.  I don't, I don't know where it's going.  I

12   have to hear the evidence to see if there's enough to even get

13   it.  It's one thing for me to deny summary judgment.  It's

14   another thing for me to find that the plaintiff -- all of the

15   plaintiff's case survives to go to the jury.  So it's two

16   different things.  So I don't know how you intend to present

17   it, but I don't want it confusing my jury from the moment they

18   hear opening statements.

19            MS. SCHWENDENER:  I mean, Judge, I -- if it's a

20   factual issue --

21            THE COURT:  Well, there are factual issues that

22   ultimately the Court does rule on as a matter of law later.  So

23   they find certain facts, and then it's the Court that makes

24   other determinations.  That happens all the time especially if

25   there are cases with chancery issues, you know, milled with,

21

 1    you know, factual issues, law issues.  So that's, that's the

 2    point.  You can mix things up.  And some of it is going to be

 3    the judge's decision, and the jury's trying to figure out what

 4    they do with certain information.  Is that what you're trying

 5    to say, Counsel?

 6              MR. DAVIS:  Exactly, Your Honor.

 7              THE COURT:  You know what, why don't we worry about

 8    that after we get the jury picked.  We'll have a break before

 9    opening statements, and we can discuss it again.  The jury is

10    outside.  And you will get if you didn't just get -- did you

11    just get a list of jurors?

12              MS. SCHWENDENER:  Yes, Your Honor.

13              THE COURT:  All right.  So you have a list of the

14    jurors.  You will after they get it copied get a list of -- get

15    the, the packets with their answers to the questionnaires.  I

16    need everybody on this side of the room has to move over.  Give

17    my jurors room.  All right.  If I get any disturbances during

18    my jury questioning, you will be asked to leave.  All right.

19    And there will be no hassling my potential jurors during

20    breaks.  They will be taking breaks during this process, and

21    they should be able to do that without anybody talking to them.

22              Is there anything else from plaintiff before I have

23    the jury come in?

24              MR. DAVIS:  That's it, Your Honor.

25              THE COURT:  Anything else from defense?

1    MS. SCHWENDENER:  Yes, Your Honor.  John Thomas,
2  who's the superintendent for District 152 is here.  Would it be
3  appropriate for him to sit at the table with us as a
4  representative?
5    THE COURT:  Yes, if he's representing -- representing
6  the defendant, yes.
7    MS. SCHWENDENER:  Yes.  He's just not a named
8  defendant.  I just want to make that --
9    THE COURT:  All right.  Yes -- oh, he's not?
10   MS. SCHWENDENER:  He is not a named defendant.
11   THE COURT:  No, he's not named, but he represents the
12  school district?
13   MS. SCHWENDENER:  Correct.
14   THE COURT:  Yes.
15   MS. SCHWENDENER:  Thank you.
16   THE COURT:  All right.  And again, your other clients
17  should all -- always sit right, right on the front pew so that
18  you can be able to have conversations with them.  Again, for
19  all the parties the rule is if you're a party or a party
20  representative, you need to step out for some reason, I don't
21  have to get into what it is, you step out.  But if I am still
22  holding court when you come back in, you have to sit in the
23  pews.  You do not walk back up to the table.  Is that
24  understood?  Only lawyers can step out and come all the way
25  back to the table.  Is that understood?

1        All right.  If there's anybody who's bringing you

2  anything, you know, any paperwork, bringing counsel any

3  paperwork, again, they cannot come past that front pew.  They

4  have to sit in the pews until a break is taken.  Or if the

5  lawyer wants to go step out and get it from them, they can.

6  The plaintiff or the representatives of the parties cannot do

7  the carrying of the item that somebody has.

8        So, in other words, ma'am, if somebody comes in with

9  something for your lawyer, you can't go get it if he's busy and

10  then bring it back to the table.  And the same for defense.

11  You can't go get it and bring it back to the table.  All right.

12  That person should have the information and stay out.  I don't

13  want my jury focused or somebody walking in with the, you know,

14  mysterious folder or packet.  All right.  Okay.  So that's the

15  rules.

16        I will take breaks throughout this.  And anybody

17  sitting at the tables or on the front pew, you're free to go

18  take a break when I take a break for the jury.  You come back

19  to where you are.  And it's up to you if you want to go to

20  lunch.  We don't take an official lunch as lawyers and the

21  Court because we want to get this done for the jury so we can

22  get to the case.  So you have to make that decision.  On a

23  break talk to your lawyers if you want to go and get something

24  to eat or feel you have no problem staying.

25        And also we're also going to do the -- you'll be

24

introduced to the jury by your lawyers.  I'm assuming you both

explained that to your clients?

MR. DAVIS:  Yes.

THE COURT:  So I give a chance for the introduction.

And then counsel will introduce -- when I introduce counsel,

counsel can then introduce your clients.  All right.  That will

be the time to do so.  Okay?  All right.  We'll be back in a

few minutes.  Once you get them organized and they'll be -- the

jury will come in before I will.  All right.  If there's

nothing else, I'll be back.  Thank you.

MR. DAVIS:  Thank you, Your Honor.

(Short break taken.)

(Whereupon, jury selection was commenced.)

(Whereupon, said trial was recessed at 2:15 p.m., until

 2:30 p.m.)

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   DR. DENEAN ADAMS,                    ) No. 15 C 8144
                                          )
 4                    Plaintiff,          )
                                          )
 5           v.                           )
                                          )
 6   BOARD OF EDUCATION HARVEY SCHOOL     ) October 29, 2018
     DISTRICT 152, GLORIA JOHNSON in her  ) Chicago, Illinois
 7   individual capacity, BETTY JOHNSON   ) 2:30 p.m.
     in her individual capacity,          )
 8   DR. KISHA McCASKILL in her           )
     individual capacity, JANET ROGERS    )
 9   in her individual capacity, TYRONE   )
     ROGERS in his individual capacity,   )
10   LINDA HAWKINS in her individual      )
     capacity, FELICIA JOHNSON in her     )
11   individual capacity,                 )
                                          )
12                    Defendants.         ) Trial

13                          VOLUME 1
                     TRANSCRIPT OF PROCEEDINGS
14     BEFORE THE HONORABLE SHARON JOHNSON COLEMAN, and a
                             jury
15

16   APPEARANCES:

17   For the Plaintiff:    MR. JEROME M. DAVIS, ESQ.
                           9024 McIntosh Court
18                         Lakewood, Illinois  60014

19   For the Defendants:   HAUSER IZZO PETRARCA GLEASON & STILLMAN
                           1415 West 22nd Street
20                         Suite 200
                           Oak Brook, Illinois  60523
21                         BY:  MR. CHRISTOPHER L. PETRARCA

22

23            TRACEY DANA McCULLOUGH, CSR, RPR
                     Official Court Reporter
24                 219 South Dearborn Street
                          Room 1426
25                 Chicago, Illinois  60604
                       (312) 435-5570
```

APPEARANCES CONTINUED:

```
                        LAW OFFICES OF JENNIFER K. SCHWENDENER LLC
                        5117B Main Street
                        Suite 4
                        Downers Grove, Illinois  60515
                        BY:  MS. JENNIFER K. SCHWENDENER
```

1    (The following proceedings were had in open court outside

2       the presence of the jury:)

3           THE COURT:  So as everybody starts getting seated,

4    just so you'll know, we have a few people that are talking

5    about Halloween.  My deputy heard normal -- we'll probably let

6    them out an hour early if I need to for Halloween.  There's

7    nobody with babies on that jury.  It is everybody with school

8    age kids.  So, you know, we'll see where we are.  We'll see

9    what happens.  Just letting you know I have a couple of mothers

10   I guess that were chosen that were upset about -- just upset,

11   so ...

12           MR. DAVIS:  Well, I don't want them to go in upset,

13   Judge.

14           THE COURT:  No, and I don't mean mad.  And we cannot

15   do anything about it, so -- not mad.  People are -- I would

16   venture if I worried about people being upset, I would not have

17   any juries.  All right.  Almost every, every case somebody's

18   got issues.  So they've already been told by my deputy that we

19   will see where we are and try to make an adjustment for

20   Halloween to the best that we can.  All right.  And also I'm

21   going to also have to do please vote early.  You want them to

22   vote, but they've got to vote early.  They can't come in here

23   on Tuesday with an excuse.  Or if Tuesday is where we're doing

24   closing arguments, then they wouldn't have to come in till 10.

25           I'll just make some adjustments so people will get

 1   that opportunity.  We don't want one civic duty to be the
 2   reason why you can't do another one.  All right.  Just putting
 3   it out there.  It just hit me.  Since I voted, I didn't think
 4   about it for anybody else.  Me and my house have voted.  All
 5   right.  So that's where we are.  The podium has been turned.
 6   Counsel, I hope it's fine for you.  If not, we can always just
 7   turn it back.
 8             MR. DAVIS:  That's fine, Judge.
 9             THE COURT:  Go get them.
10        (Before the jury:)
11        (Jury duly sworn.)
12             THE COURT:  All right.  You may be seated, ladies and
13   gentlemen.  And, ladies and gentlemen of the jury, you are now
14   sworn in.  And the Court -- you are now members of the jury.
15   All right.  And I know that as I told you, we get out earlier
16   than we normally do.  There are exceptions.  I understand there
17   are some issues about Halloween.  I am not Scrooge or whatever
18   they call for Halloween, so we will make some adjustments as we
19   can.  We'll also see where we are.  There's also adjustments
20   that will be made for voting, even though I would encourage
21   people to vote early if you're going to vote, which I hope you
22   all will.  But we will also make arrangements so if you need to
23   do that first thing in the morning, you'll be able to do that
24   on Tuesday.
25             Monday is off.  Monday is an off day.  This Court has

1  to be in Arlington Cemetery on Monday.  So I will go there and

2  then come right back here, and -- if we need it.  We may not

3  need Tuesday, but that's the sixth day.  Monday is not the

4  sixth day.  All right.  That's the general schedule.  Usually

5  around 9:30 at the earliest to 9:45 is about the regular and

6  again until about 4:45.  Even though today we're leaving at 4.

7  But that's going to be the schedule.  A lot of it depends on

8  how the witnesses are going in.

9          And so you do have an hour for lunch.  And during

10  lunch you're able to whatever, go do your errands.  Talk on the

11  phone, do work that's not related to this case on devices

12  either in the jury room or out.  You have a lot of flexibility

13  with that.  And again, the sooner you get back, the sooner we

14  start.  If someone is late for a couple of minutes, you don't

15  need to call the Court at all.  You know, we'll wait 15 minutes

16  because life happens.  And that's for all the lawyers.

17  Sometimes somebody's sick or, you know, the train is delayed or

18  something happens.

19          And this Court understands that.  So it's no need to

20  get in a huff, and you don't think that, you know, things are

21  wrong or you're going to get in trouble.  No.  Just give us a

22  call and let us know if it's more than 15 minutes expected

23  delay, just give u an call.  All right.  And we'll make an

24  adjustment so that all the people who are here will understand

25  it, and then they will be able to relax, go down to 2, get some

1    coffee or do what they want to do.

2            There is breakfast that's provided every day,

3    including coffee, you know, continental breakfast.  We only get

4    one order, though.  If there's something that you would like in

5    particular, we can't reorder until the next day.  All right.

6    Other than that, lunch is on your own until deliberation day.

7    That's the general outlines of what things are.

8            But as you just heard earlier, we talked about the

9    importance of jury duty.  And again, salute your service.  I'm

10   going to ask that whenever you all come out that you must stand

11   and remain standing.  That is the respect that you get from us

12   as a group.  Just like you give me respect for being in a black

13   robe, you are now part of this team.  Meaning you're going to

14   dispense justice, and so we need the whole group to get the

15   salute, as it were.  That's what we call it.  All right.

16           And as we go through this, you are going to be the

17   judges of the facts in this case.  You will decide who is

18   believable, who is not.  You will decide who has maybe a bias.

19   You will look at how they testify, how things are related.  You

20   decide the facts.  There's going to be evidence presented, and

21   you will decide what the facts really are.  Then I give you the

22   law, and then you put the two together and you reach a

23   decision.  You'll get plenty of instruction, direction on how

24   that works.

25           What the lawyers say is not evidence unless I

1   specifically tell you that it's evidence.  And the -- as I told

2   you, there's a way that trials go about.  The plaintiff in a

3   second is going to be the first to present his opening

4   statement.  Then the defense follows.  It's usually plaintiff

5   first, defense second until the defendant puts on their case.

6   The plaintiff you will hear more about the burden of proof,

7   proving their case.  And I will tell you about that later.  But

8   that burden is on the plaintiff.  So that's the way of the

9   case.

10              You will also hear as we go through the case, you

11  will hear objections made.  The lawyers have a duty to make an

12  objection if they believe it's what is necessary to give a fair

13  and full hearing for their client.  Don't hold that against

14  them.  This Court will rule on objections.  I'll say objection

15  sustained.  That means you must not consider the question or

16  any answer that has started if there has been one to start.

17  There are times when an objection has been sustained someone

18  may have already given an answer.  This Court might say, ladies

19  and gentlemen, strike it from the record and don't give it any

20  consideration.

21              You must do your best even though you have heard it

22  to try to sort of erase it from your mind and not make it part

23  of your deliberations.  Or if someone brings it up during

24  deliberations, somebody else reminds them and says, oh, no.

25  No.  No.  The objection was sustained.  We're not supposed to

1   consider that.  All right.  Otherwise the Court says objection
2   overruled.  If an objection is overruled, then you can consider
3   the answer that is given.  All right.  But you must not give it
4   any greater weight, any greater importance than you would have
5   if there had been no objection at all.
6          You will see evidence on your screens.  And if you
7   can't, if your screen has a glitch, you know, just like
8   sometimes at home, we can't get something up.  If for some
9   reason it remains dark while everyone's is lit, let me know.
10  All right.  Also let my staff know, again, if you cannot hear
11  or see clearly some evidence.  Because you're the judges of the
12  facts, you have to be able to see and hear the evidence.
13         You were given notebooks.  You will use that notebook
14  or additional ones if you need to throughout this process if
15  you want.  There is no duty or requirement that you take notes,
16  but the notes that you will take or the pads that you write in
17  must be left here at each night.  And when you go to lunch, you
18  do not take them out of the courtroom except -- out of the jury
19  room except to come in here with them.  They will be locked,
20  and no one will look at them until the close of the case.  And
21  even then it is my staff.  They have seen hundreds of notes.
22  And so basically they go shred it and they're gone.
23         All right.  Also please note that again, it's up to
24  you to decide what's important to write down or if you want to
25  write something down.  It's not for the lawyers to say take

1  this down, ladies and gentlemen, this is important.  That would
2  be argument.  You don't have to take down anything individually
3  if you don't want to.  Don't get peer pressure to write notes.
4  All right.  If you take down grocery lists, you're doing to do
5  lists, you're doing caricatures, you're just doodling, that's
6  your private business.  And again, it goes right to the
7  shredder as soon as we finish.  All right.  And you'll hear
8  some other instructions about notes at the close of these
9  proceedings.

10       Again, you cannot ask discuss this matter or begin to
11  deliberate in your minds until we get to the end of the case.
12  You cannot discuss and have small talk with counsel or any
13  witnesses, anybody you see in this courtroom, around the
14  courthouse.  You're going to take one elevator.  For the most
15  part, they're going to take another one.  But you may be on the
16  second floor of the cafeteria, you may be outside, and you see
17  them.  They are told and they know that they cannot engage you
18  in how are those Bears.  That's not going to do it.  Or are you
19  ready for Halloween?  They cannot even make small talk with
20  you.

21       All right.  So don't think they're being rude.
22  They're following my direction.  Because what it does is if
23  somebody else walks by and they see even a simple conversation,
24  they may take it to be something else.  And we don't want that
25  chance that people don't believe that there's fair treatment

Davis - opening statement

1  for each side.  All right.  That's the following up on the
2  general instructions.
3          You're about to hear opening statements from each
4  side.  Opening statements are not evidence.  They are simply
5  overviews on what the evidence is expected to be.  Counsel.
6     OPENING STATEMENT ON BEHALF OF THE PLAINTIFF
7          MR. DAVIS:  Thank you, Your Honor.  Again, ladies and
8  gentlemen, thank you.  My name is Jerome Davis, and again, I
9  want to thank you guys for your service and the sacrifice of
10 being here and participating and making this all possible.  I
11 represent Dr. Denean Adams, who's the plaintiff in this case.
12 And as the judge said, she's going to tell you what the law is
13 at the end of the case.  So my job right now is to give you a
14 preview of what the evidence that we're going to present will
15 show.
16         And there are two counts in this complaint that Dr.
17 Adams has brought.  The first count is a First Amendment
18 retaliation count.  And the second count is a due process
19 claim.  One thing I want you to remember when it comes to the
20 retaliation claim is remember the date July 10th, 2015, because
21 the evidence is going to show that prior to July 10th, 2015 Dr.
22 Adams had an exemplary record.  She was a career educator.
23 Dedicated her life to service to children and education.  She
24 came to Harvey School District in 2013.  The District was in
25 shambles.  It was failing students for many many years, many

Davis - opening statement

1  underprivileged students.  And she came in and she worked her

2  heart out, and she made strides and improvements in the lives

3  of those children and in that school district.

4         However, on July 10th --

5         THE COURT:  Excuse me, Counsel.  Before you get to

6  actual -- the complaint, again, you need to remember a ruling

7  that I just made and understand that it sort of applies to you

8  too.  So be careful in that certain area.  All right?

9         MR. DAVIS:  I understand, Judge.

10        THE COURT:  Okay.

11        MR. DAVIS:  I'll certainly do that.

12        THE COURT:  All right.  Thank you.

13        MR. DAVIS:  So what the evidence is going to show is

14 that prior to July 10th Dr. Adams came into the Harvey District

15 in 2013.  She -- the District was in shambles.  Her predecessor

16 was an abysmal failure.  She worked hard, had some success and

17 so much so that the defendants offered to extend her employment

18 contract.  Her contract initially was for three years.  And

19 they were concerned in the last year that if they didn't renew

20 her contract, they might lose her.  So they didn't want to lose

21 her, so they gave her a contract extension.

22        They voted as a board in an open meeting lawfully to

23 extend her contract by one year.  So her contract instead of

24 expiring June 30th of 2016 would expire June 30th of 2017.

25 Okay.  And after that vote was taken, that was again -- that

Davis - opening statement

1    was in February 2015.  February 23rd to be exact.  Things went

2    along.  You'll hear that after that contract extension was

3    voted Dr. Adams wanted a new contract, and she approached the

4    board about changing terms in the new contract, but that

5    discussion you'll hear never went anywhere.  It only went as

6    far as one individual.  She never formally broached that with

7    the entire board, and she was living under the existing

8    contract with the extension.

9              You'll hear that prior to July 10th there were no

10   disciplinary infractions against Dr. Adams.  She got good

11   performance reviews both of the two years that she was there.

12   Much better than her predecessor.  However, on July 9th Dr.

13   Adams circulated a request for a proposal for an audit of the

14   district's finances.  You'll hear that she was concerned about

15   some of the expenditures in the District, so she wanted an

16   auditor to come in, an outside auditor to look at the books.

17   She circulated that RFP, which had been approved initially by

18   the members of the board.  She couldn't do it without their

19   approval.

20             However, when she circulated on July 9th the actual

21   proposal, Tyrone Rogers, who's not here today, who's one of the

22   defendants, became enraged.  He was enraged because the

23   proposal included auditing and investigating individual board

24   members' interaction and financial dealings with the District.

25   So within minutes of my client sending out that RFP to all the

Davis - opening statement

1   board members, he called her on the phone and he threatened her

2   violently.  She was very upset obviously.

3           So the evidence will show she didn't call the police

4   or do anything right away.  She was startled.  The next morning

5   July 10th, there's that date, she came in and she talked to

6   some of her co-workers.  Shortly after she came into the office

7   and told them about the incident, the evidence will show that a

8   police officer came to her office.  She didn't call the police,

9   but someone did.  And the police officer asked her about the

10  incident, and she told the police officer what happened to her.

11  She told the police officer what Mr. Rogers said to her.  But

12  she told the police officer at that time she didn't want to

13  file a police complaint.  She wanted to try to work this out

14  within the District, and the police officer left.  That was a

15  Friday, July 10th.

16          Immediately after she talked to the police officer,

17  the wife of Tyrone Rogers, Miss Janet Rogers, who's also not

18  here today but is a defendant, came to my client's office and

19  told her I want to call a special board meeting to take

20  disciplinary action against you.  Put it on the agenda.  We're

21  going to do this.  That was July 10th.  Again, that following

22  Monday, July 13th after thinking about it and talking to her

23  family, the evidence will show my client decided she couldn't

24  accept this.  She couldn't accept this treatment.  She wanted

25  to file a police complaint.  So on July 13th, the Monday she

Davis - opening statement

1  called the police.  This time she called, and the detective

2  came back, and she told the police officer I want to file a

3  formal complaint.

4          What happened on July 13th again?  Janet Rogers put

5  out another agenda item, special board meeting to discipline

6  Dr. Denean Adams.  And what you're going to find is from that

7  date forward, from July 10th until my client was no longer in

8  the District everything changed 180 degrees.  She was no longer

9  lauded by the District.  She was no longer wanted by the

10  District.  And the first thing that changed is in August 17th,

11  2015 that contract extension that they had gave her, they took

12  it back.  They just called her into a meeting and said we're

13  rescinding this contract extension.  And so that was the first

14  thing that happened.

15          And so that's what I want you to think about when you

16  think about the retaliation claim.  The judge is going to tell

17  you the law, but she's also going to tell you don't leave your

18  common sense at the door.  If Dr. Adams is a good exemplary

19  employee before July 10th and then she made a complaint on

20  July 10th against Tyrone Rogers, and all of a sudden after that

21  actions were taken against her such as rescinding her contract

22  extension which had already been voted, your common sense may

23  tell you that it's more likely than not that whatever happened,

24  that speech, that complaint she made is what triggered the

25  change.

Davis - opening statement

1    Now, they're going to come in, as defendants often

2  do, and they've concocted a story now, and they're going to try

3  to convince you that it's all coincidental that the contract

4  was rescinded.  That they had other reasons why they had to do

5  it.  It had nothing to do with her speech.  We had no problem

6  with Dr. Adams making a complaint against Tyrone Rogers.  Don't

7  be fooled.  Use your common sense.

8    And the second count in this complaint is going to be

9  the due process count.  And all that means is you have to give

10 people a fair hearing when you --

11    MS. SCHWENDENER:  Objection, Your Honor.

12    THE COURT:  Objection sustained.  Counsel, you go

13 down this road the door opens.

14    MR. DAVIS:  Okay.  Okay, Judge.  The due process

15 claim, the evidence is going to show that prior to the contract

16 extension being taken back, my client didn't get an opportunity

17 to appear before the board to answer any of the charges.

18    MS. SCHWENDENER:  Objection, Your Honor.

19    THE COURT:  Objection sustained.

20    MR. DAVIS:  Judge, I'm --

21    THE COURT:  Counsel, you're going to open the door.

22    MR. DAVIS:  Okay, Your Honor.  Thank you.  So the

23 second count of the complaint is going to be due process, and

24 you're going to hear evidence on that about what happened with

25 regard to the rescission of the contract and what preceded the

Schwendener - opening statement

1  rescission of the contract and what kind of notice was given to

2  her, et cetera.  And if at the end of the presentation of this

3  evidence you believe -- your common sense tells you more likely

4  than not that all of this was precipitated by the complaint

5  that she made on July 10th, then we're going to ask you to

6  return a verdict for Dr. Adams on both her retaliation claim

7  and on her due process claim.  Thank you.

8          THE COURT:  Thank you very much, Mr. Davis.  All

9  right.  You may proceed.  And, Counsel, I caution you not to go

10 beyond where he went.  Do you understand?

11         MS. SCHWENDENER:  Thank you.

12         THE COURT:  All right.

13    OPENING STATEMENT ON BEHALF OF THE DEFENDANTS

14         MS. SCHWENDENER:  Good afternoon.  My name is

15 Jennifer Schwendener, and my partner Chris Petrarca and I

16 represent the defendants in this matter.  Defendants Board of

17 Education of Harvey School District 152, Gloria Johnson, Betty

18 Johnson, Dr. Kisha McCaskill, Janet Rogers, Tyrone Rogers,

19 Linda Hawkins, and Felicia Johnson.  On behalf of myself, my

20 partner, and the defendants in this case we'd like to thank you

21 for your time over the next couple of days.

22         Now, you already heard from counsel about what

23 plaintiff's version of the events -- what they expect

24 plaintiff's version of the events to show.  I'm going to tell

25 you what we expect defendants' version of the events to show.

Schwendener - opening statement

1    I'm going to give you a little bit of background information

2    about the Harvey School District.  It serves 2,200 students and

3    is made up of a preschool, five elementary schools, and a

4    middle school.  All schools are located in Harvey, Illinois,

5    which is about 20 miles south of the downtown.

6              The Board of Education of Harvey School District is a

7    group of individuals who are called board members.  They are

8    elected by the public.  The board members do not receive any

9    compensation for serving on the board.  They volunteer their

10   time to provide the children of Harvey with the best possible

11   education and opportunities to help them succeed in school and

12   in life.  The Harvey School District has seven board members.

13   They oversee the operations of the district and all of its

14   schools.  They collectively are in charge of the school

15   district.  Not one single board member can make decisions

16   binding the school District.  Decisions are only made by a

17   majority of the board.

18             Now, plaintiff worked at Harvey School District as

19   the superintendent from July 1st of 2013 until June 30th of

20   2016.  The superintendent is essentially responsible for the

21   administration of the school and its business and fiscal

22   management.  Plaintiff had a contract with the school district.

23   The contract explicitly stated that it could not be rolled over

24   or extended until certain student performance and academic

25   achievement goals had been met by the superintendent.

Schwendener - opening statement

1    Now, plaintiff has filed a lawsuit against the Board

2    of Education and the seven board members.  Plaintiff is

3    claiming that her First Amendment rights were violated after

4    she filed a police report in response to inappropriate

5    statements allegedly made by Mr. Rogers.  She claims that Mr.

6    Rogers made these statements to her after she requested an

7    audit into the district's finances.  Plaintiff claims that the

8    District retaliated against her because her contract -- an

9    offer to extend her contract was withdrawn shortly after Mr.

10   Rogers allegedly made these statements.

11   You're going to hear evidence over the next few days

12   through various witnesses.  Plaintiff is going to try and

13   attempt to confuse the case and complicate the issues.  This is

14   actually a very simple case.  It's an employment dispute.

15   That's really it.  Please remember, ladies and gentlemen, that

16   the fundamental issue you are to consider is whether the Board

17   of Education retaliated against plaintiff by revoking her

18   contract extension because of a police report she filed against

19   Mr. Rogers.  Significantly you will not hear any evidence that

20   my clients voted to rescind her contract because of the police

21   report.

22   My clients don't dispute that in February of 2015 an

23   offer to extend plaintiff's contract was given.  The offer

24   proposed to extend her contract for one year and no more.  The

25   offer was to renew her existing contract on the same terms and

Schwendener - opening statement

1    conditions as her prior contract.  You will hear testimony that

2    plaintiff never accepted that offer.  You will hear that in

3    March of 2015 plaintiff hired an attorney.  Through her

4    attorney plaintiff requested revisions to the one-year offer.

5    She wanted a larger salary.  She wanted a longer term than one

6    year.  She wanted larger automobile reimbursement.  She wanted

7    other changes to her contract.

8            You will hear testimony from board president Janet

9    Rogers that she told plaintiff to accept the one-year offer and

10   not request any changes.  Mrs. Rogers will tell you that

11   plaintiff told her she was going to take her chances.  Now,

12   significantly the board never approved those revisions.

13   Plaintiff never accepted the Board's offer of a one-year

14   contract extension and never signed any contract extension on

15   any terms.

16           You will hear evidence that in June of 2015 plaintiff

17   told the board members she wanted to audit the District's

18   finances.  She will tell you that she had some concerns about

19   financial practices at the District.  You will hear testimony

20   that the board members were in favor of this request.

21   Significantly, Tyrone Rogers one of the defendants said that

22   plaintiff should be commended for looking after the District's

23   finances.  Even though the District had its own internal

24   auditors, the board members agreed that plaintiff could put

25   together a proposal for the audit.

Schwendener - opening statement

1      On July 9th of 2015 plaintiff gave the board members

2  the audit, the same date plaintiff claims that Mr. Rogers, the

3  same guy who commended her for watching over the District's

4  finances called her, and as counsel indicated, made a threat.

5  That threat that you will hear is Miss -- plaintiff is alleging

6  that Mr. Rogers called her and he said that she was itching to

7  get an ass whipping.  Mr. Rogers will deny making those

8  statements.

9      The next day plaintiff met with the detective and

10  told him about what Mr. Rogers said.  The detective prepared an

11  information report and -- the detective prepared an information

12  report about the incident and a couple days later spoke with

13  plaintiff.  The incident was determined it was not criminal in

14  nature.  The case was closed, and no charges were ever filed

15  against Mr. Rogers in response to the alleged threat he made

16  against plaintiff.

17      Now, fast forward a couple weeks to July 22nd, 2015.

18  There was a board meeting and all board members were present.

19  You will hear testimony from John Izzo, who is an attorney.

20  Plaintiff asked Mr. Izzo to be present at the meeting.  The

21  board members did not ask Attorney Izzo to be present.  You

22  will hear testimony that there was a discussion about the offer

23  to extend plaintiff's contract.  Attorney Izzo -- Attorney Izzo

24  was unaware that the board had previously offered to extend

25  plaintiff's contract.  He was not present at the February board

Schwendener - opening statement

1    meeting.  He didn't know that the offer had been given.

2            Attorney Izzo asked the board members if they had

3    made a finding that plaintiff had met her performance goals as

4    required by her contract.  The board members -- you will hear

5    testimony that the board members told Attorney Izzo they did

6    not make such a finding.  Attorney Izzo will testify that he

7    then told the board members because they had not made a finding

8    that plaintiff had met her goals, the offer to extend her

9    contract was ineffective.  You will hear testimony from the

10   board members that they relied on and followed Attorney Izzo's

11   advice.  They voted to rescind or revoke the offer to extend

12   plaintiff's contract based on reliance on Attorney Izzo's

13   advice.

14           Plaintiff is going to attempt to argue that the board

15   revoked her contract in retaliation over what Mr. Rogers

16   allegedly said.  You may hear clips from the July 22nd board

17   meeting throughout the trial.  Significantly, there is no

18   mention whatsoever of Mr. Rogers' alleged statement, the police

19   report, or plaintiff's request for a forensic audit in

20   connection with the discussion to extend the offer given to

21   plaintiff.  It's not there.

22           As I mentioned earlier, plaintiff is going to try and

23   complicate the case and confuse the issues.  Plaintiff will try

24   to paint the board and the board members in a bad light.  She

25   will try to argue that they made life miserable for her and

Schwendener - opening statement

1    treated her unfairly.  That is simply not true.  First,

2    plaintiff never accepted the one year contract extension.  The

3    board made the offer to extend plaintiff's contract.  Plaintiff

4    got greedy and tried to negotiate a higher amount, longer term,

5    larger salary.  She never signed a new contract.  She never

6    signed the one-year extension that the Board had previously

7    given -- or previously offered.

8            In addition, Mr. Rogers denies making any threats to

9    plaintiff.  Mr. Rogers commended plaintiff for looking after

10   the District's finances.  It doesn't make any sense that he

11   would then turn around and tell her she was itching for a

12   whipping in response to submitting a proposal for the audit.

13   Next, you won't hear any testimony from the board members over

14   the next few days that they rescinded -- that they voted to

15   rescind the contract extension because of Mr. Rogers' alleged

16   statements, the police report, or the audit.

17           During the discussion of whether to rescind the

18   contract, the discussion about Mr. Rogers was not brought up.

19   The board members, again, will tell you that they relied on

20   their attorney's advice when voting to rescind the contract

21   extension.  Plaintiff is likely going to tell you how

22   emotionally distraught she was over the stress she endured at

23   the District.  Ladies and gentlemen, let me share with you that

24   during the last year of plaintiff's contract, the school year

25   of 2015 to 2016, plaintiff missed 83 days of school.  There

Schwendener - opening statement

1   were only 260 working days that year, so she missed over

2   one/third of the school year.

3          She will try to likely argue that the stress from the

4   District caused her to miss so many days that last year.

5   However, plaintiff didn't treat with a medical doctor for any

6   of the alleged stress that she endured.  She wasn't prescribed

7   any medication.  She still received --

8          MS. SCHWENDENER:  I'm going to have to object, Your

9   Honor.  Counsel --

10         THE COURT:  Counsel.  Counsel, we don't do speaking

11  objections.  You can come to the side if you want or you can

12  just save it for the record and make sure we're not doing

13  argument.  Step over.

14         (Side bar proceedings out of the hearing of the jury:)

15         THE COURT:  All right.

16         MR. DAVIS:  Counsel --

17         THE COURT:  Quietly.  Go ahead.

18         MR. DAVIS:  -- is repeatedly misstating the facts --

19         THE COURT:  Then you can show it.

20         MR. DAVIS:  -- and the evidence in this case, Judge.

21         THE COURT:  Then you'll show that.

22         MR. DAVIS:  And I don't think she can just stand up

23  there and tell the jury just anything despite the facts.  She

24  knows that she treated with a therapist, Theresa Cunningham.

25  She was on our witness list.

Schwendener - opening statement

1      THE COURT:  Okay.  That's enough.

2      MS. SCHWENDENER:  I said plaintiff did not treat with

3  a medical doctor.  Theresa Cunningham is not a medical doctor.

4  She's a counselor.

5      THE COURT:  It's opening statement.  And if she

6  doesn't prove it up or say it and you can show it would be

7  different, obviously that's fair game in closing.  All right.

8  Thank you.

9      MR. DAVIS:  Thank you, Judge.

      (Before the jury:)

10

11      THE COURT:  Proceed.

12      MS. SCHWENDENER:  Thank you.  Over the next couple of

13  days both sides will present evidence.  Both sides will call

14  witnesses to testify.  Please remember that the law requires

15  the plaintiff, the person who filed the lawsuit, has the burden

16  of proving my clients violated her First Amendment rights.

17  Plaintiff must prove that the District and the defendants

18  retaliated against her for filing a police report against Mr.

19  Rogers.

20      After listening to witness testimony and hearing all

21  the evidence over the next few days, I am confident that you

22  will find my clients did not violate plaintiff's First

23  Amendment rights and will render a verdict in favor of the

24  defendants.  Thank you again for your time.

25      THE COURT:  Thank you very much, Counsel.  And once

Schwendener - opening statement

1  again, what the -- both sides have presented at this point in

2  opening statement is not evidence.  We're about to start the

3  evidence.  I will give you another instruction that I failed to

4  do.  We have side -- they're called sidebars.  When we stand to

5  the side and that beautiful white noise is played for you and

6  we try to keep our voices down, those are matters that must be

7  heard out of your presence.  We are not trying to waste time,

8  and this Court limits that a lot.  And so -- but please when

9  that is going on, just relax.  Don't consider it for any

10  purpose other than the fact that this is something you can't

11  hear.

12          All right.  So if we're ready for the first witness,

13  plaintiff.

14          MR. DAVIS:  Yes, Your Honor.  The plaintiff calls Dr.

15  Denean Adams.

16          THE COURT:  All right.  Dr. Adams, please step

17  forward.

18      DR. DENEAN ADAMS, PLAINTIFF, DULY SWORN

19          THE COURT:  All right.  Just keep your voice up so we

20  can hear you.  You can serve yourself water if you need to, and

21  anything else is there that you need.  Counsel will put forth

22  the questions.  Remember it has to be one at a time so

23  Miss McCullough can take down one voice at a time.

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  If there's an objection, please hesitate

Adams - direct by Davis

1   before you answer so that the Court can rule on it.

2            THE COURT:  Anytime you're ready, Mr. Davis.

3            MR. DAVIS:  Thank you, Your Honor.

4                    DIRECT EXAMINATION

5   BY MR. DAVIS:

6   Q    Thank you, Dr. Adams.  At anytime you need a break, let me

7   know, and I'll ask the Court to give us a brief recess.

8   A    Okay.

9   Q    I'd like to start out by asking you about your background

10  and history prior to coming to Harvey School District 152.

11  A    Okay.  As he said, my name is Dr. Denean Adams, and I am a

12  career educator.  I have served in education prior to coming to

13  152 over 25 years in K12 education.  I served as -- or began my

14  career as a teacher in Chicago Public Schools.  Worked there

15  for a number of years.  I actually had the pleasure of going

16  back to work in the school where I attended as a student.  So I

17  went back to my neighborhood school and spent time working as

18  an educator there.

19            After serving there for a number of years, I decided

20  I wanted to pursue my administrative career, and so I pursued

21  an advanced degree and received a job in the suburbs of

22  Chicago.  And my first administrative position was as a

23  academic advisor, which is known as a dean of students, at a

24  middle school in the west suburbs.  I served in that capacity

25  for a number of years, and then moved into the role of

Adams - direct by Davis

1   principal.

2         As a principal I had the distinct honor during my

3   tenure as a principal of opening a brand new school, a brand

4   new community.  Spend time just really enjoying and loving the

5   work that was being done with the students with the communities

6   for which I was servicing.

7         THE COURT:  All right.  Counsel, let's put a

8   question.  This isn't just a full bio.  At least let's move it

9   along.

10         MR. DAVIS:  Sure, Judge.  I understand.

11         THE COURT:  Thank you.

12   BY MR. DAVIS:

13   Q    When did you come to work at Harvey School District 152?

14   A    I began my contract in 152 on July 1st of 2013 as

15   superintendent of schools.

16   Q    And were you hired pursuant to an employment contract?

17   A    Yes.  I received a three-year contract upon my entry into

18   the District.  And the contract would be valid from July 1,

19   2013 through June 30th of 2016.

20   Q    I'm going to show you an employment contract, and I'm

21   going to give it to you, a hard copy if that's okay.

22   A    That's fine.

23   Q    So please look at Exhibit 1, which I'm going to --

24         THE COURT:  Plaintiff's Exhibit 1.

25         MR. DAVIS:  Right.  And this is coming from

Adams - direct by Davis

1    plaintiff's table, Your Honor.  Plaintiff's Exhibit 1, I'd like
2    to publish to the jury.
3            THE COURT:  All right.  One second.  Any objection?
4            MS. SCHWENDENER:  No objection.
5            THE COURT:  All right.
6    BY MR. DAVIS:
7    Q    Do you see the employment contract, Dr. Adams?  Open up to
8    Exhibit 1.
9    A    Yes.
10   Q    And is this the three-year agreement that you had, that
11   you were just referencing?
12   A    Yes.
13   Q    Okay.  And what was your -- let's look at the terms of the
14   agreement.  Compensation, Section 4 of the contract.  What was
15   your annual compensation?
16   A    My annual salary in 2013 was $165,000, and that was for
17   the 2013-2014 school year.
18   Q    Okay.  And as part of this contract did you receive annual
19   performance evaluations?
20   A    Yes, I did.
21   Q    And that's pursuant to Section 5 of the contract?
22   A    That's correct.
23   Q    So now we heard counsel in her opening statement reference
24   goals and saying that your contract -- this contract could be
25   extended, right?

Adams - direct by Davis

1   A    Yes, that was my understanding.

2   Q    Okay.  So if we look at Section 3 of the contract.  Read

3   where it says student performance and academic improvement

4   goals.  Read that first section.

5   A    Student performance and academic improvement goals.  This

6   agreement shall not be extended or rolled over prior to a

7   scheduled expiration unless the following performance and

8   improvement goals have been met by the superintendent.  Goal 1,

9   the superintendent will provide leadership to improve student

10  academic growth.  Indicator A, each fall the superintendent

11  will evaluate and report to the board on students' academic

12  growth as measured by assessment used by the District.

13          B --

14          THE COURT:  Are you meaning to go that quickly,

15  Counsel?

16          THE WITNESS:  Yes, there you go.  B as part of --

17          MR. DAVIS:  I'm sorry, Judge.

18          THE COURT:  That's okay.

19          THE WITNESS:  That's okay.

20          MR. DAVIS:  I forgot everybody's watching this.  I'm

21  sorry.

22          THE COURT:  Go ahead.

23          THE WITNESS:  Indicator 1B under goal 1, Section B,

24  as part of the report the superintendent will make

25  recommendations to the board on how to improve student academic

Adams - direct by Davis

1   growth.  Goal 2, the superintendent will provide leadership and

2   strengthening the skills of all certified staff.  Indicator A,

3   each spring the superintendent will evaluate and report to the

4   Board of the then current state of professional development of

5   the certified teaching staff.

6   BY MR. DAVIS:

7   Q    Okay.  And --

8   A    And Indicator B.  As part of the report the superintendent

9   will make recommendations for continued and expanded

10  professional development activities.

11  Q    And finally read the last paragraph.

12  A    Further, the superintendent and the board shall consult no

13  later than October 1st, 2013 and June 1st of each contract year

14  thereafter in order to mutually determine whether such goals

15  should be amended, or additional goals need to be included.

16  Any amendment or addition mutually agreed upon by the parties

17  shall be attached hereto and incorporated as part of this

18  agreement.

19  Q    So cutting through the legales, what does this mean in

20  practical terms?  How did this work in the District for you?

21  A    In --

22  Q    This section.

23  A    This particular section in 152 we held a annual re -- a

24  retreat twice a year.  And that retreat was established to

25  determine not only the goals, but the progress that were being

Adams - direct by Davis

1  made on the goals.  And so each -- it was usually held in June

2  and again in December or January is that time frame.  The

3  purpose of those activities were to provide an opportunity for

4  the board to share direction, to share goal areas, to talk

5  about what directions or what new goals or if there were new

6  goals that needed to be established.  It was also an

7  opportunity for us -- or me to provide feedback to the board on

8  how we were processing in terms of the goals that had been

9  established.  So --

10 Q    Let me --

11 A    I'm sorry.

12 Q    I'm sorry.  Let me stop you because I want to put

13 something up.

14 A    Okay.

15 Q    Please turn to Exhibit 2, because I want you to see

16 Exhibit 2 as you're talking about this goal setting process.

17 Do you recognize Exhibit 2?

18 A    I do, yes.

19 Q    What is Exhibit 2?

20 A    So Exhibit 2 was --

21           MR. DAVIS:  Excuse me.

22           THE COURT:  One second.

23           MR. DAVIS:  May I publish to the jury, Your Honor.

24           THE COURT:  If there's no objection.

25           MS. SCHWENDENER:  No objection.

Adams - direct by Davis

1    THE COURT:  All right.  Proceed.

2    THE WITNESS:  Exhibit 2 was a continuous improvement

3  planning cycle that we utilized with both board input and my

4  input as the superintendent.  Each year we would get together

5  during the retreat cycle, and these are some of the initiatives

6  and the timelines that would occur so that we could continue to

7  establish and work on the agreed upon goals.  So, for example,

8  if you see step one is started with Board and superintendent

9  agreeing on the goals for the school year, and then in -- and

10  once that agreement was made, we moved into working on action

11  plans, creating action plans so that we as the administrators

12  in the District could get the work done.

13    THE COURT:  All right.  Let's stop right there.  Put

14  a question, please.

15  BY MR. DAVIS:

16  Q    Okay.  And so if we just look at this chart, it goes step

17  by step setting the goals, measuring the goals, and modifying

18  the goals throughout the year as necessary.  Is that basically

19  what this chart shows?

20  A    That's basically what the chart shows, correct.

21  Q    Okay.  And you came into the District in 2013, right?

22  A    Correct.

23  Q    Was this process in place then?

24  A    I'm -- I'm not sure.  I know during our first retreat we

25  established a timeline for this.  I'm not sure if it was

Adams - direct by Davis

1  practice that they were using prior to me coming into the
2  District.
3  Q    Okay.  Let me ask you this:  Did you have a performance
4  evaluation in 2015?
5  A    In 2015?
6  Q    Yes.
7  A    I received a performance evaluation in 20 -- for the
8  2013-2014 school year and for the 2014-2015 school year.  Those
9  were the two evals that I received while -- during my tenure.
10 Q    So the 2014-15 school year evaluation, when did that take
11 place?
12 A    I actually -- so the culminating activity for the
13 evaluation process was for the board and the superintendent to
14 walk through the evaluation document in executive session.  And
15 that we usually -- we did around the January, February time
16 frame.  The due date so that that is done according to the
17 state is March 1st.  And so we -- those two years we did follow
18 that process and make sure that the evaluation was completed in
19 a timely manner.
20 Q    Okay.  So --
21 A    Does that answer your question, Counsel?  I'm sorry.
22 Q    How did the evaluation tie into this process we just
23 looked at?  So we're now in the 2014-15 school year.  You've
24 got an evaluation coming up in early 2015.  How does this
25 process apply to that?

Adams - direct by Davis

1   A    So the, the evaluation process actually starts if you look

2   back at step one in May, in the summer of the previous year

3   before it is completed.  So we would work on the goals, and

4   then as I said, the administrators we would develop the action

5   plans and things like that during the month of June.  And then

6   in August those would be presented by me to the Board of

7   Education.  That becomes the basis for the evaluation.  If you

8   look at the evaluation tool, it identified indicators under

9   those same four areas that had been established as goals in the

10  District.

11  Q    So let's do that.  Let's look at the evaluation that you

12  received.  Let's look at the 2015 evaluation.  That's Exhibit

13  5.

14           THE COURT:  Is it in the direction you intend for it

15  to be?

16           MR. DAVIS:  It is not, Judge.  I need to rotate this

17  exhibit.  Let me take --

18           THE COURT:  It's not being shown to the jury.

19           MR. DAVIS:  Right.  I understand.  Let me have

20  Exhibit 5 momentarily.  And so I'd like to publish to the jury,

21  Your Honor.

22           THE COURT:  Any objection, Counsel?

23           MS. SCHWENDENER:  No objection.

24  BY MR. DAVIS:

25  Q    So now you can see on the screen, Dr. Adams, Exhibit -- is

Adams - direct by Davis

1  this your performance evaluation for 2015?

2  A    Yes, that looks like it.

3  Q    Okay.  And that's the first sheet.  So now if we look

4  at -- what are we looking at now?

5  A    So the -- the process included each of the board members

6  contributing information based on the feedback that they were

7  receiving from me and providing me with a rating from 1 to 4 in

8  the areas as you see identified here.  1 being unacceptable or

9  needing improvement.  4 being outstanding.  And so each board

10 member contributed to the cumulative averages that you see

11 there, and then the bar graph represents each of those

12 questioned and the actual average score that was attained in

13 each of those indicators.

14 Q    So putting it simply, a 1 is a fail, needs improvement?

15 A    Needs improvement, correct.

16 Q    Did you receive any 1's in your evaluation in 2015?

17 A    No, I did not.

18 Q    So if we go through and continue looking at the

19 evaluation, we can see how you were rated in the various

20 categories.  And these categories and these ratings tie into

21 the goal cycle that you started in May of 2014?

22 A    Correct.

23 Q    So the cycle started in May.  The board got together

24 developed these goals, identified what they were going to be,

25 and set up the process step by step to evaluate them as you

Adams - direct by Davis

1   went along.  Culminating in the performance review.  And even

2   before the performance review, you said you had a retreat in

3   December -- in January to again look at the goals and measure

4   how you were doing, is that correct?

5   A    That is correct.

6   Q    So all of this culminated in February with this

7   performance evaluation.  As we go through the performance

8   evaluation, as you said, there are no 1's.  I'm moving quickly

9   here.  But for the purposes right now, the key thing is there

10  were no unsatisfactory, needs improvement ratings on this

11  review?

12  A    Correct.

13  Q    And you can just look with me as I go through these

14  various sheets.  And I won't belabor the point and go through

15  all of them.  Suffice it to say, as you've already said, you

16  had no needs improvement in any category.  And you said the

17  board members made various comments, though.  Because the

18  ranking, the score is an average?  There's seven Board members.

19  The ranking is the average of all seven's score?

20  A    Uh-huh.

21  Q    But each indivi --

22          THE COURT:  Is that a yes?

23          THE WITNESS:  Yes.  I'm sorry.

24  BY MR. DAVIS:

25  Q    But each individual board member got to make comments?

Adams - direct by Davis

1    A    Correct.

2    Q    So when we look at the comments on this sheet here,

3    comment one, superintendent appears to work diligently to

4    enhance her personal and professional skills.  However,

5    implementation is vague.  The superintendent's level of ethics

6    and honesty are often present, but integrity in certain

7    situations has been absent.  Superintendent mimics the wishes

8    of the board.

9           Let me ask you this, Dr. Adams:  I've looked at some

10   of these comments, and not all these comments are positive, is

11   that correct?

12   A    That's correct.  Yes.

13   Q    And how do you respond to that?

14   A    Well, I know that working in that capacity as a

15   superintendent was a very challenging job.  What needs to

16   happen is you have to balance the wishes of seven board

17   members, and sometimes they come with different

18   interpretations, different understandings, different

19   perceptions of the actions that are taken and why they're

20   taken.  Sometimes -- and so I think that shows up in overall

21   comments.  Each board member had an opportunity to provide

22   comments as an individual, and that's where some of these

23   comments have surfaced.

24   Q    Okay.  So all of these comments that are negative, are

25   they wrong?  Is that what you're saying?

Adams - direct by Davis

1   A    The comments that are here, there wasn't enough -- I mean,
2   I never had enough information to know exactly what was meant
3   by each and every comment.
4   Q    Okay.  And when you see the comments, you go back and try
5   to work through it with the individual Board members to get
6   more understanding of what the basis was?
7   A    And typically during that session when we would talk about
8   the evaluation itself, we would walk through it, that would be
9   my opportunity to ask questions and clarifying questions on
10  some of the comments.
11  Q    Okay.  And we've already gone through your evaluation --
12  you had this same evaluation the prior year 2013-14, correct?
13  A    That's correct.
14  Q    And did you receive any unsatisfactory 1 ratings in any
15  category --
16  A    No, I did not.
17  Q    -- in 2013-14?
18  A    I'm sorry.  No, I did not.
19  Q    So for the entire two years you were with the District and
20  you were evaluated, you never received an unsatisfactory
21  rating, correct?
22  A    That's correct.
23  Q    So in February of 2015, which is the same time you got
24  this evaluation, how is it that you came -- tell me about the
25  contract extension.  How did that come about?

Adams - direct by Davis

1  A     The contract extension began as a conversation between

2  myself and the then board president, who was Janet Rogers.

3  Mrs. Rogers and I -- Mrs. Rogers actually approached the idea

4  of providing me with a -- an extension, a one-year extension at

5  that time because she -- we were, we were nearing the

6  completion of year two in a three-year contract.  And she

7  wanted me to be committed to stay into the district.  And so we

8  discussed giving or having a one-year extension to the

9  contract.  She said she would talk to the board members and get

10 back to me, and let me know if they were going to move forward

11 with the one-year extension.

12 Q     So Janet Rogers approached you and said we want to give

13 you an extension, or did you ask her for an extension?  How did

14 it work?

15 A     Mrs. Rogers at that time approached me for -- about a

16 one-year extension.

17 Q     And, in fact, on February 23rd, 2015, the board actually

18 voted to give you the one-year extension you were just

19 discussing?

20 A     Correct.

21 Q     Right?

22 A     That's correct.

23 Q     So if we look at Exhibit 7.  Exhibit 7 are --

24       MR. DAVIS:  And may I publish, Your Honor.

25       THE COURT:  Any objection?

Adams - direct by Davis

1      MS. SCHWENDENER:  No objection.

2  BY MR. DAVIS:

3  Q    Exhibit 7 is the minutes of the special board meeting.  So

4  how it worked is the board had meetings, right, regular

5  scheduled meetings, special meetings, et cetera?  And at those

6  meetings they'd vote on certain things as a board.

7      MS. SCHWENDENER:  Objection, leading.

8      MR. DAVIS:  Well, this is --

9      THE COURT:  Excuse me, Counsel.  I'll allow that one.

10 Overruled.  But watch out for leading.  Proceed.

11     MR. DAVIS:  Sure, Judge.  This is so mundane.

12     THE COURT:  Proceed, Counsel.

13 BY MR. DAVIS:

14 Q    Tell me what we're looking at in Exhibit 7, Dr. Adams.

15 A    So Exhibit 7 is -- or are the minutes, excuse me, from the

16 Monday, February 23rd Board of Education meeting.  We

17 usually -- it was usually recorded all of the activity that

18 took place, all of the votes that had taken place during that

19 particular meeting.  And this was standard procedure for the

20 Board of Education.  Once items were presented to the full

21 board, there was a formal vote that needed to be taken, and you

22 needed to have a majority in order for the issue or the, the

23 item to move forward.

24 Q    So I've now brought up on the screen, it says

25 superintendent contract one-year extension approved.  Is that

Adams - direct by Davis

1   the one-year extension that you received?

2   A    That is correct.

3   Q    And so it says here all the people, the ayes, the nays,

4   the absent.  The ayes are all the people that voted for the

5   extension?

6   A    That is correct.

7   Q    So counsel said you never signed the agreement.  You never

8   signed the contract.  Was there any requirement for you to sign

9   something after the board voted to approve --

10            MS. SCHWENDENER:  Objection.  Calls --

11   BY MR. DAVIS:

12   Q    -- the extension?

13            MS. SCHWENDENER:  Objection.

14            THE COURT:  Basis?

15            MS. SCHWENDENER:  Calls for a legal conclusion.

16            THE COURT:  Sustained.

17            MR. DAVIS:  I'm asking her about the procedures in

18   the district, Your Honor.  I'm not asking her --

19            THE COURT:  You need to -- Counsel, you need to

20   rephrase the question.  Ask another question.  I've ruled.

21   Proceed.

22   BY MR. DAVIS:

23   Q    What was the process for giving extensions in the

24   district?  Were you -- are you familiar when you were in the

25   district as a superintendent what the process was for contract

Adams - direct by Davis

1  extensions?

2  A    This was my only experience with a contract extension

3  being issued in the district.  I did not have an actual

4  document to sign because my original contract was signed, and

5  so I assumed that that was carried on through the extension as

6  well.

7  Q    So did Janet Rogers or anybody tell you -- let me phrase

8  it this way:  What you just said is once they voted to approve

9  it, what was your understanding?

10  A    My understanding was that it went into effect.  It was

11  a -- it was valid and it was in effect.

12  Q    Right.  And what you just said is you didn't think you had

13  to sign anything because it wasn't a new contract?

14  A    Correct.

15  Q    They were just extending the existing contract.  You

16  signed it in 2013, right?

17            MS. SCHWENDENER:  Objection.

18            THE COURT:  As to leading, objection sustained.

19  BY MR. DAVIS:

20  Q    Well, we saw the contract Exhibit 1.  Was that signed?

21  A    Yes, it was.

22  Q    And that was the same contract that they extended by one

23  year?

24  A    That's correct.

25  Q    And we saw in that contract where it provided that

Adams - direct by Davis

1   extensions were allowed if goals were met.  Is that what we

2   looked at earlier?

3   A    That's correct.

4   Q    So February 23rd they voted you an extension.  And counsel

5   said something about you got greedy.  You wanted more money

6   and, and you didn't sign the contract.  What is your response

7   to that?

8   A    My response was I wanted to negotiate a brand new

9   contract.  I did several market analyses of the superintendents

10  and what benefits -- what compensation packages they had in the

11  surrounding suburbs, in the surrounding areas, and decided that

12  I wanted to pursue that as an option with the Board of

13  Education.  So I approached our then board president Janet

14  Rogers about the possibility of creating a new contract.

15  Q    So you only talked to Janet Rogers?  You didn't --

16  A    Yes.

17  Q    Right?

18  A    That's correct.

19  Q    Okay.  And you say you were seeking a new contract.  Let

20  me bring up exhibit number -- let me bring up Exhibit No. 9.

21            MR. DAVIS:  May I publish, Your Honor?

22            THE COURT:  Any objection?

23            MS. SCHWENDENER:  No objection.

24            THE COURT:  All right.

25  BY MR. DAVIS:

Adams - direct by Davis

1  Q    So what is number -- Exhibit No. 9, Dr. Adams?

2  A    That is a copy of the new contract that -- with the

3  changes that I was requesting for the new contract to go into

4  effect.  So it identified the areas that I wanted -- that I

5  wanted to change in the current contract.

6  Q    So this isn't the same contract.  This is a new document,

7  new contract.  How did this come about?

8  A    I worked with an attorney at that time, and this was the

9  document that was produced.

10 Q    And without getting into the legales too much, can you

11 read the first sentence of this agreement.  Can you read that?

12 A    Uh-hum.  Yes.  This agreement is made by and between Board

13 of Education Harvey School District 152 board and Dr. Denean

14 Adams, Superintendent.  And then there is a line drawn through

15 the dates.

16 Q    Did you read the part below that, this agreement

17 constitutes?

18 A    Okay.  I can.  This agreement constitutes a successor

19 administrative performance based employment contract entered

20 into during the term of an existing predecessor administrative

21 performance based employment contract in accordance with the

22 provision in 105 ILCS 5 slash 10 - 23.8 of the Illinois School

23 Code.  The superintendent and board confirm and acknowledge

24 that the superintendent has met the goals and indicators of

25 student performance and academic achievement as stated in the

Adams - direct by Davis

1    original predecessor contract.

2    Q    So again cutting through the legales, what does that mean?

3             MS. SCHWENDENER:  Objection.  Calls -- objection.

4             THE COURT:  Objection sustained.  Rephrase the form

5    of the question.

6    BY MR. DAVIS:

7    Q    When your lawyer put this together for you, what was your

8    intent with this agreement?

9    A    Can you rephrase that, Mr. Davis.

10   Q    What were you -- this new agreement, you had a lawyer put

11   it together for you?

12   A    Correct.

13   Q    And how did this agreement relate to the -- you said you

14   had an existing contract that was extended.

15   A    Yes.

16   Q    What was the relationship between this and that?

17   A    So this particular contract was going to replace the

18   existing contract under which we were operating.

19   Q    Thank you.

20   A    You're welcome.

21   Q    So what happened with this?  Did you ever --

22   A    This particular draft of the contract, so I, I had

23   conversations with then board president Janet Rogers.  And this

24   was around Febru -- late February, March.  I don't remember the

25   exact timeline.  But I know that we were coming upon board

Adams - direct by Davis

1  elections.  And so in our discussions she informed me that she
2  didn't think it was a good idea to move forward with a new
3  contract at this time because we were approaching the board
4  election cycle, and we needed to just kind of wait and see how
5  that played out.
6  Q    So that was the end of it?
7  A    So then it died -- yes, it died.  It never went to the
8  full board.
9  Q    Okay.  Moving forward, Dr. Adams.  We talked about the
10 retreats.  What were these retreats again?  What was the
11 purpose of these retreats?
12 A    The purpose of the retreats were for the board and myself
13 to engage in conversations around the goals, if the goals were
14 being met, the indicators.  I was to provide data on where we
15 were in terms of meeting the goals.  I often invited my
16 administrative team to assist with that process.  And we
17 engaged in conversations around goals and what the action plan
18 or activities would be as the school year progressed.  It was
19 also an opportunity for the board to share any concerns,
20 anything that was going on, any additional information that
21 they may want us to work on for that school year.
22          So it was really an opportunity for us to dialogue
23 about where we were in terms of the goals, what was happening
24 with the goals, and how we were moving forward as a, as a team.
25 Q    So did you all have a retreat in June 2015?

Adams - direct by Davis

1   A    We did, yes.

2   Q    And what happened briefly at that retreat?

3   A    So the June retreat we talked about the goals that had

4   been established.  I shared multiple data sets with them in

5   terms of the goals that had been established.  We talked about

6   the responses from parent surveys.  We pulled in the work that

7   was being done in the district.  We looked at professional

8   development across the district.  One of the things that I, I

9   remember very clearly was having a discussion about a goal but

10  really looking at the results from a parent survey that talked

11  about us needing to focus more on student safety and making

12  that a priority for the district.

13         So that became an area that, that I was going to

14  pursue in terms of looking at how we were going to move forward

15  with making our parents feel a lot more -- a lot better about

16  the safety procedures that we had in place in the district.

17  Q    Let me ask you this:  We saw in the contract one of the

18  things -- one of the goals before you could get an extension

19  talked about student achievement?

20  A    Yes.

21  Q    Did you all talk about student achievement goals at the

22  August -- I'm sorry, at the June 2015 retreat?

23  A    We did.  We, we talked about student achievement at every

24  retreat that we were in -- that we ever participated in.  So

25  with the student achievement goal we looked at the data on our

Adams - direct by Davis

1  local assessments, and so I would bring -- prepare the reports

2  for them to show progress that our students were making in the

3  district as we moved through the school year.  When I first

4  came to Harvey, there wasn't a local -- local assessment is

5  like an assessment that you give across the entire district.

6  And prior to my arrival there, there was not a local assessment

7  in place.

8          So we put a local assessment in place, which would

9  allow us to not only establish some goals for increasing the

10  achievement, but give us the opportunity to monitor those goals

11  towards student achievement as the school year progressed.

12  Q    And I want to move forward quickly.  Did you report any

13  progress -- did you make any progress in June of 2015 on

14  academic achievement in the district?

15  A    Yes, we did, Counselor Davis.  We made lots of progress.

16  Particularly in English, language arts, and in math.  We saw

17  improvements across the district of right around 7 or 8 percent

18  as a district, which was steady improvement moving in a

19  positive direction.

20  Q    And so when you presented --

21          THE COURT:  All right.  Counsel.  Counsel, excuse me

22  one second.  I'm going to give my jury a two- to three-minutes

23  break for any type of facilities if it's needed, or we will go

24  on for 20 minutes.  Everybody fine?  All right.  Not seeing any

25  distress.  If you want to take a break, let me know.  Do you

Adams - direct by Davis

1   need one?  You do?  All right.  All rise.

2       (Jury excused.)

3           THE COURT:  Anything on the record, plaintiff?

4           MR. DAVIS:  No, Your Honor.

5           THE COURT:  Anything on the record, defense?

6           MS. SCHWENDENER:  No.

7           THE COURT:  This is going to be a really short time.

8   I just saw somebody was in distress.  All right.

9           MS. SCHWENDENER:  Thank you.

10          THE COURT:  Thank you, Your Honor.

11          THE COURT:  All right.

12      (Short break taken.)

13          THE COURT:  Anything on the record from the plaintiff

14  before they come out?

15          MR. DAVIS:  No, Judge.

16          THE COURT:  Anything defense?

17          MS. SCHWENDENER:  No, Your Honor.

18          THE COURT:  All right.  I don't -- you can give a

19  reason for your objection.  No speaking objections.  We'll come

20  to the side on those, or I might tell you I'll hear it later

21  and we keep going.  Okay.  But just one basic statement.  In

22  fact, I usually tell you, and I don't know if I did.  All

23  right.  Thank you.

24          MR. DAVIS:  Okay.  Thank you, Your Honor.

25      (Before the jury:)

Adams - direct by Davis

1      THE COURT:  You're still under oath.  Proceed when

2  you're ready, Mr. Davis.

3      MR. DAVIS:  Thank you, Your Honor.

4  BY MR. DAVIS:

5  Q    So, Dr. Adams, we were talking about the retreat in June

6  of 2015.  Were all of the defendant board members present at

7  that retreat?

8  A    Yes, I do believe so.

9  Q    And you talked about presenting the goals and achievement.

10  Did anybody at the board meeting express any criticism or

11  problem with your performance or anything at that retreat?

12  A    No.  No.  Nothing related to -- no.  The academic goals,

13  the goals that were established, there was nothing related to

14  that.  As a matter of fact, I had one -- there was one board

15  member or maybe a couple that talked about the depth of the

16  information that was presented, and the fact that they had been

17  presented -- almost inundated with information.  Enough

18  information or a lot of information regarding the goals and the

19  student achievement and the way that things were moving in the

20  district in terms of student performance.

21  Q    Great.  So is that that same retreat that you first

22  brought up the idea of having an audit, an outside audit,

23  correct?

24  A    That is correct, yes.

25  Q    And without going into too much detail, why did you want

Adams - direct by Davis

1   to have an audit?

2   A    So prior to the retreat and upon entering the district,

3   throughout the course of my tenure there I had questions about

4   several expenditures and just some financial processes that

5   were in place or not in place or were not consistent.  And so I

6   thought it was a good time at that point to get the board to

7   give me the permission or the go ahead to complete a forensic

8   audit to investigate these practices further and find out where

9   we stood financially.

10          And although we had an annual audit that was

11  performed every year in the district, I wanted to go a little

12  bit further because I really wanted to wrap -- I wanted to make

13  sure that the data that the board was receiving was accurate.

14  I wanted to make sure that our financial procedures and things

15  were in place, and they were implemented with fidelity.  So I

16  wanted to look at just our overall financial picture and make

17  sure that we were solid and we had accurate information that

18  had been conveyed for years in, in the district.  And so that

19  was my need for -- or my request for a forensic audit.

20  Q    Right.  So you asked the board for the audit.  What was

21  the reaction?

22  A    Several board members commented that they thought it was a

23  good idea.  I received approval from all of them to move

24  forward with drafting the RFP.  And so -- the RFP is a request

25  for a proposal.  So I, I received approval from all of them in

Adams - direct by Davis

1  doing -- moving forward to do that.  And initially all of the

2  board members voted that they thought it was a good idea or

3  they were in support of a forensic audit being completed.

4  Q    And that includes Tyrone Rogers.  Counsel said Tyrone

5  Rogers commended you for wanting to do an audit, right?

6  A    That's correct, yes.

7  Q    Okay.  Great.  So you then put together the RFP, the

8  proposal, right?

9  A    Correct.

10  Q    And let me bring up on the screen that proposal.  I'm

11  going to ask you to look at Exhibit 10.  Is that the RFP?

12         THE COURT:  I don't see anything yet, Counsel.  And

13  the jury's not going to see it until after I make sure he's got

14  it.  All right.  Any objection to the RFP being shown?

15         MS. SCHWENDENER:  No objection.

16         THE COURT:  All right.

17         MR. DAVIS:  Are you looking at the RFP?  Can we

18  publish to the jury.

19         THE COURT:  Yes.

20         MR. DAVIS:  Thank you, Your Honor.

21  BY MR. DAVIS:

22  Q    So what is this, Dr. Adams?

23  A    So the first document there is just a letter to all of the

24  board members sharing with them a copy of the RFP that was

25  going to be posted so that we would get bids so we can conduct

Adams - direct by Davis

1    the work.  And so this was a cover letter that went out with

2    the RFP for the forensic audit.

3    Q    And so if we scroll down through the RFP, is this what you

4    sent out to the board members on July 9th?  Did you circulate

5    this?

6    A    I did.  I circulated it to all of the board members on

7    July 9th.

8    Q    Okay.  And if we go to the scope of the audit.  Talk about

9    the scope of the audit.

10   A    The scope of the audit was going to include an

11   investigation of our financial practices that were in place.

12   What we were looking for was making sure we had checks and

13   balances that were appropriate for the district.  I also

14   included information or a scope that was looking at not just

15   the internal auditing practices but also our board members and

16   previous board members that had been a part of the school

17   district.  Because again, I wanted to gain a complete

18   understanding of how we were -- what we really looked like as a

19   district.  And so that was one of the things that was included

20   in the scope as well.

21   Q    So looking at No. 1 where it says, gain an understanding

22   of financial activities of the district.  This includes the

23   board members would be investigated as part of this audit,

24   current and former, correct?

25   A    That's correct.

Adams - direct by Davis

1  Q    So you sent this out on July 9th to all the board members.
2  And then what happened?
3  A    So I sent this out on July 9th, and I received a phone
4  call in the afternoon of July 9th from Tyrone Rogers.  And he
5  shared his displeasure with me having put particularly this
6  information in here with regards to board members and
7  investigating the board members as part of the forensic audit
8  that I was requesting to have done.
9  Q    Okay.
10  A    That conversation he called me in the afternoon of
11  July 9th, and he told me specifically that because of this
12  audit or because of this request that I was itching for an ass
13  kicking.
14  Q    Okay.
15  A    And that was this -- that I felt was totally
16  unappropriate -- inappropriate to do that.
17  Q    I understand.  So drawing your attention to Exhibit 11.
18  Oh, wow.  Here we go again.  I've got an unrotated document
19  here.  Let me have Exhibit 11.  Okay.  So looking at the
20  document.  Okay.  So this is exhibit --
21        THE COURT:  Any objection to this exhibit?
22        MS. SCHWENDENER:  No objection.
23  BY MR. DAVIS:
24  Q    This is Exhibit No. 11.  What is this, Dr. Adams?
25  A    That looks like my phone log from the cellphone that was

Adams - direct by Davis

1   issued by the district to me, and a listing of the calls that

2   were incoming as well as outgoing.

3   Q    And so did the district give phones, mobile phones to you

4   and all the board members?

5   A    That's correct.  Yes, they did.

6   Q    And were all of them on Sprint Mobile?

7   A    Yes.  Yes, they were.

8   Q    So drawing your attention down here to July 9th, the

9   incoming call.  Do you recognize that number?

10  A    Yes, that was the --

11              THE COURT:  Excuse me one second.

12              THE WITNESS:  I'm sorry.

13              THE COURT:  Which July 9th call?  You have got

14  numbers on the outside.

15              MR. DAVIS:  It's an incoming call at 4:31.

16              THE COURT:  What about the same, 77, 78, and 79?  Do

17  you see what I'm saying, Counsel?  There's more than one

18  incoming call on that day.

19              MR. DAVIS:  Right.  Well, I'm referring to a

20  particular number.  This number --

21              THE COURT:  Right.  But if you start on the outside,

22  it might be easier, but you have it marked.  However you wish

23  to proceed, go ahead.

24  BY MR. DAVIS:

25  Q    Okay.  So drawing your attention to 4:31 p.m.  Incoming

Adams - direct by Davis

1   call and the number is 708, what is that?  516-2875?

2   A    I think it's 2276, right?

3   Q    I should put my glasses on.  Okay.  All right.  Do you

4   recognize that number, Dr. Adams?

5   A    Yes, I do recognize that number.

6   Q    And whose number is that?

7   A    That is Tyrone Rogers'.  Mr. Rogers' phone number --

8   cellphone number, Sprint phone number.

9   Q    And again, this is on July 9th the afternoon?

10  A    Right.

11  Q    And how long did that call approximately?

12  A    About five minutes.

13  Q    Thank you, Dr. Adams.  I'll hand this back to you.

14       So what happened -- July 9th was a Thursday, right?

15  July 9th, 2015?

16  A    I believe it was a Thursday, yes.

17  Q    Okay.  So the next day was a workday, school day?

18  A    The next day was a --

19  Q    July 10th?

20  A    Yes, it was a school -- it was a workday, correct.

21  Q    So what happened on July 10th?

22       THE COURT:  Perhaps this is where we should stop.

23       MR. DAVIS:  Sure, Judge.

24       THE COURT:  I think this is a good spot.

25       MR. DAVIS:  This would be a good idea.

1          THE COURT:  All right.

2          MR. DAVIS:  I --

3          THE COURT:  All right.

4          MR. DAVIS:  I was going to bring Detective Wright in

5     for --

6          THE COURT:  I told you to watch your time.  I told

7     the jury 4:00.  How long is he expected to take?

8          MR. DAVIS:  10 minutes, Judge.

9          THE COURT:  It's up to the jurors.  Can we go ahead

10    and get this witness on and off?  It's one more down, which

11    means we're closer to being finished every one we do.  All

12    right.  If there's no objections, people don't have a train in

13    the next -- Counsel, he's going to have to come back if it's

14    4:15 and by then.  All right.

15         MR. DAVIS:  Well, I don't want to impose on the

16    jurors.

17         THE COURT:  No.  They're, they're letting me know.

18         MR. DAVIS:  I can -- we can make --

19         THE COURT:  They will let me know if they have a

20    train --

21         MR. DAVIS:  -- him come back, Judge.

22         THE COURT:  -- if they have a train.  I know he has

23    been waiting the entire day.

24         MR. DAVIS:  I know.  And that's why I was going to

25    try to --

82

1          THE COURT:  So if we could put him on, but you only

2     have the total of 15 minutes.  Remember they have to question

3     him also.  You may step down.  So --

4          MR. DAVIS:  Well, in that case, Judge --

5          THE COURT:  Okay.  Counsel, step over to the side.

6     Step over to the side.

7        (Sidebar proceedings out of the hearing of the jury:)

8          THE COURT:  All right.  Did you think I was playing

9     when I said 4:00 o'clock?

10         MR. DAVIS:  I didn't.

11         THE COURT:  You must have thought I didn't mean what

12    I said.

13         MR. DAVIS:  I didn't look back at the time.  That's

14    my mistake.

15         THE COURT:  We took a break, and I said it's

16    4:00 o'clock.  And I know he's been out there.  You all should

17    have figured -- you know, I don't know why he's been out there

18    since the morning.  And I know he's mad.

19         MR. DAVIS:  Let's bring him back, Judge.  Because if

20    they're going to cross him --

21         MR. PETRARCA:  We are, Judge.

22         MS. SCHWENDENER:  We are going to cross him.

23         MR. DAVIS:  And I don't want to PO these folks.

24         THE COURT:  Right.  Right.  No, the first day is when

25    they're still trying to get their heads around --

1          MR. DAVIS:  Exactly.

2          THE COURT:  Okay.  All right.  Thank you very much.

3          MR. DAVIS:  Thank you.

4     (Before the jury:)

5          THE COURT:  All right.  Ladies and gentlemen, we are

6     going to stop now and allow you to leave.  And remember that

7     you can't discuss this matter.  Don't do any independent

8     homework.  We will be starting up tomorrow -- I'll be here at

9     8:45.  You will be here at 9:30.  I have another call.  Again,

10    follow the directions.  Come to the side door.  Court will be

11    going on in here with other matters having nothing to do with

12    this.  Or we could actually be doing something on this that you

13    can't hear about.  All right.

14         So in the morning we'll see you at 9:30.  You'll

15    leave your pads in the back.  You will exit the door that my

16    deputy has told you is the door we exit.  All right.  Thank you

17    very much, ladies and gentlemen.  All rise.

18    (Jury excused.)

19         THE COURT:  You are still under oath.  And although

20    your counsel is questioning you, I'm not -- there's no reason

21    why you can't take your -- take your personal notebook with

22    you.

23         THE WITNESS:  Okay.

24         THE COURT:  You can take that back to the table if

25    you wish with you.  All right.  But you may be asked whether

1  you talked to your lawyer.  That's fair game.  All right.

2  Proceed.  Watch your step.

3            All right.  Counsel, I'm going to give you a chance,

4  unless there's something else on the record, to talk to your

5  witness out there.

6            MR. DAVIS:  Yes, Judge.

7            THE COURT:  See if you'll have him tomorrow.

8            MR. DAVIS:  My happy witness.

9            THE COURT:  All right.  So anything on the record

10 real quick before you go out, Counsel?

11           MR. DAVIS:  That's it, Your Honor.

12           THE COURT:  All right.  For now.  But don't leave.

13 Go do that.  I always meet back here for a few minutes.

14 Anything else on the record?

15           MS. SCHWENDENER:  No, Your Honor.

16           THE COURT:  All right.  I'll see you all back here

17 within seven minutes.  All right.  Thank you.

18           MR. DAVIS:  Thank you, Your Honor.

19     (Short break taken.)

20           THE COURT:  Anything on the record, plaintiff?  So

21 you want to tell me your schedule tomorrow.

22           MR. DAVIS:  I told Detective Wright to be here at 10.

23 And if he's here at 10, I would put him on quickly and let him

24 go.

25           THE COURT:  I bet you will.  All right.

1    (Laughter.)

2          MR. DAVIS:  He wasn't happy.  I had to remind him

3    he's still under subpoena.  He said he had some other

4    engagement.  I told him, I wouldn't mess with Judge Coleman if

5    I was you.

6          (Laughter.)

7          THE COURT:  Oh.  Okay.  Yes, that's why I get paid

8    those big bucks.

9          MR. DAVIS:  Absolutely, Judge.

10         THE COURT:  All right.  So any objection to them

11   doing what they're doing out of turn?

12         MS. SCHWENDENER:  No, Your Honor.

13         THE COURT:  All right.  So tomorrow we -- I need you

14   to be here -- I would say be here by 9:15.  Do we know -- we're

15   going to leave it at 9:30.  And if he shows up, he shows up.

16   He's on the lam, right?

17         THE CLERK:  Yes.

18         THE COURT:  Okay.  All right.  So we have -- we'll

19   start as close to 9:30 as we can.  We may be able to start just

20   with us a little before that.  I have a 9:30 case in which we

21   really don't expect anyone to show.  So that's where we are.

22         Anything else on the record to deal with for

23   tomorrow?  If you get here early enough, and I would say maybe

24   aim at 9:15.  You get here early enough, we can discuss the

25   issue that is still hanging out there about the two -- the

1   second -- Count 2 of the complaint, right, which is the

2   public -- the due process claim?

3           MS. SCHWENDENER:  Due process.

4           THE COURT:  All right.  So we can also look at that.

5   I remind everybody again to reread my order on that if you

6   haven't.  Okay.  Anything else from the plaintiff?

7           MR. DAVIS:  That's it, Your Honor.

8           THE COURT:  Defense, anything?

9           MS. SCHWENDENER:  No.

10          THE COURT:  All right.  I'm trying to work it out

11  that what I'll do is on -- just for scheduling, we will go all

12  day tomorrow and till 4:45 -- between 4:45 and 5 tomorrow, with

13  a lunch.  I will see if we can -- we'll see if we can cut them

14  to 45 minutes.  If I can, I will.  I don't like to do that, but

15  we will see.  On the 31st so we're going -- I'm going to ask

16  the jury to come at 9:15.  So hopefully we can start at 9:30

17  sharp at the latest, if not before.  I will ask them about

18  taking a shorter lunch.  And then my plan is we'll look at

19  their -- oh, wait a minute.  Did you get them back from them?

20  If you have the questionnaires, they have to be given to us

21  before you leave here today.

22          MS. SCHWENDENER:  Yes.

23          THE COURT:  The questionnaires that the jurors filled

24  out themselves have to be all in my hands.  Not your personal

25  notes.  Not your printed out list, but all the ones that they

1    wrote themselves.  I need all of those.  Usually I do that
2    before you get to orally argue.  So yes, the list you can keep.
3    It's the people's signed documents you can't.  All right.  I'll
4    look at their schedules and determine whether or not -- what
5    time we may have to break, whether it's 3 or 3:30 for
6    Halloween.  If somebody has to get a train, then I might have
7    to break at 3.  We'll see how we are on Wednesday.
8            And then on November 1st, again, we'll adjust as best
9    we can.  It probably won't be until -- more than likely it will
10   be a 9:45 start, regular start.  And then 4:30 Thursday is the
11   stop time.  I'll figure out with my class.  And then for
12   scheduling purposes again on Friday have them come in at 9:15.
13   And we'll see where we go.  It is my plan that you all talk
14   either on Thursday or even Halloween since we're getting out
15   early, where you all have your last and informal instructions
16   conference.  You can give to me -- let's make that Wednesday
17   the 31st.  And you can give me the very small packet of ones
18   that you object to.
19           All right.  And then that way my hope is on Friday we
20   get as much evidence in as we need to by that time and be able
21   to have a full jury instruction conference, you know, at
22   3:00 o'clock in the afternoon or something when the jury is on
23   its way.  Send them early and then we close on Tuesday.  That's
24   my plan.  So that's the plan we're going to try to stay on.  I
25   will cut minutes from here and there on their lunches or

1   whatever.  But that's where we are.  Please keep that in mind

2   with your witnesses and how long you take.  Again, either side

3   call somebody, you got to take into account the other side is

4   going to question them.

5           All right.  Anything else on the record for the

6   plaintiff?

7           MR. DAVIS:  Not on the record, Judge.  Housekeeping.

8           THE COURT:  All right.  Thank you.

9           MR. DAVIS:  Thank you, Judge.

10          MR. PETRARCA:  Thank you, Your Honor.

11          MS. SCHWENDENER:  Thank you, Your Honor.

12          THE COURT:  All right.  See you all in the morning.

13      (Whereupon, said trial was recessed at 4:15 p.m., to

14       reconvene on 10/30/18, at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25