```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   DR. DENEAN ADAMS,                  ) No. 15 C 8144
                                        )
 4                    Plaintiff,        )
                                        )
 5              v.                      )
                                        )
 6   BOARD OF EDUCATION HARVEY SCHOOL   ) October 30, 2018
     DISTRICT 152, GLORIA JOHNSON in her) Chicago, Illinois
 7   individual capacity, BETTY JOHNSON ) 9:30 a.m.
     in her individual capacity,        )
 8   DR. KISHA McCASKILL in her         )
     individual capacity, JANET ROGERS  )
 9   in her individual capacity, TYRONE )
     ROGERS in his individual capacity, )
10   LINDA HAWKINS in her individual    )
     capacity, FELICIA JOHNSON in her   )
11   individual capacity,               )
                                        )
12                    Defendants.       ) Trial

13                        VOLUME 2
                   TRANSCRIPT OF PROCEEDINGS
14   BEFORE THE HONORABLE SHARON JOHNSON COLEMAN, and a
                          jury
15

16   APPEARANCES:

17   For the Plaintiff:   MR. JEROME M. DAVIS, ESQ.
                          9024 McIntosh Court
18                        Lakewood, Illinois  60014

19   For the Defendants:  HAUSER IZZO PETRARCA GLEASON & STILLMAN
                          1415 West 22nd Street
20                        Suite 200
                          Oak Brook, Illinois  60523
21                        BY:  MR. CHRISTOPHER L. PETRARCA

22
             TRACEY DANA McCULLOUGH, CSR, RPR
23                Official Court Reporter
                219 South Dearborn Street
24                      Room 1426
                 Chicago, Illinois  60604
25                    (312) 435-5570
```

1  APPEARANCES CONTINUED:

2                              LAW OFFICES OF JENNIFER K. SCHWENDENER LLC
                               5117B Main Street
3                              Suite 4
                               Downers Grove, Illinois  60515
4                              BY:  MS. JENNIFER K. SCHWENDENER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (The following proceedings were had in open court outside

2       the presence of the jury:)

3          THE CLERK:  15 CV 8144, Adams versus Board of

4  Education Harvey School District 152.

5          MR. DAVIS:  Good morning, Your Honor.  Jerome Davis

6  for the plaintiff Dr. Adams.

7          THE COURT:  Good morning.

8          MS. SCHWENDENER:  Good morning, Your Honor.  Jennifer

9  Schwendener on behalf of the defendants.

10         MR. PETRARCA:  Good morning, Your Honor.  Chris

11  Petrarca also on behalf of the defendants.

12         THE COURT:  All right.  Thank you.  We have some

13  things I guess to clear up, and then you all can go ahead and

14  explain to me what the rest of my day is like today.  Starting

15  with plaintiff.  Or what you need -- what else you need to

16  discuss today.

17         MR. DAVIS:  Well, I expect Detective Wright in first

18  thing today, Judge.  And then I expect to continue with my

19  client.

20         THE COURT:  Now, when you say he's first thing today,

21  did you not say you told him 10:00 o'clock?

22         MR. DAVIS:  Yes.

23         THE COURT:  All right.  Well, I'm going to be ready

24  to start before then.  So we can go to your client for a little

25  while.  We can't, we can't afford to wait.  So I thought that

1     that's what you were saying when you said you told him 10 that

2     you wanted to finish up something else with her before you

3     started with him, and then go back to her.  Otherwise I would

4     have told you to tell him to come in at 9:30.

5             MR. DAVIS:  Okay.

6             THE COURT:  We'll be ready to go in five minutes.

7     And based on our schedule and the jurors' situation, I can't --

8     you know, I can't wait 20 minutes.

9             MR. DAVIS:  Okay.

10            THE COURT:  All right.

11            MR. DAVIS:  No problem, Judge.

12            THE COURT:  So unless he's here early, we'll just go

13     a little further with your client, and then we'll take the

14     break.

15            MR. DAVIS:  Okay.

16            THE COURT:  All right.  Anything else that you need

17     to bring up today?

18            MR. DAVIS:  Yes, I have a document here, it's dated

19     August 27th.  It's from Dreyer Medical Clinic, and this is from

20     Dr. Theresa Cunningham, and this indicates that Dr. Denean

21     Adams was under her care.  And that the patient would be going

22     out on a medical leave.  Now, this was not included as one of

23     my exhibits.  However, this is a document that was produced by

24     the District during discovery.

25            THE COURT:  Before we go any further, have you --

1   you're showing this now.  I'm assuming you have seen this

2   document?

3          MR. DAVIS:  No, we just --

4          THE COURT:  Okay.  One of my rules was that I didn't

5   expect you all to step up here and present something to me

6   without it being presented to each other.

7          MR. DAVIS:  I understand, Judge.

8          THE COURT:  All right.  So you all -- let's put that

9   to the side till she gets a chance to look at it.  You all talk

10  about it, and then we'll make sure that if -- hopefully you all

11  can work it out.  I mean, that's my plan.  That you show them

12  something, tell them how -- what the issue is, and they might

13  not have any issue at all.  If they do, you can work it out.

14  Putting that to the side for now.  Anything else, Counsel, on

15  your schedule today?  Or again, we're having a regular lunch

16  time.  Somewhere around 12.  It will be for an hour, and then

17  we'll go until maybe 5:00 o'clock.  4:45 to 5:00 o'clock today.

18  That's the schedule for the Court.

19         MR. DAVIS:  Another issue, Judge, that came up

20  yesterday in light of counsel's opening.

21         THE COURT:  All right.  Go ahead.

22         MR. DAVIS:  I believe she opened the door.  She

23  stated to the jury that my client missed 83 days during the

24  school year.  And, therefore, I think she opened the door to my

25  being able to explain to the jury that why she missed those 83

1   days.  That she was on a medical leave for most of that time.

2   Starting as this letter indicates August 27th, 2015, she was

3   under a medical care up and through March of 2016 when her

4   doctor put her on a unpaid FMLA medical leave.

5          And so I need to be able to give the jury some

6   context to understand what happened.  Otherwise the impression

7   is she just didn't show up for work.  And so I need to be able

8   to show the jury that beginning after July 10th and going

9   forward --

10          THE COURT:  The Court understands your issue.

11          MR. DAVIS:  Okay.

12          THE COURT:  Response.

13          MS. SCHWENDENER:  Yes, Judge.  Plaintiff was not on

14  an FMLA leave.  She did take a medical leave, but it was not

15  under FMLA.  And Miss Cunningham, who is plaintiff's counselor,

16  who apparently recommended the leave, my understanding is not

17  going to testify.  So I don't -- she was on the list, and I

18  don't know that she's still going to testify.  So I would think

19  that counsel could probably get that in through Miss

20  Cunningham's testimony.  But we didn't open up the door.  We

21  did indicate that she was -- we did indicate that she was

22  absent for most of the school year.

23          And I mean counsel certainly can I think refute that

24  through Miss Cunningham's testimony, but absent presenting Miss

25  Cunningham on the stand, I don't know -- it would be hearsay

1   and foundation to try to establish through plaintiff the

2   medical reasons why she was absent for that time frame.

3            THE COURT:  Well, I think plaintiff can say why she

4   was absent.

5            MS. SCHWENDENER:  But as far as the --

6            THE COURT:  She can say -- first of all, there's no

7   opening the door in opening statement such as that.  She made

8   an argument.  You have every right in your case in chief.  I'm

9   assuming that would be an issue you'd want to front anyway

10  because even if they didn't say that in opening argument, it

11  would come out that she had a big gap.  And so, you know, as to

12  any diagnosis or any -- the doctor's note itself, I mean, she

13  can say she received one.  As to the fact that she didn't,

14  didn't prepare it herself, you know, that would be a problem as

15  to whether it got in as evidence without them agreeing that she

16  wrote it.  But you can get in that she got a note from the

17  doctor.  She was sick.  She can testify to what she knows.

18           MR. DAVIS:  Exactly, Judge.  And counsel did say she

19  was out without -- she didn't get treated by a doctor.  She

20  made that point to the jury.  And --

21           THE COURT:  You can make it, you can make it clear,

22  Counsel.

23           MR. DAVIS:  And --

24           THE COURT:  All right.  Without referring to her --

25  again, I tell them at the beginning and at the end opening

1  statements are not evidence.  And so I'd be careful about

2  hitting too hard about what she claims the medical evidence

3  versus, you know, therapy evidence.  That really was not for

4  them to take under consideration.  So --

5           MR. DAVIS:  I understand that, Judge.

6           THE COURT:  -- you can bring it in.  I don't see any

7  reason why everything except if you don't have authority or a

8  basis, foundation for the actual letter other than that she can

9  say she gave a letter to her employers to support her time off.

10 She can say that.  You know, that's part -- you know, and she

11 has a letter.  But as to authenticating the letter, other than

12 she got it.  The contents of the letter that referred to a

13 specific diagnosis, that she can't.  But she can refer to the

14 letter, be shown the letter, and say yes, that's the letter I

15 gave to support my time off.  She can do all of that.

16          MR. DAVIS:  And that's all I want to do that, Judge.

17          THE COURT:  You can do all that.  That's normal

18 evidence.  So okay.

19          MR. DAVIS:  And beyond that, Judge, as I get into my

20 case, I need to talk to her about what she was experiencing

21 throughout the rest of the year that caused her to be in

22 treatment.

23          THE COURT:  Counsel, that's your case.  If you want

24 to ask her how she's feeling throughout the case, she's the

25 only one who can testify to that.

1      MR. DAVIS:  Thank you, Judge.

2      THE COURT:  Is there anything else that you need to

3  bring up now for at least the witnesses we have this morning,

4  which I'm assuming is just the officer and your client?

5      MR. DAVIS:  That's correct.

6      THE COURT:  All right.  And is there any chance that

7  the other side will get to cross-examination today?

8      MR. DAVIS:  Yes.

9      THE COURT:  Good.  All right.  Glad to hear it.  Glad

10  to hear it.  Anything else?  Let's see.  We have our schedule.

11  Defense, what do you have to bring up?

12      MS. SCHWENDENER:  Judge, if I could just make a

13  response to counsel's comment that he wants to get in how Dr.

14  Adams was feeling throughout the year, which is fine.  I just

15  want to make sure that we state our objection for the record

16  that counsel does not go into any disciplinary action or any of

17  the sham disciplinary proceedings that relate to Count 3 that

18  has already been dismissed by the Court.

19      THE COURT:  That's also -- the Court has dismissed

20  it.  Hasn't it also been the subject of the motion?

21      MS. SCHWENDENER:  Yes.

22      THE COURT:  And motions in limine?

23      MS. SCHWENDENER:  Yes.

24      THE COURT:  Then yes.  So if it's already been a

25  decision from the Court, I don't see how counsel can bring that

1    in.  Counsel.

2         MR. DAVIS:  Well, Judge, I don't want to bring in --

3    again, we're back to this issue of the pleadings.  And, you

4    know, counsel keeps making this point that because you

5    dismissed Count 3, all the allegations, all the evidence

6    pertaining to the retaliation, which we say started in August

7    and continued through --

8         THE COURT:  Hold on one second.  All right.  Go

9    ahead.

10        MR. DAVIS:  Well, we're back to this issue, Judge, it

11   makes -- it doesn't make much sense for me to say how were you

12   feeling during the year and I can't tell the jury why she was

13   feeling that way.  She was feeling that way because she was

14   constantly being hit with sham discipline --

15        THE COURT:  But that you can't bring in.  You can

16   just -- you can -- there's other ways to put this information,

17   Counsel.  And referring to, oh, I was sick because of sham

18   discipline, that goes directly to --

19        MR. DAVIS:  Well --

20        THE COURT:  That goes directly to what I dismissed,

21   and that's not coming out.  That's not something they're going

22   to decide.  She can talk about how they treated her.  How she

23   was being treated.  Use that word.  She can talk about problems

24   on the job.  She was being -- you know, not happy.  People

25   weren't treating her well.  She can say things like that, but

1  to say sham discipline, the Court -- that --

2          MR. DAVIS:  Well, that's my terminology, Judge.

3          THE COURT:  Well, but either -- no, it's not just

4  your -- I mean, I know.  It's part of the -- it was part of the

5  pleadings, and the Court had addressed it.  But that, that

6  cannot be used.

7          MR. DAVIS:  I simply want her to be able to say I had

8  a proceeding in August where they were giving me performance

9  directives.  In November they gave me a notice to remedy that

10  outlined a number of things.  In December I was suspended with

11  pay because of a number of things, and throughout this period

12  she was being treated by a doctor.  And that ultimately in

13  April she did go on a FMLA.  The exhibit is in the exhibit list

14  that she filed an FMLA form.  That's all I want to establish,

15  Judge.  I'm not going to talk about the contract nonrenewal.  I

16  just want to establish for the jury what she was experiencing

17  in context.

18          THE COURT:  Response.

19          MS. SCHWENDENER:  Yes, Judge.  Again, that's getting

20  back into Count 3, which was already dismissed.

21          THE COURT:  Well, wait.  Well, the problem is,

22  Counsel, you just keep going to Count 3.  This whole case is

23  about how she was treated, retaliation.  The fact that he chose

24  to plead it the way he pled it and got -- Count 3 was thrown

25  out, that does not negate certain facts, which are that this

100

1   matter was ongoing.  Now, as to how he emphasizes each of these

2   matters, that's a different issue, Counsel.  You know, going

3   through step by step by step of some of the things that

4   might -- would be either prejudicial -- overly prejudicial and

5   not relevant, and because they may have been just confined to

6   Count 3, then yes, you better step cautiously, or the Court --

7   there may be an objection and the Court grants it.

8            I can't really make a full decision on this because

9   it's intertwined.  It's a job issue.  She's being disciplined,

10  and she wants to talk about how this problem on her job over

11  several years or over a certain time period has affected her.

12  But this is really what's left here is about the retaliation

13  and about what happened after her call for the audit.  Am I

14  correct?

15            MS. SCHWENDENER:  Right, Judge.  Yes.

16            THE COURT:  And so that's why they're saying you

17  can't just go through all of the step by step disciplinary

18  issues because all of them are not relevant here anymore,

19  correct?

20            MS. SCHWENDENER:  Correct, Judge.  Yes, the, the --

21            MR. DAVIS:  Well -- okay.  I understand.

22            THE COURT:  She can talk about her treatment.  She

23  can talk about her relationship on the job.  She can talk

24  about, you know -- again, you all know the case better than I

25  do.  There's some places where it is going to cross.  But to do

1    a step by step by step of disciplinary actions that had nothing

2    to do with the audit, that have -- that you can show have

3    nothing to do with the audit, they're listed that she got

4    disciplined for X, that's not going to be allowed.

5         MR. DAVIS:  Judge, we introduced into evidence the

6    deposition sworn testimony of Tyrone Rogers that everything

7    they did started with August 18th and was predicated on in our

8    view the July 10th police statement.  And that in his words

9    everything that happened thereafter was a progression all the

10   way up to the point where she left the district.  Where even at

11   that point they were still trying to terminate her before the

12   end of her contract on June 30th.  So that's their words.  That

13   evidence is there.

14        THE COURT:  Well, it's not -- the evidence is not

15   here yet.

16        MR. DAVIS:  Well, I'm just saying I want to be able

17   to present that evidence.  And if they want to counter it, they

18   can.  I'm not going to present it in the context of saying

19   Count 3 or it's a separate retaliation claim.  I'm simply

20   trying to show that the retaliation was not confined to

21   rescinding the contract in August.

22        THE COURT:  And is that -- and is that what -- is

23   that what the -- the retaliation of the audit, of her doing --

24        MR. DAVIS:  The retaliation was not based on the

25   audit, Judge, but based on the police report.

```
 1              THE COURT:  And -- well, audit leading to police
 2    report.  But it sounds like there's some other stuff here that
 3    you want to get in that have nothing to do with that.
 4              MR. DAVIS:  Well, all of this -- again, the
 5    progression started from the police report, and at that point
 6    they wanted to get rid of her.  They wanted to fire her, Judge.
 7              THE COURT:  Are you talking about anything that's
 8    happening before the audit?
 9              MR. DAVIS:  In terms of discipline?
10              THE COURT:  Of discipline.
11              MR. DAVIS:  No.
12              THE COURT:  All right.  Counsel.
13              MS. SCHWENDENER:  Judge, again it goes to relevance,
14    and it's going to be prejudicial to my client.  The retaliatory
15    act in response to the police report was rescinding her
16    one-year contract extension and issuing the performance
17    directives.  That's a part of the complaint, and that's what
18    plaintiff testified to.
19              THE COURT:  Part of the complaint.  But I think he
20    testified to just the overall there's more injury, isn't that
21    true?
22              MR. DAVIS:  Yes, Judge.  And --
23              THE COURT:  Counsel, I'm not talking to you.  I'm
24    talking to her.
25              MR. DAVIS:  I'm sorry.
```

1      MS. SCHWENDENER:  No, plaintiff test -- the

2  retaliatory act in response to her filing a police report was

3  the district issuing the performance directive on August 17th

4  of 2015, and the vote to rescind her contract on August 17th,

5  2015.  Any additional and -- disciplinary acts that came after

6  that in November of 2015, December of 2015, the nonrenewal of

7  her contract, the suspension without pay, and issuing a notice

8  to remedy, plaintiff testified and which was pled in her

9  complaint was that was in retaliation to her filing the

10 lawsuit, which is no longer a part of the case.

11     So if plaintiff is allowed to bring in all these

12 additional retaliatory acts that have nothing to do with the

13 filing of her police report, it's going to be prejudicial to

14 the defendants because the jury is going to hear all these

15 other additional acts that have nothing to do with, with her

16 filing a police report.  And it's, it's going to be prejudicial

17 to the defendants.  It's going to give the presumption that

18 they took all these additional steps, which really were

19 relating to the filing of her police report, which has already

20 been dismissed by the Court.

21     So we're not objecting to how plaintiff was treated

22 up until the August 17th, 2015 Board meeting or any

23 disciplinary actions relating up to that point.  But to allow

24 plaintiff to go into how she was treated at the district, you

25 know, beyond, beyond that is going to give -- going to give the

1    presumption that she continued to be -- that the district

2    continued to retaliate against her, when that's already been --

3    that related to the filing of her lawsuit, which is no longer a

4    part of the case.

5             THE COURT:  The filing of her lawsuit versus the

6    filing of the --

7             MS. SCHWENDENER:  The police report.

8             THE COURT:  And you distinguish between those two?

9    Other than obviously in the complaint he had a certain count

10   that was separate.

11            MS. SCHWENDENER:  Correct.

12            THE COURT:  And again, that's part of the pleading

13   too, Counsel.  So go ahead and respond.  On the other hand, the

14   Court could open up some rebuttal depending on if you open

15   doors to make her sound just like a horrible employee across

16   the board, and they had a reason to get rid of her.  That opens

17   the door to him saying, well, wait a minute.  There are all

18   these -- if he's calling them frivolous actions or actions that

19   were questionable just because of the fact that she filed a

20   lawsuit.  It all depends on how you paint her also.  If you

21   confine your presentation to that, then maybe he doesn't have

22   to come back with that.

23            Right now I'm going to make this ruling to be able to

24   get us started here.  And that is that, sir, you are confined

25   right now not to all of the other disciplines.  You are

1  confined to the audit and the police report and the filing of

2  the police report.  Those are the things -- and you can talk

3  about her medical condition later on, and you can do -- you

4  know, based on how I was treated at work, a general statement

5  that this, this happened and I had to take off of work, and I

6  had a note.  And I gave them the note to support that, and it

7  was from a whatever type of doctor it is.  Right now --

8          MR. DAVIS:  So we can bring her back on redirect?

9          THE COURT:  I'm not saying that you will.  I'm saying

10  right now you can ask for that.  Right now we're going to go

11  ahead with her testimony with the limitations that have been

12  stated.  Even though as far as the document -- and what number

13  is it, this document?

14          MR. DAVIS:  It hasn't been given a number yet, Judge.

15          THE COURT:  Okay.  Well, let me say the letter dated

16  what date?

17          MR. DAVIS:  August 27th.

18          THE COURT:  The letter dated August 27th --

19          MR. DAVIS:  2015.

20          THE COURT:  -- of 2015 will be allowed to be used.

21  And just the substance of the letter cannot be set forth

22  because she's not a doctor and she didn't write the letter, but

23  she can use the letter and point out why she needed the letter,

24  and that she gave it to her supervisors and was allowed to have

25  time off.

```
 1              MR. DAVIS:  And that she continued in treatment?
 2              THE COURT:  Oh, yes, she can say that she continued
 3    in treatment, yes.  She just can't as a layperson give the
 4    diagnosis.
 5              MR. DAVIS:  And she was in treatment because of what
 6    she was going through at her --
 7              THE COURT:  At work in general?  Yes, in general.
 8              MR. DAVIS:  -- at her job.
 9              THE COURT:  In general, yes, she can say that.  All
10    right.  In general.  Okay.  She can't go blow by blow about
11    each disciplinary action.  At least not at this point.  And,
12    you know, when we take a break at lunch or before they do their
13    cross, if you have something more to argue, I'll listen to it.
14    Okay?
15              MR. DAVIS:  Okay, Judge.  Thank you.
16              THE COURT:  All right.  All right.  Thank you.
17              MS. SCHWENDENER:  Thank you, Judge.
18              THE COURT:  Let's get -- are we ready to go?  We got
19    everybody.  Everybody is here.
20         (Short break taken.)
21              THE COURT:  All right.  Anything else on the record,
22    plaintiff?
23              MR. DAVIS:  That's it, Your Honor.
24              THE COURT:  Defense.
25              MS. SCHWENDENER:  No, Your Honor.
```

                    Wright - direct by Davis

1           THE COURT:  Dr. Adams, please step --

2           MR. DAVIS:  Detective Wright is here, Your Honor.

3           THE COURT:  Oh, the detective is going to be first.

4           MR. DAVIS:  I asked him to step in.

5           THE COURT:  Okay.  All right.  We're ready.  All

6    right.

7       (Before the jury:)

8           THE COURT:  Good morning, ladies and gentlemen.  You

9    may have a seat.  All right.  Ladies and gentlemen, we are

10   going to -- we are in the middle of hearing evidence.  We are

11   going to take a brief recess from the plaintiff's testimony.

12   This is at the plaintiff's request to allow the detective,

13   who's been called to be here to testify and go back to what his

14   regular job is.  All right.  Sir, please step up.

15      ROBERT WRIGHT, PLAINTIFF'S WITNESS, DULY SWORN

16          THE COURT:  All right.  Keep your voice up.  And

17   obviously you know to wait until objections are made to

18   continue an answer.  All right.  And if you need water, it's

19   there.  Proceed, Mr. Davis.

20          MR. DAVIS:  Thank you, Your Honor.

21                    DIRECT EXAMINATION

22   BY MR. DAVIS:

23   Q    Good morning, Detective Wright.

24   A    Good morning, sir.

25   Q    I'm Jerome Davis.  We've spoken briefly yesterday.  I'm

Wright - direct by Davis

1    counsel for the plaintiff Dr. Denean Adams in this lawsuit.

2         Can you state your name and occupation.

3    A    Detective Robert Wright, Harvey Police Department.

4    Q    And how long have you been with the Harvey Police

5    Department, Officer?

6    A    10 years January.

7    Q    And as part of your job, are you called to routinely go

8    out on calls, investigate calls, take complaints from citizens?

9    A    Yes, I am.

10   Q    Okay.  And walk me through how that process works if I

11   want to make a complaint to the police in Harvey.

12   A    Okay.  If you want to make a complaint, anybody has the

13   right to file a complaint.  They would call what's our

14   dispatch, 911 Center to say they have a complaint.  At that

15   time dispatch would dispatch a officer to the complainant or

16   victim depending on what it is to find out what the call is,

17   and then go from there.

18   Q    Okay.  And an officer like you might be dispatched to a

19   call?

20   A    Correct.

21   Q    And what do you do when you get there?  What happens?

22   A    You find who the complainant is.  Talk with the

23   complainant and find out what -- if there is a crime that was

24   committed, and then go from there also.

25   Q    Okay.  So you make out a report or how do you document --

Wright - direct by Davis

1    A    Correct.

2    Q    -- your conversation?

3    A    Regardless if you -- whatever the complaint is you're

4    going to make a report regardless.  Now, depending on your

5    report is what you would title it to depend on what the actual

6    scenario or case was.

7    Q    So explain that to me.

8    A    So, for example, if you had somebody that, that was shot,

9    you would pretty much title that a battery right off the bat.

10   Q    Okay.

11   A    A lot of times your dispatch would know exactly what's

12   going on before the officer ends up into -- you know, going in

13   front of that situation so that they're trying to cover

14   themselves at the same time.  Sometimes you have dispatch will

15   send you to a information call, whereas they're not sure

16   exactly what the complainant's thought pattern is.  So you're

17   going over to find out what the, what the actual incident is.

18   And sometimes you have to title it information just to get the

19   report rolling or get that process going.

20   Q    But either way you make a report --

21   A    Correct.

22   Q    -- when you interview a complainant?

23   A    Correct.  Yes, sir.

24   Q    So drawing your attention to July 10th, 2015.  Were you

25   working for Harvey Police Department then?

110

Wright - direct by Davis

1   A    Yes, I was.

2   Q    Okay.  And do you -- were you dispatched to go to the

3   school in Harvey District 152 on July 10th to meet with Dr.

4   Denean Adams?

5   A    Yes, I was.

6   Q    And you came -- tell me what happened.

7   A    The call was dispatched.  My chief, which was Denard Eaves

8   at the time, who has since retired, dispatched me to go and,

9   and talk with Dr. Adams to find out what the -- to get

10  information, because I don't think he was a hundred percent

11  sure of what was going on.  Once I got there, I spoke with Dr.

12  Adams, and she informed me that she had some issues with one of

13  the Board members for 152, which I believe it was Tyrone

14  Rogers, but she wasn't ready to pursue anything at that time.

15  She just wanted to let me know that there were, you know,

16  things that, that were said, and she wanted to pretty much

17  handle it with the Board first or she wanted to present it to

18  the Board first to see if they could handle it in-house as far

19  as maybe HR or something of that nature.

20          At that time I had pretty much said no, no problem.

21  If you decide that you want to, you know, pursue any further,

22  give me a call back, and I can come back.  But I'm going to do

23  an information report stating that we talked and what had

24  happened.

25  Q    So specifically what did she tell you happened with regard

Wright - direct by Davis

1  to Tyrone Rogers?  Do you recall?

2  A    Nothing on the 10th.  Nothing on the 10th.  I think she

3  was going to hold it for herself because she wanted to talk to

4  the Board personally before she went any further.

5  Q    She didn't tell you what happened?  How her interaction

6  went with Dr. -- I'm sorry, with Tyrone Rogers?  She didn't

7  tell you what he did, what he said, any of that?

8  A    She told me it was inappropriate the way he spoke -- what

9  he had spoke to her, but I never got a quotation of what

10 actually was said until the 13th.

11 Q    Okay.  Did you do a report that day?

12 A    Yes.

13 Q    And if I show you the report, can that refresh you --

14 A    It probably would --

15 Q    -- on what happened?

16 A    -- 'cause it's been about three or four years, so, yes,

17 sir.

18 Q    Okay.  Thank you.

19         THE COURT:  One second.  One second, Counsel.

20 There's an objection?

21         MS. SCHWENDENER:  There's an objection.

22         THE COURT:  You need to say it.

23         MS. SCHWENDENER:  Objection, Judge, yes.

24         THE COURT:  All right.  Basis of the objection?

25         MS. SCHWENDENER:  Hearsay and inappropriate -- or not

Wright - direct by Davis

1   proper refreshing of a witness' recollection and --

2          THE COURT:  Well, first of all, I didn't hear him say

3   he needed his recollection refreshed until counsel offered to

4   give him something to refresh his recollection.  So on that

5   basis sustained.

6   BY MR. DAVIS:

7   Q    Are you clear on the conversation that you had with Dr.

8   Adams a couple years ago on the 25th -- July 10th, 2015,

9   Detective?

10         THE COURT:  Do you remember it, sir?

11         THE WITNESS:  I remember the conversation.

12         THE COURT:  All right.

13         THE WITNESS:  By and large.

14         THE COURT:  All right.

15         THE WITNESS:  I, I couldn't tell you that because I

16  haven't, I haven't read that report in years.  So I know

17  that --

18         THE COURT:  Well, sir, right now we're not asking --

19         THE WITNESS:  I'm not sure.

20         THE COURT:  -- what the report says.

21         THE WITNESS:  Oh, yes, sir -- yes, ma'am.

22         THE COURT:  We're asking if you can remember facts --

23         THE WITNESS:  The content.

24         THE COURT:  -- without the report.

25         THE WITNESS:  Say that one more time, please.

Wright - direct by Davis

1      THE COURT:  Can you remember facts without the

2  report?  Everything you've testified to answering Counsel's

3  questions --

4      THE WITNESS:  Correct.

5      THE COURT:  -- have come from your memory, is that

6  correct?

7      THE WITNESS:  Correct.  Yes, ma'am.

8      THE COURT:  All right.  Has there been any need for

9  you to look at the report up to this time?

10      THE WITNESS:  Not as of yet, no, ma'am.

11      THE COURT:  All right.  Counsel, ask your questions.

12  BY MR. DAVIS:

13  Q    Well, if I ask you specifically what Dr. Adams said, could

14  you recall that now without looking at the report?

15  A    If that be the case, no, not word for word verbatim.

16  Q    So if I showed you the report, would that refresh your

17  recollection --

18  A    Yes, it would.

19  Q    -- of what she said?

20  A    Yes, it would.

21  Q    Thank you.

22      THE COURT:  Sir, do you have a paper copy for

23  refreshing recollection?  If not, I'll make sure that I just

24  make sure he sees it only.

25      MR. DAVIS:  I do have a paper copy.

Wright - direct by Davis

1    THE COURT:  All right.  If you have the paper one, it
2  would be fine.  Or if you want to put it up, just warn me so I
3  can make sure the jury doesn't see it.  Only the witness sees
4  it.  This is only for refreshing recollection, so the jury
5  cannot see it.
6    MR. DAVIS:  I will show you a paper copy.
7    THE COURT:  Of the report, right?  Sir -- so,
8  Detective, just look over the report, and let us know when you
9  have looked at it.  And then it will be taken away.  It's only
10  to refresh your recollection.  It's not for you to read it to
11  the jury.  All right.  All right.  You finished?  All right.
12    THE WITNESS:  Yes.
13    THE COURT:  Thank you.
14    THE WITNESS:  Thank you.
15  BY MR. DAVIS:
16  Q    And is that your report?
17  A    Yes, it is.
18  Q    And what's the date on it?  The date that you made this
19  report.
20    THE COURT:  It would be the same -- go ahead.
21    THE WITNESS:  It was in July of 2015.
22  BY MR. DAVIS:
23  Q    You want to see -- you want to look at it again?
24  A    Yeah, I wasn't looking at the date.  I was just --
25    THE COURT:  Well, the question is I guess, sir, to

Wright - direct by Davis

1  move this along, was it the same day that you saw her --

2  　　　　THE WITNESS:  Yes, same, same day.

3  　　　　THE COURT:  -- or the next day?  Can you give us

4  that?

5  　　　　THE WITNESS:  No, same day.

6  　　　　THE COURT:  All right.

7  　　　　THE WITNESS:  Same day, yes.  Yes.  Yes.

8  BY MR. DAVIS:

9  Q    Okay.  So now that you've had a chance to look at the

10 report, can you tell me what Dr. Adams said to you?

11 A    She had had a verbal -- she had a verbal confrontation

12 with Tyrone Rogers, and she felt that it was inappropriate.

13 Q    Were those her exact words?  Is that what you documented

14 in your report?

15 A    Correct.

16 Q    Does it say inappropriate, or does she say what he said to

17 her?

18 A    No, it says inappropriate.  It doesn't say what she said

19 because that wasn't told till three days later.

20 　　　　MR. DAVIS:  Well, now, Judge, I'm going to have to

21 ask to for impeachment purposes read the report, because I

22 don't see anywhere in the report where it says inappropriate.

23 I see --

24 　　　　THE COURT:  Counsel.

25 　　　　MS. SCHWENDENER:  Objection.

Wright - direct by Davis

1    THE COURT:  Counsel, let's step to the side.  Step to

2    the side.

3    MR. DAVIS:  Okay.

4    (Sidebar proceedings out of the hearing of the jury:)

5    THE COURT:  You're impeaching your own witness?

6    MR. DAVIS:  At this point actually I see where he did

7    say inappropriate.  So I'm not going to do that.  I'm going to

8    withdraw that, Judge.

9    THE COURT:  Okay.  Thank you.

10   MR. DAVIS:  It's in the next report.

11   THE COURT:  Okay.  Thank you.

12   (Before the jury:)

13   BY MR. DAVIS:

14   Q    Okay.  Back, Detective Wright.  So you were saying that

15   you met with Dr. Adams and she told you -- say again what you

16   just said.

17   A    Say again which part?

18   Q    What did she tell you happened?

19   A    She had a conversation with Tyrone Rogers which she felt

20   was inappropriate.

21   Q    Okay.  And you testified she told you she didn't want to

22   file a police report at that point.  She wanted to try to work

23   it out with the Board members?

24   A    Correct.

25   Q    And you told her if she later changed her mind, call you

17

Wright - direct by Davis

1  back?

2  A    Correct.

3  Q    And this was on Friday, July 10th, correct?

4  A    Correct.

5  Q    Did you have -- were you working on July 13th, 2015?

6  A    Yes, I was.

7  Q    The following Monday in Harvey?

8  A    Yes, I was.

9  Q    Did you have an occasion to receive a call from Dr. Denean

10 Adams to be dispatched again to the school?

11 A    No, I did not.  No, sir.

12 Q    Okay.  Did you meet with Dr. Adams on July 13th?

13 A    Yes, I did.

14 Q    And how did that come about?

15 A    My chief of police Denard Eaves told me to --

16         MS. SCHWENDENER:  Objection, hearsay.

17         THE COURT:  I'm sorry.  As to what his chief told

18 him.  Just tell us what happened next without telling us who

19 told you what to do.  You can't say what the chief told you to

20 do.  You can say you talked to your chief, and then what you

21 did.  Do you understand?

22         THE WITNESS:  Yes.  It's like it's --

23         THE COURT:  You cannot say what someone else told

24 you.  That's objectionable.

25         THE WITNESS:  I responded to a call.

Wright - direct by Davis

1          THE COURT:  Okay.

2          THE WITNESS:  To go to see Dr. Adams.

3    BY MR. DAVIS:

4    Q    Okay.  And you went back to the school, right?

5    A    Correct.

6    Q    And you met with Dr. Adams?

7    A    Correct.

8    Q    And what did she tell you at that meeting?

9    A    I can't recollect unless I get a chance to look at that

10   report.

11          MR. DAVIS:  May I, Judge.

12          THE COURT:  And which report is it?  Is it another

13   report?

14          THE WITNESS:  It's the 13th.  Yes, the second report

15   that I wrote.

16          THE COURT:  All right.  The second report.  You may

17   approach.  Are you complete with the report, sir?

18          THE WITNESS:  Yes.

19          THE COURT:  All right.  Thank you.

20   BY MR. DAVIS:

21   Q    And this is a report again that was authored by you,

22   right --

23   A    Correct.

24   Q    -- Detective Wright?

25   A    Correct.

19

Wright - cross by Schwendener

1  Q    What did Dr. -- based on what you read in the report, what
2  transpired when you met with Dr. Adams on the 13th?
3  A    She informed me that she spoke with the school district
4  and they advised her to pursue any avenues that she wished to
5  pursue.  And that's when she informed me about what the actual
6  statement was that Tyrone Rogers made to her, which I put in
7  parenthesis and quotations, you're itching for an ass whipping.
8  Q    And did she tell you how that statement came about?
9  A    Yes.  She told me because she was doing an audit of 152,
10 District 152's financial background, which I'm not sure of what
11 that entails.
12           MR. DAVIS:  Thank you, Detective.  No further
13 questions.
14           THE WITNESS:  Yes, sir.
15           THE COURT:  All right.  Any cross-examination?
16           MS. SCHWENDENER:  Thank you, Judge.
17                CROSS-EXAMINATION
18 BY MS. SCHWENDENER:
19 Q    Good morning, Detective.
20 A    Good morning.  How are you?
21 Q    No criminal charges were filed against Mr. --
22           MR. DAVIS:  Objection, Judge.  Beyond the scope of my
23 direct.  My direct went to --
24           THE COURT:  Counsel, there's no speaking objections.
25           MR. DAVIS:  I'm sorry, Judge.

120

Wright - redirect by Davis

1        THE COURT:  Beyond the scope, overruled.  This is

2   cross-examination.  She can ask.

3   BY MS. SCHWENDENER:

4   Q    No criminal charges were filed against Mr. Rogers in

5   response to the alleged threat against Denean Adams, correct?

6   A    No, not at that time, no.

7        MS. SCHWENDENER:  Thank you.  No further questions.

8        THE COURT:  Redirect.

9        MR. DAVIS:  Yes, Judge.

10             REDIRECT EXAMINATION

11  BY MR. DAVIS:

12  Q    Does the fact that no criminal charges are filed mean that

13  you determined that Tyrone Rogers didn't do what Dr. Adams said

14  he did?

15  A    Not at all, sir.

16       MR. DAVIS:  Thank you.

17       THE COURT:  Anything else?

18       MS. SCHWENDENER:  No, Your Honor.

19       THE COURT:  Thank you, Detective, for waiting for

20  today.

21       THE WITNESS:  Yes, ma'am.

22       THE COURT:  Appreciate it.

23    (Witness excused.)

24       THE COURT:  All right.  Dr. Adams, you may retake the

25  stand.  Watch your step.  You're already sworn, ma'am.

21

Adams - direct by Davis

1        THE WITNESS:  Thank you.

2        THE COURT:  All right.  Same rules apply as

3    yesterday.

4        THE WITNESS:  Yes, ma'am.

5        THE COURT:  Anytime you're ready, Mr. Davis.

6    DR. DENEAN ADAMS, PLAINTIFF, PREVIOUSLY SWORN

7        DIRECT EXAMINATION (Resumed)

8    BY MR. DAVIS:

9    Q    Good morning, Dr. Adams.

10   A    Good morning.

11   Q    We just heard Detective Wright talk about meeting with you

12   on the 10th at the school.  What happened after you met with

13   Detective Wright on the 10th?

14   A    On July 10th, on July 10th after meeting with Detective

15   Wright I received a visit from one of the board members Janet

16   Rogers, who --

17   Q    Let me stop you.  Do you see Janet Rogers?

18   A    I do.

19   Q    I see she came to court today.  She didn't --

20       THE COURT:  Counsel.

21       MR. DAVIS:  I'm sorry, Judge.

22   BY MR. DAVIS:

23   Q    Do you see Janet Rogers in court?

24   A    Yes, I do.

25   Q    Would you point her out for the jury.

Adams - direct by Davis

1  A    Yes, she is second in the first row on the defendants'

2  side.

3  Q    Thank you.

4  A    You're welcome.

5  Q    Continue, please.

6  A    So on July 10th after speaking with Detective Wright, I

7  received a visit from board member Janet Rogers, who came to my

8  office at that time and shared with me that she was -- that she

9  wanted to have a special board meeting, and that during that

10  special board meeting she had some concerns about my

11  performance and she wanted to address specifically an issue

12  with Echo.  Echo was the co-op that we shared services with for

13  special education students in the district.

14  Q    Okay.  And she was telling you this so you could put --

15  call together the meeting?

16  A    Correct.  So the normal procedure was that you would

17  inform the superintendent and you would inform the board

18  president as well.  At that time my board president was Gloria

19  Johnson.  And so she -- I can't remember if she said she had

20  spoken with President Johnson already.  But she did say that

21  they were going to schedule a special board meeting.

22  Q    Is Miss Johnson in court today?

23  A    Yes, sir.

24  Q    Could you point --

25         THE COURT:  Please use first names and Johnson

123

Adams - direct by Davis

1    together.  We have too many Johnsons.

2                MR. DAVIS:  Okay.

3    BY MR. DAVIS:

4    Q    Is Gloria Johnson --

5    A    Oh, I'm sorry.  Yes, Gloria Johnson.

6    Q    Can you point her out?

7    A    Yes.  Former President Gloria Johnson is sitting in the

8    first seat on the defendants' side.

9    Q    Thank you.  So --

10                THE COURT:  I'm sorry.  With the cap on?

11                THE WITNESS:  With the cap, yes, ma'am.

12   BY MR. DAVIS:

13   Q    Okay.  So what happened -- again, we're still on

14   July 10th -- after your meeting with Janet Rogers?

15   A    After that meeting with her, it was a very brief meeting.

16   Just an exchange of information there.  And then because it was

17   the summer, we were on half days for Fridays, and so at that

18   point I do believe the office was closed, and we were able to

19   go home at that point.  And that was the end of that exchange

20   with her on the 10th.

21   Q    Okay.  Did you subsequently have any other communication

22   with her or from her --

23   A    Yes, I --

24   Q    -- on that day?

25   A    I later received an e-mail copy of the items that she

Adams - direct by Davis

1  wanted placed on the agenda for that meeting.  That special

2  meeting that was being called.

3  Q    And I'm going to show you what we have labeled as

4  Plaintiff's Exhibit --

5           THE COURT:  10?

6           MR. DAVIS:  15 actually.  I clicked on the wrong one.

7  Exhibit -- Plaintiff's Exhibit 15.  And can I publish this,

8  Your Honor.

9           THE COURT:  First you can publish it to the --

10          MR. DAVIS:  Can you see it, Dr. Adams?

11          THE COURT:  Now she can.

12          THE WITNESS:  Yes.

13          THE COURT:  All right.  Any objection to publishing

14  Exhibit 15?

15          MS. SCHWENDENER:  No, Your Honor.

16          THE COURT:  All right.  Thank you.  Proceed.

17  BY MR. DAVIS:

18  Q    So can you describe what this is, Dr. Adams.

19  A    Yes.  That was a copy of the e-mail or the attachment to

20  the e-mail that I received on July 10th following that meeting

21  in the office, in my office.  And it identified for me and for

22  President Gloria Johnson the items that Mrs. Rogers was

23  requesting be placed on the agenda for the special board

24  meeting that was scheduled on July 22nd.

25  Q    And where it says under executive session I would like to

Adams - direct by Davis

1   include the following, can you read those two bullet points?

2   A     Yes.  The first one says, review of superintendent's

3   personnel file.  And the second bulleted item says possible

4   disciplinary action against a central office administrator.

5   Q     Okay.  Thank you.  And so Detective Wright testified that

6   he met with -- so after the 10th -- the 10th was a Friday,

7   right?

8   A     Correct, yes.

9   Q     So you told him -- we heard what he said you told him?

10  A     Yes.

11  Q     What happened after that during the weekend?

12  A     So over the weekend I felt -- I, I had conversations with

13  my husband, my family and just shared with them what happened.

14  I was very upset about the conversation.  Having received that

15  response from a board member about the audit and then a

16  subsequent meeting from his wife about where we were going to

17  go or what we were going to do next.  Or the action that I felt

18  that they were going to start or take with me.  So I was pretty

19  distraught by that.  I had been in the district for two years

20  and just felt like if -- I'm sorry.

21             THE COURT:  Excuse me.

22             THE WITNESS:  I'm sorry.

23             THE COURT:  Counsel, we need a question.  She can't

24  just --

25             THE WITNESS:  I'm sorry.

726

Adams - direct by Davis

1    MR. DAVIS:  Okay.

2    THE WITNESS:  I'm sorry.

3    THE COURT:  No.  No.  You're fine.

4  BY MR. DAVIS:

5  Q    Thank you, Dr. Adams.  You spoke with your family about

6  the incident, right?

7  A    Yes.  Correct.

8  Q    And did you make any decisions with your family?

9  A    I did.  I decided that I was going to pursue a police

10 report on Monday when I returned to work.  I felt threatened.

11 I felt that my safety was a concern in that district at that

12 point, and I wanted to make a record of what had occurred.

13 Q    So what did you do?

14 A    So on the 13th I reached out to -- I did contact the

15 police chief and I believe I also contacted Detective Eaves --

16 I'm sorry, Detective Wright.  And subsequently Detective Wright

17 came to my office.  I told him I wanted to follow up with him

18 from our conversation from Friday.

19 Q    Now, let me back up.  You told Detective Wright when you

20 first met him you wanted to try to work it out with the board.

21 What did you do in connection with that?

22 A    I did.  So on Friday sometime between -- after the time --

23 I believe it was after the time I left the office, I did reach

24 out to President Gloria Johnson to have a conversation with

25 her.  I shared with her -- she wasn't available, but she called

1  me back later that day, that evening on Friday.  So in our

2  conversation I shared with her what happened on that Thursday

3  with Mr. Rogers, the threat that I had received.  And I asked

4  her if she could take the matter up with the board, and she

5  said she would look into it.  I don't remember her exact words,

6  but I know she said she would have some conversations or

7  something.  And, and I'm assuming that she did at that point.

8  Q    So after that conversation, between then and Monday did

9  you ever hear from Gloria Johnson again or any board member?

10 A    I believe I spoke with Gloria Johnson again, and she

11 shared with me when I talked with her the second time that she

12 had spoken with Mr. Rogers, and that he did not admit saying

13 those things to me.  And she said if he -- the first step to

14 solving a problem is that a person has to admit that there's a

15 problem.  Those were the words that she said to me.  And then

16 she -- and that was it, and that was the extent of our

17 conversation.

18 Q    So how did you feel after that?  Did you feel --

19 A    Yes, I felt like I needed to -- I felt threatened again.

20 I felt like it was on me.  I needed to take care of this

21 situation myself.  That's how I felt.

22 Q    So what did you do next?

23 A    So then that was part of my decision for moving forward

24 with trying to file a formal police report.  Again, to

25 solidify, document what had transpired in the district or from

28

Adams - direct by Davis

1   that phone call.

2   Q    And after you met with Detective Wright on the 13th, did

3   you have any other contact or communication from Janet Rogers?

4   A    I did.  On July 13th I received a revised agenda for the

5   upcoming meeting on July 22nd.  And it went to myself and I

6   believe it was also sent to our then board president Miss

7   Gloria Johnson.

8           MR. DAVIS:  And I'm going to show the witness

9   Plaintiff's Exhibit 16.

10          THE COURT:  Any objection to publishing 16?

11          MR. PETRARCA:  Can we see the whole thing, Your

12  Honor.

13          THE COURT:  You can go ahead and start asking

14  questions.

15          MS. SCHWENDENER:  Yes, no objection.

16          THE COURT:  There is no objection?

17          MS. SCHWENDENER:  No objection.

18          THE COURT:  All right.

19  BY MR. DAVIS:

20  Q    So can you see item 16, Dr. Adams?

21  A    I can, yes.

22  Q    And what is this?

23  A    That was the revised items for the upcoming special board

24  meeting that was scheduled for July 22nd.

25  Q    And this is from?

Adams - direct by Davis

1   A    This was from Janet Rogers.

2   Q    Okay.  And basically what, what is she saying here?  We

3   could all read it, but summarize it for us.

4   A    Basically this was a list of all the items that she wanted

5   placed on the agenda to be discussed at the, the upcoming

6   meeting.

7   Q    And she wanted the attorney to be present --

8   A    Correct.

9   Q    -- at the meeting?

10  A    Correct.

11  Q    Okay.  And so yesterday counsel indicated that Attorney

12  Izzo, the board -- who is Attorney Izzo?

13  A    Attorney Izzo was one of the board's attorneys.  He often

14  sat in our board meetings.  He provided counsel to the board as

15  a board.

16  Q    Okay.  And yesterday counsel indicated that you asked him

17  to come to the special board meeting on the 22nd.  Do you

18  remember that?

19  A    I remember the statement, yes.

20  Q    And the statement -- she also talked yesterday saying that

21  Attorney Izzo advised the board that the contract extension

22  wasn't effective.  You remember that?

23  A    I remember that statement.

24  Q    And counsel indicated that you were the one who wanted him

25  to come to the meeting to discuss that on the -- at the special

Adams - direct by Davis

1  board meeting on the 22nd, is that correct?

2  A    That's what was said yesterday.  However, that's not

3  accurate.

4  Q    Okay.  What really happened?

5  A    So I received concerns, complaints in addition to Mr.

6  Rogers' threat, but also a couple of other board members that

7  talked about the scope of the audit that had been -- the RFP,

8  the request for the proposal for the audit.  And that the scope

9  of that audit was so broad and it had included specifically in

10  No. 1 an investigation with -- that involved board members.

11  And so what I was told to do was to ask -- I'm sorry.  Ask

12  Attorney Izzo to attend the meeting so that we could talk about

13  item No. 1 from that, that request for a proposal to clarify

14  what exactly that scope would mean, what it might look like,

15  and if we needed to, in fact, take it out of the RFP, the

16  proposal.

17          MR. DAVIS:  So I'm showing the witness, Your Honor,

18  exhibit -- Plaintiff's Exhibit 19.  I'd like to publish also to

19  the jury.

20          THE COURT:  All right.  First of all, is there any

21  objection to publishing?  And, Counsel, you don't have to wait

22  for the publishing.  If you want to start asking her questions,

23  you can once she sees it.

24          MR. DAVIS:  Okay.

25          THE COURT:  Publishing can always come up later.  Is

Adams - direct by Davis

1    there an objection?

2            MS. SCHWENDENER:  No objection.

3            THE COURT:  All right.  Thank you.

4    BY MR. DAVIS:

5    Q    Can you see Exhibit --

6            THE COURT:  She can.  She's been able to see it since

7    you called it up.

8            MR. DAVIS:  Okay.

9            THE WITNESS:  Yes.

10   BY MR. DAVIS:

11   Q    What is this, Dr. Adams?

12   A    That is a copy of the e-mail that I sent to Attorney Izzo

13   on July 19th requesting that he does attend the meeting, but

14   it's specifically to address the proposal that was sent out

15   to -- for the forensic audit.  And this was at the request of

16   the board members.

17   Q    So what does it mean I've heard complaints regarding No.

18   1?  Refresh us.  What was No. 1?  What does that mean?

19   A    No. 1 from the proposal dealt with an investigation of

20   looking into the financial interactions, dealings from the

21   board members, current and past board members.  And so the

22   scope included those pieces relating to the board.

23   Q    And so who were you getting complaints from about that?

24   A    I received complaints from a couple of board members.  I

25   specifically remember Mr. and Mrs. Rogers having some concerns

Adams - direct by Davis

1  with it being with the board members being included in that.

2  At the time President Gloria Johnson shared that she thought

3  the scope was so broad, and we needed to narrow the scope of

4  the forensic audit.  I think those were the three.  Those are

5  the three that I recall getting complaints from.

6  Q    And yesterday counsel said Tyrone Rogers wanted the audit.

7  He commended you on having the audit, right?

8          MS. SCHWENDENER:  Objection.

9  BY MR. DAVIS:

10 Q    Do you recall that?

11         THE COURT:  Objection, basis?

12         MS. SCHWENDENER:  Misstates the --

13         THE COURT:  Opening statement.

14         MS. SCHWENDENER:  -- opening statement.

15         THE COURT:  All right.  Yes, Counsel, it's

16 inappropriate questions to continue to refer to what counsel

17 said in opening statement.  The jury has been already

18 instructed opening statement is not evidence.  Proceed.

19 BY MR. DAVIS:

20 Q    Okay.  Well, let me play something for you, Dr. Adams.

21 This is going to be a audio tape from the retreat in June of

22 2015.  I've already shared these tapes with counsel.

23         THE COURT:  Thank you.

24         MR. DAVIS:  This is going to be our Exhibit 71.  This

25 is going to be volume VN810183.  And it's from the June 2015 --

133

Adams - direct by Davis

1    MS. SCHWENDENER:  Objection, Your Honor.

2    THE COURT:  Basis?  Did you have an objection to this

3  before?

4    MS. SCHWENDENER:  I did, Your Honor, yes.

5    THE COURT:  All right.  And before meaning in the

6  motions in limine?

7    MS. SCHWENDENER:  Yes.

8    THE COURT:  You want to give me the number.  Counsel,

9  if this matter was objected to, why are we bringing it up if

10  this Court ruled?

11    MR. DAVIS:  Because Your Honor only ruled that we

12  would need to have a foundation laid.  You didn't rule that the

13  tapes were inadmissible.

14    THE COURT:  All right.

15    MR. DAVIS:  And you asked the parties --

16    THE COURT:  All right.  Thank you.  I'm trying to

17  find out where it is in my order.  Counsel, is there a way you

18  can go on and ask another set of questions while I look this

19  up?

20    MR. DAVIS:  Sure.

21    THE COURT:  Thank you.

22  BY MR. DAVIS:

23  Q    So you remember at the retreat when you first brought up

24  the audit, right?  You addressed the board?

25  A    Yes, I do.

34

Adams - direct by Davis

1   Q     And every -- all of the board members were present, all
2   the defendants in this case?
3   A     Yes, they were.
4   Q     Including Tyrone Rogers?
5   A     Yes, he was.
6   Q     And what was Tyrone Rogers' response when you said you
7   wanted to have the audit?
8   A     Mr. Rogers was fine with that.  He actually said that it
9   was a good thing that I was looking out for the money of the
10  district or something along those lines.  But he did say he
11  thought it was a good idea to go ahead and proceed with an
12  audit at that point.
13  Q     And this is June 2015, correct?
14  A     This was June of 2015, correct.
15  Q     Did Mr. Rogers' view change after June 2015?
16        MS. SCHWENDENER:  Objection.
17  BY MR. DAVIS:
18  Q     Let me ask it this way:  You submitted or circulated the
19  actual -- so the board gave you permission, said go ahead do
20  this.  And then what did you do?
21  A     So the board gave me permission at the retreat to go ahead
22  and put together the RF -- the proposal so that we could get
23  someone to come in and complete the audit.  So from June --
24  from the retreat through July 9th is when I worked on drafting
25  the proposal for the audit.  On July 9th is when the audit was

Adams - direct by Davis

1   actually circulated to the board members.

2   Q    Right.  And we've gone over --

3   A    Yes.

4   Q    -- Mr. Rogers' reaction to that.

5   A    Yes.

6   Q    So at the July 22nd --

7            MR. DAVIS:  What I'd like to publish, Judge, is

8   Tyrone Rogers at the July -- at the June retreat which Dr.

9   Adams just testified about, and I'd like to publish him at the

10  July 22nd board meeting.

11           THE COURT:  And again, you're talking about audios?

12           MR. DAVIS:  Yes.

13           THE COURT:  All right.  And the Court has stated that

14  without proper foundation of what the state of the tape is, her

15  knowledge of the tape as a true and accurate recording, under

16  what circumstances it was recorded, and when it was recorded.

17  That has to be a foundation you have to lay with the jury here.

18           MR. DAVIS:  Right.  I understand that, Judge.

19           THE COURT:  All right.

20           MR. DAVIS:  But you also --

21           THE COURT:  And I reserved the ruling until I heard

22  that you --

23           MR. DAVIS:  Right.

24           THE COURT:  -- you did that.

25           MR. DAVIS:  And you also said that the lawyers should

Adams - direct by Davis

1  get together during the pretrial conference --

2          THE COURT:  Counsel, let's have a sidebar.

3          MR. DAVIS:  Okay.

4      (Sidebar proceedings out of the hearing of the jury:)

5          THE COURT:  You can't keep making statements that are

6  general.  Either ask for a sidebar.  When you start talking

7  about what the lawyers said, the jury doesn't need to hear all

8  this.

9          MR. DAVIS:  Okay, Judge.

10         THE COURT:  That's an inappropriate comment in front

11 of the jury.

12         MR. DAVIS:  Okay.

13         THE COURT:  All right.  So yes, I said the lawyers

14 should get together.  If you don't get together --

15         MR. DAVIS:  And I gave her the list, Judge.

16         THE COURT:  But if you don't get together, either you

17 have to -- if you know he's going to go and try it or if you

18 want to continue to try it, somebody needs to tell me that

19 before I bring the jury out.

20         MR. DAVIS:  She didn't object to the list, Judge.

21         MS. SCHWENDENER:  That's not correct, Counsel.

22         THE COURT:  I've got in writing she objected if a

23 foundation wasn't laid, and asked this Court to reserve it

24 until then.  So it's in my order.

25         MS. SCHWENDENER:  It's number --

Adams - direct by Davis

1    MR. DAVIS:  After you issued your order at the

2    pretrial conference, you said lawyers do this everyday, and you

3    didn't want to get involved.  You wanted a stipulation.  I then

4    circulated to her a list of the tapes.

5        MS. SCHWENDENER:  That's not --

6        MR. DAVIS:  She didn't respond with any objection

7    saying that she had a problem with the tapes or the

8    authenticity of the tapes.  And so I expected when I came in

9    here today, that I'd be able to play the tape.

10        THE COURT:  I understand exactly -- wait a minute.  I

11    understand what he's saying.  If there was no nailing down of

12    your positions.  But, on the other hand, Counsel, that doesn't

13    mean she abdicated.  You just went ahead and assumed that

14    because she didn't respond the way you wanted to that she was

15    saying yes.  From here on out please both sides know, you all

16    are very contentious, you're very adversarial, the chances of

17    somebody agreeing to something by silence are slim to none.  So

18    if you want to make sure you don't have this kind of

19    interruption, which will definitely delay this trial probably

20    past Tuesday, then you need to address those things.

21        Judge, I just want to make sure there's no problem

22    with me getting in the tapes because I am going to use them.

23    We can have it out before the jury comes in.  Or, Judge, we

24    want to make sure he's not playing those tapes that he referred

25    to, and you can have it out right then.  Otherwise we'll be

Adams - direct by Davis

1  doing sidebars all day long.  And right now we've done more

2  sidebars just in these two days than I've done in my last three

3  trials.  All right.

4         MR. DAVIS:  And I've got a lot of tapes, Judge.

5         THE COURT:  So --

6         MR. DAVIS:  And I don't want to waste a bunch of time

7  every day --

8         THE COURT:  Well, first of all --

9         MR. DAVIS:  -- arguing about these tapes.

10         THE COURT:  -- if you have a lot of tapes, then

11  that's an issue.  And that's also something we should have

12  dealt with with the scheduling of this trial.  What you were

13  talking about is not a six-day trial.  You're talking about a

14  two-week trial on a very simple set of issues.  And so, you

15  know, I don't know.  We're going to have to figure out

16  something.  I looked up the train reports.  Round Lake is an

17  hour and 40 minutes by train.  She only has certain trains she

18  can take.

19         MR. PETRARCA:  Who's this, Your Honor?  I'm sorry?

20         THE COURT:  This is one of the witnesses --

21         MR. PETRARCA:  Oh, I'm sorry.

22         THE COURT:  One of the jurors.

23         MS. SCHWENDENER:  The jurors.

24         THE COURT:  So, you know, she has to -- if she leaves

25  at 5 -- she does have school age children.  If she leaves at

Adams - direct by Davis

1    5:15 or a 5:25 train, she doesn't get home till 7 every night.

2    She doesn't get to her town and her car till 7.  So this is not

3    a case I can keep pushing until 6 or 7 every night.  I can't do

4    that.  She has to leave 5:30 in the morning to get here for

5    your trial.  So either we're going to be one less juror, which

6    I don't have a problem with because we can go down to six.  But

7    I'm just letting you know you're stretching this out.  You

8    know, and I can only -- you know, I've got court calls.  I can

9    only keep switching stuff.

10              MS. SCHWENDENER:  Judge --

11              MR. DAVIS:  I had hoped to work this out, Judge.  As

12   I said, I gave them all of the tapes.

13              THE COURT:  Right now what's your, what's your

14   objection to a fourth tape?  What's the objection?

15              MS. SCHWENDENER:  Well, Judge, first of all, we -- I

16   did ask counsel at the pretrial conference to send me the -- he

17   just identified four tapes that he wants to show the jury.  He

18   did not identify the dates, the, the portions.  I have no

19   idea --

20              THE COURT:  Step back.

21        (Before the jury:)

22              THE COURT:  All right.  Ladies and gentlemen, please

23   rise.  All right.  We're going to handle this, so you can relax

24   while we handle this.  We'll take about 10 minutes.  Please

25   step out.

Adams - direct by Davis

1        (Jury excused.)

2            THE COURT:  All right.  Ma'am, you're under oath.

3    Step down, step outside the doors.  Thank you.

4        (Brief pause.)

5            THE COURT:  All right.  So there's how many tapes,

6    four?

7            MR. DAVIS:  There's a list.  It must be a dozen

8    tapes, but I'm not talking about playing the whole tapes,

9    Judge.  I'm talking about small snippets.

10           THE COURT:  Okay.  So --

11           MR. DAVIS:  Some of them 30 seconds out of 12

12   different tapes.

13           THE COURT:  So this is what I want done within less

14   than five minutes, get your lists of tapes, sit down on the

15   same side, and you talk about the tapes real quick, and then

16   I'll come back out.  All right.

17           MR. DAVIS:  Thank you, Judge.

18       (Short break taken.)

19           THE COURT:  All right.  First of all, Counsel, Mr.

20   Davis, did you get a -- were you able to read the Court's

21   ruling while you were out on this issue, on the motions in

22   limine?

23           MR. DAVIS:  The motion in limine, Judge?

24           THE COURT:  Yes.

25           MR. DAVIS:  No, I haven't looked at it since it

Adams - direct by Davis

1  was -- we first dealt with it.

2  THE COURT:  All right.  The Court would suggest you

3  have it nearby during trial.  But defendant's motion No. 14, as

4  I was saying on the side, specifically as to barring any of the

5  closed session audio recordings, and that's what we're talking

6  about, right?

7  MR. DAVIS:  Right.

8  THE COURT:  It says here, first of all, the Court

9  would reserve this ruling until you can demonstrate foundation,

10  authentication, identification of the speakers, and a

11  permissible basis for the admissibility.  It's the last part

12  that you may not have focused on, the permissibility.  I'm

13  assuming, first of all, she sued the board members; is that

14  correct?

15  MR. DAVIS:  Yes.

16  THE COURT:  And the majority of them are here, or

17  they're either available to be here.  She's here.  So on what

18  basis would the -- would it be able to be brought in in the

19  case in chief when everybody's here to testify to what

20  everybody said?

21  MR. DAVIS:  If I could address first your order,

22  Judge.  I read your order thoroughly.  I understood your order.

23  And you said you would reserve the issue.  You didn't say no

24  tapes would come in.

25  THE COURT:  No.  I said I'd reserve it.

Adams - direct by Davis

1        MR. DAVIS:  Yes.

2        THE COURT:  If there's -- it's been either way, but

3   they've already stated an objection.

4        MR. DAVIS:  Right.

5        THE COURT:  But even still, reserve my ruling.  I

6   focused on the last words permissible basis for admissibility.

7        MR. DAVIS:  I understand, Judge.

8        THE COURT:  The Court just asked you a question.  I

9   don't want you to go back.  I want you to answer what's the

10  admiss -- basis for admissibility of the tapes.

11       MR. DAVIS:  They are admissions, Judge.  And they are

12  admissions of parties.  And, therefore, they're not hearsay,

13  and they would come in as admissions of a party to go to

14  showing their intent and what they did and why they did what

15  they did.

16       THE COURT:  And you think that should be able to come

17  in regardless of whether the people are here to actually

18  testify to it?

19       MR. DAVIS:  Well, they would come in for impeachment.

20       THE COURT:  Impeachment, there you go.  The Court

21  totally agrees with that.  Even though there still has to be

22  some authentication.  Meaning you have to show they're showing

23  who they are on the tapes, or there's some way to tell that

24  each person is who they are who's on the tapes.  You have to be

25  able to show the date.  You have to be able to show who took

Adams - direct by Davis

1    them, all of that, which I'm assuming -- and that's why I was

2    asking, if it's a closed session audio, that you all should be

3    able to work -- that was one reason I said that, I'm sure these

4    are not just like phone tape -- cellphone tapes.

5               MR. DAVIS:  Right.  And that's what I've tried to do,

6    Judge.

7               THE COURT:  They are regular -- but bringing them in

8    in your case in chief when she can testify to what was there,

9    impeachment is one thing.  Case in chief is something else.

10   And so that's -- that is not admissible.  That's not seen as

11   best evidence when it's only the tapes.  This isn't a, a

12   shakedown of a drug buy where people have to see what's going

13   on.  Or there's some other unidentified or, you know,

14   confidential informant that's not in front of the Court.

15              MR. DAVIS:  I don't think admissions, Judge, are

16   limited to impeachment.

17              THE COURT:  Well, what's your case for that?

18              MR. DAVIS:  I think admissions are broadly used.  I

19   cited cases in my papers saying that admissions is the heart of

20   the adversarial system.

21              THE COURT:  And, Counsel, the Court did not say you

22   couldn't use admissions.  The Court said tapes versus -- where

23   she's the witness here, she can testify to what any of these

24   defendants said.  She can say however it is.  If someone else

25   says it and it's not correct, you can impeach them on it.  You

Adams - direct by Davis

1  can use it as rebuttal if someone says something later on that

2  you say the tapes don't say.  I don't even need a witness on.

3  You're right, you could play the tape in rebuttal.

4         But for case in chief for you to go through tape by

5  tape with someone who was there and who can say what was said,

6  this Court believes is inappropriate, and unless you have case

7  law to show me otherwise.

8         MR. DAVIS:  Judge, I was going to do it because

9  counsel frankly misrepresented to the jury in my opinion --

10         THE COURT:  Counsel, she can't -- but it's opening --

11         MR. DAVIS:  -- yesterday.  I understand it was

12  argument, but people are people.  And I just don't think

13  lawyers should just throw things out there that they know

14  aren't true.  And forgive me, that's my view ethically and as a

15  professional.

16         THE COURT:  All right.

17         MR. DAVIS:  And I wanted to be able to convey to the

18  jury what this man said and put it in context.  Now --

19         THE COURT:  You will be able to convey to the jury

20  what this man said by asking your client.

21         MR. DAVIS:  And I'll do that, Judge.  And I'll

22  reserve the tape for when he's on the stand.

23         THE COURT:  All right.

24         MR. DAVIS:  And in the interim I will once again try

25  and work out with counsel stipulations to avoid these delays,

Adams - direct by Davis

1   which I understand is impingent upon the Court's valuable time.

2           THE COURT:  It's not the Court's valuable time.  I'm

3   here.  It's really the jury's time.  We want to make sure we

4   don't lose the jury, and we want to make sure the jury -- their

5   time is put to use.  The Court is here.

6           MR. DAVIS:  I understand, Judge.

7           THE COURT:  The Court is here.  It's not -- my time

8   is the taxpayers' time, you know.  Except for a cemetery issue

9   on Monday, I'm here.  All right.  Counsel.

10          MS. SCHWENDENER:  Judge, just for the record, counsel

11  continues to indicate that I have misrepresented facts during

12  the opening.

13          THE COURT:  The Court already dealt with it.

14          MS. SCHWENDENER:  And --

15          THE COURT:  The Court understands opening statement

16  is a statement.  And I've said it multiple times to the jury,

17  and I can even -- I will make sure it's part of my instructions

18  at the end.

19          MR. DAVIS:  Absolutely.

20          THE COURT:  You know, that what the lawyers say is

21  not evidence.  I have said that.  And, you know, you could have

22  objected a little earlier actually, and then it would have

23  stopped sooner.  The Court would have intervened, but the Court

24  believes I ruled on your objection.  I made the statement to

25  the jury about your comments not being evidence, and we move

Adams - direct by Davis

1  on.  All right.

2          MS. SCHWENDENER:  Thanks, Judge.  And then for the

3  record for -- with regards to the tapes, counsel and I did

4  speak at the pretrial last week.  I did ask counsel to send me

5  the list of tapes because they were just identified as tapes 1,

6  2, 3, and, and one was dated.  I did not receive anything from

7  counsel.  We did confirm, and it was sent to an old e-mail

8  address and not my current e-mail address, so I did not receive

9  anything until just a few minutes ago with regards to the tape.

10          THE COURT:  All right.

11          MS. SCHWENDENER:  So I don't want the --

12          THE COURT:  Well, I don't want there to be fault

13  assessed to either side.  You evidently took a leave or left

14  where you were.  He didn't have the proper e-mail.  I don't

15  know if it was properly forwarded or put on the docket or

16  whatever.  That's a no harm, no foul on either side as to

17  anybody being at fault for that.  These are tapes that I'm

18  assuming your client gave --

19          MS. SCHWENDENER:  Correct.

20          THE COURT:  -- to them.

21          MR. DAVIS:  Yes.

22          THE COURT:  So they are tapes you have.

23          MS. SCHWENDENER:  Correct.

24          THE COURT:  So as to what he's going to use.  Again,

25  as we go from here on, I don't think any tape's going to be

147

Adams - direct by Davis

1   used at least for the next bit of testimony, is that correct?

2           MR. DAVIS:  No.  No, Judge.

3           THE COURT:  All right.  So he's going to go through

4   it.  And then if you want to discuss during the lunch break if

5   it's going to be used or how you will use it, that's fine.  But

6   when I come out and say -- or if when they go I say, is there

7   anything that we need to discuss, that's anything.  So if you

8   think that there's going to be an issue with something, that's

9   the time to discuss it with me.  Like I said, it can be

10  anything as mundane as we don't have water in our carafe, to

11  there's going to be prejudicial evidence and we want to front

12  it.  All right.  Or we want to make sure there's no problem.

13  That's fine too.

14          And if everybody says, oh, no problem, that I love.

15  It's kumbaya.  That's fine.  If it's not and you say, Judge,

16  you still haven't ruled on that or, Judge, we got the

17  impression it's all okay and the defense says, well, no, it

18  isn't, then it's on.  We do it before the jury comes out or

19  during the break.  All right.  That would be my preference, but

20  there's some things that can't go on in front of the jury like

21  speaking objections, taking digs at each other.  That I will

22  take a sidebar for every time.  And then if it continues, I

23  will actually make my comments from the bench without a

24  sidebar.  Everybody understand me?  Plaintiff?

25          MR. DAVIS:  Yes, Judge.

Adams - direct by Davis

1    THE COURT:  Defense.

2    MS. SCHWENDENER:  Yes, Judge.

3    THE COURT:  All right.  Thank you.

4    MR. DAVIS:  Thank you, Your Honor.

5    THE COURT:  Anything else before the jury comes back

6  out?

7    MR. DAVIS:  That's it, Judge.

8    THE COURT:  Let's get your client in.  Have her on

9  the stand.

10    MR. DAVIS:  Thank you.

11    (Before the jury:)

12    THE COURT:  All right.  Thank you for allowing us

13  that break.  We're going to go till lunch.  And proceed with

14  your questions.

15    MR. DAVIS:  Thank you, Your Honor.

16  BY MR. DAVIS:

17  Q    So before we had an intermission, Dr. Adams, we were

18  talking about Tyrone Rogers' view of the audit both before he

19  received the RFP on July 9th and after.  And how would you

20  characterize his view of the audit before at the retreat and

21  after July 9th?

22    MS. SCHWENDENER:  Objection.

23    THE COURT:  Form of the question sustained.

24  BY MR. DAVIS:

25  Q    At the June 22nd meeting what did Tyrone Rogers say with

149

Adams - direct by Davis

1  regard to the audit?

2  A    At the meeting that we had regarding the audit, prior

3  to -- once -- prior to there was -- every board member was in

4  agreement with me completing an RFP, a proposal for the audit,

5  including Tyrone Rogers.  He thought it was a good idea.  He

6  actually said, you know, I -- he commended me for looking out

7  for the finances of the district or something to that effect is

8  what he said at that time.

9          THE COURT:  All right.  Question.

10 BY MR. DAVIS:

11 Q    And did his view change after you released the proposal on

12 July 9th?

13 A    Yes --

14         MS. SCHWENDENER:  Objection.

15         THE COURT:  Basis?  Basis?

16         THE WITNESS:  Speculation.

17         THE COURT:  Did his view change.  Form of the

18 question sustained.  Just what did he do on the next date.

19 BY MR. DAVIS:

20 Q    What happened -- what did he say after he received the

21 proposal on July 9th, in particular at the July 22nd board

22 meeting?

23 A    At the board meeting his view changed from I commend you

24 for doing that to who do you think you are?  We are the board.

25 We're not going to be investigated.  We don't work for you.

Adams - direct by Davis

1  You work for us.  That's -- those are some of the quotes that I

2  remember him saying at that meeting.

3  Q     Thank you.  What else happened at that meeting on

4  July 22nd?  This is the special meeting Janet Rogers called.

5  What else happened of note at that meeting?

6  A     During that special meeting there was discussion on the

7  items that had been presented on the agenda.  The board -- the

8  board members asked questions about an Echo billing statement

9  that had been done.  There was a list of maybe four or five

10 things that were discussed at that July 22nd meeting.  And it

11 was in the form of a discussion.  One was with summer work

12 hours.  One was, as I said, the Echo bill.  One was something

13 related to contracts -- signing of contracts, instructional

14 contracts.  And then there was another item that dealt with --

15 I can't remember the fourth item, but, but it was a list of

16 things that were on the agenda.

17            THE COURT:  Excuse me.  There's no drinks in the

18 courtroom.

19 BY MR. DAVIS:

20 Q     And so were these just talking points, or were these

21 things they said you did wrong?  What was the nature of the --

22 A     These were items that had been placed on the agenda

23 because they were -- I was being asked about these things.

24 What happened with these things and if I, in fact -- these were

25 the performance things that Mrs. Rogers brought up in terms of

Adams - direct by Davis

1  me having to discuss what they were or where we were with those

2  items.

3  Q    Right.  And before July 22nd had any of these items been

4  brought up?

5  A    In a meeting, no.  These were the items that Mrs. Rogers

6  shared with me on that July 10th.

7  Q    Well, even outside of a meeting, had you ever had any

8  disciplinary report or any communication from the board saying

9  we're concerned about these things before July 10th?

10 A    No.  No.

11 Q    So these are all things that came up after July 10th?

12 A    Correct.

13 Q    Okay.  And so what happened next at the meeting,

14 July 22nd?

15 A    So July 22nd that meeting we went into executive session

16 and had discussions about each of the items that were listed on

17 that agenda.  The board -- after we went through those items,

18 then President Gloria Johnson said that we would -- that there

19 was no action -- I don't remember the exact words that she

20 used.  But then she did mention something about my contract or

21 thinking about the contract extension that was granted.  She

22 shared a statement about that before we left executive session

23 on that day.

24 Q    And the nature of the statement, if you recall?

25 A    The nature that I recall from the statement was that they

152

Adams - direct by Davis

1   were looking into it because there was something wrong with the
2   execution of that contract, or that extension.
3   Q     And again, you had never heard that before July 10th?
4   A     That's correct.
5   Q     And the extension was granted again when?
6   A     The extension was voted on by all board members in
7   February of that year, so February of 2015.
8            MR. DAVIS:  How are we for time, Judge?  I've got
9   another 10, 15 minutes.
10           THE COURT:  Oh, you're fine.
11           MR. DAVIS:  Okay.  Great.
12  BY MR. DAVIS:
13  Q     So fast forward to August 17th, 2015, Dr. Adams.  What
14  happened on August 17th?
15  A     August 17th, 2015 was a regularly scheduled board meeting,
16  and we proceeded through the business of the board in open
17  session.  We went into executive session on August 17th, and we
18  had discussions again around several items.  One being the Echo
19  billing, one being the summer work hours.  I believe one being
20  the contracts I do believe.  And so in executive session the
21  board -- representatives from the board just talked about these
22  items that we had and what was going -- and what was the status
23  of each one.  Because I was to bring back information about the
24  Echo billing at that August 17th meeting.  And so I shared the
25  information that had been put together regarding that billing

Adams - direct by Davis

1  and how we were going to proceed forward at that meeting.  And
2  then --
3  Q    Let me stop you there.
4  A    Okay.
5  Q    I want to show you something.
6  A    Okay.
7  Q    I want to show you Plaintiff's Exhibit 22.  Can you see
8  it?
9  A    I can, yes.
10            MR. DAVIS:  And I'd like to publish this, Your Honor.
11            THE COURT:  Any objection?
12            MS. SCHWENDENER:  No objection.
13            THE COURT:  All right.  It will be published.
14  BY MR. DAVIS:
15  Q    What is this, Dr. Adams?
16  A    This was a partial performance evaluation and directives.
17  This is what I was handed after the August 17th -- or at the
18  end of the August 17th executive session or board meeting that
19  evening.
20  Q    So just so I'm clear, did you get these before the
21  meeting?  Did you get this document before the meeting?
22  A    No.  This was handed to me after the meeting.
23  Q    Okay.  And these performance directives, it says they were
24  dissatisfied with your performance.  And let's look at these.
25            You keep -- you mentioned several times the Echo

Adams - direct by Davis

1   billing issue.  This is the issue that Janet Rogers first put
2   on her request for the special meeting, right?
3   A     That is correct.
4   Q     On July 10th?
5   A     On July 10th, correct.
6   Q     So tell me what this is briefly.  What is Echo, and what's
7   this about?  What did they say you did wrong here?
8   A     So Echo is a cooperative where we send all of our special
9   education -- not all of them, I'm sorry.  Selected special
10  education students for intensive support.  So we're not able --
11  we were not able to service them in the district, and so Echo
12  provides that intensive support that the students would need.

13        For example, if we have some physically handicapped
14  students and we're not able to accommodate them in our
15  district, then we have an agreement with Echo who will take
16  those students and provide a free and appropriate education to
17  them.  And then we pay them as a district.  The district then
18  pays them tuition for those students to attend.  So we had
19  several of our students from 152 that were serviced at Echo.
20  And Echo provides us with a bill every -- usually every month
21  or every quarter.  I can't remember how they billed.  And then
22  it's our responsibility -- it was our responsibility as a
23  district to pay those bills.

24        So during the course of an audit for Echo, there are
25  several other districts that utilize Echo as well.  So you have

Adams - direct by Davis

1    these, these high needs students that are in this cooperative

2    and they're getting this intensive support.  And then the

3    cooperative bills out all of the districts in which they are

4    providing the service to the students.  So in the course of

5    Echo completing an audit of their financial records, they

6    discovered that they had been under billing and/or overbilling

7    all of the districts that were a part of the cooperative.  So

8    Echo was in the process of confirming or, or identifying the

9    specific amounts, and it varied from each district because some

10   districts paid too much.  Some districts didn't pay enough.

11              THE COURT:  All right.

12              THE WITNESS:  I'm sorry.

13              THE COURT:  A question.

14   BY MR. DAVIS:

15   Q    So Echo came back in January of 2015 and said, oh, we just

16   discovered our billing's all screwed up, and we may have under

17   billed you?

18   A    Correct.

19   Q    So did they immediately send out a bill in January?  What

20   did they do next?

21   A    No, they did not send out a bill.  We met monthly as the

22   cooperative for Echo.  And each month they would provide us

23   with an update on how close they were to confirming that these

24   numbers were accurate --

25   Q    So they --

Adams - direct by Davis

1   A    -- based on their auditing practices.

2   Q    I'm sorry.  They needed to go and confirm -- get their

3   arms around how much was owed by whom?

4   A    Correct.

5   Q    Okay.  And that was in January of 2015?

6   A    Correct.

7   Q    And how long did it take Echo to decide how much you all

8   owed, and how much did you owe?

9   A    It took a few months.  I do believe that in May they

10  finally had it figured out as to how many -- how much was owed

11  by each district and if you were over or under.  For Harvey 152

12  the amount was $175,000 that was owed, and that was based on

13  Echo under billing 152 during that time period.

14  Q    So when did they send you all the final audited statement

15  saying you owe us $175,000?

16  A    That statement, we, we started having conversations around

17  it around June or so.  And in June once I received the billing

18  from Echo, my, my concern was that it was $175,000 that took

19  them this amount of time to figure out if we owed the money or

20  not.  And then once we did, I felt it was my responsibility to

21  confirm that this amount was accurate and that their billing

22  was accurate.

23       So when I received the final information on what we

24  owed, I wanted to investigate according to our records to

25  confirm that it was accurate.  So I asked or I directed our

Adams - direct by Davis

1   Director of Special Services to investigate this and confirm

2   that this billing was actually done correctly because she had

3   been in place for a number of years.

4   Q    So you didn't just get a $175,000 bill in June and write a

5   check?

6   A    I wasn't comfortable doing that, Mr. Davis, because I

7   was -- I wasn't comfortable for the -- because of the amount of

8   time it took them to confirm that we actually owed the money, I

9   wanted to make sure that they were accurate in their records.

10  So I needed to do my own investigation in the district to make

11  sure our records actually confirmed that before sharing that

12  information with the board.

13  Q    Did you -- okay.  You just answered my next question.  So

14  you wanted to verify everything before you brought this

15  information to the board?

16  A    That was my plan.

17  Q    So you asked your subordinate to investigate it?

18  A    Correct.

19  Q    And did she do that?

20  A    She did, yes.  She --

21  Q    Go ahead.

22  A    She investigated the --

23            THE COURT:  I'm sorry.  Who is she?

24            THE WITNESS:  I'm sorry.  Her name is Dr. Sofia

25  Jones-Redmond.  She was the Director of Special Services at

Adams - direct by Davis

1  that time.

2        THE COURT:  All right.  Question, please.

3  BY MR. DAVIS:

4  Q    And so she -- Dr. Jones-Redmond came back and told you,

5  yeah, this looks okay.  And what did you do at that point?

6  A    At that point I then talked with our then assistant

7  superintendent of Business Services.  His name was Kevin

8  Nohelty.  I spoke with him, and the three of us -- well, the

9  three of us together, I told them that I wanted them to come up

10  with a plan on how we were going to pay back the funds.  So

11  part of Echo's agreement was that we as a district could

12  present a payment plan to them that was acceptable to them to

13  pay back the $175,000, because they understood that districts

14  don't have that kind of money just laying around in the

15  district at the end of a fiscal year, and so --

16        THE COURT:  All right.  We're going to stop there.

17  BY MR. DAVIS:

18  Q    I want to show you an exhibit, Dr. Adams.  This is

19  Plaintiff's Exhibit No. 24.

20        MR. DAVIS:  I'd like to publish, Your Honor.

21        THE COURT:  Any objection?

22        MS. SCHWENDENER:  Yes, Your Honor.  I object.

23        THE COURT:  You do object?

24        MS. SCHWENDENER:  Yes, Your Honor.

25        THE COURT:  Before I hear the basis, do you have

Adams - direct by Davis

1  another exhibit you can go to so we don't have to stop?  We're
2  on a bit of a roll for us.
3          MR. DAVIS:  Okay.  I was going to go next to Exhibit
4  25, Judge.
5          THE COURT:  All right.  And what exhibit number was
6  the one that I just asked you to pass?
7          MR. DAVIS:  24.
8          THE COURT:  All right.  And so we're going to go to
9  25.  Any objection to 25?
10          MS. SCHWENDENER:  No.
11          THE COURT:  All right.  There being no objection, I
12  will publish it.  And I'm going to ask the witness, please try
13  to answer the questions yes or no or very short instead of
14  getting the whole context.  All right.
15          THE WITNESS:  Yes, ma'am.
16          THE COURT:  Thank you.  All right.  Proceed when
17  you're ready, Counsel.
18  BY MR. DAVIS:
19  Q    What is Exhibit No. 25, Dr. Adams?
20  A    Oh, that is the -- that is the actual request to the
21  assistant superintendent asking him to -- I'm sorry, making
22  sure that the Echo would -- the extension we proposed -- I'm
23  sorry.  The payment plan we proposed to Echo, making sure that
24  it was approved by them.  Making sure it was together,
25  presented to the board, and then we were going to submit it to

Adams - direct by Davis

1   Echo.

2           MR. DAVIS:  Okay.  So I'll skip -- I'll withdraw 24

3   for now.  Dr. Jones-Redmond will be in, and we'll revisit that.

4           THE COURT:  All right.

5   BY MR. DAVIS:

6   Q    So you got the bill in June.  You verified.  You asked

7   your subordinate to verify it.  They did it.  You then asked

8   them to work out a payment plan?

9           What was the -- let's go back to Exhibit No. 22, the

10  Board's performance directives.  What was their problem with

11  the way the whole thing was handled?

12          MS. SCHWENDENER:  Objection.

13          THE COURT:  Basis?  As to what the Board's problem

14  was.  Objection sustained --

15  BY MR. DAVIS:

16  Q    Well, what did the Board say in --

17          MR. DAVIS:  Can we publish Exhibit 22 again, Judge?

18          THE COURT:  No problem.  It's already been done.

19  BY MR. DAVIS:

20  Q    What is this paragraph A?

21  A    A talked about the Echo billing and just the situation

22  that I described.  And the board was not happy.  They said that

23  I failed to communicate to them in a timely manner about this

24  billing.

25  Q    Okay.  Did you -- after you asked your subordinate to work

Adams - direct by Davis

1   out a payment plan, how did the Echo thing get resolved?  Did
2   it get resolved?
3   A    Yes, it did.  So the Echo was resolved by we entered into
4   an agreement, a payment -- a repayment agreement over a
5   three-year period, and we paid -- broke it up into three
6   payments and paid over the three years.  There was no
7   additional penalty.  No additional funds or money that was
8   required from the board.  So we paid it off.
9   Q    Let me ask you this --
10              THE COURT:  And once again we have to wait until each
11  person --
12              MR. DAVIS:  I'm sorry.
13              THE COURT:  -- asks their question or answers so Miss
14  McCullough will not have issues.  Proceed, Counsel.
15  BY MR. DAVIS:
16  Q    What you did working out a payment plan, is that basically
17  what the other members of the co-op, the other districts did?
18              MS. SCHWENDENER:  Objection.
19              THE COURT:  Objection sustained to the form of the
20  question and speculative.
21  BY MR. DAVIS:
22  Q    To your knowledge, do you have any knowledge of what other
23  members of the co-op did vis-a-vis -- were there other members
24  of the co-op that had bills that they owed Echo?
25  A    There were, yes.  There were others.

Adams - direct by Davis

1  Q    Do you have any --

2           THE COURT:  All right.  Stop there.  Go ahead.

3  BY MR. DAVIS:

4  Q    And do you have any knowledge of what they did in their

5  situations?

6           MS. SCHWENDENER:  Objection.

7           THE COURT:  Objection, form of the question, they.

8  It's vague and not specific.  Proceed.

9  BY MR. DAVIS:

10  Q    Can you tell me a specific board -- a specific co-op

11  member that you're aware of that had a problem and how they

12  resolved it.

13  A    Yes.  I can tell you that one other school district, 147

14  worked out a payment plan also.  That was School District 147.

15  They also worked out a repayment plan.

16  Q    And the bottom line, everything is the bottom line, did

17  the district lose any money because of the Echo situation?

18  A    No.  No.

19  Q    Okay.  Moving on, Dr. Adams.  What's item B?

20  A    B --

21  Q    On Exhibit 22.

22  A    B is I failed to bring to the board for its consideration

23  and approval a change in the district's summer work schedule

24  until the board meeting on July 22nd after the change had

25  already been implemented.  That's what it says.

Adams - direct by Davis

1    Q    So when did summer school start that year in 2015?

2    A    So we had two sessions of summer school.  They usually

3    started early July, 1st of July and ran through about -- for

4    six weeks or so, something like that.

5    Q    Okay.  I'd like to show you Plaintiff's Exhibit No. 27,

6    and I'd like to publish.

7              THE COURT:  Any objection?

8              MS. SCHWENDENER:  No objection.

9    BY MR. DAVIS:

10   Q    What is Plaintiff's Exhibit No. 27, Dr. Adams?

11   A    That is a copy of a weekly newsletter that I sent to the

12   board members usually on Fridays, every Friday.

13   Q    And so when was this one sent?

14   A    This one was sent June -- the week of June 15th through

15   the 19th of 2015.

16   Q    And is there anything in here as I scroll down that

17   pertains to the summer school schedule?

18   A    There is.  So under enclosed for your review, I gave them

19   copies of the proposed schedule change for summer work hours

20   for that year.

21   Q    Okay.  And why were you -- were you changing the schedule

22   that year?

23   A    The schedule -- yes, I was changing the schedule for that

24   year.

25   Q    And briefly why did you want to change the summer school

Adams - direct by Davis

1  schedule?

2  A      I wanted to change the summer work schedules for our

3  central office employees because when we took -- when we had a

4  parent survey back in June, we discussed it at the retreat, we

5  talked about that some parents were not feeling and some

6  students were not feeling safe in the schools.  So we opted to

7  have Fridays for summer school were field trip days.  And on

8  Fridays typically in the past our central office was closed, so

9  employees would work Monday through Thursday but it would still

10 be their 40 hours per week Monday through Thursday.

11         My thought or what I wanted to do was change it to

12 Monday through Thursday regular work hours -- or I think they

13 worked an extra hour or so, and then on Friday I needed a half

14 day.  My rationale for that was because the students were in

15 field trips on that Friday.  And I was not comfortable not

16 having adults or administrators in the district while we had

17 students out on field trips for the district during summer

18 school.  So I wanted to change the work hours so that we would

19 be able to work until noon or so on Friday, but that would

20 ensure that all of our students made it back safely from field

21 trips that they partaked in during the summer, the summer

22 enhancement program that we were offering.

23 Q      And when you circulated this in June to the board members

24 and you attached the schedule showing the changes, did you get

25 any feedback, don't do that, why are you doing that?

65

Adams - direct by Davis

1  A    I did not.  I did have a conversation with our then Board
2  President Mrs. Gloria Johnson even before sending this out
3  about the changes that were being made and why, the rationale
4  for why those changes were going to be -- or why I was
5  proposing those changes.  And at that time we both agreed that
6  it was a day-to-day operations, and that we were fine.  But she
7  did want me to send it out to all of the board members, and so
8  I did do that.
9  Q    What do you mean by day-to-day operations?  What does that
10 mean briefly?
11 A    So brief --
12         MS. SCHWENDENER:  Objection.
13         THE COURT:  I'm sorry?  Objection?
14         MS. SCHWENDENER:  Calls for speculation.
15         THE COURT:  What does she mean by day-to-day
16 operations?
17         MS. SCHWENDENER:  I believe it was in response to
18 what Gloria Johnson said.
19         THE COURT:  All right.  Objection's overruled.
20 Proceed.
21         THE WITNESS:  So day-to-day operations, when you're
22 hired as the superintendent you are respons -- you're supposed
23 to be responsible for day-to-day operations within a district.
24 The board is supposed to be a governing board, and they're
25 supposed to set policy, establish policy.

Adams - direct by Davis

1    THE COURT:  Okay.  Excuse me.  You were asked about

2  day-to-day operations, not about what about the board's --

3    THE WITNESS:  Oh, okay.  I'm sorry.  So that's what

4  day -- that's day-to-day.

5  BY MR. DAVIS:

6  Q    Okay.  So the idea is the superintendent is supposed to

7  manage the business, and she doesn't call the board every time

8  she wants to --

9  A    Correct.

10  Q    -- order a roll of toilet paper?

11  A    Correct.  Correct.

12  Q    What have you.

13    MR. DAVIS:  Okay.  So let me go back to Exhibit 22,

14  if I could, Judge.  The performance directives.  And again, I'd

15  like to publish to the jury.

16  BY MR. DAVIS:

17  Q    So we've now talked about Echo was one of the things,

18  disciplinary items they brought against you.  We've now talked

19  about the summer school work schedule.  And the last one -- or

20  the next one, C on here says that you signed a contract without

21  getting permission.

22    How do you -- what is your response to that?

23  A    So this contract was an Imagine Learning contract, and it

24  was actually an extension of an existing contract.  Typically

25  when we worked with vendors on instructional programs, I had

Adams - direct by Davis

1  been given the authority to continue those programs without any
2  lapse in service.  And so we typically -- I typically would
3  sign them before the current contract would end and to make
4  sure that the program was up and running for the start of the
5  next school year without any lapse in service.  So I continued
6  to do so with an Imagine Learning program that we were using
7  inside the district as well.
8  Q    And was there an advantage to you signing the contract
9  when you did for the district?
10 A    There was an advantage to me signing.  One of -- the
11 biggest advantage was that it was a cost savings to the
12 district if you would sign the contract in advance.  And the
13 district would save something like 15 or 10 percent.  I don't
14 remember the exact percentage, but there was a cost savings to
15 the district for that.
16 Q    Had you signed contracts like this -- you say you had had
17 authority.  You came in the district in 2013, right?
18 A    Correct.  Yes.
19 Q    Had you signed other contracts like this between 2013 and
20 2015?
21 A    Yes, that's correct, I had.
22 Q    Can you name some of those that you signed?
23 A    One in particular that I recall is with -- there was a
24 testing program that we used in the district.  I believe it was
25 called Discovery Ed, the program that we used.  And we used it

Adams - direct by Davis

1    for multiple years.  And so we would engage in that at the
2    time.

3    Q    And do you recall the amount?

4    A    I don't.  I'm sorry.

5    Q    All right.  So when you saw this, you told -- did you tell
6    the Board, hey, I've already had this authority?  I don't
7    understand why now you -- how did you react?  What did you say
8    to the board?

9    A    Well, yeah, I was -- I did, in fact, say that this is
10   nothing new.  Past practice, I've always been able to do this.
11   So I did ask them if there was a change in what I was being
12   asked to do because I was a little confused by this statement
13   as well.

14   Q    Okay.  And finally, Dr. Adams, it says here you have not
15   been in the district for a sufficient amount of time.  Had you
16   been out the district 83 days on August 17th --

17   A    No.

18   Q    -- 2015?

19   A    No.

20   Q    So what's your recollection on August 17th -- how many
21   days of time outside the district had you taken when this
22   statement was made?

23   A    So without having the exact reports or, or documents in
24   front of me, I know that in July I took vacation days in July.
25   I do recall that.  And those vaca -- I believe it was five

Adams - direct by Davis

1  vacation days.  I know that I had taken a professional

2  development day, and I believe there were some sick days that I

3  had taken by August 17th as well.

4  Q    Well, let me help you out.  I want to look at exhibit --

5  Plaintiff's Exhibit No. 28.

6         MR. DAVIS:  And I'd like to publish this to the jury,

7  Your Honor.

8         THE COURT:  Any objection?

9         MS. SCHWENDENER:  No objection.

10        THE COURT:  Are you ready, Counsel?

11        MR. DAVIS:  Yes, Judge.

12  BY MR. DAVIS:

13  Q    So what is Exhibit 28, Dr. Adams?

14  A    So this is an absentee report.  We used this to track

15  attendance every day in the district.

16  Q    And so the school year starts from 7/1/2015 and goes

17  through the, the next year is 7/1/2016.  Is that --

18  A    Well, June 30th of 2016, yes.

19  Q    Okay.  June 30th.  So this is all of your absences during

20  this period.  So let's look at the period from 7/1 to 8/17 when

21  this statement was made.  And about how many days were you out

22  then?  You said you took some vacation?

23  A    Yes, I --

24  Q    How many vacation days?

25  A    I took five vacation days, which were 7/27, 7/28, 7/29,

Adams - direct by Davis

1  7/30, and 7/31.  So that was a week of vacation.  I had a sick

2  day on July 13th.  And then on July 1st I had a professional

3  development day.  I had another sick day on August 10th.

4  Q    Okay.

5  A    And that goes through -- I mean, that -- that was the time

6  I was off between July 1 and August 17th.

7  Q    And were any of those unexcused absences where you just

8  didn't go to work, or did you get permission before taking

9  those absences?

10  A    So vacation days have to be preapproved.  And that week

11  was preapproved by the board.  The Board President in

12  particular usually approve my vacation days.

13  Q    That would have been Gloria Johnson?

14  A    Correct.  At that time, yes.  And then the same for

15  professional development days.  Those were usually preapproved

16  because they provided -- they were usually a day where you

17  attended a conference or something like that.  So that has to

18  be preapproved as well.  And then it looks like I had two sick

19  days in addition to that.

20  Q    Okay.  So that's what they're referring to in item C on

21  Exhibit 22.  Now, let's look at the rest of this list while

22  we've got it up.  And beyond August 17th, 2015 and there's a

23  long list of sick days here.  What is that pertaining to, Dr.

24  Adams?

25  A    So there's -- there are quite a few sick days that I had

Adams - direct by Davis

1  taken, and I was under the care of a doctor, a therapist that I

2  was seeing in regards to just some things that were going on in

3  the district that were quite stressful.  And I was under her

4  care during those time periods.

5  Q    So let me stop you there.

6        MR. DAVIS:  If I may, Judge, I'd like to publish a

7  letter we talked about.

8        THE COURT:  Well, why don't you lay a foundation,

9  Counsel, before you publish that.

10 BY MR. DAVIS:

11 Q    Okay.  What was the name of the doctor that you --

12 A    Dr. Cunningham.

13 Q    And what did you see her for?

14 A    There were several -- it was very stressful.

15       THE COURT:  First of all, what kind of doctor was

16 she, ma'am?

17       THE WITNESS:  Oh, okay.  Thank you.  She was a

18 licensed therapist.

19       THE COURT:  All right.  Question.

20 BY MR. DAVIS:

21 Q    Okay.  And you saw her at a hospital or medical facility?

22 A    I did.

23       MR. DAVIS:  And I'm going to show you -- if I may,

24 Judge.

25       THE COURT:  Why don't you show counsel again, and

72

Adams - direct by Davis

1   then if there's an issue that we need to deal with.

2           MS. SCHWENDENER:  Same objection, Your Honor.

3           THE COURT:  All right.  Step to the side real

4   quickly, please.

5       (Sidebar proceedings out of the hearing of the jury:)

6           THE COURT:  All right.  So this is a letter

7   addressed -- oh, it's to whom it may concern.

8           MR. DAVIS:  This is what she gave her employer.

9           THE COURT:  Okay.  All right.

10          MR. DAVIS:  This is from their record.

11          THE COURT:  You're going to have to -- instead of

12  saying I'm going to show you this, you show just her the letter

13  and you don't publish it, and you ask her to identify it and

14  explain some things about it.  Okay.  First of all, did she see

15  this letter, how did she receive it.  Even though it's not

16  addressed to her, just ask her how she received it, and then

17  what she did with the letter, find out about that.  Then again,

18  this is somebody saying she's under their care -- under her

19  care, and it says the patient will require regular outpatient

20  treatment.  She can't testify to that.  That's what the

21  doctor -- that's substantive.  That has to do with her medical.

22          MR. DAVIS:  Sure.

23          THE COURT:  She can say it says she's under her care.

24  She can say that.  And then ask for them to contact her if she

25  has any other -- she can talk about those, but this is not

Adams - direct by Davis

1  going to be published to the jury.  You can show it to her.

2  MR. DAVIS:  Okay.

3  THE COURT:  But that's it.

4  MR. PETRARCA:  Thank you, Your Honor.

5  MS. SCHWENDENER:  Thank you, Your Honor.

6  THE COURT:  All right.  You're welcome.

7  (Before the jury:)

8  THE COURT:  All right.  Thank you very much.

9  BY MR. DAVIS:

10  Q    I'm going to hand --

11  THE COURT:  You can hand it to her or you can show it

12  to her on the screen.  However you want to do it.  That way you

13  can both have it, or whatever you want to do, Counsel.

14  MR. DAVIS:  It's fine.

15  THE COURT:  Okay.

16  BY MR. DAVIS:

17  Q    What is that, Dr. Adams?

18  A    This is a copy of the medical note that I received from my

19  doctor regarding care.

20  Q    Let me ask you, who was the doctor?

21  A    Dr. Theresa Cunningham.

22  Q    And does it say what her office -- who she works for?

23  A    Yes.  She's from Dreyer Medical Clinic Psychology in Fox

24  Valley.

25  Q    And what's the date of the letter?

Adams - direct by Davis

1  A    August 27th of 2015.

2  Q    And have you seen this letter before?

3  A    I have.

4  Q    And how did you see this letter?

5  A    Because I gave this letter to HR and to the board in

6  Harvey 152.

7  Q    Okay.  And why did you do that?

8  A    Because I wanted them to be aware of why I was being

9  absent or away from the district.

10 Q    Okay.  Thank you.

11 A    You're welcome.

12 Q    So starting on August 27, 2015 you were under -- being

13 treated, seen by Dr. Cunningham?

14         MS. SCHWENDENER:  Objection, Your Honor.

15         THE COURT:  Starting on August ... objection --

16         MR. DAVIS:  The letter is dated August 27th, 2015.

17         THE COURT:  That's the top of the letter?

18         MR. DAVIS:  Yes.

19         THE COURT:  Overruled.

20 BY MR. DAVIS:

21 Q    So if we go back to the exhibit that we had up and with

22 the absentee report.  Can you scroll -- I'm going to scroll

23 down, Dr. Adams.  And are these sick days absences where you

24 were excused on these sick days?

25 A    Those were periods of time when I did have to see Dr.

Adams - direct by Davis

1  Cunningham, yes.

2  Q    Right.  And so this goes all the way through from August

3  2015.  Do you know where it ends?  Well, let me put it this

4  way:  How long were you seeing Dr. Cunningham?

5  A    I saw her until September -- I believe it was September of

6  2015.

7  Q    Okay.  And did you -- what were you going through in

8  general that required you going to see the doctor this many

9  times and being under her care?

10           THE COURT:  And, ma'am, I caution you just to say it

11  from your standpoint.  Not from something that she told you.

12           THE WITNESS:  Sure.

13           THE COURT:  All right.

14           THE WITNESS:  So it was very stressful.  Sorry.

15  BY MR. DAVIS:

16  Q    Take your time, Dr. Adams.

17           THE COURT:  How about putting another question.

18           THE WITNESS:  Okay.  Thank you.

19           THE COURT:  And making it a general question.

20  Proceed, Counsel.

21  BY MR. DAVIS:

22  Q    So these things that you were seeing her about, were they

23  work related, or were they related to your personal life?  What

24  were they related to?

25  A    Well, they were work related, but they did affect my

Adams - direct by Davis

1  personal life.

2  Q    Okay.  And how were they work related?  Without going into

3  any detail, how were they work related?

4  A    There were things that happened to me when I would go to

5  work.  I'm sorry.

6  Q    No problem, Dr. Adams.  You need a drink of water?

7           THE COURT:  It's all there.  She can get it if she

8  wants it.

9           THE WITNESS:  I'm okay.

10           THE COURT:  If you wish to move to another area of

11  questioning, you can.

12           THE WITNESS:  I'm okay.

13  BY MR. DAVIS:

14  Q    So at a certain point, Dr. Adams, did you ever go on a

15  medical leave, take a medical leave?

16  A    I did, yes.

17  Q    When was that?

18  A    That was in April -- I believe it was April of 2015 --

19  2016.  I'm sorry.

20  Q    And were you -- did a doctor sign that?

21  A    She did, yes.  Dr. Cunningham signed the paperwork for

22  that as well.

23  Q    So I'm drawing your attention to Plaintiff's Exhibit

24  No. 49.

25           THE COURT:  Any objection?

Adams - direct by Davis

1         MS. SCHWENDENER:  Yes.

2         THE COURT:  There's an objection.

3         MS. SCHWENDENER:  No, yes, Your Honor, there is an

4    objection.

5         THE COURT:  Correct, there is an objection.

6         MS. SCHWENDENER:  I'm sorry.  Yes.  Thank you.

7         THE COURT:  All right.  Yes.  Basis?

8         MS. SCHWENDENER:  Hearsay and foundation.

9         THE COURT:  All right.  One second, please.  I need

10   you to keep it there for me, Counsel.

11        MR. DAVIS:  Yes, I'm just blowing it up, Judge.

12        THE COURT:  All right.  Thank you.  Counsel, I need

13   you to scroll up, please.

14        MR. DAVIS:  Scroll?

15        THE COURT:  Scroll up.  All right.  Objection

16   sustained.

17   BY MR. DAVIS:

18   Q    So did you go on a medical leave in April of 2016, Dr.

19   Adams?

20   A    Yes.  Yes.

21   Q    And did you have a doctor fill out the form for you to do

22   that?

23   A    Yes.

24   Q    And who was the doctor?

25   A    Dr. Theresa Cunningham.

Adams - direct by Davis

1   Q    Thank you.  I may have asked this.  Prior to July 10th,
2   2015 how many -- how much vacation did you take that prior --
3   the year before that?  That would have been the what, 2013-14
4   school year?
5   A    Yes.  During the 2013-2014 school year I want to say maybe
6   10 days or so for the entire year.  I'm not sure of the exact
7   number.
8   Q    And under your contract that we saw yesterday, how many
9   days did you have vacation allotted to you every year?
10  A    25.
11  Q    And could you also add to that personal days?  How many of
12  those did you have?
13  A    Yes.  There were three -- in addition to vacation, there
14  were three personal business days and then there were -- I
15  believe it was 12 sick days every year.
16  Q    And do you have an idea of how many combined personal and
17  vacation days you carried over?  If you don't use it, you can
18  carry it over to the next year, right?
19  A    For sick days and -- yes, we were able to carry over those
20  days from year to year.  And I don't recall the exact number,
21  but I -- I know that maybe around, around 20 or so.  I don't
22  know the exact number --
23  Q    Is what you carried over you believe?
24  A    -- that were carried over, correct.  But I know there was
25  some carry --

Adams - direct by Davis

1   Q    Let me ask you this --

2   A    I'm sorry.

3   Q    I'm sorry.  In your entire time in the district, prior to

4   July 10th, 2015 did you ever use up all of your total amount of

5   vacation and personal days?

6   A    No.

7   Q    The hearing -- they gave you the performance directives

8   that we saw at Exhibit 22, and you already said that you didn't

9   receive that before the hearing, right?

10  A    Correct.

11  Q    When did you receive it actually?

12  A    The performance directives?

13  Q    Yes.

14  A    I received that document at the end or -- at the end of

15  the board meeting on that evening of August 27th -- August

16  17th.  I'm sorry.

17  Q    Okay.  And did you tell the Board or say anything about --

18           MR. DAVIS:  I want to republish Exhibit 22, Your

19  Honor.

20           THE COURT:  You don't have to republish it.  Just

21  show it whenever you want.

22           MR. DAVIS:  Okay.  I'll put it back on the screen.

23           THE COURT:  All right.  Proceed.

24  BY MR. DAVIS:

25  Q    So you're called in the meeting.  They bring all these

Adams - direct by Davis

1   things up, and they hand you these performance directives.

2   What was your response?

3   A    Well, initially I --

4   Q    Literally without going through each one, what you said,

5   what was your general response?

6   A    Well, of course, I was upset by them, and wanted an

7   opportunity to, to give my side of what was happening or what

8   happened in these cases.  And, you know, just -- just very

9   upset by this.

10  Q    And did they give you a chance to present your side?

11  A    We had conversations before I received this, and I

12  approached the Attorney Izzo after and asked if I would have an

13  opportunity to respond to these.  And he said that I could

14  write a rebuttal for my personnel file or something like that.

15  Q    So you're in the hearing.  You didn't get anything before

16  the hearing.  You get hit with these different things.  You all

17  talk about them.  As you're leaving, they hand you this

18  document, is that correct?

19  A    That's correct.

20  Q    And so once you get the document with the -- that's the

21  first time you get the specific charges in hand, and that's

22  when you asked Attorney Izzo, well, I'd like to respond to

23  these; is that correct?

24  A    That's correct, yes.

25  Q    And he told you you could just put something in the file?

Adams - direct by Davis

1  A    Correct.  He told me I could put -- I could write a
2  rebuttal for my personnel file.
3  Q    So then what did the board do on August 17th?  Did they
4  have a vote that evening?
5  A    Yes, there was a vote that evening.  And the vote was to
6  rescind the one-year extension that I had been granted.
7  Q    And so the one-year extension was then revoked?
8  A    Correct.  Yes.
9  Q    And did they tell you why they were revoking it?
10 A    They said ineffective -- it was ineffective.
11 Q    And did they explain what that meant?
12 A    No.
13        MR. DAVIS:  Okay.  That's all I have for the witness
14 at this time, Your Honor.
15        THE COURT:  All right.  Why don't you both step to
16 the side really briefly.
17    (Sidebar proceedings out of the hearing of the jury:)
18        THE COURT:  All right.  I think it's better to take a
19 lunch break here.
20        MS. SCHWENDENER:  I agree.
21        THE COURT:  And then we'll get started back.  I'm
22 going to give them 45 minutes and see if that will suffice.
23        MS. SCHWENDENER:  Sure.
24        THE COURT:  Just to make sure we can keep it going.
25 Okay.

```
 1            MS. SCHWENDENER:  Okay.
 2            MR. DAVIS:  Thank you.
 3            THE COURT:  How many witnesses do you have this
 4    afternoon?  At least one?
 5            MR. DAVIS:  I don't have any now because Wright has
 6    come and gone.  I can take --
 7            THE COURT:  You weren't putting on any of the
 8    defendants in your case in chief?
 9            MR. DAVIS:  Yes.  I can -- yeah, I can take one of
10    them --
11            THE COURT:  Well, you do have witnesses.
12            MR. DAVIS:  -- this afternoon.
13            THE COURT:  You do have witnesses.
14            MR. DAVIS:  Yeah.
15            THE COURT:  You've got a lot of them.
16            MR. DAVIS:  Sure.  Absolutely.
17            THE COURT:  Okay.  All right.  Good.
18         (Before the jury:)
19            THE COURT:  All right.  Before we get to
20    cross-examination, I think this is a good time to take the
21    break.  All right.  And again, to keep us moving and try to --
22    trying to accommodate some schedules for tomorrow's date, I'd
23    like to do 45 minutes today for lunch.  Is that fine with
24    everyone?  Does somebody absolutely positively need that full
25    hour?  All right.  45 minutes.  So it's 12 -- it's 11:45.
```

1  Please be back at 12:30.  Feel free to go wherever for lunch.
2  Leave your pads inside, and then make sure that you don't
3  discuss this matter.
4          If you're on the second floor and you see people,
5  familiar faces that you see in here, don't engage them in
6  conversation.  They will understand.  And they should not be
7  talking to you.  If they do, I would ask you to report that to
8  my deputy.  All right.  All rise.
9      (Jury excused.)
10          THE COURT:  All right.  Again, you're being -- you're
11  under oath.  You are free to talk to your lawyer and have lunch
12  within your family.  If you do discuss this matter, know that
13  it will be fair game for them to ask you about on
14  cross-examination.  All right.  Step down.
15      (Witness excused.)
16          THE COURT:  All right.  And again, we'll step up.
17  Anything else as she steps down?  Anything else on the record?
18  I believe, Counsel, you withdrew that Exhibit 24.  So since you
19  withdrew 24, we don't need to talk about it anymore, is that
20  correct?
21          MR. DAVIS:  Right.
22          THE COURT:  All right.  And let me see about any of
23  my other --
24          MR. DAVIS:  And I withdrew it because the witness is
25  going to be here tomorrow.

1          THE COURT:  All right.  All right.  Thank you.

2          MR. DAVIS:  Actually on the 1st.

3          THE COURT:  Okay.  Thank you.

4          MR. DAVIS:  The day after tomorrow.

5          THE COURT:  Okay.  Thank you.  All right.  Anything

6     else on the record, Counsel?

7          MS. SCHWENDENER:  Yes, Judge.  Just briefly.

8          THE COURT:  Everybody else can either be seated or

9     leave.  All right.

10         MS. SCHWENDENER:  Just briefly, Judge.  I know the

11    issue of the due process claim is still unresolved.  Counsel

12    kind of I think briefly went into it.  I didn't want to --

13         THE COURT:  Well, I thought you all were going to

14    bring it up this morning, but nobody did when we had time

15    earlier.  So I mean, if you all want to do it, we can either do

16    it now or we can do it later.  Is that coming up in your

17    cross-examination?

18         MS. SCHWENDENER:  It was, Judge.  I can probably keep

19    it limited to the, to the scope of the direct.  I think counsel

20    asked a couple questions about did she receive notice.  I don't

21    think I have to go much more beyond that.

22         THE COURT:  Well, we can do -- we can also do this:

23    You all talk briefly even if you don't agree.  Let him know

24    when you're going to bring -- where you're going to bring it up

25    so he's not taken by surprise.

1        MS. SCHWENDENER:  Sure.

2        THE COURT:  And vice versa.  Maybe you can work it

3   out.  If you can't, 10 minutes before they come out, I will

4   address it.  So if you can be back here at about 12:25, at

5   12:25.  And if we need to take 10, 15 minutes to deal with

6   this, we will.  All right.

7        MS. SCHWENDENER:  Sure.  Thank you, Judge.

8        THE COURT:  All right.  And once again, unless you

9   are a party to the case, we have these sidebars or times off,

10  you're welcome to be here, but it's not really necessary.  It

11  really doesn't concern the gallery.  All right.  Thank you.

12  All right.

13      (Whereupon, said trial was recessed at 11:50 a.m., until

14         12:25 p.m.)

15

16

17

18

19

20

21

22

23

24

25

786

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3    DR. DENEAN ADAMS,                    ) No. 15 C 8144
                                          )
4                      Plaintiff,         )
                                          )
5              v.                         )
                                          )
6    BOARD OF EDUCATION HARVEY SCHOOL     ) October 30, 2018
     DISTRICT 152, GLORIA JOHNSON in her  ) Chicago, Illinois
7    individual capacity, BETTY JOHNSON   ) 12:35 p.m.
     in her individual capacity,          )
8    DR. KISHA McCASKILL in her           )
     individual capacity, JANET ROGERS    )
9    in her individual capacity, TYRONE   )
     ROGERS in his individual capacity,   )
10   LINDA HAWKINS in her individual      )
     capacity, FELICIA JOHNSON in her     )
11   individual capacity,                 )
                                          )
12                     Defendants.        ) Trial

13                        VOLUME 2
                  TRANSCRIPT OF PROCEEDINGS
14   BEFORE THE HONORABLE SHARON JOHNSON COLEMAN, and a
                           jury
15

16   APPEARANCES:

17   For the Plaintiff:    MR. JEROME M. DAVIS, ESQ.
                           9024 McIntosh Court
18                         Lakewood, Illinois  60014

19   For the Defendants:   HAUSER IZZO PETRARCA GLEASON & STILLMAN
                           1415 West 22nd Street
20                         Suite 200
                           Oak Brook, Illinois  60523
21                         BY:  MR. CHRISTOPHER L. PETRARCA

22

23            TRACEY DANA McCULLOUGH, CSR, RPR
                   Official Court Reporter
24                219 South Dearborn Street
                         Room 1426
25               Chicago, Illinois  60604
                     (312) 435-5570
```

187

1   APPEARANCES CONTINUED:

2                           LAW OFFICES OF JENNIFER K. SCHWENDENER LLC
                            5117B Main Street
3                           Suite 4
                            Downers Grove, Illinois  60515
4                           BY:  MS. JENNIFER K. SCHWENDENER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (The following proceedings were had in open court outside

2          the presence of the jury:)

3          THE COURT:  All right.  Court's back in session, and

4  what do we have to address, plaintiff?

5          MR. DAVIS:  Judge, I was about to show counsel when

6  you walked out.  I have an exhibit that I didn't include in my

7  exhibit list.  I'm going to call it Exhibit 18-A, and it is a

8  closed session minutes from the retreat that you heard so much

9  about.  They have a secretary on the board who takes minutes

10  for closed sessions.  She's one of the defendants, Betty

11  Johnson.  These are her redacted closed session minutes,

12  because they were redacted for attorney/client privilege and

13  other issues way back when in discovery.

14          And I may use this document.  I don't want to talk

15  about where or how right now, but I wanted to show it to her

16  beforehand and see if she had any objection.

17          THE COURT:  And, and why was it not -- and not only

18  this one, is there anything else that you haven't shown them

19  that we're going to be showing them that was in the packet?

20  Even though these are your minutes.  They're minutes -- this is

21  from them, right?

22          MR. DAVIS:  This is my exhibit.

23          THE COURT:  I know.  But I just want to know, this is

24  the second exhibit today that you didn't show them.

25          MR. DAVIS:  Right.  There are no more today, Judge.

1     THE COURT:  Okay.  You can promise me today that

2  today.

3     MR. DAVIS:  I can't promise about tomorrow.

4     THE COURT:  All right.  Let's deal, let's deal with

5  that.  All right.  So -- okay.  And so, Counsel.

6     MS. SCHWENDENER:  Judge, this is the second page of

7  the exhibit.  If counsel has the first page, I'm, I'm sure it's

8  fine, but --

9     THE COURT:  It's not readable?

10    MS. SCHWENDENER:  -- it doesn't -- it doesn't have a

11 date.  And I, I don't know.  There's no first page that

12 indicates which meeting it's from.

13    MR. DAVIS:  Well, the very first page is their

14 letter.  This is how they produced it.  This is their cover

15 letter from their law firm, and this is how they produced the

16 document.  And, you know, I'm just producing it the way it is.

17 It is a redacted document, and it does --

18    THE COURT:  All right.  Why don't you hand it up

19 to -- I mean, unless, Counsel, you disagree.  If it was given

20 to them by your office or the office that was working on this

21 when you maybe weren't --

22    MS. SCHWENDENER:  Sure.

23    THE COURT:  -- there can't be any objection.

24    MS. SCHWENDENER:  No, Judge, and I, I have a -- I

25 think I actually have the, the full copy.  I just wanted to

1    verify the date.  I don't have a problem with, with counsel
2    using this.  It's just there's a lot of minutes in this case
3    from different dates and time frames.  So if I could at least
4    take a minute to review it.  Maybe --
5              MR. DAVIS:  Sure.
6              THE COURT:  Where's your partner?  Is he coming this
7    afternoon?
8              MS. SCHWENDENER:  Yes.  I'll go grab him, Judge.
9              THE COURT:  Okay.  Well, no, not yet.  I'm just
10   saying let's deal with whatever else we have out here.
11             MS. SCHWENDENER:  I'm sure we can get this worked
12   out.
13             MR. DAVIS:  That's it for me, Judge.
14             THE COURT:  All right.  And I -- well, they're
15   getting ready to do cross, so they can --
16             MR. DAVIS:  Right.
17             THE COURT:  Her partner can look at this while she's
18   doing cross.
19             MR. DAVIS:  Right.
20             MS. SCHWENDENER:  That's fine.
21             THE COURT:  All right.  And then we'll address it
22   when Dr. Adams gets off the stand.  And we'll address it real
23   quickly, but counsel is making me aware that this is coming,
24   and it comes from you.  So I've got that much.  All right.  So
25   if there's any objections or a better copy, then, you know,

1    I'll see that during the next break.

2              Anything else from the plaintiff?

3              MR. DAVIS:  That's it, Your Honor.

4              THE COURT:  Defense, anything else?

5              MS. SCHWENDENER:  I don't believe so, Judge.  I know

6    just the, the due process is still lingering out there so --

7              THE COURT:  Okay.  Then let's say it.  Not just the

8    due process.  And, Counsel, I, I guess I keep looking over.  I

9    know you keep asking me to reconsider it, but again, tell the

10   Court what you want done here with this three-year contract.

11             MR. DAVIS:  Well, what I want done with the

12   three-year contract, Judge, is --

13             THE COURT:  That I haven't already ruled on?

14             MR. DAVIS:  Well, you've already ruled that Count 3

15   didn't qualify as a matter of law of public protected speech

16   because it wasn't a matter of public concern.  You said it was

17   a employment discrimination lawsuit, run of the mill and not a

18   matter of public concern.  So you declined to -- you dismissed

19   it on that basis, because you couldn't have a retaliation count

20   based on that because the speech requirement was missing.

21             I accept the Court's ruling there.  All I'm trying to

22   do is make sure that A, the jury has a complete picture of what

23   my client experienced.  And B, that with that complete picture,

24   they're able to if they find in her favor award damages that

25   she's entitled to.  And I believe those damages could, up to

1    the jury -- the jury's the one to draw the line and decide

2    where damages begin and end or if they exist or not.  And I'm

3    simply saying that the jury should hear about the retaliatory

4    actions that began August 17th and culminated in her being

5    forced out of the district on a medical leave.  And then the

6    jury can decide whether to give damages based on what it heard

7    as it sees fit.  That's all I'm saying.

8              THE COURT:  So you're not, you're not making any

9    reference at all to the three-year contingency that wasn't --

10   hadn't even come about yet?  You're not --

11             MR. DAVIS:  Well, what I was going to make reference

12   to is that the sequence of events, Judge, is they gave her a

13   notice to remedy in November.  November 9th to be exact.  And

14   then on December 21st they told her because of the notice to

15   remedy, we're not renewing your contract.  The evidence will

16   show --

17             THE COURT:  Renewing the, the one-year contract.

18             MR. DAVIS:  No, the three-year.

19             THE COURT:  You're not talking about the extension?

20             MR. DAVIS:  They said they won't renew her contract.

21             THE COURT:  And what -- you know, you did give me

22   lots of cases, but those cases were different and distinct.  So

23   the three years had already -- was part of the agreement.  Like

24   if it was tenure.  I think one of the cases was tenure.  If

25   it's tenure, that's something that there is an expectation of.

1 It's almost a vested expectation, if you want to call it, which
2 is different from the situation here where you had clearly the
3 one-year extension, but any three-year after that was totally
4 speculative.

5 MR. DAVIS: But not quite, Judge. The one case I
6 gave you, the St. Louis case they found, in fact, that under
7 Missouri law the teachers didn't have a right to an extended
8 contract or no expectation. And that's why the due process
9 claim failed there, but the retaliation claim didn't fail.
10 Even though the law said they didn't have an expectation or a
11 right to a renewal, the Court found that because they didn't
12 renew they contract because of they speech, they had a valid
13 retaliation claim and declined to grant summary judgment on
14 that issue.

15 And so that is exactly on point on all fours with
16 what we're dealing with here. We're not saying she was
17 entitled to the three-year contract. That's --

18 THE COURT: Yes, you are.

19 MR. DAVIS: No, what I'm saying is she's entitled not
20 have to them punish her by refusing to renew because of her
21 speech.

22 THE COURT: But -- okay. So on the one hand you're
23 saying she's not entitled to it, but then you're saying, well,
24 but even though in general she's not entitled to it,
25 specifically you want a finding that they didn't entitle her to

194

```
1   it because of something that was said --

2               MR. DAVIS:  I want --

3               THE COURT:  -- which is her --

4               MR. DAVIS:  I'm sorry.

5               THE COURT:  -- her filing a complaint.  Right?

6               MR. DAVIS:  I want the jury to be able to decide if

7   this was part and parcel of the retaliation.

8               THE COURT:  No.

9               MR. DAVIS:  Take the Umbehr case, Judge --

10              THE COURT:  But, but, Counsel -- Counsel, I'm going

11  to stop you right there.  The Court has ruled.  This is now a

12  motion --

13              MR. DAVIS:  Okay.

14              THE COURT:  -- to reconsider.  But again, as I

15  stated -- and I'm looking at my entry right now.  As I stated,

16  it's speculation.  The nonrenewal of the three-year contract

17  that hasn't come about yet, was going to come about after the

18  one-year extension, it was out there in the atmosphere, but it

19  had not come about yet.  And even -- and so -- and even you

20  said she wasn't entitled to the three-year.  But you want the

21  jury to determine if part of their reasoning for that was what

22  was going on here.  But she wasn't entitled to it anyway, so it

23  really doesn't matter.

24              MR. DAVIS:  The evidence, Judge, is that before they

25  issued the notice to remedy, which was the basis for
```

195

1    nonrenewing her, they issued a letter when they told her we're

2    nonrenewing, and they said these are the reasons we're not

3    renewing your contract because of this notice to remedy.  The

4    evidence is on tape admissions from them.  Before they even

5    issued the notice to remedy, they said we already decided we're

6    not renewing her contract.

7             So the evidence is -- and we also have Tyrone Rogers

8    saying we wanted to get rid of her in August, but we had to go

9    through and create a paper trail.  And this was all part and

10   parcel of the paper trail.

11            THE COURT:  All right.  Next argument.  Do you have

12   anything to say?

13            MS. SCHWENDENER:  In response, Judge, I mean, I know

14   we've litigated this -- or argued this multiple times.  Again,

15   my arguments remain the same in response.  The Court's already

16   ruled on this in the motion for summary judgment.  Also

17   addressed in the motion for reconsideration.  Plaintiff --

18   there is no testimony by any witness that plaintiff was offered

19   a three-year extension and the board revoked it.  The issue is

20   that whether the one-year contract extension was rescinded

21   because of Mr. Rogers' statements and the police report

22   plaintiff filed.

23            Counsel is getting into again all of this other

24   disciplinary action that plaintiff testified and which is

25   consistent with what was in her pleading that that -- all this

106

1   other retaliatory acts were regarding her filing of the

2   lawsuit.

3              THE COURT:  I think one of the issues here is -- one

4   of the problems is, is that, you know, first of all, this

5   three-year extension or additional renewed contract, that was

6   already set.  I mean, the fact that she might get it, it was

7   sort of speculation.  That's one thing to the side.  Nobody

8   seems to disagree with that.  What the problem is is that for

9   whatever reason, among other things that went on, this board

10  decided to sort of pile on and, and wolf up some extra problems

11  that she had after the fact.  But it doesn't matter when they

12  could have done it anyway without any of this.

13             To say that they came back and then said, yeah, and

14  another thing, whatever, I mean that's basically in the

15  vernacular what I'm hearing that you're saying, is that

16  correct?  That they could have done it anyway.  She didn't have

17  a property right in that.  It was speculative, and it really

18  doesn't matter what they said?

19             MS. SCHWENDENER:  Correct.  Correct.  They --

20  whatever they did in response to nonrenewal -- there's been no

21  testimony by anyone that, that there was even any discussions

22  about extending her contract for an additional three-year term.

23  The board voted in December to nonrenew her contract.  The

24  plaintiff testified in her -- and her pleading, her complaint

25  indicates that that was in retaliation for her filing a

1   lawsuit, which has already been dismissed by the Court.  So
2   there's been no testimony by plaintiff, and it's not in her
3   complaint, that the nonrenewing her contract was in retaliation
4   for filing the police report.  The only retaliatory act for the
5   police report was rescinding the one-year offer that the board
6   did offer to extend.

7              MR. DAVIS:  The evidence --

8              THE COURT:  The last brief argument from Mr. Davis.

9              MR. DAVIS:  Yes, Judge.  Thank you.  The evidence is
10  that the reason they didn't renew wasn't piling on, but was
11  because they wanted to retaliate for her speech and making the
12  police report.  Before they even issued the notice to remedy --
13  and counsel keeps saying there's no evidence, no evidence -- is
14  their own testimony in a closed meeting where they say, well,
15  we know we already ain't going to renew this contract.  We're
16  just going to --

17             THE COURT:  Okay.  Excuse me.  What's wrong with that
18  statement for the three-year one?

19             MR. DAVIS:  Because under the established law going
20  all the way back to Umbehr, the Supreme Court has said even if
21  you don't have a right to something, the government cannot
22  deprive you of it because they want to retaliate against you
23  because of your speech.  If that were the case --

24             THE COURT:  If you don't have a right to --

25             MR. DAVIS:  Exactly.

108

```
1          THE COURT:  -- something that you -- they won't allow
2   you to deprive -- if you don't have a right to it, what are you
3   being derived of?
4          MR. DAVIS:  The cases use examples lottery tickets,
5   law licenses, any number of things.  Driver's license.  Nobody
6   has a right under the Constitution to a driver's license.  But
7   if the government can say the only way you can get a driver's
8   license is you must pledge an oath of loyalty to the Trump
9   administration, that would be an unconstitutional condition.
10  And so the cases say if you couldn't do that explicitly, we're
11  not going to let you do it implicitly by retaliating against
12  somebody who happens to be anti-Trump and a Clinton supporter
13  and say, we know you're not entitled to a driver's license, but
14  because of your speech and we don't like it, you don't get a
15  driver's license.
16          And the Courts say at that point that's a First
17  Amendment retaliation claim.  And whether they had a property
18  right in that issue -- in that item is immaterial.  That's the
19  language from Sindermann.  That's not the issue.  The issue is
20  did the government take it away because of the speech?  And
21  here we've got clear evidence that the reason they took it away
22  was because of her speech.  No other reason.
23          THE COURT:  All right.
24          MR. DAVIS:  I'm sorry, Judge.
25          THE COURT:  No.  No.  No.  I'm just -- I'm trying to
```

199

```
1    get both of you out -- some of it you've said before.  Some of
2    it was new, or at least put in a different way.  Counsel,
3    anything further?
4         MS. SCHWENDENER:  Judge, I, I -- if counsel's arguing
5    that she had a property interest in the three-year contract,
6    that's not accurate.  There was no discussions.  It was purely
7    speculative, and --
8         THE COURT:  No, that's not -- what he just argued
9    was --
10        MR. DAVIS:  That's not what I argued.
11        THE COURT:  What he just argued was, you know, she
12   didn't even have to have a property right.  He's saying the
13   fact that -- she doesn't have to have a property right and they
14   could have just said, no, we're not renewing and left it there,
15   and he wouldn't have a word to say about it.  But he's saying
16   because they decided and this continued jawing back and forth
17   went on about how she shouldn't have opened her, quote,
18   unquote, mouth to file some claim against them or something
19   that's been going on here, that that's why they were going to
20   let her go.
21        Even though it sounds like they said, well, we
22   weren't going to renew you first, and then they said besides,
23   and then it's yak, yak, yak.
24        MR. DAVIS:  Well --
25        THE COURT:  That's what you just said.  That was your
```

200

1    argument.  They weren't -- they already told her they weren't

2    going to renew her anyway.

3            MR. DAVIS:  No.

4            THE COURT:  But then after that they went on to

5    say --

6            MR. DAVIS:  No.  No.

7            THE COURT:  And the reason why -- that's what you

8    just said, Counsel.

9            MR. DAVIS:  Well, maybe I'm not being clear, Judge.

10           THE COURT:  Okay.

11           MR. DAVIS:  And I appreciate you giving me the chance

12   to clarify.  They never told her they weren't going to renew.

13   The typical routine is they tell a superintendent whether

14   they're going to renew 60 days before expiration of the

15   contract, which would have been in the spring of 2016.

16           THE COURT:  For the one year?

17           MR. DAVIS:  Not for the one year.  For the whole

18   contract.

19           THE COURT:  For the next contract, the three years?

20           MR. DAVIS:  Right, for the next contract.  They have

21   to within 60 days give notice whether they're going to renew.

22   They only gave her the one-year out of an abundance of caution

23   because they wanted to keep her and didn't want to have her

24   looking for work in the last year.  But generally they do this

25   60 days out.  So we're now in December of 2015, almost six

1    months or four, five months before they had to give her notice.

2    We go back even further.  The comments I'm telling you they

3    made were in October of 2015, and they said we're going to

4    paper trail her to death.  That's one of the quotes from Kisha

5    McCaskill.  And we've already decided we're not going to renew

6    her, but we're going to issue this notice to renewal anyway to

7    paper trail her to death.

8            They issued the notice to renewal.  And then on four

9    weeks later they said because of the notice to renewal, we're

10   not renewing your contract.  So they had never told her we're

11   not going to renew your contract.  And the decision not to

12   renew the contract was made purely on the basis of the speech

13   in July.  As Tyrone Rogers said, it was all a progression.  We

14   wanted to get rid of her in July.  We couldn't fire her then,

15   so we had to go through this process.  We had to do first the

16   directives.  Then the notice to remedy.  But it was a fait

17   accompli.

18           THE COURT:  Okay.  Again, I'm having a hard time with

19   the one-year.  So you're saying, oh, the one-year was

20   already -- I mean, obviously these directives, some of these

21   statements are going toward the one-year extension, which they

22   didn't want to do.  And you're going saying, oh, no.  No.  It's

23   beyond that.

24           MR. DAVIS:  It was a series, Judge.  Retaliation is

25   often --

202

1          THE COURT:  Well, but, but, Counsel, you have to be

2     able to show that the three-year was already decided that she

3     had a right to, to argue that you can't take this away from me.

4     And I am not hearing that, and I want counsel to respond to my

5     question.

6          MR. DAVIS:  And that's the disconnect.  Counsel has

7     not cited any authority for the proposition --

8          THE COURT:  Well, neither one of you have really

9     cited --

10         MR. DAVIS:  Well, I've cited Umbehr.  I'm cited

11    Sindermann.

12         THE COURT:  You've cited, but the Court sees

13    distinctions between the, the fact pattern that's included

14    there.  And I guess it's almost like there's none out there

15    like this one.

16         MR. DAVIS:  Well, in Umbehr it was a, a garbage

17    hauling case.  He had a contract with the city to hall garbage.

18    And he got political and criticized the mayor, and the mayor

19    said no more hauling garbage for you.  And the city said, well,

20    you're not entitled to haul our garbage.  And so you don't have

21    a property right in hauling our garbage, so you're out.  The

22    Supreme Court said it doesn't matter if he didn't have a right

23    to --

24         THE COURT:  My problem is, Counsel, there's an

25    intervening job situation.  That is, the one-year extension,

1    which sounds fine to me.  You can argue that all you want.  You

2    can't say that the three-year is also part of that.  That was

3    my ruling, and that's my ruling now.  Anything further?

4            MS. SCHWENDENER:  No, Judge.

5            THE COURT:  Okay.  That's it.  The three-year is not

6    proper.  You can't bring all that -- you can bring it in, but

7    for the one-year.  For the one-year.

8            MR. DAVIS:  So --

9            THE COURT:  That was what -- that's like the garbage

10   contract being cut.  She already thought she had the one-year.

11   That was right there, and they decided, oh, we don't want her

12   to have that either.  Right?

13           MR. DAVIS:  I differ -- I respectfully disagree,

14   Judge.

15           THE COURT:  Did they -- they gave her the one-year?

16           MR. DAVIS:  They gave it and took it back.

17           THE COURT:  And took it back.  No more for you.

18           MR. DAVIS:  And then after they took it back, they

19   weren't done.  They wanted her out before June 30th.  So they

20   set about all of this other stuff to get her out so she

21   wouldn't even stay till June 30.

22           THE COURT:  Gotcha.

23           MR. DAVIS:  And in the process they engaged in this,

24   quote, progression.  And what you're doing is cutting --

25   respectfully not allowing the jury to hear evidence simply

204

1    because counsel keeps waving the pleadings around.  I remember

2    somewhere in law school federal courts have liberal standards

3    for pleadings.  Pleadings are just for notice.  And the idea

4    that we're here arguing about the pleadings --

5                THE COURT:  There's liberal --

6                MR. DAVIS:  -- and not looking at the substance,

7    Judge --

8                THE COURT:  Okay.  Excuse me, Counsel.  There's

9    liberal pleadings to get into court and to go forward, not --

10   you don't do liberal pleadings five years down the road on a

11   case, almost five years down the road and you're at trial, and

12   all of a sudden you say, well, we can put in whatever we want

13   because of liberal pleadings.  Liberal pleadings go to initial

14   motions to dismiss, for failure to state a claim where people

15   can be fairly liberal.  And even if we dismiss it, we dismiss

16   it without prejudice.  We are at trial.  So right now my ruling

17   is still the same.  Right now.

18               MR. DAVIS:  Well, can we at least, Judge, have

19   counsel to make a complete record, as I imagine this is going

20   to go up on appeal.  To provide one case that says you must

21   have a property right in order to bring a First Amendment

22   retaliation claim on a contract nonrenewal.  I don't know any

23   case like that.  And I'd like for them at least to provide some

24   authority and give me an opportunity to respond to it.

25               THE COURT:  Why don't you do this:  After we get the

205

1    cross-exam and get through one full witness, then if you want

2    to bring -- right now it's still without prejudice for the last

3    time.  You can make your brief arguments, and, Counsel, you

4    cannot just rely on this Court.  You do have to make your own

5    argument.

6              MR. DAVIS:  Exactly.

7              THE COURT:  All right.  I know the Court spelled it

8    out.  But, Counsel, also on a motion to reconsider if you don't

9    cite anything new, I didn't even have to even begin to

10   consider --

11             MR. DAVIS:  You're very generous, Judge.

12             THE COURT:  -- your motion to reconsider at any of

13   these points because you're saying the same thing you've said.

14   You're right, that's what the Appellate Court is for.  I was on

15   one once.  They wouldn't have a job if judges didn't do things

16   that lawyers thought should be appealed.  So --

17             MR. DAVIS:  Thank you, Judge.

18             THE COURT:  -- that, that is fine with me.  We'll see

19   what happens.  Right now my ruling stays the same.

20             MR. DAVIS:  I understand.

21             THE COURT:  All right.  And so let's abide by it.

22   So --

23             MR. DAVIS:  Thank you, Your Honor.

24             THE COURT:  Okay.  All right.  So, Counsel, you just

25   should be able to -- there's something that your partner is

206

1    supposed to be looking at while we put this on.

2           MS. SCHWENDENER:  Yes.

3           THE COURT:  All right.  And, Miss Adams, can you

4    take -- Dr. Adams, can you come up and take the stand.  And,

5    and let me just say right now.  If for some reason I slip and I

6    don't call you, Doctor, there's no disrespect at all.

7           THE WITNESS:  Okay.  That's fine.

8           THE COURT:  My parents were both Ph.Ds.  They just

9    didn't use it unless they were at school, so all right.

10          THE WITNESS:  That's fine.

11          THE COURT:  Anything else while he's looking --

12   counsel's going to be looking that over during this time, but

13   the -- and if you know already --

14          MR. DAVIS:  Well, counsel handed me a revised

15   absentee report that extended beyond the one that I showed Dr.

16   Adams earlier.  And I don't have a problem with the revised

17   report.

18          THE COURT:  As opposed to the one you gave them?

19          MR. DAVIS:  Yes.

20          THE COURT:  Okay.  Is that -- everybody's good on

21   that?  What's that, what's that exhibit number?

22          MS. SCHWENDENER:  We haven't introduced any exhibits

23   yet, Judge.

24          THE COURT:  I just want to -- what have we been

25   talking about?  Give it a label.

Adams - cross by Schwendener

1          MS. SCHWENDENER:  1.  We will do Defendants' Exhibit

2    No. 1.

3          THE COURT:  Defendants' Exhibit 1.  All right.  But

4    plaintiff is going to use it.

5          MR. DAVIS:  Yes.

6          THE COURT:  All right.  Thank you very much.  And

7    also for the -- I think it was one of the parties who came in.

8    I'm sorry if you weren't present when the Court talked about

9    its rules of no outside drinks.  I wasn't trying to make

10   anybody waste money, so -- but yes, other than me and my mug,

11   nobody gets to bring in a drink.  You get water.  If you had a

12   bottle of water, that would be okay.  But coffee drinks, the

13   jury can't have them out here and neither can anybody else in

14   my courtroom.

15         All right.  If there's nothing else.

16      (Before the jury:)

17         THE COURT:  We left off so that we could begin the

18   cross-examination of Dr. Adams:

19         MS. SCHWENDENER:  May I begin.

20         THE COURT:  Yes.

21         MS. SCHWENDENER:  Thank you, Judge.

22                 CROSS-EXAMINATION

23   BY MS. SCHWENDENER:

24   Q    Good afternoon, ma'am.

25   A    Good afternoon.

Adams - cross by Schwendener

1   Q    Dr. Adams, we've already gone through this a couple times
2   but you had a three-year contract with the district, correct?
3   A    Yes.
4   Q    And that was from July 1st of 2013 until June 30th of
5   2016, correct?
6   A    Yes.
7   Q    And you agree with me that your contract could not be
8   extended or rolled over unless certain student performance and
9   academic achievement goals had been met, correct?
10  A    It was laid out in the contract, correct.
11  Q    Now, you signed your three-year contract with the board,
12  correct?
13  A    Correct.
14  Q    And as part of your job as superintendent, you were
15  responsible for the school district's fiscal and business
16  management, correct?
17  A    Correct.
18  Q    Now, the board voted to extend your superintendent
19  contract for one additional year, correct?
20  A    Correct.
21  Q    And that would have been in February of 2015, correct?
22  A    That's correct.
23  Q    And that extension was a continuation of your existing
24  contract, correct?
25  A    Correct.

Adams - cross by Schwendener

1  Q    It is under the same terms and conditions, correct?

2  A    Correct.

3  Q    You never signed a one-year contract extension, correct?

4  A    I was never presented a document, a paper document for

5  that.

6  Q    You never signed a one-year contract extension, correct?

7  A    Correct.  I was never given a paper copy of a one-year

8  contract.

9  Q    Now, after you were presented with a contract extension,

10  you tried to alter the terms of the contract, correct?

11          MR. DAVIS:  Objection, Your Honor.

12          THE COURT:  Basis?

13          MR. DAVIS:  Mischaracterizes the facts.

14          THE COURT:  Objection's overruled.  This is

15  cross-examination.  Proceed.

16          THE WITNESS:  My intent was to actually create a new

17  contract with different terms.  I wanted to change some of the

18  terms in the original contract.

19  BY MS. SCHWENDENER:

20  Q    All right.  And let's go through that.

21          MS. SCHWENDENER:  May I approach, Your Honor.

22          THE COURT:  Oh, yes.

23          MS. SCHWENDENER:  This is Exhibit No. 9, the revised

24  superintendent's contract.

25          THE COURT:  All right.

Adams - cross by Schwendener

1  BY MS. SCHWENDENER:

2  Q    If you look at page 1.

3        MS. SCHWENDENER:  And, Your Honor, I'd like to

4  publish this to the jury.

5        THE COURT:  Any objection, or has this already been

6  published?

7        MS. SCHWENDENER:  I believe it actually has already

8  been.

9        THE COURT:  I believe it has, yes.  Right now it's

10  just with the witness.  And you're ready for it to be published

11  as it has been already?

12        MS. SCHWENDENER:  Yes, Your Honor.

13        THE COURT:  Any objection?

14        MR. DAVIS:  No, Judge.

15        THE COURT:  Thank you.

16  BY MS. SCHWENDENER:

17  Q    If we look at -- it appears, Dr. Adams, that there are

18  underlying changes in -- at least on the first page, correct?

19  A    There are some underlying changes, yes.

20  Q    And those underlying changes would have been changes that

21  you or your attorney requested, correct?

22  A    That is correct.

23  Q    And if we look at page 2, there is paragraph 4.  An

24  underlying change for compensation, correct?

25  A    That is correct.

211

Adams - cross by Schwendener

1  Q    And isn't it true that you did request a greater

2  compensation then your existing contract, correct?

3  A    According to this document, I did.  I requested $185,000.

4  Q    And if we look at page 5, paragraph 14.  You also

5  requested a higher automobile reimbursement, correct?

6  A    Correct.

7  Q    Now, the board never responded to your proposed changes,

8  correct?

9  A    These changes were never presented to the board to my

10  knowledge.  Not as a full board, no.

11  Q    You never received a response -- you never received a

12  response or -- strike that.

13        The board never agreed to these changes, correct?

14  A    That's correct.

15  Q    And you never signed a new contract with the board,

16  correct?

17  A    A new contract?

18  Q    Correct.

19  A    That's correct.

20  Q    And you never signed a one-year extension agreement with

21  the board, correct?

22  A    I was never given a one-year extension document to sign

23  for the board.

24  Q    My question was you never signed a contract, correct?

25  Regardless of whether you were presented, you never signed

Adams - cross by Schwendener

1  anything, correct?

2  A    That's correct.

3       MR. DAVIS:  Objection, argumentative, Judge.

4       THE COURT:  Objection's overruled at this point.  It

5  is cross-examination, but watch your tone, Counsel.  Proceed.

6  BY MS. SCHWENDENER:

7  Q    I'd like to show you what has been marked as Plaintiff's

8  Exhibit 1, the superintendent's contract.

9       THE COURT:  All right.  Any objection?

10      MS. SCHWENDENER:  May I approach.

11      MR. DAVIS:  What is that?  I have not seen that.  Oh,

12  yes.  Is that our 1?

13      MS. SCHWENDENER:  Your 1.

14      MR. DAVIS:  Yes, that's fine.

15      THE COURT:  All right.  Proceed.  And you'd like this

16  published, Counsel?

17      MS. SCHWENDENER:  Yes, please, Your Honor.

18      THE COURT:  Proceed.

19  BY MS. SCHWENDENER:

20  Q    Dr. Adams, if you could turn to page 7 of the contract,

21  paragraph 20.4.  Could you please read that.

22  A    20.4?

23  Q    Yes, ma'am.

24  A    This agreement contains all the terms agreed upon by the

25  parties with respect to the subject matter of this agreement

Adams - cross by Schwendener

1    and supersedes all prior agreements, arrangements, and

2    communications between the parties concerning such subject

3    matter whether oral or written.  Except as may otherwise be

4    provided herein, no subsequent alteration, amendments, change,

5    or addition to this contract shall be binding upon the parties

6    unless reduced in writing and duly authorized and signed by

7    each of the parties.

8    Q    Thank you.

9    A    You're welcome.

10   Q    Earlier you testified that you did ask for an audit into

11   the board's finances in the spring or summer 2015, correct?

12   A    That was part of the proposal, yes.

13   Q    And isn't it true that in response to -- in response to

14   your request for an audit Tyrone Rogers commended you?

15   A    Can you repeat that.

16   Q    Sure.  Isn't that true that in response to your request

17   for an audit Tyrone Rogers commended you?

18   A    In the initial request for me to do that, yes.

19   Q    And in the initial request he was in favor of the audit,

20   correct?

21   A    In the initial request he was in favor, yes.

22   Q    In fact, all board members were in favor of the audit?

23   A    That is correct.  The, the initial was always in favor --

24   all were in favor.  Excuse me.

25   Q    Now, the board members voted and allowed you to prepare a

Adams - cross by Schwendener

1    request for a proposal for the audit, correct?

2    A    That is correct.

3    Q    The board members never told you that you couldn't prepare

4    a request for, for the audit, true?

5    A    That's true.

6    Q    Mr. Rogers never threatened you at this board meeting

7    after you initially suggested the audit, correct?

8    A    Not prior to the RFP, no.

9         THE COURT:  So the answer is correct?

10        THE WITNESS:  That's correct, yes.

11   BY MS. SCHWENDENER:

12   Q    Mr. Rogers -- your testimony earlier was that Mr. Rogers

13   called you in the afternoon of July 9th, 2015, correct?

14   A    That's correct.

15   Q    And you were alone at the time?

16   A    I was, that's correct.

17   Q    And it's your testimony that Mr. Rogers said that you

18   were -- I believe you said you were itching for an ass

19   whipping?

20   A    Ass whipping or ass kicking, one of those two.  You're

21   itching for an ass, I thought it was kicking but maybe it was

22   whipping.

23   Q    Mr. Rogers didn't say that he personally was going to whip

24   you, did he?

25   A    It was implied -- I took that to mean that was a threat to

Adams - cross by Schwendener

1  me from Mr. Rogers.  That was my interpretation of what he said

2  to me.

3  Q    But he didn't say that he personally was going to cause

4  you any harm, correct?

5  A    I took his comment as a threat to me.

6           THE COURT:  Can you answer her question, ma'am.

7           THE WITNESS:  He did not say it, no.

8  BY MS. SCHWENDENER:

9  Q    Mr. Rogers never threatened you in the past, correct?

10  A    No.  That's correct.

11  Q    Now, you didn't tell any of the board members about Mr.

12  Rogers' statement that same evening on July 9th, correct?

13  A    I did not, that is correct.

14  Q    You didn't go to the police that evening, correct?

15  A    I did not, that's correct.

16  Q    And the next day you testified that you spoke with

17  Detective Wright about Mr. Rogers' statements?

18  A    That is correct.

19  Q    But you didn't actually contact the police about his

20  statements, correct?

21  A    That is correct.

22  Q    You personally never reported the incident to the police,

23  correct?

24  A    I reported it to him when he -- when he came to my office.

25  Q    Prior to him arriving at your office, you had not reported

Adams - cross by Schwendener

1    the incident to the police, correct?

2    A    Correct.

3    Q    So he just -- Detective Wright showed up at your office

4    the next day?

5    A    Correct.

6    Q    And you told Detective Wright about the incident, correct?

7    A    That's correct.

8    Q    And you told -- on that date you told Detective Wright

9    that you first wanted to speak with the school board president

10   about the matter?

11   A    That is correct.

12   Q    You did not ask Detective Wright to file a complaint on,

13   on July 10th, correct?

14   A    Not at that time, that's correct.

15   Q    And that's because you wanted to first speak with the

16   board president, and that would have been Gloria Johnson?

17   A    That is correct.

18   Q    And you wanted some direction from Miss Johnson about how

19   to handle the matter?

20   A    I don't know -- it wasn't direction, no.  I wanted to

21   inform her of the situation.  And together I thought we could

22   work out a solution or something that made me feel a little

23   more comfortable about what, what was said.

24   Q    And that's because it was a school matter.  You wanted to

25   talk with the board president about a school related matter,

Adams - cross by Schwendener

1    correct?

2    A    Because she was my direct supervisor, so she supervised

3    me.  She was my boss.

4    Q    And it was a -- you would agree that it was a school

5    matter, correct?

6    A    I reported it to her because she was my boss, and she

7    needed to know.  And as I said, I wanted to work -- see if we

8    could work it out.

9    Q    My question, ma'am, would you agree that it was a school

10   matter?

11           MR. DAVIS:  Asked and answered, Judge, now three

12   times.

13           THE COURT:  She didn't answer it the last time, so

14   let's see.  Can you answer that question, ma'am.

15           THE WITNESS:  Well, I'm not sure if it is -- if it

16   was a school matter.  I think it was -- if I would have

17   received that information from anyone, my response probably

18   would have been the same in terms of reaching out to the police

19   and feeling threatened by that.

20   BY MS. SCHWENDENER:

21   Q    And you did speak with board president Gloria Johnson

22   about the matter, correct?

23   A    I did, correct.

24   Q    Isn't it true that Miss Johnson told you to pursue

25   whatever avenue you needed if you felt threatened?

Adams - cross by Schwendener

1   A    I believe she did say something to that effect, yes, she
2   did.
3   Q    And when you spoke with Detective Wright a couple days
4   later on July 13th, you shared with Detective Wright that the
5   board told you to pursue whatever avenue -- whatever avenue was
6   needed, correct?
7   A    Can you repeat that one more time.
8   Q    Sure.  When you spoke with Detective Wright on July 13th,
9   you shared with him that the board told you to pursue whatever
10  avenue was needed, correct?
11          MR. DAVIS:  Objection, Judge.  It's confusion.
12          THE COURT:  Objection's overruled.  It's cross --
13          MR. DAVIS:  Can we -- do we need a sidebar?
14          THE COURT:  No, we don't need a sidebar.
15          MR. DAVIS:  Okay.
16          THE COURT:  All right.
17          THE WITNESS:  One more time, please.
18          MS. SCHWENDENER:  Sure.
19          THE COURT:  You know what, Miss McCullough, ask the
20  question.
21      (Record read.)
22          THE COURT:  Can you answer that?
23          THE WITNESS:  I don't -- I can't answer that, because
24  I don't recall if I told Detective Wright that.
25          THE COURT:  All right.  Then just say you don't

219

Adams - cross by Schwendener

1    recall.

2              THE WITNESS:  I don't recall if I told him that.

3              THE COURT:  All right.

4              THE WITNESS:  I don't.

5    BY MS. SCHWENDENER:

6    Q    You did not ask the board members to take disciplinary

7    action against Mr. Rogers, correct?

8    A    That is correct.

9    Q    Now, your testimony was that you met with Janet Rogers on

10   July 10th of 2015?

11   A    Correct.

12   Q    And you said that the purpose of the meeting was to

13   discuss concerns she had with you?

14   A    It wasn't a formal meeting.  She came into my office.  We

15   didn't have it scheduled.  It was not on the books.  She came

16   into my office to share with me that she was going to move

17   forward with the special board meeting.

18   Q    You don't have any information that Mrs. Rogers knew that

19   you had spoken with the police prior to her encounter with you

20   on the 10th, correct?

21   A    I can't answer that.  I don't know of anything that she

22   had at that time.

23   Q    You were -- you were obviously pre -- or were you present

24   at the July 22nd board meeting?

25   A    Yes.

220

Adams - cross by Schwendener

1  Q    And you did ask Attorney Izzo to attend the board meeting
2  that day, correct?
3  A    I asked the attorney -- Attorney Izzo to attend when we --
4  to address the forensic audit issue.  Specifically No. 1, yes,
5  I did.
6  Q    And I presume you're aware that Attorney Izzo told the
7  board members that your one-year contract extension was
8  ineffective because you had not met your goals?
9  A    That was not a discussion that I was privy to.
10 Q    Fair to say you've heard, you've heard that statement so
11 far?
12 A    I've heard it recently.  But I can't say that I heard it
13 on the 22nd.
14 Q    You don't have any evidence that Attorney Izzo did not
15 give that advice, correct?
16 A    I don't.
17 Q    And the board did tell you on July 22nd of 2015 that the
18 offer to rescind your contract was ineffective and would likely
19 to be rescinded, correct?
20 A    As I was leaving the room during executive session,
21 President Gloria Johnson at that time did say that there was
22 some conversation around the extension being ineffective, yes,
23 she did.  She did say that.
24 Q    You attended the board meeting on August 17th, correct?
25 A    That's correct.

Adams - cross by Schwendener

1  Q    And during that meeting you were presented with a partial

2  performance evaluation, correct?

3  A    During executive -- after executive session of that

4  meeting, yes.

5  Q    And during that August 17th meeting, the board also took a

6  formal vote to rescind the offer extending your contract for

7  one year, is that correct?

8  A    That is correct.

9  Q    And you were told that the board was rescinding the offer

10 because the extension was ineffective, correct?

11 A    That is what was in the minutes, correct.

12 Q    And that was because there was no finding that your goals

13 had been met, correct?

14 A    That I'm not sure.  I'm not clear on that, that part of

15 it.

16 Q    Dr. Adams, earlier I believe you testified that your --

17 that your goals were discussed during the June 2015 retreat?

18 A    Yes.

19 Q    And that was four months after the board had voted to

20 extend your contract, correct?

21 A    That is correct.

22 Q    Isn't it true that the goals you were presented were

23 actually district wide goals as opposed to personal goals for

24 you?

25 A    Superintendent's goals are typically district goals.  They

Adams - cross by Schwendener

1   are usually one in the same.

2   Q     There was no formal finding that your goals had been met

3   for that year, correct?

4   A     That's not true.  According to the goals that, that I had,

5   there were evidence of progress that was presented at that

6   retreat or during that retreat.  That was the purpose of the

7   retreat, to go through those items and look at where we were in

8   terms of meeting those goals.

9   Q     Let me ask it this way:  There was no agenda from that

10  June meeting to show that the board made any findings that you

11  had met your goals, correct?

12  A     There was an agenda for that meeting, and on the agenda we

13  did list -- I did list reporting out on the goals or the

14  strategic plan, or somehow it was listed that that's what we

15  would be covering.  That was the purpose of the retreat was to

16  go through that information.

17  Q     There was no motion by the board that you had made a

18  finding -- that they had made a finding on your goals, correct?

19  A     At what point?

20  Q     At, at the June 20th, 2015 board meeting.

21  A     I don't recall, no.

22  Q     There were no minutes from that June retreat to show that

23  the board made any finding that you had met your goals,

24  correct?

25  A     I would disagree with that.  I would say there were

Adams - cross by Schwendener

1  minutes that reflected the reports that were made on the
2  progress for those goals that had been established.
3  Q    I'm not asking for a report or discussion.  My question
4  was, was there -- you would agree -- or there were no minutes
5  indicating that the board met a formal finding that you had --
6  or a determination that you had met your goals at that June
7  retreat, correct?
8  A    So I believe in the minutes they would reflect the
9  reporting out that was done on the goals.  That's what I
10 believe was documented from that meeting.
11 Q    My question -- there was no formal resolution by the board
12 that stated superintendent had met her goals, would you agree?
13 A    There was no formal resolution.  I would agree with that.
14 Q    Getting back to the August 17th meeting where you were
15 handed a performance directives.  You asked for an opportunity
16 to be heard on the directives, correct?
17 A    That is correct.
18 Q    And no one from the board told you that you could not
19 respond to the performance directives, correct?
20 A    I asked Attorney Izzo.  He was representing the board, and
21 I believe he's the one that handed me the partial performance.
22 And that's why I asked him.
23 Q    And I believe your testimony was that Attorney Izzo did
24 say that you could submit a rebuttal or, or put something in
25 writing?

Adams - cross by Schwendener

1    A    Correct, for the personnel -- for my personnel file.

2    Q    Sure.  Now, it's your testimony that the board retaliated

3    against you because you filed a police report in response to

4    Mr. Rogers' alleged threats, correct?

5    A    That is correct.

6    Q    And you also claim that your contract extension was

7    rescinded and received the performance deficiencies at that

8    August 17, 2015 meeting as a result of the police report,

9    correct?

10   A    That is correct.

11   Q    Let's start -- let's discuss the performance deficiencies.

12   As a direct result of the performance -- of receiving the

13   performance deficiencies in August of 2015, you did not receive

14   a reduction in pay, correct?

15   A    I did not, no.

16   Q    As a direct result of receiving the performance

17   deficiencies in August of 2015, you were not placed on any type

18   of suspension after receiving those deficiencies, correct?

19   A    Not on August 17th, no.

20   Q    As a direct result of receiving the performance

21   deficiencies in August 2015, you did not receive a loss of

22   benefits at that time, correct?

23   A    Not at that time, that is correct.

24   Q    With regards to the, the contract extension for that one

25   year, no board member told you that they were going to take

Adams - cross by Schwendener

1    adverse action against you because of Mr. Rogers' threat,

2    correct?

3    A    Can you repeat that one more time.

4    Q    No board member told you that they were going to take any

5    adverse action against you because of Mr. Rogers' threat?

6    A    That's correct.

7    Q    You did not overhear any conversation that the board

8    members were going to take adverse action against you because

9    of Mr. Rogers' threat?

10   A    Did I hear any?  No, I did not.

11   Q    No one from the board told you that they were going to

12   rescind your contract because you reported Mr. Rogers' comments

13   to the police, correct?

14   A    No, they wouldn't have -- they didn't say that to me.

15   Q    Earlier you testified that you had stress from the

16   district, correct?

17   A    That is correct.

18   Q    You would agree with me that any job can carry stress,

19   fair to say?

20   A    A certain level absolutely.

21   Q    Fair to say you had stress prior to working at the

22   district?

23   A    Absolutely.  There was some stress.

24   Q    And you treated with Theresa Cunningham, correct?

25   A    Correct.

226

Adams - cross by Schwendener

1  Q    And isn't it true that Miss Cunningham is a licensed
2  therapist?
3  A    As far as I know, yes.  She works through -- I received a
4  referral to go to her after seeing my regular primary
5  physician.  So yes, she's affiliated with my medical clinic.
6  So yes, she is.
7  Q    A licensed therapist, correct?
8  A    Yes.
9  Q    Okay.  She is not a medical doctor, correct?
10 A    I, I don't think so.  I think she's a licensed therapist,
11 right.
12 Q    And you never treated -- strike that.
13         You were never prescribed any medications for your
14 stress, correct?
15 A    That is correct.  Actually, Counselor, she offered, but I
16 refused.  I -- no.  So no, I was not prescribed.
17 Q    In the 2015-16 school year isn't it true that you had 83
18 absences?
19 A    I -- I'm not sure of the number of days.  I would have to
20 look at the reports.
21 Q    Do you have any reason to disagree that you were absent
22 from school for 83 days in the 2015 to '16 school year?
23 A    I would want to look at the report.  I know there were
24 multiple days.  I was under the care of Dr. Cunningham.  I saw
25 her -- I saw her, excuse me, on a regular basis during that

Adams - cross by Schwendener

1    school year.  And I also -- at the beginning of that year I
2    know there were vacation days, and then there were also
3    professional development days.  And those days needed to be
4    preapproved.
5    Q    Sure.
6    A    And so those were noted as well.
7    Q    Thank you, ma'am.  All right.  Let's -- if I could show
8    you what we have marked as Defendants' No. 1.
9    A    Sure.
10            THE COURT:  All right.  Do you want her to review
11   this now?  Are you going to use it for questions?
12            MS. SCHWENDENER:  Yes, please.
13   BY MR. DAVIS:
14   Q    If you could please take a look at that.
15   A    Sure.
16   Q    Thank you.
17            THE COURT:  Is this to refresh her recollection?
18   What's the purpose of the document?
19            MS. SCHWENDENER:  The purpose of the document is to
20   refresh her recollection.
21            THE COURT:  All right.  So just look at it.  Read it
22   over, and let us know when you're done, ma'am.
23            THE WITNESS:  Okay.  Yes, ma'am.
24            THE COURT:  All right.  Then close it up.
25   BY MS. SCHWENDENER:

228

Adams - cross by Schwendener

1   Q   Yes, please.  If -- looking at the first page of, of the
2   report.  It appears that this is an absentee report from --
3           THE COURT:  All right.  Wait a minute, Counsel.  You
4   asked her to refresh her recollection.  And --
5           MR. DAVIS:  Right --
6           THE COURT:  Excuse me, Counsel.  Refresh her
7   recollection.  She did that.  You can't switch off to another
8   document.  You've got to perfect that remembrance, if it were.
9           MS. SCHWENDENER:  Sorry, Judge.  It was the same
10  document.
11          THE COURT:  That's the same document?
12          MS. SCHWENDENER:  Same document, Judge.
13          THE COURT:  All right.  All right.  So then actually
14  she shouldn't have refreshed her recollection with it if you're
15  going to be showing it to her.
16          MS. SCHWENDENER:  Sure.
17          THE COURT:  All right.  Proceed.
18  BY MS. SCHWENDENER:
19  Q   Dr. Adams, you would agree that this report is from July
20  1st of 2015 through June 30th of 2016, correct?
21  A   Yes, that's correct.
22  Q   And this report indicates that you had a total absences of
23  83 days, is that correct?
24  A   That is correct.
25          THE COURT:  All right.  Did you have that -- were you

Adams - cross by Schwendener

1  trying to publish that or no?

2          MS. SCHWENDENER:  No, I don't need to publish it.

3          THE COURT:  All right.  Thank you.

4  BY MS. SCHWENDENER:

5  Q    And you would agree that there are about 260 days of work

6  in the 2015-16 school year, correct?

7  A    That's correct.

8  Q    So fair to say you missed about a third of the year that

9  year, correct?

10 A    I would go back to the breakdown of the days.  There were

11 several vacation --

12         THE COURT:  Ma'am.

13         THE WITNESS:  Oh.

14         THE COURT:  It's only the question of she's asking

15 you to do some number work.  Answer that question if you can.

16 Mr. Davis will have the opportunity --

17         THE WITNESS:  Oh, okay.

18         THE COURT:  -- to come back and ask you questions on

19 redirect.

20         THE WITNESS:  Yes, ma'am.

21         THE COURT:  Proceed.

22         THE WITNESS:  Can you repeat your question.

23 BY MS. SCHWENDENER:

24 Q    You would agree that you missed about one/third of the

25 school year that year, correct?

Davis - redirect by Davis

1  A    83 days it looks like.  83 days, yes, ma'am.

2  Q    Fair to say you did receive the majority of your salary

3  for that year, correct?

4  A    The majority?

5  Q    Yes, the majority.

6  A    Yeah, the majority.

7            MS. SCHWENDENER:  Thank you.  Nothing further.

8            THE COURT:  All right.  Nothing further.  Redirect

9  based on the cross that was presented.

10           MR. DAVIS:  Thank you, Your Honor.

11                 REDIRECT EXAMINATION

12 BY MR. DAVIS:

13 Q    Let's start with where we just left off, Dr. Adams, the

14 report, the 83 days.  Does this report include time that you

15 were out of the district on medical leave, FMLA medical leave?

16 A    Yes, it does.

17 Q    So when did you go on FMLA medical leave?

18 A    It was in April of 2016.

19 Q    So any dates on there from April forward to June 30th, you

20 would have been on leave?  You weren't even in the district?

21 A    Correct.

22 Q    And prior to going on leave, isn't it true that most of

23 the absences began on or about or after August of 2015?

24 A    That is correct.

25 Q    And were those absences, absences we talked about earlier

Davis - redirect by Davis

1   attributable to you being under a doctor's care related to the

2   events you were experiencing at work?

3   A    That is correct.

4   Q    And prior to August 17th, we discussed earlier you only

5   had like what, nine days absent?

6   A    Something like that, yes.

7   Q    Right.

8   A    That's correct.

9   Q    And those were all approved absences?

10  A    The majority of them were, yes.

11  Q    And all the absences in prior years, you had never had --

12  even used your full amount of the vacation time, correct?

13  A    That's correct.

14  Q    Okay.  And even the time that you were off that counsel

15  just showed you in the report, you had excused absences or used

16  vacation time, none of those -- that time off was improper?

17  A    That is correct --

18           MS. SCHWENDENER:  Objection.

19           THE COURT:  Basis?  Basis.

20           MS. SCHWENDENER:  Leading.

21           THE COURT:  Objection sustained.  This is redirect.

22  It's not cross.

23  BY MR. DAVIS:

24  Q    Was any of that time time that you weren't authorized to

25  take?

232

Davis - redirect by Davis

1   A    No, it was not.

2   Q    And did you go through all the procedures you were

3   required to go through, providing your employer notice,

4   et cetera, before you took those times -- that time off?

5   A    Yes, I did.

6   Q    Okay.  Thank you.  Counsel asked you as a result of the

7   August 17th performance directives did you get suspended.  Did

8   you ever get any suspension --

9        MS. SCHWENDENER:  Objection --

10  BY MR. DAVIS:

11  Q    -- after August 17th?

12       THE COURT:  Excuse me.  There's an objection.  After

13  August 17th.  All right.  Let's step to the side.

14    (Side bar proceedings out of the hearing of the jury:)

15       THE COURT:  All right.  Remind me again, August 17th.

16       MS. SCHWENDENER:  August 17th was when they issued

17  the partial performance directives.  Counsel's question is at

18  any point did she get suspended.  She did in December of 2015.

19  My question was as a direct result of the performance

20  directives in August of 2017 did you get suspended.  So

21  counsel's going into -- or I anticipate that counsel's going to

22  ask her if at any point she got suspended, which was in

23  December several months later.

24       THE COURT:  Which was not part of --

25       MS. SCHWENDENER:  Which was not part of -- correct.

Davis - redirect by Davis

1    MR. DAVIS:  She opened the door, Judge, by asking --

2    THE COURT:  How did she open the door?

3    MR. DAVIS:  Because she asked her was she suspended.

4   And I think that the jury needs to hear the complete picture.

5   She's giving the misimpression that she never was suspended,

6   and the only discipline that she ever happened was on

7   August 17th.

8    THE COURT:  So when we went back, and I can --

9   looking at my same time, on, on direct he asked the question

10  about her suspension at this same time, correct, or no?

11   MR. DAVIS:  I didn't raise it then because I

12  couldn't.

13   THE COURT:  Right.

14   MR. DAVIS:  She opened the door.

15   THE COURT:  So now you have raised it, and you want

16  to limit it to the exact date you were talking about, is that

17  correct?

18   MS. SCHWENDENER:  I -- that's -- that was my question

19  was -- that yes, because -- and she said not at that time.  So

20  the jury --

21   THE COURT:  She said not at that time.  So now the

22  jury has it in its mind that it may have happened some other

23  time.  The problem is, Counsel, if she goes into she was

24  suspended some other time, you all are going to open the door

25  that you can't control, and the Court is going to be asking

Davis - redirect by Davis

1    them to disregard all kinds of information because it's going

2    to go way too far afield.

3              MR. DAVIS:  Well, I'm just going to ask did she have

4    any suspension.  I'm not going to go beyond that.

5              THE COURT:  Right.  And how does that help your

6    client?

7              MR. DAVIS:  Because it establishes that the

8    discipline that she experienced was not limited to those

9    performance directives.  And it corrects the misimpression that

10   that was the only thing that happened to her.

11             THE COURT:  And, and why do you have a problem with

12   this?

13             MS. SCHWENDENER:  That's outside the scope of cross

14   too.

15             MR. DAVIS:  You're asking her?

16             THE COURT:  Yes.

17             MR. DAVIS:  I'm sorry.

18             MS. SCHWENDENER:  My question was simply, you know,

19   on this date did you receive a suspension as a result of this?

20   And her question was no, not at that time.  So now she can talk

21   about a suspension she had several months later for an

22   unrelated -- that didn't have anything to do with the

23   performance directives.

24             THE COURT:  I mean, the area has been on the

25   performance directives.  You have gone through the performance

Davis - redirect by Davis

1    directives, and she asked the question.  And now you want to

2    get back and then go beyond something that you haven't had

3    testified to.

4              MR. DAVIS:  I want to just establish and correct the

5    impression that just because she didn't get suspended in that

6    particular day, it didn't mean that she didn't ever experience

7    a suspension.  Because the impression that's being given to the

8    jury, Judge, is that you didn't suffer any harm.  Nothing

9    happened to you.  She can't open the door and --

10             THE COURT:  Okay.

11             MR. DAVIS:  -- limit it.

12             THE COURT:  Okay.  We don't need all the body

13   language.

14             MR. DAVIS:  I'm sorry.

15             THE COURT:  They can read that.  So again, what is

16   your problem with this?  Just -- how does this hurt your

17   client?

18             MS. SCHWENDENER:  Well, I guess if the question is

19   specifically at any point did you get suspended, yes, and leave

20   it at that.

21             THE COURT:  As to opening the door and going into --

22             MS. SCHWENDENER:  It's opening the door.

23             THE COURT:  As to, as to opening the door and going

24   down the road of what all these were, I'm not going to allow

25   that.

Davis - redirect by Davis

1    MR. DAVIS:  I'm not going to --

2    THE COURT:  So it's one question?

3    MR. DAVIS:  Yes.

4    THE COURT:  Okay.

5    MS. SCHWENDENER:  And for the record I still object.

6    THE COURT:  You still object.

7    MS. SCHWENDENER:  I still object.

8    THE COURT:  So it's one question.  I'll allow him to

9    do it.  All right.

10   MR. DAVIS:  Thank you, Your Honor.

11      (Before the jury:)

12   THE COURT:  All right.  Excuse me, ladies and

13   gentlemen.  We'll proceed.

14   BY MR. DAVIS:

15   Q    So again, Dr. Adams, counsel asked you -- well, counsel --

16   yes, she asked the question were you suspended as a result of

17   the performance directives on August 17th, 2015, and your

18   answer was no, is that correct?

19   A    That's correct.

20   Q    My question is were you suspended at any other time after

21   August 17th, 2015 by the District?

22   MS. SCHWENDENER:  Objection for the record, Your

23   Honor.

24   THE COURT:  Objection for the record is made.  Same

25   ruling.  Proceed.

Davis - redirect by Davis

1      THE WITNESS:  I was --

2   BY MR. DAVIS:

3   Q    No.  No.  It's simple --

4      THE COURT:  It's a yes or no answer.

5      THE WITNESS:  Yes.  Yes.

6      MR. DAVIS:  Okay.  Thank you.

7      THE COURT:  All right.  Anything further on redirect,

8   Counsel?

9      MR. DAVIS:  Yes, Judge.

10     THE COURT:  All right.

11  BY MR. DAVIS:

12  Q    Counsel also said -- asked you did you receive any pay

13  reduction as a result of the performance directive on

14  August 17th, 2015, right?

15  A    Correct.

16  Q    In fact, by them rescinding -- by the Board rescinding the

17  contract extension, did that not result in a loss to you

18  financially?

19     MS. SCHWENDENER:  Objection.

20     THE COURT:  Objection's overruled.  I'll let him ask.

21     THE WITNESS:  Can you repeat that one more time.

22  BY MR. DAVIS:

23  Q    How much financially did you lose when the board rescinded

24  the contract extension that they had granted in February?

25     THE COURT:  All right.  Counsel, that's two different

238

Davis - redirect by Davis

1    questions.

2              MR. DAVIS:  Okay.

3              THE COURT:  Objection is sustained on how much.  You

4    asked if --

5    BY MR. DAVIS:

6    Q    Did you have a financial loss as a result of the

7    rescission of the contract extension?

8    A    Yes, I did.

9    Q    Do you know how much it was?

10   A    A year's --

11             MS. SCHWENDENER:  Objection.

12             THE COURT:  All right.  You know what, I'm going to

13   go ahead and let her testify.  Proceed.

14             THE WITNESS:  That would be a year's salary at

15   minimum is what I, I lost.

16   BY MR. DAVIS:

17   Q    And how much was that?  Refresh us.

18   A    165,000.

19   Q    Thank you.  Counsel asked you if you ever had stress in

20   any previous job, and you said yes.  Were you ever forced to

21   go -- or did -- did you go seek medical help from a doctor

22   related to stress in any previous job?

23   A    No, I did not.

24   Q    Did you ever go on a medical leave because of stress

25   related to any job you ever previously held?

Davis - redirect by Davis

1    A    No, I did not.

2    Q    Counsel asked you did the board tell you could do whatever

3    you needed to do after it was reported that Tyrone Rogers

4    threatened you.  You remember that?

5    A    I remember, yes.

6    Q    In fact, the only person you heard from or talked to was

7    Gloria Johnson, is that what you testified to?

8    A    That's correct.

9    Q    But you never heard from or had any communication with the

10   other board members?

11   A    That is correct.  Not regarding that situation, no.

12   Q    So the person who told you do whatever you need to do, who

13   was that?

14   A    President Gloria Johnson.

15   Q    Thank you.  And counsel showed you the new contract and

16   she went through various underlined things and had you look at

17   those.  But I want to be clear, was that to substitute, replace

18   the existing contract or was that to modify the existing

19   contract?

20   A    The proposed contract was to replace.  It was going to be

21   a new contract.

22   Q    Exactly.  Okay.  Counsel asked you did you sign the

23   extension that they voted for on February 23, 2015, the

24   one-year extension.  Were you ever asked to sign before they

25   voted?  Did anybody say you got to sign this before we vote?

Davis - redirect by Davis

1   A    No, I was not -- I was not asked.

2   Q    Did anybody come to you after they voted and approved it

3   and say, oh, we need you to sign this?

4   A    No.

5        THE COURT:  Meaning the one-year extension.

6   BY MR. DAVIS:

7   Q    The-one year extension.

8   A    No.

9   Q    Counsel talked to you about the goals and said that the

10  goals at the retreat were -- she asked you whether the goals at

11  the retreat were the district goals or your goals.  You

12  remember that?

13  A    I do.

14  Q    And she also made a point that the board didn't formally

15  vote at the retreat met all goals.  Do you remember that?

16  A    I do, yes.

17  Q    You testified yesterday at length about the goal process.

18  A    Correct.

19  Q    Right?

20  A    Correct.

21  Q    And can you briefly -- that was like a year long process,

22  right?

23  A    Correct.  Yes.

24  Q    With many steps along the way to check the goals, tweak

25  the goals, et cetera?

Davis - redirect by Davis

1    A    Correct.

2    Q    And you testified that that happened all the way up to

3    June 2015, correct?

4    A    That's correct.

5    Q    So if there would have been any problems with you meeting

6    the goals, there was many steps along the way when they would

7    have told you that, right?

8             MS. SCHWENDENER:  Objection.

9             THE COURT:  That's speculative and the form.

10   Sustained.  Save it for argument.

11   BY MR. DAVIS:

12   Q    What would have happened in -- you all had a retreat in

13   December 2015 where you talked about the goals, right?

14   A    That was -- that would have been December of 2014,

15   correct.

16   Q    I'm sorry.

17   A    Yes.

18   Q    2014.

19   A    Yes, that's correct.

20   Q    Did anybody say there, hey, you're not meeting your goals?

21   You got a problem?

22   A    No.  Any issues that we --

23             THE COURT:  Counsel -- I'm sorry.  Miss --

24             THE WITNESS:  I'm sorry.  No.  I'm sorry.  I'm sorry,

25   Judge.

Davis - redirect by Davis

1    THE COURT:  Dr. Adams.

2    THE WITNESS:  Yes, ma'am.

3    THE COURT:  Only yes.  We'll never get through this.

4    THE WITNESS:  Okay.

5    THE COURT:  Yes.

6    BY MR. DAVIS:

7    Q    And in January, again you all talked about the goals at

8    another retreat, January 2015?

9    MS. SCHWENDENER:  Objection.

10   THE COURT:  Basis?

11   MS. SCHWENDENER:  Leading.

12   THE COURT:  Objection -- the form of the question is

13   slightly leading.  Sustained.

14   BY MR. DAVIS:

15   Q    Did you ever have another retreat after December where you

16   all talked about the goals after December 2014?

17   A    We did, yes.

18   Q    Did anybody at that retreat say, oh, you didn't meet the

19   goals.  We got a problem?

20   A    No.

21   Q    On your performance review that we looked at yesterday,

22   did anybody say, oh, you're not meeting the goals.  We've got a

23   problem?

24   A    No.

25   Q    And finally in the previous years -- you came to the

243

Davis - redirect by Davis

1   district in 2013, right?

2   A    Correct.

3   Q    You had goals for 2014 -- 2013-14 year too, right?

4   A    Correct, yes.

5   Q    And they were on the same cycle, schedule?

6   A    That is correct.

7   Q    So at the retreat in June of that cycle, did anybody stand

8   up and say you met the goals?  Did anybody place a resolution

9   and say you met the goals at the retreat?

10  A    No, that was -- no, they did not.

11  Q    So as far as you know that was never part of the

12  district's process --

13             MS. SCHWENDENER:  Objection.

14             THE COURT:  Let him finish the question.

15  BY MR. DAVIS:

16  Q    In your experience did the district ever have a process

17  where they had to formally vote to say you met the goals?

18  A    That was not my experience, no.

19  Q    In fact, what they -- the whole process as you've

20  described it now was to see if you weren't meeting the goals

21  and whether they needed to be changed, right?

22  A    That is correct.

23             MR. DAVIS:  Thank you.  I think that's it, Your

24  Honor -- one last question.

25  BY MR. DAVIS:

244

Adams - recross by Schwendener

1   Q    Counsel asked you about the July 22nd meeting.  They never

2   took a vote about rescinding the contract at that meeting,

3   right?

4   A    That is correct.

5   Q    When was that vote taken?

6   A    On August 17th.

7               MR. DAVIS:  Thank you, Dr. Adams.

8               THE WITNESS:  You're welcome.

9               THE COURT:  Thank you very much, Mr. Davis.  Any

10  recross?

11              MS. SCHWENDENER:  Brief, Your Honor.

12              THE COURT:  All right.

13                     RECROSS-EXAMINATION

14  BY MS. SCHWENDENER:

15  Q    Dr. Adams, I believe you indicated that no one told you

16  that you had to sign your contract extension?

17  A    That's correct.

18  Q    Okay.  Isn't it true that you had a conversation with

19  Janet Rogers about your contract extension?  She told you to

20  sign it, and you said in response that you would take your

21  chances with the new board?

22  A    I don't recall that.  I recall having a conversation with

23  Janet Rogers, but not about that.

24              THE COURT:  All right.  You don't wish to go any

25  further?

245

1          MS. SCHWENDENER:  I don't.  Thank you.

2          THE COURT:  All right.  Thank you very much.  You may

3    step down.

4          THE WITNESS:  Thank you.

5       (Witness excused.)

6          THE COURT:  All right.  And before we call our next

7    witness, we'll take a slight break so we can make sure we have

8    everyone here that we need.  All right.  All rise for the jury.

9       (Jury excused.)

10          THE COURT:  All right.  Plaintiff, anything on the

11    record?

12          MR. DAVIS:  Just a point of housekeeping, Judge.  I

13    had planned on calling Janet Rogers after I had Mayor Kellogg,

14    who's scheduled to be in tomorrow and after Dr. Nohelty, who's

15    also going to be in tomorrow.  However, in the interest of not

16    wasting any time, I'm prepared to talk to her today.  But I

17    would like to have an opportunity to bring her back in my case

18    in chief after those individuals testify tomorrow.  My

19    intention today --

20          THE COURT:  Okay.  Excuse me, Counsel.  Why all this

21    strategizing on time?  I'm telling you this is the first.  You

22    put a witness on.  That's it.  All right.  I mean, that -- you

23    don't have all these I want to bring her in for this point,

24    this point.  Every other jury I've had on any type of case

25    including patent trials does not come in twice to explain.

246

1          MR. DAVIS:  Well, I bet the lawyer on the other side

2  in those cases don't make objections on foundation and things

3  that could be stipulated to.

4          THE COURT:  Oh, yes, they do.  You'd be wrong.  You

5  all have --

6          MR. DAVIS:  So my issue is I need to talk to Mr.

7  Kellogg about certain documents I need him to authenticate

8  first, and then I need to talk to her about those documents.

9          THE COURT:  Well, why don't you -- why don't you find

10  out if they have any objection to the particular documents that

11  you're talking about.  That also is supposed to be part of the

12  exhibit thing --

13          MR. DAVIS:  It is a part of the exhibits.

14          THE COURT:  No.  No.  Between the two of you on the

15  final pretrial order.  If the exhibit isn't objected to, then

16  you don't need to have somebody else come in and authenticate

17  it before you can talk to the other person.  I want you to look

18  at that.  I don't care what order you put it on.  I just need

19  somebody else with their -- in this seat in about 10 minutes.

20  All right?

21          MR. DAVIS:  I'm with that.

22          THE COURT:  All right.  2:00 o'clock.

23          MR. DAVIS:  Thank you.

24          THE COURT:  All right.  I'm not saying, though, they

25  can come back.  Okay.  We're not going back and forth.

247

1          MR. DAVIS:  Okay.

2      (Short break taken.)

3          THE COURT:  Okay.  So who's your next witness?

4          MR. DAVIS:  Janet Rogers, Judge.

5          THE COURT:  All right.  And what is the issue with

6  Miss Rogers and -- Miss Rogers, step out please in the hall.

7  Just right outside the door.  Thank you.

8      (Brief pause.)

9          THE COURT:  All right.  So what are we having -- keep

10  your voices down.

11          MR. DAVIS:  I showed counsel the exhibits, two

12  exhibits I was interested in.  One is the performance review

13  for Eric Kellogg, my client's predecessor.  And the other one

14  is a buyout contract that he received.  And she objects.  They

15  didn't object on the witness list in the joint status report,

16  but now they object.

17          THE COURT:  All right.  So can you tell me as to --

18  now, there was an objection as to -- Mr. Kellogg you have an

19  objection.  I noticed that, but what are you -- what is your

20  objection to Miss Rogers?

21          MS. SCHWENDENER:  We don't have an objection to Mrs.

22  Rogers.  We have an objection to --

23          THE COURT:  The exhibit.

24          MS. SCHWENDENER:  -- the exhibit that pertains to

25  Eric Kellogg's performance evaluation and the severance

248

1    agreement that he received.

2            THE COURT:  As to?

3            MS. SCHWENDENER:  Relevance and --

4            THE COURT:  Well, that's the first one that comes to

5    this Court's mind.  How is that relevant to this case?

6            MR. DAVIS:  You already ruled on this in the motion

7    in limine, Judge, and granted -- or denied their objection to

8    Mr. Kellogg coming in.  He's coming in as a disparate treatment

9    circumstance.

10           THE COURT:  One second.  That's to him coming in,

11   though.  Why are you using this document with her?

12           MR. DAVIS:  Well, this document is part of the

13   showing of disparate treatment, Judge.

14           THE COURT:  But you're bringing him in to deal with

15   his own -- and I may say by asking that he not be here till

16   Thursday, I'm assuming you're going with his schedule, the

17   Court's a little bit put out because he should be on my

18   schedule.  That puts -- pushes this case to Thursday.

19           MR. DAVIS:  He's going to be tomorrow.

20           THE COURT:  I thought you said Thursday.

21           MR. DAVIS:  I'm sorry --

22           THE COURT:  The 1st.

23           MR. DAVIS:  -- if I misspoke.

24           THE COURT:  So he'll be here Halloween?

25           MR. DAVIS:  Yes.

249

1          THE COURT:  Okay.  All right.  Okay.  So all of
2     that's water under the bridge then.  But if it was Thursday, I
3     was like whoa, wait a minute.
4          All right.  So what number since it's your motion in
5     limine?
6          MS. SCHWENDENER:  Well, you already --
7          THE COURT:  But can you refer me so I'm looking at --
8     you all have been putting a lot in front of me.  Defendants'
9     motion number --
10          MS. SCHWENDENER:  No. 3, Judge.
11          THE COURT:  All right.  No. 3 as to --
12          MS. SCHWENDENER:  That's to bar reference --
13          THE COURT:  Again, it was without prejudice, which
14     means that they could bring it back again.  So that's fine.
15     The Court did it without prejudice.  I think one of the things
16     was I don't even know if you were talking about whether you
17     would definitely have him.  That was one question.  The other
18     question was, you know, I don't know how he's going to be used.
19     And I don't think there was any in-depth information, if I
20     recall, on how you were going to use him.  And so I denied it
21     saying, hey, there's no basis you're showing me to mess with
22     his witness list.  Just because he's mayor now does not, you
23     know, take him out of a -- the possible witness hat.
24          So that was the reason for it.  And I denied it
25     without prejudice because I did not know how he was going to be

250

```
 1   used.  So --
 2             MR. DAVIS:  Well --
 3             THE COURT:  Go ahead.
 4             MR. DAVIS:  I set forth in my papers, Judge, in my
 5   response to their --
 6             THE COURT:  Objection?
 7             MR. DAVIS:  -- motion in limine my objection,
 8   objection to it.  That the Seventh Circuit in the Massey case
 9   clearly established that you can show motive and intent in a
10   retaliation case by showing that similarly situated individuals
11   were treated differently.  That's one of the indirect ways to
12   show retaliation.
13             THE COURT:  And the question is similarly situated.
14   Other than having the same job, what else -- I'm assuming
15   that's your issue, that he's not similarly situated?
16             MS. SCHWENDENER:  Correct, Judge.
17             THE COURT:  And you've read his response.  Why are
18   you -- just spell out a little bit more why you're saying that
19   this is not a case that, that should be allowed in.
20             MS. SCHWENDENER:  Well, this is not a, a disparate --
21   Judge, may I sit, or would you like me to -- am I okay right
22   here?
23             THE COURT:  Yes.
24             MS. SCHWENDENER:  Okay.  It is not a disparate
25   treatment case, Judge, and a First Amendment retaliation
```

251

1    whether the district retaliated against Dr. Adams for pursuing

2    a contract extension.  That's the issue.  I don't know aside

3    from Mayor Kellogg having the same position as Dr. Adams,

4    there's no other similarities between the two.  There's no

5    testimony, and even if Eric Kellogg wasn't punished for

6    retaliating against for filing a police report against any of

7    the board members, there's no similarities.

8            And Mr. Rogers was never -- didn't allegedly threaten

9    Mayor Kellogg and received some type of disciplinary action as

10   a result.  So there's no similarities between the two of them.

11   And the fact that Eric Kellogg may have received a severance

12   package and plaintiff didn't goes to the fact that her

13   contract -- again, goes to the issue of whether her contract

14   may have been renewed or not or whether she was terminated from

15   the district, not whether a one-year extension was revoked.

16           Plaintiff -- there would be no reason why plaintiff

17   would receive any type of severance package.  And I don't

18   believe there's been any argument that plaintiff should have

19   received a severance package for -- after her contract

20   extension was revoked.

21           THE COURT:  All right.  Response.

22           MR. DAVIS:  Judge, I don't think the requirement in

23   the case law is similarity of cause of action.  I don't think

24   you got to show he filed a similar cause of action.

25           THE COURT:  No, I'm looking at the fact that the

252

1   circumstances surrounding it, yes, he may have been terminated,

2   he may have had a board package.  Things may have happened,

3   happened to him in regards to his own situation with the Board.

4   But the Board had complaints that he was protecting -- the

5   allegations that he was protecting political allies and

6   relatives.  That's what was going on here, which has nothing to

7   do with -- this is all an issue of either what she said and

8   filing the -- what was said to her, filing the police report.

9   And maybe there may be some statements about performance

10  evaluations in general.  That does not seem to be the bulk of

11  the situation with Mr. Kellogg.  Why would he testify?

12          MR. DAVIS:  The bulk, Judge, is he was disciplined --

13  well, he wasn't disciplined.  That's the issue.  His

14  performance evaluations show that he was rated low on the

15  performance scale and charged with having some of the same

16  things that they say Dr. Adams did.  They said he didn't

17  communicate with the board.  They said here in the directives

18  they charged that she changed the summer school schedule

19  without permission.  Well, according to his performance

20  evaluation, he changed the entire school schedule without

21  notifying the state, the board, or anybody else.

22          THE COURT:  And yet?

23          MR. DAVIS:  And yet he was not disciplined.  There's

24  no discipline in his file.  Echo, another issue here.  We heard

25  a lot about Echo.  For six months he didn't show up to the Echo

1    meeting when he was the co-op board member.  It caused the

2    district thousands of dollars because they were sending

3    students to a closed building.  The building was closed because

4    of a student strike.

5              THE COURT:  All right.  Let's go at two parts here.

6    That's one part of why you want to put him on, and you think

7    there should be no -- he should not be barred.

8              The second issue is whether or not Miss Rogers -- how

9    much of this is she going to testify as opposed to Mr. Kellogg

10   himself?

11             MR. DAVIS:  Well, when she was deposed, she was

12   deposed as the board rep.  And so this is why she was

13   questioned about the disparate treatment of Mr. Kellogg.

14             THE COURT:  So she was the board rep for that

15   deposition?

16             MR. DAVIS:  Yes.

17             THE COURT:  That's a little bit different from being

18   the, the chairman of the board say like Miss Gloria Johnson,

19   right?

20             MR. DAVIS:  She's been the board president in the

21   past.  Plus, Judge, the way the school boards work --

22             THE COURT:  Well, not in the past.  I'm talking about

23   when Mr. Kellogg was going through what he was going through.

24   Who was the, who was the board president?

25             MR. DAVIS:  Mr. Rogers was I'm told.

254

1        THE COURT:  Mr.?

2        MR. DAVIS:  Mr. Rogers.  And then for part of it

3   Janet Rogers was president.  So she was president of the board

4   during part of his tenure as well.

5        THE COURT:  Okay.  Last, last word even though I'm

6   going to tell you, the Court does see some of this as relevant.

7   I'll limit some of the testimony, but it's relevant, especially

8   if some of the same things on the Echo, on the performance,

9   et cetera.  That's the same thing that happened.  He was

10  preceding her.  If he didn't get disciplined, that's relevant

11  for them to bring out.  All right.  But the question is I'm not

12  going to let this go on and on.  I'm also -- I don't see any

13  reason to at all bring Miss Rogers back.

14       MR. DAVIS:  Well, I'm fine with that, Judge.  And --

15       THE COURT:  You'd have to make the case for it later,

16  but I would not plan on it.  I mean, I just don't see based on

17  what you're telling me that that's the role that's necessary.

18  You can ask anything you want to about him, or you can talk --

19  ask her.  Or you can have one of the other people who are here

20  who are defendants.  So, you know, we can go do this.  And if

21  there's another one ready, I want another one too.

22       MR. DAVIS:  Can we show her his performance review

23  that she reviewed as a 30 (b) 6 witness?

24       THE COURT:  You're going to put her down as an

25  expert?

255

1          MR. DAVIS:  No.  I'm going to -- she was the board

2     rep --

3          THE COURT:  She's a board rep.  As an admission?

4          MR. DAVIS:  -- when she was deposed.  And she --

5          THE COURT:  But you're going to have him.  She can

6     talk about what she did as a member of the board, sure.  What

7     she did or she knew the board had, sure.  She's a board person.

8     She can do that.  As to being able to give all the information

9     and what happened between -- you know, Mr. Kellogg is going to

10    have to tell his side of it, and she'll tell hers.  So, in

11    other words, this isn't going to go far afield.  This is

12    relevant to --

13         MR. DAVIS:  Sure.

14         THE COURT:  -- the disciplinary action if she has

15    knowledge of and it was brought before the board and she was a

16    member of the board.  She's a defendant.  You want to state

17    your objection.

18         MS. SCHWENDENER:  Yes, Your Honor.  Objection for the

19    record as far as relevance.

20         THE COURT:  All right.  All right.  As to relevance?

21         MS. SCHWENDENER:  Correct.

22         THE COURT:  All right.  Again, but the Court will

23    limit how far we go.  And I'll tell you get in your mind about

24    the next one.  It's only 2:30.  And so my expect --

25         MR. DAVIS:  Well, I have a lot for Janet Rogers,

256

1   Judge --

2          THE COURT:  Okay.  Well, we'll see what a lot is.

3          MR. DAVIS:  -- based on my experience.  But beyond

4   that, if you want to go to the next person --

5          THE COURT:  We'll see where we are.

6          MR. DAVIS:  -- I would like to call Tyrone Rogers,

7   who's not here.

8          THE COURT:  Well, you've got to go with who's here.

9   You have to let people know if you need witnesses.  The

10  defendant doesn't -- despite your statements, the defendant

11  doesn't have to be here unless they're being asked to -- you

12  know, you have subpoenaed them to be here today and they're not

13  here, then you need to let me know that at the beginning.  But

14  they don't have to be in court for the whole court case.

15         MR. DAVIS:  Yes, I --

16         THE COURT:  Even the plaintiff doesn't have to be.

17         MR. DAVIS:  I decided not to subpoena them, Judge,

18  because they're under the jurisdiction of the Court.  You got

19  personal jurisdiction.  I thought being defendants they would

20  be here.

21         THE COURT:  This is a civil case.  They don't have to

22  be here.

23         MR. DAVIS:  But I decided not to subpoena them, so --

24         THE COURT:  But you have other defendants here.

25         MR. DAVIS:  There are civil cases.  One was right

257

1   down the hall, Judge Tharp had --

2           THE COURT:  Okay.  Stop right there.  Don't compare

3   me and don't tell me anything about Judge Tharp.  All right.

4   That's Judge Tharp's case, and he's not -- I don't -- he's not

5   a precedent for me.  And the Court is just saying this case had

6   a lot of different people.  A lot of them are here.  I'm

7   certain if you had just told counsel that you needed to have

8   Mr. Rogers here, they would have had him here.  Or if not and

9   if for some reason you both expected him to be here and he's

10  not here, then that's worth noting.  But --

11          MR. DAVIS:  Well, I'll tell them when I want him to

12  be here, Judge, and we'll go from there.

13          THE COURT:  I just need you to be ready with a full

14  set of witnesses.  And since we have defendants here, I'm not

15  going to let them go early today when everybody here knows we

16  have people who want to go early tomorrow.  And so, you know,

17  we can't waste the time.  We do that, then all of a sudden

18  we're at Thursday.  And by the time Thursday comes, you know,

19  we're in a pinch, and I don't want to be there.

20          MR. DAVIS:  I think I've got enough here, Judge.

21          THE COURT:  Okay.  Let's see.

22          MR. DAVIS:  I've got about 30 pages.

23          THE COURT:  If you have all of that, are you sure

24  there's not something else that we need to talk about before we

25  start doing sidebars here?

 1          MR. DAVIS:  Well, the, the tapes.  I've got a lot of

 2   tapes, Judge.

 3          THE COURT:  Which -- okay.

 4          MR. DAVIS:  But I'm to ask her a question and --

 5          THE COURT:  My question is do you have objections to

 6   the tapes, and do you know what he's asking?

 7          MS. SCHWENDENER:  I, I guess -- I don't have a

 8   problem with the tapes if he's using them to impeach her or

 9   refresh her recollection.  But just to, to replay what she may

10   have said at a board meeting, yes, I would object to that.

11          THE COURT:  Well, I'm assuming she's -- since she's a

12   defendant, she's an adverse witness, so he'll already be in

13   cross-examine mode.  His use of them with her is different from

14   the use with, with the plaintiff.

15          MS. SCHWENDENER:  The only other objection for the

16   record, Judge, is again, I know we talked about the tapes

17   earlier too, and I'm not trying to be difficult.  I understand

18   that we produced the tapes, but when we produced the tapes, not

19   all of them had dates on them.  So I know counsel stated

20   earlier that, you know, this is -- you know, I'm going to play

21   a tape from this July 22nd board meeting.  I, I -- because I

22   didn't get to listen till today and I know that there's an

23   e-mail issue, I can't necessarily stipulate -- I mean, if the

24   witness can testify to the date and knows the date and knows

25   who was present, that's fine.  I won't object to it.  But I

259

1    just --

2         THE COURT:  I understand what you're saying, Counsel.

3    But like you just said, these are your tapes.  These are your

4    clients.  You produced them without dates.  You produced them

5    to them without identifying markers.

6         MS. SCHWENDENER:  Sure.

7         THE COURT:  So now you can keep out the tapes that

8    you produced by saying they don't have enough information?

9         MS. SCHWENDENER:  No, I'm not trying to keep them

10   out, Judge.

11        THE COURT:  That doesn't fly.

12        MS. SCHWENDENER:  I just, I just -- I don't know --

13   for the record I can't necessarily stipulate to the dates on

14   the tapes.  If counsel matched up or figured out the dates, I

15   necessarily cannot stipulate to that.  I'm not trying to be

16   difficult.

17        THE COURT:  You don't have to stipulate to it.  I

18   think the thing is is if the dates depending on what it is mean

19   that much, you're going to have to get out and actually admit

20   to the jury that your clients don't keep good records.  And,

21   therefore, you don't know.  That's up to you.  That's the only

22   way that issue is dealt with.  These are your tapes, your

23   clients.  They had responsibility for the tapes and keeping

24   them straight.  And you can't benefit from them not being able

25   to give good documentation.

1    So the Court will allow you to go into that, but, you

2  know, they need to know that that's -- that's where you're

3  going to have to go if you want to challenge what came out on

4  what date, you know.  And, Counsel, you'll have to explain why

5  you don't have the dates, because the jury doesn't need to be

6  confused with just having tapes out there.  So it's going to

7  come out once or twice that these were not properly documented

8  tapes.  That's where they are.  And he can definitely use them

9  because they're adverse witnesses.

10    Now, the only issue that you might have, Counsel, is

11  the fact that if we're using them for admissions against

12  interest, then we've got to make sure that she's on that tape.

13    MR. DAVIS:  Sure.

14    THE COURT:  Okay.  Or that we have a pretty good idea

15  she's on that tape.

16    MR. DAVIS:  Yes.  I'll ask her.

17    THE COURT:  Okay.

18    MR. DAVIS:  And --

19    THE COURT:  And I'll also suggest that we not go

20  through every tape if all of them are all messed up.

21    MR. DAVIS:  Sure.

22    THE COURT:  This is no help to the jury.

23    MR. DAVIS:  For the sake of clarity, Judge, so we

24  don't waste time, I intend to ask her in certain instances

25  she'll be on the tape, other defendants will be talking on the

261

 1   tape.  And I'll ask her is that Gloria Johnson saying that
 2   there?  Is that Kisha McCaskill?  Do you recognize that voice?
 3           THE COURT:  Yes.
 4           MR. DAVIS:  It's going to be clear up front.
 5           THE COURT:  Okay.
 6           MR. DAVIS:  Because that would expedite everything
 7   rather than trying to bring every defendant to testify about
 8   the same meeting --
 9           THE COURT:  Okay.
10           MR. DAVIS:  -- redundantly.
11           THE COURT:  Well, we'll see how it goes.  I don't
12   intend to take too many sidebars.  Is there any other question
13   you have about this?  You all know what's on the tapes?  You
14   know the problem with the tape better than I do.  And again,
15   I'm just not going to allow the tapes to be floating out there
16   if there's no way to tie them up or connect it.
17           MR. DAVIS:  Well, to the best of my ability each tape
18   I introduce I say this is the meeting from June 22nd from
19   listening to many hours of them and --
20           THE COURT:  And Mr. -- Mr. Davis, how many, how many
21   tapes did you intend to produce here?
22           MR. DAVIS:  In the entire case?
23           THE COURT:  For today.  For this witness.
24           MR. DAVIS:  Well, there's going to be three different
25   tapes, but there's volumes on the tapes.  The way the tapes

1  are.

2        THE COURT:  Okay.  How much do you intend to use?

3  Remembering your audience and thinking about what they can

4  stand.

5        MR. DAVIS:  I'm not going to use a lot of tapes.  If

6  she's on the witness stand --

7        THE COURT:  Thank you.

8        MR. DAVIS:  -- then I want her to answer the

9  questions.

10       THE COURT:  Okay.  Sounds good.

11       MR. DAVIS:  It's just in my experience with

12  Mrs. Rogers I often have to resort to the tape.

13       THE COURT:  Well, if you have to re --

14       MR. DAVIS:  But she's --

15       THE COURT:  If you have to do that, and then the

16  Court after watching the dynamics and hearing what her

17  responses are or lack thereof, the Court will make the

18  appropriate ruling.  All right.

19       MR. DAVIS:  Thank you, Your Honor.

20       THE COURT:  Anything else?

21       MS. SCHWENDENER:  Yes, Judge.  One last thing.  I

22  apologize.  I did look at the list counsel gave me today for

23  the tapes, and there are tapes from December of 2016 board

24  meetings and clips for -- from October 19th of 2015.  So I

25  would just renew my objection.  Those are all getting into

1  discussions about issues I believe the Court has already ruled

2  upon.

3         MR. DAVIS:  And I'm not going to get into any of

4  those issues at this point given the Court's ruling.  However,

5  Your Honor held out a ray of hope that that issue may be

6  revisited.

7         THE COURT:  Not right now it's going to be.

8         MR. DAVIS:  Not right now.  And so that will be

9  deferred as a dream deferred.

10        THE COURT:  All right.  You can have the witness come

11  if there's nothing else.  The jury's been standing up this

12  whole time.  So it might be good for them, but it's time for

13  them to come in and get to work.  All right.  All right.

14  Everybody rise.

15     (Before the jury:)

16        THE COURT:  All right.  Ladies and gentlemen, you may

17  be seated.  All right.  We are here.  We're waiting for another

18  witness.  And please step forward, ma'am.

19        MR. DAVIS:  Plaintiff would like to call Miss Janet

20  Rogers.

21        THE COURT:  Miss Rogers, as you step over.  Ladies

22  and gentlemen, Miss Rogers is a defendant, a party in this

23  case.  As such, the plaintiff has a right to call a defendant

24  in their case in chief.  They are doing this.  They will treat

25  her as an adversarial witness, which means plaintiff can

J. Rogers - direct by Davis

1   cross-examine her in that form of questioning.  All right.  And

2   it works both ways.  So if the other side wants to call the

3   other party in their case in chief, they may do so.

4       JANET ROGERS, PLAINTIFF'S WITNESS, DULY SWORN

5               THE COURT:  Keep your voice up at a normal level.

6   I'll adjust the volume.

7               THE WITNESS:  Okay.

8               THE COURT:  You can have the water there and serve

9   yourself, if you need it.  Wait until each question is fully

10  asked before you answer the question.  All right?

11              THE WITNESS:  Yes, ma'am.

12              THE COURT:  All right.  Proceed when you're ready.

13              MR. DAVIS:  Thank you, Your Honor.

14                  DIRECT EXAMINATION

15  BY MR. DAVIS:

16  Q    Good afternoon, Miss Rogers.  How are you?

17  A    I'm doing great today.

18  Q    Thank you.  Are you currently a member of the Board of

19  Education for Harvey 152?

20  A    Yes.

21  Q    How long have you been a member of the Board?

22  A    Off and on since 1991.

23  Q    And are you related to Tyrone Rogers --

24  A    Yes, I am.

25  Q    -- the defendant in this case?  What relationship is that?

J. Rogers - direct by Davis

1   A    He's my husband.

2   Q    How long have you been married?

3   A    Since 2007.

4   Q    So you were married in 2015, right?

5        THE COURT:  She said since 2007.

6        THE WITNESS:  2007.

7   BY MR. DAVIS:

8   Q    Right.  Right.  Okay.  So both you and he were members of

9   the board in July of 2015, correct?

10  A    Yes.

11  Q    In February of 2015 isn't it true that you and the other

12  board members voted to extend the contract of my client Dr.

13  Adams by one year?

14  A    Yes.

15  Q    And isn't it also true that before you voted for that

16  extension, you contacted your lawyer to make sure it was okay

17  to grant that extension?

18       MS. SCHWENDENER:  Objection.

19       THE COURT:  As to contacting the -- the form of the

20  question sustained based on the Court's previous ruling.  All

21  right.

22  BY MR. DAVIS:

23  Q    Did you have a discussion with counsel about the contract

24  extension before?  I don't want to know what you said or what

25  he said.  Did you have a discussion?

J. Rogers - direct by Davis

1    A    I don't recall.

2    Q    Okay.  So you don't recall being at a board meeting in

3    February of 2015 and saying something to the effect -- you

4    recall being at a board meeting in February talking about the

5    extension, right?

6    A    Yes.

7    Q    With the other board members?

8    A    Yes.

9    Q    And you don't recall telling one of your colleagues,

10   Dr. Kisha McCaskill that you checked with the attorney and he

11   said it was okay to give the extension for one to five years?

12   A    I don't recall.  I could have, but I don't recall.

13   Q    Is there something that, that would refresh your

14   recollection on that -- in fact, let's not do it this way.

15         You were deposed in this case previously, right?

16   A    Yes.

17   Q    Okay.  So is it something I can play for you or show you

18   that would refresh your recollection about that meeting and

19   whether you said those things?

20   A    If you have the minutes.

21   Q    I do in an audio form.  Thank you.

22         THE COURT:  Well, how can her recollection be

23   refreshed without the jury hearing that recollection being

24   refreshed?  Do you have the --

25         MR. DAVIS:  Well, she has to hear it, yes.

267

J. Rogers - direct by Davis

1     THE COURT:  Do you have the written minutes?

2     MR. DAVIS:  Not for that particular meeting, Judge.

3     THE COURT:  All right.  So, ma'am, you're saying you

4  can't remember?

5     THE WITNESS:  If there's some written minutes, I can

6  see those, yes.

7     MR. DAVIS:  And, of course, you can refresh her with

8  anything, audio, a write-up --

9     THE COURT:  You can, but that's not what the jury's

10  supposed to see.

11     MR. DAVIS:  I understand that's a problem in front of

12  the jury.

13     THE COURT:  I'm not moving them.

14     MR. DAVIS:  I understand.

15     THE COURT:  All right.  Maybe we go back and get it

16  at the end.

17     MR. DAVIS:  Okay.

18     THE COURT:  Try another tact.  All right.

19     MR. DAVIS:  Okay.

20     THE COURT:  Thank you.

21     MR. DAVIS:  Great.  Thank you, Judge.

22  BY MR. DAVIS:

23  Q    Are you familiar with the goal cycle that the district has

24  of setting goals, strategic goals, goals for the

25  superintendent?  Are you familiar with that?

J. Rogers - direct by Davis

1  A    Yes.  You're talking about two different types of goals,
2  so I don't, I don't know which one you're talking about.
3  Q    Okay.  What, what -- you're saying there's two different
4  types of goals.  It's different goals for the superintendent
5  than for the district strategic goals?  Let me do it this way:
6  Let me show you a document so we're not talking in the
7  abstract.
8          I'm going to show Plaintiff's Exhibit No. 2, which
9  was previously published to the jury.
10          MR. DAVIS:  Can we publish this to the jury, Your
11  Honor.
12          THE COURT:  Proceed.
13  BY MR. DAVIS:
14  Q    Do you see the exhibit on the screen, Miss Rogers?
15  A    Not all of it.  Just part of it.
16  Q    Okay.  Let me scroll down.
17          THE COURT:  She sees the same part everybody else
18  sees.
19  BY MR. DAVIS:
20  Q    Have you had a chance to look at it?
21  A    Yes, sir, I see it.
22  Q    Are you familiar with this document?
23  A    Yes, I am.
24  Q    Are you familiar with the goal cycle that this document
25  depicts?

J. Rogers - direct by Davis

1   A    Yes, I am.

2   Q    And isn't it true this is the goal cycle that the district

3   has been using for a couple of years now to set its goals and

4   to measure its goals?

5   A    What type of goals are we --

6   Q    Well, it says it's for setting goals.  It doesn't say any

7   particular type of goals.  It says goals.

8   A    Can you scroll back to the top.  There's a title.

9   Q    Okay.

10  A    Okay.

11  Q    Annual planning and evaluation cycle.  Board and

12  superintendent agree, No. 1, on goals for the year.

13  A    Yes, those are district goals.

14  Q    And those are the goals that the board and the

15  superintendent set for the year, correct?

16  A    Yes.

17  Q    And you monitor those goals according to these bubble

18  points throughout the year, right?

19  A    Repeat your question.

20  Q    Those goals are monitored and possibly modified as you go

21  through the year, correct?

22  A    By us or -- you're asking me do we modify them?

23  Q    Well, I'm looking at the chart.  And it talks about the

24  different steps you take.  Starting in May you set the goals.

25  In June the administration creates action plans to improve the

270

J. Rogers - direct by Davis

1  goals.  In August the superintendent goes to the board to get
2  authority to implement the goals.  You said you're familiar
3  with the process, right?
4  A    Yes, I -- yes, I am.
5  Q    Okay.  So in this process starting in May, the goals are
6  set and then as you go through the year they're monitored and
7  changed as needed as you go along, is that correct?
8  A    Not by the board.
9  Q    Who changes them?
10 A    The superintendent.
11 Q    So you're saying the superintendent can unilaterally
12 decide to change the goals that were set by the board?  It says
13 that No. 1 the board set the goals in May.  So you're saying
14 that in August if the superintendent decides I don't like those
15 goals, I want to set new goals, she can do that, or he?
16 A    No.
17 Q    You're not saying that?
18 A    No.
19 Q    So these goals are considered when you go to retreats.
20 We've heard about retreats that you all have, right?
21 A    Yes.
22 Q    And at the retreat you talk about the goals.  You want to
23 know are you achieving them, right?
24 A    Yes.
25 Q    And the superintendent will appear at the retreat and tell

J. Rogers - direct by Davis

1  you all this is where we are.  This is the progress, this is
2  what still needs to be done, correct?
3  A    Yes.
4  Q    And these goals and the superintendent's progress on these
5  goals are then incorporated in an evaluation that you do of her
6  performance, right?
7  A    No.
8  Q    So you're saying that none of these goals and nothing that
9  she does with regard to these goals has any input in her
10  performance evaluation?
11 A    I didn't say -- some of them are.  Some of them aren't.
12 You're going -- you're talking about goals --
13 Q    So which goals -- let's specify then.  You tell me which
14 ones -- which part goes into the performance and which part
15 doesn't.
16 A    This is an annual planning and evaluation cycle, and this
17 cycle is done twice a year.  These goals are set.  They're
18 district goals.  They're not -- some are in the
19 superintendent's contract, some aren't.
20 Q    Which ones -- which is which?  I don't know.  You tell me.
21 A    These are the goals that are set for the district.  These
22 are district goals that we set.  There's several people that
23 come in.  If you look at the progress that we have and the
24 information, it's not just the superintendent.  It's several
25 people that come in and they talk about these different things.

272

J. Rogers - direct by Davis

1   Q    On this chart it talks about the board and the
2   superintendent and the administration.  I don't see anything
3   about anybody else.  No. 5, superintendent completes
4   self-evaluation and work progress towards goals.  No. 6, the
5   board evaluates the superintendent performance in light of the
6   goals.  So according to this chart, which you just said you've
7   been using for a couple of years, these goals are used to
8   evaluate the superintendent's performance.  Is that what it
9   just said?
10  A    It's not what I said.  That's what's here.
11  Q    Okay.  So you disagree with what's here?
12  A    This is an annual planning and evaluation cycle.
13  Q    But you just told me this is what you all have been using
14  for a couple of years in the district.
15  A    That's correct.
16  Q    And so you've been following these steps, right?
17  A    Yes.
18  Q    So you followed step No. 6, right?
19  A    Some of them we followed, and some of them were not
20  followed.
21  Q    Okay.  Well, let's be specific.
22  A    Okay.
23  Q    In 2015 when you evaluated Dr. Adams in February, January
24  of 2015, did you follow step 6?
25  A    We didn't evaluate her in that -- in 2015, not to my

J. Rogers - direct by Davis

1  recollection.

2  Q    Well, can I show you something that might help you

3  understand that -- when she was evaluated?

4  A    Yes, please.

5  Q    I'd like to show -- and this is one of those that needs to

6  be rotated.

7          MR. DAVIS:  This has already been published

8  previously, Judge.

9          THE COURT:  All right.

10 BY MR. DAVIS:

11 Q    I'm going to show you a document -- can you see the

12 document?

13 A    Yes, sir.

14 Q    You see where it says January 2015?

15 A    Yes.

16 Q    You see it says Harvey Schools 152 superintendent

17 evaluation?

18 A    Yes.

19 Q    Does that refresh you that you did evaluate Dr. Adams in

20 January of 2015?

21 A    Yes, it does.

22 Q    Okay.  So again, when you did this evaluation, you all

23 according to the goal cycle considered in making these

24 evaluations her progress towards the goals, right?

25 A    Those are two different things.  That's the

J. Rogers - direct by Davis

1    superintendent's evaluation, and these are the goal setting.

2    There's two different documents.  That's why I was a little

3    confused a minute ago.

4    Q    Okay.  Well, let's try to unconfuse it, if we can.  You

5    keep saying that it's two different things.  It's a different

6    thing.  Are you telling me there's another set of goals

7    somewhere that existed in 2015 that were used to monitor the

8    superintendent that were different from the goals that the

9    district had?

10   A    In the superintendent's contract, yes.

11   Q    So you're saying there were goals in her contract that

12   were different?

13   A    Yes.  The paper you showed me earlier was the district

14   goals.

15   Q    Okay.  But if we look at the contract, the contract -- and

16   I'm bringing up Exhibit 1, which was previously published.

17            MR. DAVIS:  If we may publish, Your Honor.

18            THE COURT:  You may.

19   BY MR. DAVIS:

20   Q    If you look at the contract -- you see the contract,

21   Miss Rogers?

22   A    Yes, I do.

23   Q    Okay.  Now, where are the goals that you're talking about

24   that are different in the contract?  Can you point them out to

25   me?

275

J. Rogers - direct by Davis

1    A    There are some goals that are written here --

2    Q    Goals --

3    A    -- on student performance --

4         THE COURT:  I'm sorry.  You both can't talk at the

5    same time.

6         THE WITNESS:  All right.  Talk?

7         THE COURT:  Go ahead.

8         THE WITNESS:  There's some goals that you have in the

9    front of me that are goals that looks like they're in the

10   superintendent's contract that you just presented.

11   BY MR. DAVIS:

12   Q    Okay.  So what does goal 1 say?

13   A    The superintendent will provide leadership to improve

14   student academic growth.

15   Q    And the indicators?

16   A    Each fall the --

17        THE COURT:  Wait.  Wait.  Wait.  Wait.  She's not

18   going to read all that.  We've already had her read all the

19   same thing.

20        MR. DAVIS:  Right.

21        THE COURT:  She's your witness.

22        MR. DAVIS:  Right.

23   BY MR. DAVIS:

24   Q    Okay.  So it says goal 1 is student academic achievement,

25   right?

J. Rogers - direct by Davis

1  A    Yes.

2  Q    Was that one of the things that was on the chart that we

3  saw that the district looked at in its goal cycle?  Was

4  academic student achievement in there?

5  A    I'd have to go back and look at it.  If you have a copy.

6  Q    Well, let me ask you in general, would it be important to

7  the school board in monitoring student academic achievement?

8  How would you do that?  Wouldn't you do that through some of

9  the goal cycle that we talked about?  Are you telling me there

10  was some other way to monitor No. 1?

11  A    Yes.

12  Q    Let me ask it this way:  Is there a different way to

13  monitor No. 1, the goal No. 1 in this contract?  Is there a

14  different process than the one that we just looked at in the

15  chart?

16  A    Yes.

17  Q    And what is that process?

18  A    Through test scores that are provided by Illinois State

19  Board of Education that's online.

20  Q    Okay.  So where is that in terms of -- you all have a

21  written procedure for doing that?

22  A    We can go to the student -- the Illinois Association of

23  School Board's website and look at the test scores.

24  Q    Well, I'm asking you, Harvey 152.  Did Harvey 152 in

25  January, February 2015 have a process for using state test

J. Rogers - direct by Davis

1   scores as the way of measure -- of measuring goal 1?  Where is
2   that specified?  What policy is that?
3   A    Past practice.
4   Q    Past practice?
5   A    Yes.
6   Q    What does that mean?  It sounds like a legal term.
7   A    We've done it all the time in the district with all the
8   superintendents.  They give information with the Illinois State
9   Board of Education, and the test scores we can see whether they
10  went up or went down.
11  Q    Okay.  So your testimony is forget what this life cycle --
12  the goal cycle chart says and the fact that you said you all
13  used it for a couple of years.  When it came time for you to
14  evaluate the superintendent, you looked at what did you say?
15  Goal No. 1, what is it you looked at?
16  A    I didn't say forget the cycle.  I said if I wanted to
17  check test scores, that's what I went to -- we went to do.
18  We've done that in the past.
19  Q    Well, we're not just talking in general.  I -- maybe my
20  questions aren't focused enough.  I don't want to know
21  generally.  Anybody that cares about test scores can go check
22  right now, right, the IASB scores?  Anybody can go online and
23  do that, right?
24  A    Yes.
25  Q    I'm not asking about that.  I'm asking a specific

J. Rogers - direct by Davis

1  question.  You've got a contract, and you just told me the

2  superintendent's contract set forth her goals.  And goal No. 1

3  was improve student academic achievement.  And you told me that

4  numbers -- I asked you if No. 6 in the goal cycle where it said

5  you considered the superintendent's progress towards goals in

6  her evaluation was used to evaluate Dr. Adams in 2015,

7  January 2015, and you said no.

8          And now I'm asking you what did you use?  What

9  instrument did you use?  If you didn't use the goal cycle --

10          THE COURT:  And, Counsel, you are, you are switching

11  midstream in questions.

12          THE WITNESS:  Confusing.

13          THE COURT:  -- in questions.  You are lengthening

14  questions.  Then you change the question.  I need you to --

15          MR. DAVIS:  Okay.  Well, let me try it this --

16          THE COURT:  We're going to pitch that one.  We're

17  going to try again.  All right.

18          MR. DAVIS:  Okay.  Let me try again, Judge.  Thank

19  you.

20  BY MR. DAVIS:

21  Q    Do you have a written document that specifies what goals

22  you all considered in evaluating Dr. Adams in February 2015?

23  A    The superintendent's contract.

24  Q    So other than this contract, you have no other

25  documentation on what was used?

279

J. Rogers - direct by Davis

1  A    And the instrument that you showed me a minute ago, that's
2  what we used.  That's it, yes.
3  Q    Okay.  So you did use the instrument that I just showed
4  you?
5  A    The superintendent's contract you just --
6  Q    And the contract?
7  A    And the evaluation, yes.
8  Q    Okay.  So would it be fair to say here's the contract.
9  The contract specifies the goals.  And then these goals get
10 implemented through the life cycle chart.  And that's how it
11 works.  Is that what you -- we're now -- my understanding?
12 A    You have to repeat the question.
13 Q    So these goals in the contract are incorporated in the
14 life cycle report that we have been talking about, right?
15 A    It looks like some of them are, yes.
16 Q    And they're used throughout to evaluate the
17 superintendent.  So I want to move on, Miss Rogers.  Did you
18 all have a retreat in June 2015?
19 A    Yes, we did.
20 Q    And isn't it true that Dr. Adams appeared at that retreat
21 and presented to the board her progress towards the goals for
22 that academic year?
23 A    Toward the district goals, yes.
24 Q    Okay.  And did you all hear her presentation?
25 A    Yes.

280

J. Rogers - direct by Davis

1  Q    And isn't it true that she reported significant progress
2  in student academic achievement?
3  A    Which was not true, yes.
4  Q    I'm asking you a yes, no question.
5  A    Yes.
6  Q    Did she present progress in student academic achievement?
7  A    Yes.
8  Q    And are you now saying -- and did anybody -- you just said
9  it wasn't true.  Did anybody at the meeting say that's not
10 true?
11 A    No.
12 Q    She presented goals on providing professional development
13 for the staff in the district, is that right?
14 A    Yes.
15 Q    And she showed progress there, right?
16 A    I don't recall.
17 Q    Okay.  Did she present on financial stability in the
18 district?
19 A    Dr. Nohelty did.  He worked for the district.
20 Q    Well, he was her subordinate, right?
21 A    Yes.
22 Q    Okay.  He was the business manager and she was the
23 superintendent, right?
24 A    He was the assistant superintendent in charge of business
25 affairs.

J. Rogers - direct by Davis

1  Q    Okay.  So I don't want to make this too long, Miss Rogers,
2  on this point.  At any point when she presented the goals at
3  the meeting in June 2015, did anybody say what you're saying is
4  not valid, it's not true and challenge what Dr. Adams
5  presented?
6  A    I did not at that meeting, no.
7  Q    Did any board member at that meeting?
8  A    I don't recall, but not to my knowledge.
9  Q    Okay.  And did any board member say at that meeting those
10 aren't our goals, those are the district's -- those are the
11 district's goals?  Those aren't your performance goals?  Did
12 anybody tell her those goals are one thing, but now let's talk
13 about your individual performance goals?
14 A    Not to my knowledge.
15 Q    So did anybody at the retreat bring up any performance
16 issues outside the goals?  Anything, absenteeism, anything with
17 Dr. Adams at the retreat in June of 2015?
18 A    That was three years ago.  I'd have to see some
19 documentation, some minutes if you have them preferably.
20 Q    Okay.  So you don't recall?
21 A    No, I don't recall.
22 Q    Is there something -- well, I'd have to play the audio of
23 the tape to refresh your recollection.  Let me ask you this,
24 Miss Rogers:  You were deposed in this case, right?
25 A    Yes.

J. Rogers - direct by Davis

1   Q    Testified under oath?

2   A    Yes.

3   Q    And I'm trying to see -- and you testified that Dr. Adams

4   presented improved reading scores in all grades except 6th in

5   your deposition?

6   A    I don't recall.

7   Q    Okay.  Let me show you your deposition.  Would that

8   refresh your recollection?

9   A    Yes.

10  Q    So I'm looking at Plaintiff's Exhibit No. 59.

11       MR. DAVIS:  And I'd like to publish, Your Honor.

12  It's the deposition of Janet Rogers.  You could see for

13  yourself what it is.

14       THE COURT:  Well, I'm not going to publish that yet.

15  Go ahead and ask the question.

16  BY MR. DAVIS:

17  Q    Okay.  So Dr. Adams you were questioned reported that

18  students had improved in reading in all grade levels except

19  grade 6.  Did she report that at the meeting?

20  A    I don't recall.

21  Q    So I'd like to look at page 120, lines 10 to 24 where this

22  was talked about at your deposition.  And see if that would --

23  would that refresh you.

24       MS. SCHWENDENER:  Judge, I'm just going to object as

25  far as improperly refreshing the witness' recollection.

J. Rogers - direct by Davis

1    THE COURT:  Well, he's asking her what would refresh

2    her recollection.

3    MR. DAVIS:  Yes, I did, Judge.

4    THE COURT:  As opposed to what she's responding to.

5    Again, ma'am, would this document refresh your recollection as

6    to what was said?

7    THE WITNESS:  Yes.

8    THE COURT:  She said, yes, it would.

9    BY MR. DAVIS:

10    Q    Read line 10 through 24, Miss Rogers.

11    THE COURT:  On what page?

12    MR. DAVIS:  On 120, which is now on the screen,

13    Judge.

14    THE COURT:  120 is on the screen?  It looks like it's

15    117.

16    MR. DAVIS:  I'm sorry.

17    THE COURT:  That's okay.

18    MR. DAVIS:  Well, on my screen it says it's 120.

19    THE COURT:  All right.

20    MR. DAVIS:  It's 120 in the document Exhibit No. 59.

21    THE COURT:  All right.  And it's on the screen in

22    front of the witness.  All right.  So she can read it.  Ma'am,

23    why don't we start at the top.

24    MR. DAVIS:  From line 10?

25    THE COURT:  No, you tell me.  If she's refreshing her

J. Rogers - direct by Davis

1    recollection, where should she start at?

2            MR. DAVIS:  Line 10, Judge.

3            THE COURT:  All right.  So read to yourself what's on

4    the screen.  And then if you need him to scroll down, you can.

5            MR. DAVIS:  And can we publish this?  I'm sorry,

6    Judge.

7            THE COURT:  No.  This is being used to refresh her

8    recollection.

9            MR. DAVIS:  Okay.

10           THE COURT:  All right.  Why don't you start

11   scrolling.  All right.  Just the bottom of the page, Counsel?

12           MR. DAVIS:  For now, Judge, yes.

13           THE COURT:  All right.  Does that --

14           MR. DAVIS:  It actually rolls over to 121, but we can

15   stop --

16           THE COURT:  Well, if 121 is part of the refreshing of

17   her recollection, you can go on to 121.

18           MR. DAVIS:  Yes.

19           THE COURT:  Go on down.

20   BY MR. DAVIS:

21   Q    And look at 121, line 1 to 24, Miss Rogers.

22           THE COURT:  All right.

23   BY MR. DAVIS:

24   Q    I'll scroll.  Tell me when I need to scroll.

25   A    Scroll up -- scroll down.

J. Rogers - direct by Davis

1   Q    Is that enough or do you want me to go further?

2   A    Yes.  That's enough.

3   Q    Okay.  Did you read -- well, I need you to look at the

4   whole document.  I'm still scrolling.  Let me know when to

5   stop.

6           THE COURT:  She's saying her recollection is

7   refreshed.  Is that correct, ma'am?

8           THE WITNESS:  Yes.

9           THE COURT:  All right.  That's it.  Then okay.  Ask

10  the question.

11  BY MR. DAVIS:

12  Q    So now we can take this.  So, in fact, Miss Rogers, Dr.

13  Adams at the retreat reported significant progress in student

14  achievement, correct?

15  A    Yes, she did.

16  Q    And she also reported establishing professional

17  development goals for the staff at the retreat, right?

18  A    I don't recall, but I do see what you just said.

19  Q    Well, that was in the -- what you just read had an audio

20  where she was repeating what she said at the meeting, right?

21  A    With student achievement, yes.

22  Q    Right.  But you didn't see the other things she reported?

23  A    No.  You stopped at a certain page.

24  Q    Okay.  Well, do you recall that she presented more than

25  student achievement --

286

J. Rogers - direct by Davis

1   A   Yes.

2   Q   -- at the board meeting?

3   A   Yes.

4   Q   Accomplishments?

5   A   Yes.

6   Q   You recall that?

7   A   Some accomplishments, yes, I do recall that she presented.

8   Q   And you've already testified there were no disciplinary

9   issues raised at that meeting by you or any board member,

10  correct?

11  A   I can't speak for the others.  I can only say that I did

12  not.

13  Q   Well, do you have any recollection?

14  A   That I did not, yes.

15  Q   I beg your pardon?

16  A   I have recollection that I did not.

17  Q   Do you have any recollection that any -- you were in the

18  meeting, right?

19  A   Yes.

20  Q   Do you have any recollection that anybody else brought up

21  any performance issues?

22  A   Not to my knowledge.

23  Q   Okay.  Thank you.  So -- and do you have any knowledge of

24  any other goals, any separate goals being discussed at that

25  meeting or any meeting?  Do you have any recollection of any

J. Rogers - direct by Davis

1   District 152 meeting where a separate set of goals for the
2   superintendent Dr. Denean Adams were discussed among the board
3   members?
4   A    Not to my knowledge.
5   Q    So we've already talked about Echo, and Echo being a
6   cooperative and the Echo shortfall.  Are you familiar with the
7   Echo situation?
8   A    Yes, I am.
9   Q    And, in fact, on July 10th you brought up an agenda item
10  to put Echo on the -- call a special board meeting to discuss
11  it, correct?
12  A    To add it to the agenda for the special board meeting,
13  yes, I did.
14  Q    And that was July 10th, 2015?
15  A    Yes, it was.
16  Q    And that was after you found out that Dr. Adams made a
17  report to the police about your husband?
18  A    Absolutely not true.  Not true.
19  Q    What's not true?
20  A    That was not after I found out anything about a report.
21  That was before.
22  Q    So your testimony is that on July 10th when you came in
23  and said put this on the agenda item, I want a special meeting,
24  at that time you did not know that Dr. Adams had spoken to the
25  police about your husband?

J. Rogers - direct by Davis

1   A    I didn't even talk to Dr. Adams.  Absolutely not, that day
2   on the 10th.  No conversation.
3   Q    That's not my question.  I just asked you a question.  Are
4   you testifying here that when you put the agenda item --
5   circulated the agenda item saying that you wanted Echo put
6   on -- you wanted to call a special board meeting, did you know
7   before you did that, that Dr. Adams had spoken to the police
8   about an incident with your husband?
9   A    Absolutely not.
10  Q    So you wanted the Echo issue put on the agenda item for
11  discipline against Dr. Adams, right?
12  A    I wanted it to be put on there so the Board could know
13  what was going on with Echo.
14  Q    Okay.  And you felt it was important for the board to find
15  out about this, right?
16  A    Absolutely, yes.
17  Q    And isn't it a fact that you knew about the Echo shortfall
18  in May of 2015?  You learned about it in May?
19  A    Yes.
20  Q    And did you tell the board in May about the Echo
21  shortfall?
22  A    No.
23  Q    So it wasn't -- but -- so you didn't tell the board in May
24  when you found out, but then July 10th you -- it was an
25  urgent -- you had a need you wanted the board to know, right?

J. Rogers - direct by Davis

1    A    Yes.

2    Q    Okay.  Thank you.  Isn't it true that -- who was the

3    superintendent before Dr. Adams?

4    A    Mr. Kellogg.

5    Q    And he was superintendent -- at the same time he was the

6    superintendent of the schools he was the Mayor of Harvey,

7    right?

8    A    Yes.

9    Q    He was doing both jobs at the same time, full-time?

10            MS. SCHWENDENER:  Objection.  Objection.

11            THE COURT:  Basis?

12            MS. SCHWENDENER:  Relevance.

13            THE COURT:  Overruled.

14   BY MR. DAVIS:

15   Q    He was doing both jobs at the same time?

16   A    Yes, he was.

17   Q    And your husband was and is employed by Mr. Kellogg,

18   right?

19   A    Yes.

20   Q    And he's known Mr. Kellogg how many years?

21   A    I don't, I don't know.

22   Q    Five years, two years, three years?  How long has he been

23   working for the city?

24   A    About 10 years maybe.  Just a guesstimate.  I don't really

25   know.

J. Rogers - direct by Davis

1  Q    And he was hired by Mr. Kellogg, right?

2  A    No, he was hired by the city administrator.

3  Q    Okay.  Was Mr. Kellogg the mayor when he was hired?

4  A    Yes.

5  Q    Didn't you tell the board members in a meeting to discuss

6  Echo on July 22nd, in the special meeting, didn't you tell them

7  that when Kellogg was the superintendent, he failed to go to

8  the Echo meetings for six months?

9  A    I don't recall, but I could have.

10 Q    So you have no recollection of saying, Eric didn't go to

11 the meetings for six months, and we had students going up to

12 Echo and -- you don't remember that?

13 A    I could have said it, but I don't know how many months.

14 Q    So you remember the incident?

15 A    Yes.

16 Q    So let me see if I got the incident right.  He failed to

17 go to the meetings, right?

18 A    He failed to go to some of the meetings, yes.

19 Q    Right.  And because he didn't go to the meetings, he

20 didn't report to the board that Echo was closed.  There was a

21 strike going on, right?

22 A    Yes.

23 Q    So the district had students that it was paying for to go

24 to Echo for services, and they were showing up at a closed

25 building, right?

J. Rogers - direct by Davis

1  A    I don't recall that part, but I knew that there was a
2  strike going on.
3  Q    So if there was a strike, that meant the school -- Echo
4  was closed, right?
5  A    Not necessarily.
6  Q    So do you recall telling the board members that the
7  students were showing up and the place was closed?
8  A    I could have, but I don't, I don't remember.  I don't
9  recall that part.
10 Q    Okay.  Do you recall telling the board members that Dr.
11 Adams should be written up for that just like Eric was written
12 up -- Mr. Kellogg was written up?
13 A    I did have some discussion about it, and I don't know
14 whether those were the exact words.  But I could have said it,
15 yes.
16 Q    You were deposed, and we talked about this during your
17 deposition, right?
18 A    Yes.
19         MR. DAVIS:  Okay.  And I want to play the tape, audio
20 of the July 22nd meeting where Miss Rogers talked about this,
21 Judge.
22         THE COURT:  That she talked about this generally
23 or --
24         MR. DAVIS:  She talked about Eric Kellogg and this
25 discussion we're talking about now.

292

J. Rogers - direct by Davis

1        THE COURT:  All right.  You can come to the side.

2        (Sidebar proceedings out of the hearing of the jury:)

3        THE COURT:  She hasn't denied this, so why are we

4    going to the tape?

5        MR. DAVIS:  Well, she's wishy washy saying she

6    doesn't recall if she said that he should be disciplined --

7    that she should be disciplined the same way Eric was.

8        THE COURT:  She said she could have said it.  She,

9    she admitted it.  Why --

10        MR. DAVIS:  Okay.  I'll ask her if she said she could

11    have said it.

12        THE COURT:  Did anybody talk about settling this hot

13    mess?  Because y'all should be embarrassed.  The mayor is the

14    superintendent of the dang school board.  What the heck is

15    going on?  Did you all realize this?  You all knew this fact?

16        MR. PETRARCA:  I wasn't doing any work there at that

17    time, Judge.  My partner may have been, but I wasn't.

18        THE COURT:  This is not good for either side.  It

19    looks bad all around.  I don't know if there was ever any talks

20    about settling this, but --

21        MR. DAVIS:  It wasn't, Judge.  They didn't make an

22    offer.

23        MS. SCHWENDENER:  That's not true.

24        THE COURT:  You have to make a demand.  They don't

25    just make an offer.

293

J. Rogers - direct by Davis

1    MS. SCHWENDENER:  We did make an offer, Judge.

2    MR. DAVIS:  They made an offer of 15,000.

3    MR. PETRARCA:  Judge, can I write a figure down on

4  here.

5    THE COURT:  We'll do it during the -- we'll do it --

6  we'll talk about it during the break.  Just, just remember that

7  I did ask.  Mostly because this isn't going to get any better.

8  And you're going to have more witnesses on here.  And again,

9  all this stuff is out there, and you've got people admitting to

10  this.  You got somebody who at one time was both -- holding

11  both offices.  This is not good.  He's coming on tomorrow, and

12  he gets to be asked about it.  So, you know, I don't know if

13  you have somebody out here who you can also go to who's

14  watching this.  But, you know, you all are putting all this

15  work into it.  It has nothing to do with you all's counsel.

16  You're dealing with the hand you're dealt, you know.  I mean,

17  everybody's got some issues here.

18    MR. PETRARCA:  I agree totally, Judge.  I don't know

19  what this has to do with a First Amendment claim, but --

20    THE COURT:  I don't either, but the door is open.  If

21  you're talking about firing somebody, I have to let some of

22  this in.  So that's the issue.  So we'll go back.  We'll talk

23  about it.  But she's admitting to some extent that she said it.

24  So, you know, I don't know why the tape is coming in.

25    MR. DAVIS:  Well, if she gives it up.

J. Rogers - direct by Davis

1    THE COURT:  Yes.  I mean, she basically said yes.
2  Oh, yes, I don't remember, but I could have said that.
3    MR. DAVIS:  You're right, Judge.  I can --
4    THE COURT:  She said it.  So go from there.
5    MR. DAVIS:  I'll go from there.
6    THE COURT:  All right.  Thank you.
7    MR. DAVIS:  Thank you.
8    (Before the jury:)
9    THE COURT:  All right.  Ladies and gentlemen, we're
10  back.
11  BY MR. DAVIS:
12  Q    So, Mrs. Rogers, you basically said you could have said at
13  the July 22nd meeting, 2015, you could have said Eric didn't go
14  to Echo for six months and the kids were showing up and the
15  place was closed?  You say you could have said that, right?
16  A    Yes.  I knew it was a strike going on.
17  Q    Right.  Okay.  You also said that Eric was disciplined for
18  it.  You specifically said he was written up.  You remember
19  that?
20  A    Yes.
21  Q    And you said Dr. Adams should be written up the same way
22  Eric, Mr. Kellogg was written up, right?
23  A    I don't recall.  But I could have said it because she
24  missed 20 days of the meetings.
25  Q    So she -- you could have said that.  You're not saying you

295

J. Rogers - direct by Davis

1   didn't say it?

2   A    No, I'm not saying I didn't.

3   Q    And you were questioned at your deposition about why there

4   was no write-up on Eric Kellogg for not going to Echo.  You all

5   produced -- let me ask two questions.

6        You all produced documents in connection with this

7   litigation, right?

8   A    The District did, yes.

9   Q    Yes.  And in those documents it included personnel files

10  for other employees including Eric Kellogg, right?

11  A    Yes, it could have been.

12  Q    And you were questioned at your deposition why there was

13  no write-up for Eric Kellogg.  You remember that?

14  A    I don't remember that particular part --

15  Q    Could you --

16  A    -- but you could have.

17  Q    You could have --

18  A    Uh-huh.

19  Q    -- been questioned about that?

20  A    Yes.

21  Q    And without belaboring the point, Eric Kellogg left the

22  district in 2013 just before Dr. Adams came in, right?

23  A    Yes.

24  Q    And Eric Kellogg was given a buyout contract to leave the

25  district, is that true?

J. Rogers - direct by Davis

1          MS. SCHWENDENER:  Objection.

2          THE COURT:  Objection sustained.  That part's

3    irrelevant.

4    BY MR. DAVIS:

5    Q    Okay.  Well, was Eric Kellogg given a severance package

6    when he left the district?

7          MS. SCHWENDENER:  Same objection.

8          THE COURT:  Objection sustained.  No relevance on

9    that point.

10          MR. DAVIS:  Well, may I speak on that, Judge.

11          THE COURT:  Not right now.

12          MR. DAVIS:  Okay.

13          THE COURT:  Move on.

14    BY MR. DAVIS:

15    Q    So academic achievement under Eric Kellogg went down in

16    the district, right?

17    A    Yes.

18    Q    And when Dr. Adams came in, we already talked about the

19    improvement she reported in academic performance of students,

20    right?

21    A    Yes.  What she reported, yes.

22    Q    Okay.  You got something -- is there something you want to

23    say on that subject, Miss Rogers?  Are you saying that Dr.

24    Adams --

25    A    Yes.

J. Rogers - direct by Davis

1  Q   -- reported --

2  A   Yes.

3  Q   -- false or misleading information?

4  A   You asked me did I want to say something, and I said yes.

5  Q   I'm asking you -- no, answer my specific question.  Are

6  you saying that any information Dr. Adams reported to the

7  district at any time, are you saying that it was not true?

8  A   I didn't say any.  Talking about the --

9  Q   Okay.  Regarding student academic performance, are you

10 saying Dr. Adams reported false or misleading information?

11 A   Yes.

12 Q   When did she do that?

13 A   At the retreat.

14 Q   Which retreat --

15 A   Go back and look at the test scores online.  They are

16 20 percent lower than what she reported to us.

17 Q   Which retreat is this?

18 A   The retreat we had in June.

19 Q   And so when did you do this -- when did you look online

20 and discover this?

21 A   After the retreat.

22 Q   How far after?  2018?  Was it recently?

23 A   Shortly after the retreat.

24 Q   So shortly after June 2015?

25 A   That's correct.

J. Rogers - direct by Davis

1    Q    Would that have been before or after July 10th?

2    A    Before.

3    Q    Okay.  So you looked online after the retreat and you

4    discovered, oh, she misled us, right?  Is that what you're

5    saying?

6    A    I said the scores were not correct that she presented at

7    the retreat.

8    Q    Okay.  So that would have been misleading, right?

9    A    Yes.

10   Q    So did you call a board meeting?  We know you called --

11   you know how to call a special board meeting, right?  You've

12   done that, right?

13   A    Yes, I've called a special board meeting.

14   Q    Okay.  Did you call a special board meeting and say Dr.

15   Adams gave us some phony test scores?

16   A    No.  I called Dr. Adams.

17   Q    Answer my question.

18   A    No, I did not call a special board meeting.

19   Q    Okay.  Did you document anywhere that Dr. Adams gave us

20   some phony information?

21   A    No.

22   Q    Did any other board member document anywhere that she gave

23   you some phony information?

24   A    Not to my knowledge.

25   Q    And in the write-up that you all did, August 17th, the

J. Rogers - direct by Davis

1  performance directives, you're familiar with those; right?

2  A    Yes, I am.

3  Q    Did that say in there anything about phony test scores for

4  student academic achievement?

5  A    Not to my knowledge.

6  Q    Thank you, Miss Rogers.

7  A    You're welcome.

8         THE COURT:  I don't think he's done.

9  BY MR. DAVIS:

10 Q    So let's talk about the June -- August 17th performance

11 directives.  You all issued a set of performance directives to

12 Dr. Adams, right?

13 A    That's correct.

14 Q    And one of the performance directives was about Echo,

15 right?

16 A    Yes.

17 Q    And what did Dr. Adams -- well, let me put it to you this

18 way:  Didn't Dr. Adams tell you all that when she found out

19 about the Echo problem, she asked her staff to investigate the

20 issue?

21 A    In October, yes.

22 Q    She didn't tell you that in July?

23 A    She asked the business manager to investigate it in

24 October.  You showed it on the paper when I was in court here.

25 Q    Well, actually she asked him in October to work out a

J. Rogers - direct by Davis

1  payment plan?

2  A     That's correct.

3  Q     I'm not asking about the payment plan.

4  A     Okay.

5  Q     I'm saying when you all confronted her and said, oh, we

6  didn't know about Echo, Echo, Echo, what -- didn't she tell you

7  as soon as I got the shortfall numbers I asked Dr. Sophia

8  Jones-Redmond to investigate to make sure the number was right?

9  A     Did she tell us that?

10 Q     Yes.

11 A     That's what you showed in the paper earlier, yes.

12 Q     And, in fact, you yourself commented at one of the

13 meetings, at the meeting in July that Echo was all messed up,

14 right?  The numbers, the billing was messed up.  Didn't you say

15 that at the meeting?

16 A     Yes, for all the districts.

17 Q     Right.  And Echo, in fact, fired you reported to the other

18 board members their whole staff because -- the whole

19 accounting, business manager, they fired everybody, right?

20 A     That's correct.

21 Q     Because the numbers were so messed up?

22 A     Not because of that.  Because of other things also, but

23 that was part of it.

24 Q     Well, what you said at the meeting was because they had a

25 $3.8 million budget shortfall.

J. Rogers - direct by Davis

1  A    Yes.

2  Q    Is that what you said at the meeting?

3  A    Yes.

4  Q    Okay.  So Dr. Adams told you all she wanted to make sure

5  before she wrote a check the numbers were valid.  So I don't

6  want to belabor that.  You've testified to that.

7        The second thing that happened at the August 17th

8  meeting in the performance directives is you all said Dr. Adams

9  violated policy because she was signing checks without getting

10  board prior approval, is that correct?

11  A    No, it's not.

12  Q    You didn't say that she signed a check?

13  A    Signed contracts.

14  Q    Okay.  A contract.  A check for a contract with Imagine

15  Learning, right?  She signed a contract with Imagine Learning

16  without getting Board approval, right?

17  A    That's correct.

18  Q    And you all -- one of the performance directives was

19  because she did that, right?

20  A    That's correct.

21  Q    Isn't it a fact that Dr. Adams told you all that she had

22  been signing these type of instructional contracts since she

23  had been in the district since 2013, and she had never been

24  required to ask for board approval prior to signing?

25  A    It's board policy anything over $25,000 that she gets

J. Rogers - direct by Davis

1   approval.

2   Q    I'm not asking you what the board policy is.

3   A    Oh, okay.

4   Q    Didn't she say I've always done this since I've been here?

5   A    She said she's always done it, but she was corrected,

6   that's correct.

7   Q    Just answer my question.

8        THE COURT:  She did, Counsel.  Proceed.

9        MR. DAVIS:  Okay, Judge.

10  BY MR. DAVIS:

11  Q    And she told you the reason she did it -- why did she sign

12  the contract?  Didn't she say it was to save money for the

13  district?

14  A    That's what she said earlier today, yes.

15  Q    Well, isn't that what she told you all when discussing the

16  issue in August?

17  A    I don't recall what she told us in August.

18  Q    So does that mean she could have said it?

19  A    I don't know whether she said it or not in August.  I

20  can't tell you.

21  Q    Okay.  Well, do you recall this -- let me ask you this:

22  Didn't you say both her and Dr. Nohelty -- we already

23  established Dr. Nohelty is her subordinate, right?

24  A    Yes.

25  Q    Didn't you say both her and -- and I won't use the

J. Rogers - direct by Davis

1  profanity that you used at the time.  Did you say her and

2  Nohelty were signing stuff without board approval?  Didn't you

3  say that at the meeting?

4  A    I could have.  I don't recall, though.

5  Q    Well, I'm not going to go back to the tape.

6  A    Okay.

7  Q    I'm going to accept that you say you could have said it,

8  right?

9  A    Yes.

10  Q    And you do know Dr. Nohelty was signing contracts, right?

11  A    No.

12  Q    So you just said you could have said that he did.  Are you

13  telling me now you had no knowledge that Mr. Nohelty ever

14  signed a contract without board approval?

15  A    I said I don't recall whether they did or not.  I could

16  have.

17  Q    You were deposed on this subject, right?

18  A    Yes.

19  Q    And didn't you say at your deposition that Mr. Nohelty

20  signed contracts without board approval?

21  A    I think you put some things in the front of me at that

22  particular point, and I said yes, that was the same -- that was

23  the document.

24  Q    Okay.

25  A    But I don't have it in the front of me now, so I don't

J. Rogers - direct by Davis

1    recall.

2    Q    But you do recall saying this in your deposition --

3    A    I don't --

4    Q    -- upon being shown the document?

5    A    I really don't recall.

6              THE COURT:  She doesn't recall, Counsel.  You can

7    play the tape over objection.

8              MR. DAVIS:  Okay.  So I can play the tape, Judge?

9              THE COURT:  That's what I just said.

10             MR. DAVIS:  Thank you.  Let me find the tape now.

11   Okay.  Plaintiff's Exhibit No. 71.  And this is volume No.

12   VN810188 dot redact.  And this is from the 7/22/15 board

13   meeting.

14             THE COURT:  You said redacted.  Okay.  Go ahead.

15             MR. DAVIS:  And I'm going to play something for you.

16             THE COURT:  Make sure the sound is up, Counsel.

17             MR. DAVIS:  Okay, Judge.

18             THE COURT:  It's playing now.  You just don't have

19   sound.

20             MR. DAVIS:  Okay.  I'm trying to get to the precise

21   point on this tape.

22             THE COURT:  Go a little bit before it, Counsel.

23             MR. DAVIS:  Okay.

24             THE COURT:  Just a little bit.  And then check your

25   sound.  We're going to take a quick break.  All right.  Ladies

J. Rogers - direct by Davis

1  and gentlemen, we'll get this technically together.  All rise.

2      (Jury excused.)

3          THE COURT:  Ma'am, if you need to step out and use

4  the facilities, you may do so quickly.  I think we're just

5  doing a technology thing here.  I won't even leave the bench

6  until we --

7          MR. DAVIS:  I'm going to do this now.

8          THE COURT:  All right.  So if you wish to just take a

9  walk outside.  You can't review anything or discuss your

10  testimony with anyone.  You're still under oath.

11      (Short break taken.)

12          THE COURT:  We'll have the jury come back, and we

13  will be ready to roll.  Ma'am, you can come back to the stand.

14      (Before the jury:)

15          THE COURT:  All right.  You may be seated, ladies and

16  gentlemen.  Thank you for your patience.  Between technical

17  difficulties and a matter that was going on that we had to deal

18  with, the delay could not be helped, and we will proceed.  I

19  think we got the technical dealt with, is that correct?

20          MR. DAVIS:  Yes, Judge.

21          THE COURT:  All right.  And are you going to help

22  make sure?

23          MS. SCHWENDENER:  Yes.

24          THE COURT:  Thank you very much.  All right.  And

25  once again so that the jurors can be reminded, hold up.  Pause

J. Rogers - direct by Davis

1    it one second.  All right.  This was where we were where you're

2    playing a board tape, is that correct?

3              MR. DAVIS:  Yes, Judge.  This is a tape of the

4    July 22nd, 2015 board meeting.

5              THE COURT:  All right.

6              MR. DAVIS:  Closed session.

7              THE COURT:  All right.  And this is --

8              MR. DAVIS:  This is exhibit number --

9              THE COURT:  This is after the response that the

10   witness here was not quite certain of what was said or what

11   wasn't, is that correct?

12             MR. DAVIS:  Yes.

13             THE COURT:  That she might have said something or

14   something may have been said.

15             MR. DAVIS:  Right.  I asked the witness if Dr.

16   Nohelty had signed contracts without board authorization, and

17   she wasn't sure.

18             THE COURT:  All right.  All right.  Proceed.

19   BY MR. DAVIS:

20   Q    Good afternoon again, Mrs. Rogers.  So my question is

21   didn't you say at the July 22nd, 2015 board meeting that Dr.

22   Nohelty had signed contracts without first obtaining board

23   approval?

24   A    Yes, I did.

25   Q    Okay.  Thank you.  Isn't it also true that Dr. Adams told

307

J. Rogers - direct by Davis

1    the board on July 22nd that she had always been authorized

2    since she had been in the district to sign instructional

3    contracts, and she had never been required to get board

4    approval before signing them?  Didn't she tell you that?

5    A    Yes, she did.  She said that.

6    Q    Thank you.  And isn't it also true that I asked you if Dr.

7    Nohelty was ever disciplined for signing checks without board

8    approval, and you said no.

9    A    Signing checks?

10   Q    Contracts.  You want me to rephrase it?

11   A    You said checks.  I thought you said contracts.

12   Q    Okay.  Let me start over.

13   A    Okay.

14   Q    Isn't it true that you've stated that Dr. Nohelty was

15   never disciplined for signing contracts without board approval?

16   A    I said not to my knowledge.  You'd have to recollect.

17   Q    Well, I think you were more --

18         THE COURT:  You know, Counsel, I'm going to warn you,

19   you can't testify so ...

20   BY MR. DAVIS:

21   Q    Okay.  All right.  Well, I will come back to that, and

22   we'll play your actual response on that subject.

23         THE COURT:  And for some reason you don't want to

24   play it now?

25         MR. DAVIS:  I do want to play it now, Judge.  I just

J. Rogers - direct by Davis

1   need to find out in my notes here.  Give me one second.

2       (Brief pause.)

3           THE COURT:  So this was not the cue up we had ready

4   to go, Counsel?

5           MR. DAVIS:  Not on this specific question, Judge.

6           THE COURT:  All right.  Then, yes, I agree, come back

7   to it.  We have -- that clock is a little bit fast.  We have

8   about 15 minutes or so, 20 minutes.

9           MR. DAVIS:  Okay.

10          THE COURT:  Make the best use of your time.

11  BY MR. DAVIS:

12  Q    So, Mrs. Rogers, you all at the August 17th meeting voted

13  to issue performance directives.  And one of the performance

14  directives was that Dr. Adams had made changes to the summer

15  school program without prior board approval, correct?

16  A    Yes.

17  Q    But, in fact, hadn't she circulated a newsletter in June

18  with the changed schedule for the summer school to the board?

19  A    Yes, she circulated it, but no approval.

20  Q    Right, but if the board -- did the board -- so the board

21  received the schedule, right?

22  A    In a newsletter, yes.

23  Q    Yes.  And did anybody on the board say, oh, we don't want

24  these changes, what's going on, stop this?  Did anybody say

25  that?

309

J. Rogers - direct by Davis

1  A    Yes.

2  Q    So they told her don't implement these --

3  A    They.  I mentioned it to her that it's past practice that

4  it's always approved by the board when the workday changes in

5  the school district.  She gives us the schedule, and we approve

6  it.  She just bring it to the board meeting.

7  Q    Did she take it to the curriculum committee or any other

8  committee?  Isn't that the normal process?

9  A    No.  When you change the workday of the employees, the

10 school board always approves it.  She had the power to do it,

11 but she had to bring it to us for approval.

12 Q    Right.  Okay.  So let's assume for the sake of argument

13 you just got the newsletter and you saw the change, right?

14 A    Yes.

15 Q    And the other members saw it, right?  Did anybody other

16 than you having a conversation -- when did you -- this

17 conversation you say you had with Dr. Adams, when did that take

18 place?

19 A    I don't recall.  But when I got the newsletter, I gave her

20 a phone call.

21 Q    Was it before July 1st, which is the date the school --

22 summer school would start?

23 A    I don't recall.  I really don't.  I can't say it because I

24 don't want to force it --

25 Q    But it could have been after the summer school started?

J. Rogers - direct by Davis

1    A    It could have been.

2    Q    Okay.  You had this discussion with her.  So to your

3    knowledge did any other board member who received the schedule,

4    change schedule say let's not do this or question Dr. Adams

5    about why she didn't get prior approval?

6    A    Not to my knowledge.

7    Q    And, in fact, she told you the reason she was -- when you

8    all gave her these performance directives -- well, let's back

9    up.

10        At the June 2015 retreat didn't she report on a

11   survey where she talked about a state survey that had been done

12   of parents in the district and students?  You recall that?

13   A    Yes.

14   Q    And wasn't one of the things that the district was rated

15   very lowly on in that survey was student safety?  Specifically

16   students said they didn't feel safe in the buildings?

17            MS. SCHWENDENER:  Objection.

18            THE COURT:  Objection sustained.  Irrelevant.

19            MR. DAVIS:  Well, it's relevant.  May I.

20            THE COURT:  Right now the objection is sustained.

21            MR. DAVIS:  Okay.

22            THE COURT:  We don't have a lot.  Put a pin in it.

23            MR. DAVIS:  Okay.

24   BY MR. DAVIS:

25   Q    Did she report the results of the survey?

311

J. Rogers - direct by Davis

1  A    Yes, she reported the results.

2  Q    At the retreat?

3  A    She reported it.  I don't know whether it was at the

4  retreat, but she did report it.

5  Q    Right.  And one of the issues she raised -- one of the

6  things she reported was that the survey results showed that

7  students had issues regarding their safety in the buildings?

8  A    Yes, I heard her testify to that this morning.

9  Q    Okay.  And, in fact, when she changed the summer school

10 schedule, didn't she do it in a way where it didn't cost the

11 district any additional money?

12 A    I don't recall whether it did or not.

13 Q    Well, do you recall that it cost the district any

14 additional money?

15 A    No.

16 Q    So you did hear her testimony where she said that she

17 changed the workweek?  They were still getting paid 40 hours,

18 the same 40 hours they had been paid.  Did you hear that

19 testimony earlier?

20 A    Yes.

21 Q    Okay.  Do you have anything to contradict that?

22 A    No.

23 Q    Okay.  Thank you.  So in addition to the contract and we

24 talked about the summer school and we talked about Echo, you

25 all talked about -- one of the directives was not spending

J. Rogers - direct by Davis

1    enough time in the district, right?  Was that one of the

2    performance directives that you gave her on August 17th?

3    A    I'd have to look at it to see.

4    Q    Okay.  Let me bring it up.

5         MR. DAVIS:  And this is going to be an exhibit which

6    we previously had up, Judge.  This is going to be Exhibit No.

7    22.

8         THE COURT:  All right.  22 has already been

9    published.  Proceed, Counsel.

10   BY MR. DAVIS:

11   Q    Yes.  So can you see 22, Mrs. Rogers?

12   A    Yes.

13   Q    And you see at the bottom No. 2 where it says, you have

14   not been present in the district for sufficient periods of time

15   to satisfactorily exercise your oversight of district

16   operations?

17   A    Yes.

18   Q    Okay.  And it says here, you generally do not start your

19   business day until midmorning?

20   A    Yes.

21   Q    Okay.  Let me ask you about that because I don't think we

22   talked about that.  Was Dr. Adams -- did she sign -- punch a

23   time card every day?

24   A    No.

25   Q    Did she sign in when she came in in the morning?

313

J. Rogers - direct by Davis

1   A    Not to my knowledge.

2   Q    So how is it -- did you work in the district in August of

3   2015?  Were you employed in the district?

4   A    I'm a board member.

5   Q    Well, were you employed --

6   A    You can't be employed.

7   Q    -- physically in the building?

8   A    No.

9   Q    Did you work there?

10  A    No.

11  Q    Did any other board members work there?

12  A    Not to my knowledge.

13  Q    So what's the basis of this statement that she came in

14  every day at midmorning?  How did you all know that?  Did

15  somebody tell you that?  What --

16         THE COURT:  All right.  Counsel, you can't keep

17  asking questions.

18  BY MR. DAVIS:

19  Q    Okay.  What is the basis for this statement in a

20  performance directive?

21  A    Because when you call there, she's never there until 10,

22  11:00 o'clock every day, and the workday starts at

23  8:00 o'clock.

24  Q    So you've had occasions where you called her and she

25  wasn't there?

314

J. Rogers - direct by Davis

1   A    Quite a few times.

2   Q    Was this every day?  Was this --

3   A    Quite a few times.  I can't say -- at least two to three

4   days out of a week.

5   Q    Okay.  So this was August 17th, 2015 that these

6   performance directives are issued, right?  The school year

7   started July 1st of that year, right?

8   A    Yes.

9   Q    So between July 1st and August 17th, 2015, how many times

10  did you call there and she wasn't in until approximately --

11  A    You said the school year starts what?

12  Q    July 1st.  Didn't it start July 1st, the 2015-16 school

13  year?

14  A    No.

15  Q    When did it start?

16  A    I can't recall, but it's not in July.  The kids are not in

17  school in July.  The school year starts in August, but she's

18  there every 11 months.

19  Q    Doesn't the academic year run from July 1st to June 30th

20  the following year?

21  A    No.

22         THE COURT:  The academic year, sir, or the -- for

23  someone who's in administration, their year?

24  BY MR. DAVIS:

25  Q    The -- well, when I say academic, I mean the school

J. Rogers - direct by Davis

1  calendar, the school year.  Schools don't run on January to

2  June calendar, right?  They have a 2013-14 academic year;

3  2014-15, correct?

4  A    Yes.

5  Q    Okay.  And the 2015-2016, this would have been --

6  August 17th, 2015 would have been in the 2015-2016 calendar

7  year, right?  School year?

8  A    I would assume, yes.

9  Q    And so -- and that starts, Dr. Adams testified earlier

10 from July 1st to June 30th of 2016.  And you all issued this

11 directive in August 17th saying she's only in there -- well,

12 you know what, the directive said.  You said the basis was you

13 made phone calls and she wasn't there.  How many times can you

14 sit here and tell us that that happened in that time period,

15 from July 1st to August 17th when you put it in there?

16 A    I can't tell you how many times because I didn't count

17 them.

18 Q    Okay.  Did you write any of these times up?  Did you issue

19 any discipline before August 17th?

20 A    No.

21 Q    Did you issue any discipline saying you're never in the

22 office on time before July 10th?

23 A    Not in writing, no.

24 Q    Did you have any conversations with her before July 10th

25 about this issue?

J. Rogers - direct by Davis

1   A     During the time I was president, yes, I did.

2   Q     And when was that?

3   A     During the time I was president while she was there from

4   '13, for the first two years that she was there on her

5   contract.

6   Q     So you told her in '13 -- was it June, July?  When?

7   A     I can't tell you the month or the year.  All I can say is

8   we had a conversation about her coming in late during the day,

9   because there was issues at the school district and nobody was

10  there to cover them but the assistant.

11  Q     And did you take any form of disciplinary action at that

12  time?

13  A     No, I did not.  I could not do that as one board member.

14  Even as the president.

15  Q     Well, we know you know how to call a special board

16  meeting.  Did you call a special board meeting to address this?

17  A     No, I did not.

18  Q     Did you call any kind of meeting to address this?

19  A     No, I did not.

20  Q     Did anybody else in the district -- because you weren't

21  the only one who issued these performance directives.  Did

22  anybody else address this prior to July 10th, 2015?

23  A     You would have to speak with them.  I can only speak for

24  myself.

25  Q     To your knowledge have -- you've been on the board since

J. Rogers - direct by Davis

1    '91 off and on, correct?

2    A    That's correct.

3    Q    Do you have any knowledge of this ever being brought up as

4    a performance issue?

5    A    Other board members -- by other board members or by me?

6    Q    Yes.

7    A    Yes.  On the sheet that we have here now.

8    Q    What sheet?

9    A    The paper that we have --

10   Q    Other than the directives that we are looking at now,

11   prior to July 10th, 2015, had Dr. Adams' coming and going and

12   not being in the district, was that ever brought up?

13   A    Yes, I did bring it up to her.  I did mention it to her.

14   Q    Other than you.  You talked about that, but you don't

15   remember --

16   A    I have no knowledge of no one else --

17        THE COURT:  Wait.  Wait.  Wait.  Wait.  Wait.  One at

18   a time.

19        THE WITNESS:  Okay.

20        THE COURT:  We're ending up here, but we're not going

21   to talk over each other.

22        THE WITNESS:  Thank you.

23        THE COURT:  All right.  So --

24        MR. DAVIS:  I'm sorry.

25        THE COURT:  Go ahead, Counsel.

J. Rogers - direct by Davis

1  BY MR. DAVIS:

2  Q    You don't -- final question on this point, Miss Rogers.

3  You don't know of any other board member before July 10th that

4  raised the issue of Dr. Adams' attendance or tardiness?

5  A    I have no knowledge of no one else, no.

6  Q    Thank you.  So --

7          THE COURT:  All right.  You know what, then that's a

8  good place to stop.

9          MR. DAVIS:  Okay.

10          THE COURT:  All right.  So you'll be back here in the

11  morning, Miss Rogers.  You're required to come back to complete

12  your testimony.  And I ask that you be here by 9:15.  Do you

13  understand?

14          THE WITNESS:  Yes.

15          THE COURT:  All right.  And you're excused for now.

16  You're under oath.  Do not discuss or review anything.  If you

17  do, you could be subject to telling us about it.  And if you

18  have to tell us about it, that could reflect on your

19  credibility.  Do you understand?

20          THE WITNESS:  Yes.

21          THE COURT:  All right.  You are excused right now.

22          THE WITNESS:  Thank you.

23      (Witness excused.)

24          THE COURT:  All right.  You're welcome.  Ladies and

25  gentlemen of the jury, tomorrow Halloween day, it is the normal

319

1    day when I hear most of my criminal cases, which sometimes

2    start a little later.  But in order to be ready for -- I'm

3    going to ask you be here again -- if you can get here around no

4    later than 9:30, we should be able to start much earlier than I

5    expected we were going to.  Our schedule tomorrow will be a

6    shortened lunch.  Maybe 30 minutes for lunch.  And then this

7    Court will -- you will be out of here well before 3:15

8    tomorrow.  All right.  That's the schedule.  Okay.

9            And again, do not -- do not review anything on this

10   case.  Please do not make any consideration about the gap we

11   took, the break we took.  We were doing work that had to be out

12   of your presence, but it should not affect how you perceive the

13   evidence, which is coming from the witness stand not from any

14   speculations about our breaks.  All right.  And go home, enjoy

15   the evening, and we will see you tomorrow morning.  Again, no

16   research on the case.  No research on the parties.  And that's

17   the only way we can ensure a fair trial.  All rise.

18       (Jury excused.)

19           THE COURT:  All right.  I'll be back out in five

20   minutes, and we'll get this -- are you going put something in

21   writing on the due process thing or no?

22           MR. DAVIS:  Are you asking me, Judge?

23           THE COURT:  No.

24           MR. DAVIS:  Oh.

25           THE COURT:  You've done yours.

1      MR. DAVIS:  Yes.

2      THE COURT:  Yes.  Anything further in writing?  We

3  can -- I mean, I've just -- I've got the cases.  I've been

4  trying to read them during our breaks.  And we can have our

5  final discussion and put that to bed.  Okay.  All right.

6      MS. SCHWENDENER:  Thank you, Judge.

7      THE COURT:  Before we leave today.  I'll be back out

8  in about five minutes, letting them get out of the building.

9  Okay.  Thank you.

10      MR. DAVIS:  Thank you, Your Honor.

11     (Short break taken.)

12      THE COURT:  All right.  We're getting back to -- I

13  believe this was all again the issue of the motion in limine

14  defendants brought of No. 18 and my ruling on that, and

15  plaintiff's continued request to revisit that ruling.  Am I

16  correct, Counsel?

17      MR. DAVIS:  Hope springs eternal, Judge.

18      THE COURT:  But that's the -- that is the one, is

19  that correct?

20      MR. DAVIS:  Yes.

21      THE COURT:  All right.  So even though plaintiff's --

22  I'm sorry, defendants' motion was to bar the plaintiff from

23  seeking damages on the three-year -- the second three-year

24  future possibility contract, and the arguments have sort of

25  morphed into something else.  And the Court went and read

1   Sindermann, Coleman, Umbehr.  All of which are summary judgment

2   cases, which is an important difference as to where we are now,

3   and, and I don't see the confusion with my ruling.  Because the

4   way the ruling is you're right, it's like Umbehr where yes, she

5   gets to bring in any activity, or the way they treated her can

6   come in from -- to show that her speech of auditing -- ordering

7   an audit, her speech of -- now I'm missing it.  Her speech of

8   when --

9               MR. DAVIS:  The police report.

10              THE COURT:  The police report.  Thank you.  Filing a

11  police report and talk about the damages on that.  That's

12  allowed.  But it was for the current contract she was under and

13  the one year that she was being extended to.  And so their

14  whole decision, the reason I granted it is their whole motion

15  was on the next, the future contract.  There's nothing in the

16  cases that you have cited that I even relied on in some of the

17  cases when I was making my decision that shows otherwise.  It

18  is already a, a factual issue that this Court made the

19  determination that this is for the jury.  This was not a matter

20  for, as you brought up in one of your arguments, that it would

21  go from one point, then the Court would decide whether or not

22  they had sufficiently presented evidence as a matter of law.

23              It's been decided.  This is summary judgment.  I

24  ruled.  And I ruled that there was a factual dispute.  That it

25  wasn't a matter of law; and, therefore, you could bring that

322

1  in.  As to the three-year, it's almost a totally separate

2  argument from what was dealing --

3          MR. DAVIS:  That's right.

4          THE COURT:  -- what we were dealing with.  And

5  Umbehr, that -- they're not looking at a, a second step of the

6  contract.  They're not looking at the fact that she had a

7  permanent contract -- she had one contract that she was dealing

8  with, and she was already promised a one-year extension.  Was

9  there some talk about a three-year extension?  Yes, but that is

10 not the situation in any of the cases you have brought before

11 me.  I'm not allowing any further argument.  My ruling stays

12 the same, and you cannot get in the damages for the three years

13 beyond that that are speculative.  And the Court just does not

14 see any support for you bringing that.

15         So that's my ruling.  That's the way you present it,

16 and you follow my ruling for the rest of the argument.  We are

17 not having any more bites at the apple.  The Appellate Court

18 can deal with it.  If you all want to continue the expense up

19 there, you can feel free to do that, if you need to.  If you

20 win, I'm sure you don't care about it, and they won't be able

21 to say that they didn't have every opportunity to have the

22 Court support their position.

23         MR. DAVIS:  Right.  There was two issues, Judge,

24 actually.  And I think they've gotten melded.  One was the

25 three-year --

1          THE COURT:  That might be so.

2          MR. DAVIS:  That was the three-year.  And my position

3     was that because they retaliated against her and denied the

4     renewal as a matter because of her speech, that Umbehr and the

5     other cases were on point.  And I --

6          THE COURT:  About, about the -- so you're saying that

7     Umbehr and the other cases were on point about the next step,

8     which was the future three-year?

9          MR. DAVIS:  Right.

10         THE COURT:  That's what your --

11         MR. DAVIS:  Right.

12         THE COURT:  And the Court --

13         MR. DAVIS:  Because they --

14         THE COURT:  The Court says that is too speculative.

15    That was not promised.  That's my ruling.

16         MR. DAVIS:  And I don't think it was promised to

17    Umbehr that he would have another year on his garbage contract.

18         THE COURT:  But the problem -- the difference with

19    Umbehr is that Umbehr was getting these year contracts, and

20    they kept coming up.  That's different from saying, okay.

21    You're getting year contracts, but, you know, sometime in the

22    future we're actually thinking of you giving a five-year

23    contract with no renewals necessary.  And then they didn't do

24    it.  He would have been promised the next year because that was

25    a matter of practice, that was something they did.  As opposed

324

1    to the five-year where, ah, we could do it or we might not.

2    And I don't think you could hold that -- they could have done

3    that either way just because they were thinking of it.  That's

4    my decision.

5            MR. DAVIS:  Well, in Coleman they didn't even have a

6    property right.  But I don't want to belabor that point.

7            THE COURT:  We're done with the property right.

8            MR. DAVIS:  Right.

9            THE COURT:  It's over.

10           MR. DAVIS:  The second issue was due process, and

11   they were saying they wanted to tell the jury that the jury had

12   to decide whether Dr. Adams had a due process right in the

13   contract extension.  Their argument --

14           THE COURT:  The one year?

15           MR. DAVIS:  Yes, in the one year.  Their argument is

16   because the goals weren't in the contract and the contract

17   extension was invalid, she couldn't have a property right

18   sufficient to have a due process notice requirement before they

19   rescinded the one year.

20           THE COURT:  In the one year?

21           MR. DAVIS:  And they're saying -- and they're saying

22   that that's a jury question.

23           THE COURT:  And so --

24           MR. DAVIS:  And that's where I was saying it's a --

25           THE COURT:  Once again he can present that evidence

325

1    about what happened as regards to the one-year.  He can present

2    evidence of that.  But when we get to the close of the

3    plaintiff's case, if you don't believe that that's been met,

4    then you do a motion for directed finding or you do one and ask

5    that this Court find as matter of law --

6              MR. PETRARCA:  Right.

7              THE COURT:  -- your client has that argument.  And

8    you can object to that and say it hasn't, and then the Court

9    will make the ruling on the DV motion.  But it's almost

10   similar, that it's coming up again almost like another bite at

11   the issues on summary judgment.  But it wasn't clear from the

12   way the arguments were presented.  And that's what caused some

13   of the confusion.  But evidence can come in about different

14   actions, even disciplinary, whatever that was taken about the

15   one year, before the one -- before that.  After she gives the

16   speech.  And when we bring in that evidence at the close of the

17   plaintiff's case, plaintiff can make a motion and say, Judge,

18   as a matter of law, the evidence shows we've shown it.  And

19   then --

20             MR. DAVIS:  Well, it's the second count of the

21   complaint, Judge.  It's --

22             THE COURT:  I'm not dealing with counts.  I'm dealing

23   with the issue of the first -- the excess -- the extended

24   contract for a year.

25             MR. DAVIS:  Right.

1        THE COURT:  You bring it -- Counsel, you are

2   confusing the issue.  You're bringing in all of this with the

3   counts and the pleading.  This isn't it.  The Court had ruled

4   on summary judgment, said there were issues of fact on what --

5        MR. DAVIS:  Yes, Judge.

6        THE COURT:  -- what was going on.  And so now you can

7   bring in -- the evidence is coming in if you want it to --

8        MR. DAVIS:  That's great, Judge.

9        THE COURT:  -- to support that issue.  However, at

10  the close of your case if you want to say, Judge, we want a

11  finding as a matter of law --

12        MR. DAVIS:  Sure.

13        THE COURT:  -- that's when you do it.

14        MR. DAVIS:  Sure.

15        THE COURT:  Or they can do the same thing.

16        MR. DAVIS:  Sure.

17        THE COURT:  Okay.  That's it.

18        MR. DAVIS:  And the confusion, Judge, and I'm taxing

19  your patience I know, is you didn't let me in my opening

20  address that issue.  You were saying I was opening the door

21  because we hadn't arrived at this clarity --

22        THE COURT:  Well, one reason --

23        MR. DAVIS:  -- at that time.

24        THE COURT:  Yes, we hadn't, we hadn't -- yes, we

25  arrived at that clarity, and that's not at all unusual for the

1    Court to have reserved a ruling until trial.  And even though

2    people would like to get it in in opening, they can't.  But as

3    long as they get the evidence out in the course of their

4    putting their case on, if it's supposed to be out, and the

5    Court will obviously allow plenty of argument at the end on it.

6    The Court will also allow the instructions on it if it meets

7    that.

8              But it's not at all unusual that if the Court just

9    can't make a decision based on not hearing -- either the

10   arguments being a little bit convoluted, or that the evidence

11   hasn't come out yet.  I'm not going to allow something -- I

12   can't take it back from opening statement.  All right.

13   Especially if it's being used --

14             MR. DAVIS:  True.

15             THE COURT:  -- similar to how it's been used here.

16   She said or he said in opening statement.  So it's better for

17   the Court to say stay away from it until we get through the

18   case.  All right.  So now you know we won't discuss this again.

19   It doesn't come up again until directed verdict if you all

20   don't for some reason find your minds and settle the case.

21       (Laughter.)

22             THE COURT:  So all right.  I'll see you tomorrow.

23             MR. PETRARCA:  Thank you, Your Honor.

24             THE COURT:  Come at --

25             MS. SCHWENDENER:  Thanks, Judge.

1    THE COURT:  If you can come at -- definitely by 9:15.

2  I have prisoners that Yvette has worked miracles on who are in

3  custody that are going to be a little early.  But I really want

4  to hit it.  And there's a half an hour lunch.  Okay.

5    MS. SCHWENDENER:  Sure.

6    THE COURT:  All right.  Thank you very much.

7    MS. SCHWENDENER:  Thank you, Judge.

8    MR. DAVIS:  Thank you, Your Honor.  Thanks for your

9  time.

10    THE COURT:  All right.  Thank you.  Oh, and tomorrow

11  since we have the early Halloween, I would suggest that you

12  spend at least an hour after they leave going through your

13  instructions so that the Court can be aware of what you are

14  definitely objecting to.  You already know the witnesses who

15  are going to be called, is that correct, tomorrow?

16    MR. DAVIS:  Yes.

17    THE COURT:  They've got -- everybody knows who the

18  witnesses are going to be?

19    MR. DAVIS:  I've asked for Tyrone Rogers to be here.

20  I've got two people coming in on subpoena, Eric Kellogg and Dr.

21  Nohelty and --

22    THE COURT:  You've got the mayor coming in on

23  subpoena?

24    MR. DAVIS:  Yes.

25    THE COURT:  All right.  The problem I have is, is you

329

1    all take my nice little speech away from me.  I didn't do *Judge*

2    *Judy* this time or *People's Court*.  I usually do say this isn't

3    what this is.  I don't know if I can quite say that.

4              MR. DAVIS:  Oh, wow, Judge.  That hurts.

5              THE COURT:  And it's not just you.  I'm saying you've

6    got the mayor coming in who was the superintendent at the same

7    time.  You've got two men --

8              MR. DAVIS:  Yes.

9              THE COURT:  -- who have either been convicted or

10   indicted for something.  And then they're married to the people

11   who are here.  It's like you couldn't make this up, in the

12   words of one of my staff.  All right.  Thank you.

13             MR. DAVIS:  That's true, Judge.

14             THE COURT:  Thank you.  Hey, you know what, people

15   ask me if it's a boring job.  It is not a boring job.  I love

16   my job.  All right.  See you all in the morning.

17             MS. SCHWENDENER:  Thank you, Judge.  Have a good

18   night.

19             THE COURT:  Thank you.

20             MR. DAVIS:  Thank you, Your Honor.

21             THE COURT:  All right.

22             MR. DAVIS:  Thanks for all your time.

23             THE COURT:  Thank you.

24        (Whereupon, said trial was recessed at 5:30 p.m., to

25        reconvene on 10/31/18, at 9:15 a.m.)