1            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3  DR. DENEAN ADAMS,            ) No. 15 C 8144
                           )
4              Plaintiff,    )
                           )
5          v.            )
                           )
6  BOARD OF EDUCATION HARVEY SCHOOL   ) October 31, 2018
  DISTRICT 152, GLORIA JOHNSON in her ) Chicago, Illinois
7  individual capacity, BETTY JOHNSON  ) 10:00 a.m.
  in her individual capacity,        )
8  DR. KISHA McCASKILL in her        )
  individual capacity, JANET ROGERS   )
9  in her individual capacity, TYRONE   )
  ROGERS in his individual capacity,   )
10  LINDA HAWKINS in her individual    )
  capacity, FELICIA JOHNSON in her    )
11  individual capacity,             )
                           )
12             Defendants.  ) Trial

13                  VOLUME 3
           TRANSCRIPT OF PROCEEDINGS
14  BEFORE THE HONORABLE SHARON JOHNSON COLEMAN, and a
                    jury
15

16  APPEARANCES:

17  For the Plaintiff:   MR. JEROME M. DAVIS, ESQ.
                     9024 McIntosh Court
18                   Lakewood, Illinois  60014

19  For the Defendants:  HAUSER IZZO PETRARCA GLEASON & STILLMAN
                     1415 West 22nd Street
20                   Suite 200
                     Oak Brook, Illinois  60523
21                   BY:  MR. CHRISTOPHER L. PETRARCA

22

23         TRACEY DANA McCULLOUGH, CSR, RPR
             Official Court Reporter
           219 South Dearborn Street
24                 Room 1426
            Chicago, Illinois  60604
25             (312) 435-5570

1    APPEARANCES CONTINUED:

2                        LAW OFFICES OF JENNIFER K. SCHWENDENER LLC
                         5117B Main Street
3                        Suite 4
                         Downers Grove, Illinois  60515
4                        BY:  MS. JENNIFER K. SCHWENDENER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

332

1          (The following proceedings were had in open court outside

2          the presence of the jury:)

3                    THE CLERK:  18 CV 8144, Adams versus Board of

4     Education Harvey School District 152.

5                    THE COURT:  Go ahead, Counsel.

6                    MR. DAVIS:  Good morning, Your Honor.  Jerome Davis

7     for plaintiff Dr. Denean Adams.

8                    THE COURT:  Mr. Davis.

9                    MS. SCHWENDENER:  Good morning, Your Honor.  Jennifer

10    Schwendener on behalf of the defendants.

11                   THE COURT:  All right.

12                   MR. PETRARCA:  Good morning, Your Honor.  Chris

13    Petrarca also on behalf of the defendants.

14                   THE COURT:  All right.  Thank you very much.

15    Everyone ready to continue with Miss Rogers, or are we -- do

16    you have any news to tell me one way or the other about

17    witnesses or the state of the case?

18                   MR. DAVIS:  In terms of witnesses, Judge, I just want

19    to correct.  Mayor Eric Kellogg won't be in until tomorrow.  I

20    had the dates incorrect.  Today I've got Dr. Nohelty and Sophia

21    Jones-Redmond coming in at 10 and 11 respectively.

22                   THE COURT:  Okay.  I don't know whether or not since

23    it's 10, whether or not Miss Rogers will be done.

24                   MR. DAVIS:  Well, Miss Rogers won't be done.  So Dr.

25    Nohelty will have to wait in the witness room.

333

```
 1          THE COURT:  Okay.  Just as long as that's, that's
 2   made aware for people.  So we have two witnesses -- two more
 3   witnesses.  How many witnesses after today do you have?
 4          MR. DAVIS:  Well, I asked for Mr. Rogers to be here
 5   today as well.  So I was going to finish Janet Rogers, deal
 6   with Dr. Nohelty and Dr. Sophia Jones-Redmond, and then at
 7   least get as much as I can with Mr. Rogers.  And at the
 8   conclusion of those witnesses I would have only Mr. Kellogg and
 9   Dr. Calvin Gooch, and possibly a rebuttal with my client.  That
10   would be it.
11          THE COURT:  So you right now if things work out,
12   however, you think you might be done by Thursday evening --
13   Thursday afternoon?
14          MR. DAVIS:  Well, I kind of envision putting
15   Mr. Gooch on next Tuesday realistically.
16          THE COURT:  Wait.  Wait.  Wait.  How did you envision
17   that?  When the only reason we have Tuesday is to do closing
18   arguments --
19          MR. DAVIS:  Okay.  I understand, Judge.  But I'm
20   being --
21          THE COURT:  Clearly you don't.
22          MS. SCHWENDENER:  I'm anticipating the examination
23   with Mr. Rogers and with Janet Rogers will take the bulk of the
24   time.  But I should be able to get Mr. Gooch in by Thursday or
25   the end of this week with no problem, but I'll try to make it
```

334

1    Thursday.

2              THE COURT:  We are working Friday.

3              MR. DAVIS:  Right, I understand that.  That's why I

4    said Thursday or the end of this week.

5              THE COURT:  Right.  So I guess I'm just trying to

6    figure out -- right now you've named enough people that this

7    Court thinks should basically get us through Thursday.

8              MR. DAVIS:  Right.

9              THE COURT:  With maybe a little Friday.  And so why

10   wouldn't -- why would Dr. Gooch have to wait till -- or anybody

11   else wait till Tuesday?  Plus we have -- if defense wishes to

12   go back and put any additional testimony on.  I would ask,

13   defense, that if you -- these are some of your witnesses, if

14   you want to do something that you would do in direct, like lay

15   a little more information, that you do it while the witness is

16   up here.  And right now the Court -- since the beginning of

17   this, there should be no plan to have anybody who's local here

18   on Tuesday.  Everybody needs to get done.  All right.

19             MR. DAVIS:  That's fine, Judge.

20             THE COURT:  So -- and then again if you get to cover

21   some of these people during their testimony, do you have

22   additional witnesses from the ones that he's calling that you'd

23   be calling?

24             MS. SCHWENDENER:  Yes, Judge.  John Izzo.

25             THE COURT:  Okay.

```
 1           MS. SCHWENDENER:  Who is available tomorrow or
 2  whenever we are ready.
 3           THE COURT:  Well, look for Friday for him.
 4           MS. SCHWENDENER:  Sure.
 5           THE COURT:  Let's try to get him in on Friday if we
 6  can.  All right.  They're going to do a whole day on Friday,
 7  you know.  At least, you know, not -- definitely not super
 8  early.  They'll be here at least until 4 on Friday.  Okay.
 9           All right.  Anything else?
10           MR. DAVIS:  Well, just a point of clarification,
11  Judge.  I read your order.  I completely understand that we're
12  not to talk about anything to do with the nonrenewal of the
13  contract.  You also indicated that my client would be able to
14  present evidence regarding her other damages, and that entails
15  the other disciplinary actions taken against her after
16  August 17th, but they will all relate to the police statement
17  and the report that was filed on July 10th.  So I just wanted
18  to clarify that I'm clear, and I will make sure to avoid
19  anything to do with Your Honor's order.
20           THE COURT:  Well, I hope it works out.
21           MR. DAVIS:  Thank you, Judge.
22           THE COURT:  All right.  Counsel.
23           MS. SCHWENDENER:  Judge --
24           THE COURT:  If we have any witnesses in the room that
25  are not parties, please step out.  If you're called here to be
```

```
 1   a witness who -- well, she's a -- I said who are not parties.
 2   You're a party, ma'am, Miss Rogers.
 3              MR. DAVIS:  Dr. Nohelty is a witness.  You need to
 4   step out, Dr. Nohelty.
 5              THE COURT:  Yes.  All right.  So he's not a party.
 6   All right.  Okay.  So anything else from the plaintiff?
 7              MR. DAVIS:  That's it.  I'll step out briefly and
 8   talk to Dr. Nohelty, and I'm ready to go.
 9              THE COURT:  Yes, right.  Let Dr. Nohelty -- I don't
10   know what time you had him set for, but let him know it's going
11   to be a while.  I want to finish this witness.  I don't want a
12   ton of --
13              MR. DAVIS:  Right.
14              THE COURT:  -- interrupted witnesses.  Go do that
15   quickly, and I'll get them out here.
16              MR. DAVIS:  Thank you, Judge.
17              THE COURT:  All right.  I would tell him -- you might
18   be better off telling him about 11:30, or I don't know how long
19   you have.  So it's hard for them to know how long they have.
20   But you may want to tell him 11:30 at the earliest to come
21   back.
22              MR. DAVIS:  Right.
23              THE COURT:  All right.
24              MR. DAVIS:  Thank you, Judge.
25              MR. PETRARCA:  Thank you, Your Honor.
```

337

J. Rogers - direct by Davis

1    MS. SCHWENDENER:  Thank you, Your Honor.

2    THE COURT:  All right.

3    (Short break taken.)

4    (Before the jury:)

5    THE COURT:  Good morning, ladies and gentlemen.  You

6  may be seated.  All right.  You can bring the mike down for

7  you.  All right.  All the rules are the same.  All right.

8    THE WITNESS:  Yes, ma'am.

9    THE COURT:  Thank you.  All right.  Anytime you're

10 ready, Counsel.  We continue with the testimony of Miss Janet

11 Rogers.

12    MR. DAVIS:  Thank you, Your Honor.

13    JANET ROGERS, DEFENDANT, PREVIOUSLY SWORN

14    DIRECT EXAMINATION (Resumed)

15 BY MR. DAVIS:

16 Q    Good morning, Miss Rogers.  How are you?

17 A    Good morning.

18 Q    I'm fine.  Thank you.

19    Yesterday I asked you were you aware on July 10th,

20 2015 that the police had came to school to meet with Dr. Adams

21 to talk about a complaint against your husband, right?

22 A    Yes.

23 Q    Do you recall me asking you that?  Okay.  Let me play

24 something for you, and then I want to get your comment.  This

25 is the minutes from a December 2015 board meeting.

J. Rogers - direct by Davis

1       MS. SCHWENDENER:  Objection.

2       THE COURT:  Basis?

3       MS. SCHWENDENER:  Relevance.

4       THE COURT:  Objection's overruled.

5       MR. DAVIS:  Okay.

6    (Whereupon, said tape was played in open court.)

7       THE COURT:  All right.  Can you also give some -- or

8  are you trying to do it through the witness of getting more

9  identification as to what and who we just heard and when?

10      MR. DAVIS:  Well, yes, Judge.

11      THE COURT:  Proceed.

12      MR. DAVIS:  I was going to do that.  Thank you.

13      THE COURT:  Actually we need to probably do it on the

14  front end more, Counsel.

15      MR. DAVIS:  Okay.

16      THE COURT:  But go ahead.

17      MR. DAVIS:  We can do it that way.

18      THE COURT:  But go ahead.  No, you can ask her.

19  They've heard something they need to --

20      MR. DAVIS:  Okay.  Let's do it that way.

21  BY MR. DAVIS:

22  Q    Miss Rogers, you've been on the board since 1991 off and

23  on, right?

24  A    Yes.

25  Q    And is it a practice in the board to make recordings of

339

J. Rogers - direct by Davis

1  the closed session meetings of the board?

2  A    Yes, it is.

3  Q    And are those recordings made via audio in District 152?

4  A    Yes.

5  Q    And in connection with this case, are you aware that a

6  number of those recordings were turned over to plaintiff during

7  discovery?

8  A    Yes.

9  Q    And so those recordings are done pursuant to law.  You all

10  are required by law to make these recordings and keep the

11  recordings, right?

12  A    For a certain amount of time, yes.

13  Q    Okay.  So I'm going to again --

14        THE COURT:  You're playing that again?

15        MR. DAVIS:  Yes, Judge.

16     (Whereupon, said tape was played in open court.)

17  BY MR. DAVIS:

18  Q    So whose voices did we hear there, Miss Rogers?

19  A    You heard Felicia Johnson, Gloria Johnson, and myself.

20  Q    And all are defendants in this case?

21  A    Yes.

22  Q    They're not in the courtroom right now, correct?

23  A    No.

24  Q    Okay.  So what we heard you say is that you were in an

25  argument with Felicia Johnson and you accused her of, quote,

340

J. Rogers - direct by Davis

1  being all up in the shit and saying that she was up in there

2  with the superintendent.  That refers to Dr. Adams?

3  A    Yes.

4  Q    When they called on Tyrone?

5  A    Yes.

6  Q    And Tyrone is your husband, Tyrone Rogers?

7  A    Yes, he is.

8  Q    And you're referring to July 10th.  And in the -- what we

9  just heard it said that you got a call, you got a phone call?

10  A    Yes.

11  Q    Okay.  Thank you.  And that call was on July 10th, right?

12  A    Yes, it was.

13  Q    Okay.  Thank you.  The other thing we talked about

14  yesterday was the contract extension that Dr. Adams received.

15  You remember that?

16  A    Yes.

17  Q    And I asked you did you consult with your lawyer before

18  you gave her the extension, right?

19  A    Yes, you did.

20  Q    Who was the lawyer -- you all had a lawyer at that time,

21  right?

22  A    We had a lawyer for the district, yes.

23  Q    Yes.  And what law firm was representing you then?

24  A    Chris Petrarca, Izzo.  Izzo was.

25  Q    So the same Mr. Izzo that will appear in this case was

J. Rogers - direct by Davis

1  representing you then?

2  A    Mr. Izzo, that's correct.

3  Q    Right.  Okay.  I'm going to play Plaintiff's Exhibit 71.

4           MS. SCHWENDENER:  Objection, Your Honor.

5           THE COURT:  Basis?

6           MS. SCHWENDENER:  Relevance, foundation, and there's

7  no question pending.

8           THE COURT:  Correct, Counsel.  Why are you playing

9  this without laying any reason why?

10          MR. DAVIS:  Well, the question was presented

11 yesterday, Judge.  I can refresh or re -- restate the question,

12 but I'm trying to move things along but --

13          THE COURT:  That's appreciated, Counsel.  The problem

14 is, though, when you are playing something, you can't -- we are

15 not playing just for display.  You have to have something

16 before you play the conversation.

17          MR. DAVIS:  Sure.  I understand, Judge.

18          THE COURT:  All right.  Please do that.

19 BY MR. DAVIS:

20 Q    Did you contact the law firm in February of 2015 before

21 you all voted to give Dr. Adams the contract extension?

22 A    Did I contact them?

23 Q    Yes.

24 A    No.

25 Q    I'm now playing Exhibit 71 tape volume No. VN810174.  This

342

J. Rogers - direct by Davis

1   is from the February 23rd, 2015 board meeting.

2   A     You said December what?

3   Q     February 23rd.

4   A     Okay.

5         (Whereupon, said tape was played in open court.)

6   BY MR. DAVIS:

7   Q     Who did we just hear, Miss Rogers?

8   A     You heard me and Felicia -- I mean, McCaskill.

9   Q     Dr. Kisha McCaskill?

10  A     That's correct.

11  Q     She's another defendant in this case?

12  A     Yes she is have.

13  Q     Is she in court today?

14  A     I don't think so.

15  Q     I think you're right.  So basically do you want to change

16  your answer now about whether you contacted the lawyer before

17  the contract extension was voted on?

18  A     I checked with a lawyer.  I've been on the board since

19  1991.  And it takes one to five years you can do an extension.

20  Q     I'm sorry.  Let me stop you --

21  A     No, I didn't --

22  Q     -- Miss Rogers --

23         THE COURT:  Excuse me.  Excuse me one --

24  BY MR. DAVIS:

25  Q     I'd like a yes or no --

343

J. Rogers - direct by Davis

1        THE COURT:  One second.  One second.

2        MR. DAVIS:  Judge, could you ask --

3        THE COURT:  One second, Counsel.  He's going to ask

4   the questions.  Answer his question.  And if there needs to be

5   clarification, you have got two lawyers over at that table --

6        THE WITNESS:  Yes, ma'am.

7        THE COURT:  -- who will take care of that.

8        THE WITNESS:  Okay.

9        THE COURT:  Okay.  All right.  Proceed, Counsel.

10       MR. DAVIS:  Thank you, Your Honor.

11   BY MR. DAVIS:

12   Q    So my question is yes or no -- first of all, do you want

13   to change your answer?

14   A    No, I don't.

15   Q    Okay.  So you're saying you didn't contact a lawyer prior

16   to voting on the extension in 2015?

17   A    No, I did not.

18   Q    Let's -- we talked a lot about Echo the other day.  You

19   remember that?

20   A    Yes.

21   Q    And isn't it true, Mrs. Rogers, that the board at the

22   July 22nd, 2015 meeting talked about the Echo problem?  That

23   was a special meeting you called, right?

24   A    Yes.

25   Q    And isn't it true that the board thought that all three

344

J. Rogers - direct by Davis

1    administrators, Dr. Adams, Dr. Sophia Jones-Redmond, and Dr.
2    Nohelty should all be disciplined and bore some responsibility
3    for the shortfall not being reported to the board in a timely
4    fashion?  Isn't that true?
5    A    Yes.  Yes.
6    Q    And in point of fact, though, the only person that was
7    disciplined, who received a performance directive on this issue
8    was Dr. Adams, right?
9    A    That's correct.
10   Q    And we talked yesterday, one of the things -- one of the
11   performance directives was that Dr. Adams had signed a contract
12   without first getting prior approval from the board, correct?
13   A    Yes.
14   Q    And isn't it true that Dr. Nohelty had done the same
15   thing?
16   A    That was the question you asked yesterday, and I said to
17   you I did not recall.
18   Q    Okay.  So I want to play you -- can I refresh your
19   recollection --
20   A    Yes, you can.
21   Q    -- by giving you the board meeting minutes?
22   A    Yes, because I don't know what contract he signed.
23   Q    Okay.  Well, let me be clear.  I don't care which contract
24   he signed.  My question is did he sign contracts or a contract
25   without first obtaining authorization from the board?

J. Rogers - direct by Davis

1  A    Not to my knowledge.

2  Q    Okay.  Okay.  This is Plaintiff's Exhibit No. 71, volume

3  VN810188 dot redact, and it's from the 7/22/15 board meeting.

4      (Whereupon, said tape was played in open court.)

5  BY MR. DAVIS:

6  Q    Who did we just hear, Miss Rogers?

7  A    You heard Gloria Johnson.

8  Q    And who else?

9  A    Myself.

10 Q    And didn't you just say Dr. Nohelty signed an $11,000

11 contract without getting board approval?

12 A    Yes, I did.

13 Q    Thank you.  Did Dr. Nohelty get a performance directive or

14 any disciplinary action?

15 A    That would come from the superintendent.

16 Q    That's a --

17 A    Not to my knowledge.

18 Q    -- yes, no question.

19 A    Not to my knowledge.

20 Q    And at that same meeting on July 22nd, the special meeting

21 you called, 2015, didn't Dr. Adams tell the board, hey, I

22 don't -- you know, I've always been able to sign these

23 instructional contracts without prior approval?  Didn't she say

24 that?

25 A    Yes, she did.

346

J. Rogers - direct by Davis

1  Q    And you basically said, yeah, well, we used to do it
2  different before you came.  You remember that?
3  A    I said that anything was over a certain amount.  No, I
4  don't remember that.
5  Q    Okay.  Is there something that -- would it refresh you if
6  I played the minutes?
7  A    You have minutes, yes, I'll be able to look at the
8  minutes.
9  Q    Or audio.  I'm saying would it refresh you if I played a
10 audio of what happened at the meeting?
11 A    Yes, it would.
12         THE COURT:  Once again, Counsel, if you refresh her
13 with the audio attempt and she's not refreshed, you have just
14 put something in front of the jury that shouldn't be.
15         MR. DAVIS:  Well, Judge, you know, we could have
16 avoided this if we had a stip, but I'm not going to --
17         MS. SCHWENDENER:  Objection, Your Honor.
18         MR. DAVIS:  -- belabor that.
19         THE COURT:  Objection sustained.
20         MR. DAVIS:  I'm not going to belabor that.  I
21 understand, Judge --
22         THE COURT:  The Court -- wait.  Wait.  The jury will
23 disregard that comment by counsel.  It's not for your concern.
24 All right.  And then as to whether or not -- again, if you have
25 written minutes to use, the Court mentioned this yesterday, if

347

J. Rogers - direct by Davis

1    you have something in writing, it would be great for refreshing

2    recollection.  Otherwise we have an issue.  The jury cannot

3    hear something that's solely for refreshing recollection.

4              MR. DAVIS:  Okay.  Your Honor, I don't have written

5    transcripts of all of these tapes.  Given the large number of

6    tapes, we weren't able to get written transcripts.  I will pass

7    this, and take it up outside the presence of the jury, and

8    we'll just have to ask her the question again after she's had a

9    chance to review it outside the presence of the jury.

10             THE COURT:  All right.  If it is a significant issue,

11   the Court will allow you to do that.  At this time I will

12   consider whether it comes in or out.  All right.  Pass it.

13             MR. DAVIS:  All right.

14             THE COURT:  All right.  Proceed.

15             MR. DAVIS:  Thank you, Your Honor.

16   BY MR. DAVIS:

17   Q    Let me ask you this, Mrs. Rogers:  Dr. Adams received

18   performance directives in August of 2015, right?

19   A    Yes.

20   Q    And those performance directives listed various things

21   that she -- the board wasn't happy about her performance,

22   right?

23   A    Yes.

24   Q    Also at that meeting the board rescinded the contract

25   extension that it had voted on in February of 2015, right?

J. Rogers - direct by Davis

1   A    Yes.

2   Q    Prior to the meeting on August 17th, 2015, did the board

3   give Dr. Adams any notice or communicate -- give her a copy of

4   the performance directives?

5   A    Not to my knowledge.

6   Q    After the meeting on August 17th, 2015, did the board tell

7   Dr. -- or let's say -- do it this way:  During the meeting on

8   August 17th, 2015, did the board tell Dr. Adams she would have

9   a chance to address the charges in the directives?

10  A    If I recall, the attorney was there.  I think the attorney

11  took care of it.

12  Q    I'm asking you what the board did, and I don't want you to

13  speculate.  I'm asking you did the board tell Dr. Adams during

14  the meeting you'll have a chance to come back and have a

15  hearing to address these charges?

16  A    Not to my knowledge.

17  Q    And did the board tell Dr. Adams or August 17th, '15 --

18  2015 she could request a hearing after the meeting?

19  A    Not to my knowledge.

20  Q    To address the charges.

21  A    Not to my knowledge.

22  Q    Thank you.  You know who Dr. Nohelty is, right?

23  A    Yes, I do.

24  Q    Tell us who Dr. Nohelty is.

25  A    He was the assistant superintendent in charge of business

J. Rogers - direct by Davis

1    affairs and personnel in our district.  He was.

2    Q    And was part of his responsibility preparing budgets for

3    the district?

4    A    Yes.

5    Q    And the way it worked is he'd prepare a budget and he'd

6    present it to the board, right?

7    A    No.

8    Q    Okay.  How did it work?

9    A    The superintendent and the business manager would sit down

10   and, and work out what the budget was along with all the other

11   employees in the district, work it out.  The superintendent and

12   the, and the business manager would come up with the numbers.

13   He would prepare it, take it back to the superintendent for

14   approval, and then present it to the board.

15   Q    Okay.  So ultimately Dr. Nohelty as the business manager

16   would present it to the board?

17   A    And the superintendent, yes.

18   Q    Right.  And the board would use those numbers, that

19   budget -- you all had to report to the state what your budget

20   situation is year -- year to year, right?

21   A    The superintendent and the business manager had to report,

22   yes.

23   Q    Well, the district, the school district --

24   A    Yes.

25   Q    -- had to report to the State of Illinois here's what our

J. Rogers - direct by Davis

1  budget is, here's where we are each year, right?

2  A    Yeah, you asked me two questions.  And I don't understand.

3  So you said you all or --

4  Q    Let me clear it up.  My apologies.  Did the board have to

5  report to the state its financial budget each year?

6  A    Yes.

7  Q    Thank you.  So isn't it true that in 2014 and 2015 --

8  well, let me ask you this:  How long was Dr. Nohelty the

9  business manager for 152?

10  A    I don't really recall, and I don't want to guess.

11  Q    Okay.  We talked a lot about the retreat in June of 2015.

12  Isn't it true that Dr. Adams presented to the board a five-year

13  budget that Dr. Nohelty had prepared at the retreat?

14  A    Yes, it was presented.

15  Q    Isn't it true that the board accept -- voted to accept the

16  budget, and you believed that the budget was balanced when you

17  voted on it?

18            MS. SCHWENDENER:  Objection.

19            THE COURT:  As to what she believed.  Objection

20  sustained.

21  BY MR. DAVIS:

22  Q    Well, let me rephrase the question.  Did the board vote to

23  accept the budget that was presented at the retreat?

24  A    We don't vote at a retreat for a budget.  It's at a

25  regular board meeting.  No.  We vote at a regular board

J. Rogers - direct by Davis

1   meeting.

2   Q    Well, let me take it this way:  You -- the budget was

3   presented at the retreat, right?

4   A    I would have to see the agenda to see whether a budget was

5   presented.

6   Q    Okay.  So you don't recall Dr. Adams presenting to the

7   board at the June 2015 retreat saying here's our five-year

8   budget, this is what's going to govern our expenditures?  Do

9   you recall that?

10  A    I recall her presenting a five-year plan, not a budget,

11  yes.

12  Q    Okay.  Was it a five-year financial plan?

13  A    Five-year financial plan.  Not a budget.

14  Q    Okay.  And that five-year financial plan showed that you

15  weren't spending more than you were taking in, right?

16          MS. SCHWENDENER:  Objection.

17          THE COURT:  Objection sustained.

18  BY MR. DAVIS:

19  Q    Did the five-year -- did the board believe based on what

20  was presented that it was in the black?

21          MS. SCHWENDENER:  Objection.

22          THE COURT:  Again, Counsel, your terminology.

23  Objection sustained.

24  BY MR. DAVIS:

25  Q    Okay.  Did the board believe it was not spending -- let me

J. Rogers - direct by Davis

1  rephrase it.

2          Did the board believe it had a deficit when you --

3  when the budget was presented or the budget plan, whatever you

4  want to call it, did you think, wow, we got a deficit?

5          MS. SCHWENDENER:  Objection.

6          THE COURT:  Objection sustained.  Form of the

7  question.

8  BY MR. DAVIS:

9  Q    Let me move on, Janet -- I'm sorry.  Miss Rogers.

10 A    Okay.

11 Q    Isn't it true that you determined -- in 2015 Dr. Adams

12 brought it to the board's attention that there was a

13 $3.8 million deficit in the district's budget?

14         MS. SCHWENDENER:  Objection.

15         THE COURT:  A little foundation on that one, Counsel.

16 Sustained.  How did she determine.

17 BY MR. DAVIS:

18 Q    In 2015 when Dr. Nohelty was the business manager,

19 correct?

20 A    Yes, he was there then.

21 Q    And Dr. Adams was the superintendent, right?

22 A    Yes.

23 Q    And isn't it true that on or about November of 2015 Dr.

24 Adams came to the board and said I want to discipline Dr.

25 Nohelty?

J. Rogers - direct by Davis

1  A    She came to the board, but I don't recall the time about

2  disciplining Dr. Nohelty.

3  Q    Well --

4  A    A couple times.

5  Q    Do you recall that she said she wanted to discipline Dr.

6  Nohelty?

7  A    Yes.

8  Q    Okay.  And isn't it true the reason she wanted to

9  discipline Dr. Nohelty was because Dr. Nohelty had withdrew

10 $3.8 million from the reserves of the district without first

11 coming to the board and asking for permission?

12            MS. SCHWENDENER:  Objection.

13            THE COURT:  Objection sustained as to her speculation

14 of the reason unless you have something in writing, Counsel.

15            MR. DAVIS:  I am going to show her the exhibit, the

16 letter that Dr. Adams gave to Dr. Nohelty.

17            THE COURT:  You said a letter, Counsel?

18            MR. DAVIS:  Yes.

19            THE COURT:  All right.  Proceed.

20            MR. DAVIS:  It is -- it's dated December 21st.  And

21 it's Exhibit No. 41.  It's December 23rd, I'm sorry, 2015.

22 It's Exhibit No. 41.

23            THE COURT:  Any objection to this document?

24            MR. DAVIS:  I'm going to bring, bring it up.

25            THE COURT:  No.  I'm asking counsel.

J. Rogers - direct by Davis

1    MR. DAVIS:  Sure, Judge.

2    MS. SCHWENDENER:  No objection.

3  BY MR. DAVIS:

4  Q    I stand corrected.  It's not Exhibit 41.  I'm going to

5  come back to that question --

6    THE COURT:  All right.

7  BY MR. DAVIS:

8  Q    -- Miss Rogers.  I'm going to keep moving.

9    So do you have any recollection of Dr. Adams

10 suspending Dr. Nohelty with pay in December of 2015?

11 A    Yes.

12 Q    And she wanted -- she suspended him for using the

13 $3.8 million of the district's reserve money without telling

14 her or the board, right?

15 A    I know she suspended him, but I don't recall what it was

16 for.  So I don't want to speculate.

17 Q    Well, she came to the board and asked for the board to

18 allow her to -- before she could take disciplinary action

19 against Dr. Nohelty, right?

20 A    I don't recall whether she came to the board.  I just know

21 he was suspended.

22 Q    Okay.  So you don't recall the board telling Dr. Adams she

23 could take whatever disciplinary action she saw fit?

24 A    We could have.  I don't recall.

25 Q    Okay.  Well, this is another one of those.  If I show you

355

J. Rogers - direct by Davis

1   the tape, would it refresh your recollection on this subject?

2   A    Yes, it would.

3   Q    If I played a tape for you.  Okay.  We'll take that one up

4   during the break.

5             Isn't it true that a special board meeting -- let me

6   back up.  You recall Dr. Nohelty was suspended, right?

7   A    Yes.

8   Q    And after he was suspended, didn't you ask Gloria Johnson,

9   the board president to call an emergency meeting?

10  A    There was an emergency meeting called, and I don't know

11  whether I asked, but I know that there was one called.

12  Q    Okay.  Let me play something for you.

13            MS. SCHWENDENER:  Objection, Your Honor.

14            THE COURT:  Objection sustained.  Counsel, you have

15  to do the foundation.  You can't just play something.

16            MR. DAVIS:  Okay.

17  BY MR. DAVIS:

18  Q    Okay.  Let me ask you this way, Miss Rogers:  The

19  emergency meeting that you wanted called, the purpose of that

20  was to reverse the suspension of Dr. Nohelty, is that correct?

21  A    Yes, it was.

22  Q    So Dr. Adams suspended him with pay, right?

23  A    Yes.

24  Q    And the board immediately brought him back, correct?

25  A    Yes.  Yes.

J. Rogers - direct by Davis

1  Q    So Dr. Nohelty was not disciplined in connection with the

2  $3.8 million deficit issue, is that correct?

3              MS. SCHWENDENER:  Objection.

4              THE COURT:  As to his -- and what was his position

5  again?

6              MR. DAVIS:  He was the business manager, Judge.  And

7  I'm asking her, if I may be heard.

8              THE COURT:  We'll take a five-minute break now,

9  ladies and gentlemen, and get some of these matters out of the

10  way.  All rise.

11      (Jury excused.)

12              THE COURT:  All right.  You may step down, ma'am.

13  Don't discuss your testimony.  Step outside the doors, please.

14      (Witness excused.)

15              THE COURT:  All right.  We've got several things to

16  deal with as soon as she steps out on the record.  All right.

17  Several things to deal with, Mr. Davis, on the record.  All

18  right.  First of all, we'll deal with the last thing first, Dr.

19  Nohelty.  You're talking about his -- the reason for his job or

20  did he get suspended for something -- a problem with this

21  money, is that correct?

22              MR. DAVIS:  Yes.

23              MS. SCHWENDENER:  Yes, Judge.  It goes to relevance.

24  It's also assuming facts not in evidence.  And also I think

25  it's getting into the line of, you know, this -- I think where

357

J. Rogers - direct by Davis

 1  counsel is going is that they -- the board didn't take
 2  disciplinary action against Dr. Adams.
 3          THE COURT:  That's exactly where he's going.
 4          MS. SCHWENDENER:  Which does not relate to the First
 5  Amendment retaliation claim, which again, happened in December
 6  of 2015, which was several months after the vote to rescind the
 7  contract had taken place.  And these facts have not been in
 8  evidence, and it's irrelevant.
 9          THE COURT:  Is Dr. Nohelty testifying next?
10          MR. DAVIS:  He is, Judge.
11          THE COURT:  Why are we doing all this with her?
12          MR. DAVIS:  Because I want to establish with the
13  board the dichotomy in the way Dr. Nohelty was treated
14  vis-a-vis a $3.8 million withdrawal of funds, which actually
15  cost the district $4 million.
16          THE COURT:  Okay.  You're arguing -- you're arguing
17  now, Counsel, about --
18          MR. DAVIS:  Okay.  Well, I want to show the disparate
19  treatment, Judge --
20          THE COURT:  But can't you --
21          MR. DAVIS:  -- from the way he was dealt with and the
22  way Dr. Adams was dealt with for a small -- far smaller amount
23  of money.
24          THE COURT:  The question of the Court is why are we
25  going through all this with her as opposed to him?

J. Rogers - direct by Davis

1    MR. DAVIS:  Because I think it goes to her motive for
2   the retaliation that happened when they rescinded the contract
3   extension because it shows the level --
4    THE COURT:  Excuse me.  It goes to whose motive?
5    MR. DAVIS:  Janet Rogers' and the rest of the
6   defendants' motive because it shows the level of animus.  As it
7   turned out, they first told Dr. Adams, this is what the
8   evidence will show, that she could do what she needed to do.
9   Dr. Adams did it.  They then humiliated her by rescinding her
10  suspension and bringing Dr. Nohelty back.  This also goes to
11  the issue in the complaint that we've alleged that they as a
12  form of retaliation did everything they could to interfere with
13  her ability to operate --
14   THE COURT:  Keep your voice down a little bit.
15   MR. DAVIS:  I'm sorry.
16   THE COURT:  That's okay.  The mikes are up.
17   MR. DAVIS:  Interfere with her ability to do the
18  day-to-day operations.  And so it goes to that also, Judge.
19   THE COURT:  All right.
20   MR. DAVIS:  This is another part of the retaliation,
21  the progression that Tyrone Rogers talked about starting on
22  August 17th.
23   THE COURT:  Well, once again, Counsel, it's you who
24  have pled this as a First Amendment case.  And so the Court is
25  focusing not just on -- and one of the issues is the focusing

359

J. Rogers - direct by Davis

1   on this list or litany of different items.  It seems like you
2   want to put everything in, but you didn't plead it like that.
3   And so that's why they're saying it's irrelevant.  Defense, is
4   that correct?  I'll let you get to it in a second.
5           MR. DAVIS:  Okay.
6           THE COURT:  Go ahead.
7           MS. SCHWENDENER:  That's correct, Judge.  And, and
8   counsel is saying this goes to their motive, but these
9   incidents and events happened after the vote to rescind the
10  contract was taken.  This incident with Dr. Nohelty happened in
11  December of 2015, four months after the vote to rescind the
12  contract.  So I don't know how events that happened four months
13  later could go to the motive of the board in rescinding the
14  one-year contract extension.
15          Certainly if count -- if, if the retaliatory conduct
16  or the retaliation regarding filing the lawsuit was still being
17  litigated, that, that could arguably -- I could see where
18  counsel is going with that.  But this is only the First
19  Amendment retaliation claim regarding filing of the police
20  report.  And so events that happened after the board took a
21  vote have no relevance because it does not go to show motive
22  or, or different treatment.  The act had already been done at
23  that point.
24          MR. DAVIS:  Disparate treatment, Judge, only requires
25  showing that people in similar situations were treated

J. Rogers - direct by Davis

1   differently.  There's no requirement that the disparate
2   treatment had to have occurred prior to the rescission of the
3   contract.  If it's a similarly situated person where they're
4   accused of not reporting to the board important financial
5   information, and she's disciplined because she allegedly didn't
6   report $175,000 under billing and within a few months to that
7   the business manager in the district is shown to have withdrawn
8   money from the bank without even bothering to talk to the
9   board, and the board not only doesn't discipline him but
10  disciplines her for disciplining him, I think not only does it
11  show the disparate treatment, it also shows the level of
12  animus.
13          And you say we didn't plead this.  We did plead that
14  part of the retaliation was that they made it impossible and
15  they interfered with her day-to-day function.  All the way up
16  to and including suspending her e-mail and telling state
17  regulators she was no longer in the district.
18          THE COURT:  But, Counsel, now you're going on to what
19  is -- what with her.  We're dealing with Nohelty.  That's who
20  we're dealing with, whether his testimony should come in or
21  not.  I'm not hearing a reason to bar it, Counsel.  I mean, you
22  can't, you can't protect your clients from -- and say, oh,
23  nothing that they did during this time period that she was
24  working or other people in that area if they did things wrong,
25  they were getting either prosecuted for outside or anything

                    J. Rogers - direct by Davis

1   else, if they're still there, you know, I don't know why you
2   think that should be kept out.
3                 MS. SCHWENDENER:  Again, Judge, they're events that
4   happened after the decision to rescind the one-year contract
5   occurred.  Mr. Nohelty and plaintiff are not similarly
6   situated.  I mean, there's no allegations or evidence that Dr.
7   Nohelty --
8                 THE COURT:  And again, what is his position?  He's
9   financial officer or something.
10                MR. DAVIS:  He's the business manager, Judge.
11                MS. SCHWENDENER:  Business manager for the district.
12                MR. DAVIS:  Responsible for the finances.
13                MS. SCHWENDENER:  He was the business manager at the
14  time Dr. Adams --
15                THE COURT:  But he was an executive in the district?
16                MR. DAVIS:  Yes.
17                THE COURT:  All right.  The Court's going to overrule
18  your objection.  All right.  Now, Mr. Davis, this will take
19  forever.  We can't go through every single tape, teeny portions
20  of the tape, which frankly this Court isn't really seeing have
21  much relevance or they're getting a snippet.  We go right into
22  the middle of a conversation.  There's no official naming of
23  the conversation or the time or the subject matter.  We just
24  hear voices going at it for a few seconds, and then it's off.
25  And you can't keep going and saying, oh, well, I'm going to

J. Rogers - direct by Davis

1    play this for you because this fits into my theory of the case,
2    and I want to ask it now.

3              And we can't take all the time it's taking to do
4    that.  You're going to have to make some adjustments to your
5    questions on this.  We had the refresh recollection.  So we can
6    have her come in for that.  If she's right outside the door,
7    let's have her come in for refreshing her recollection.  I
8    believe it was -- of course, the exhibit and the numbers aren't
9    right there.  There were two.  Do you have those in front of
10   you?

11             MR. DAVIS:  Yes, I have the numbers, Judge.

12             THE COURT:  All right.  Then let's --

13             MR. DAVIS:  And I would suggest to expedite things,
14   No. 1, I don't want to drag things out.  But I disagree
15   respectfully.  I think these are important snippets.  If she
16   sits there and says I didn't know the police came on the 10th
17   and she's on tape saying I got a phone call on the 10th telling
18   me that the police was called to the school, I think that's
19   important information.

20             THE COURT:  That's not what the Court is saying.  The
21   Court is saying, again, these tapes are almost just sort of --
22   you know, there's no official naming on the tape of what the
23   tape is, when it was taken, who was present.  We have a bunch
24   of voices, you know, talking over each other.  And then we have
25   the defendant herself identifying who the people are, but we

J. Rogers - direct by Davis

1    don't have any context for the meeting.  I mean, it's just --
2    they're just snippets of conversation.  They may say what you
3    want them to say, but then the question the Court has is it in
4    full -- if we're just taking a little snippet of what you want
5    to play, then what's to stop them from saying, well, we want to
6    play the whole tape?
7                   MR. DAVIS:  Well --
8                   THE COURT:  So I'm just saying the jury is getting
9    something -- and even the importance that they place on it, if
10   we don't have anything more official surrounding it or leading
11   up to it, that this is this tape from this date after we say
12   this happens.  There has to be a way that you've set the
13   foundation, lead her into it some more.  This is your adverse
14   witness, but this isn't just an, oh, we're going to play this
15   and you react to it, which is actually what you said in one of
16   the questions.  That's not proper examination.  So we need to
17   tighten it up.  That's what I'm asking.
18                  MR. DAVIS:  I understand.
19                  THE COURT:  Now, as to the -- are you ready to
20   tell -- let's, let's test whether or not she can remember
21   something?
22                  MR. DAVIS:  I'm ready to do that, Judge.
23                  THE COURT:  All right.  Let's do that.
24                  MR. DAVIS:  In terms of the foundation, what I've
25   been trying to do is say this is tape X, Y, Z from

364
J. Rogers - direct by Davis

1  January 22nd, 2015 meeting.  That's the best I can do given
2  that they didn't label, we went through this yesterday, these
3  tapes accurately.  And that's the best I can do in terms of
4  laying a foundation of when this conversation occurred.  And I
5  think if they want to disagree and say, well, no, it was
6  another day or whatever, then they can do that.
7          THE COURT:  All right.  Well, one of the points is is
8  that we had a -- we had our conference, what, at least two
9  weeks ago?  And nothing about not labeling, no information, not
10 making these tapes more accessible, more usable was brought up.
11 So now we're at trial, and we're sort of doing it in this Court
12 believes sort of a haphazard way, because again, there's no
13 written minutes.  I don't understand that, you know, there's no
14 written transcript of these tapes.  So there's no way if she
15 says she doesn't remember, I can put it in front of the jury.
16 I can't.  And we can't stop every single time she says she
17 doesn't remember.  It's just you have to show me a very extreme
18 reason for me to have to do that each and every time she
19 doesn't remember something.
20         MS. SCHWENDENER:  Judge, if I may add.  There are
21 written minutes from the closed session board tapes.
22         MR. DAVIS:  But they're very scant, Judge.  And
23 they're not verbatim --
24         THE COURT:  Well, when you say scant, what do you
25 mean?  They don't say what you want them to say?

365

J. Rogers - direct by Davis

1    MR. DAVIS:  They may not even be on the same topic.
2   They're not complete.
3    THE COURT:  Can you say that to the Court for a fact?
4    MR. DAVIS:  Yes, Judge.
5    THE COURT:  That the ones you need are not, not in
6   writing.
7    MR. DAVIS:  Where they are, I've produced them like
8   this one.
9    THE COURT:  Okay.  All right, Counsel.
10   MR. DAVIS:  That was in my exhibit list.
11   THE COURT:  I will tell you this, and I'm sure
12  they're looking.  But find out that some of the ones that we're
13  taking breaks for refreshing recollection where there are
14  written minutes for that, this Court will not be happy.  All
15  right.
16   MR. DAVIS:  I understand.
17   THE COURT:  So ...
18   MR. DAVIS:  I just want to also point out the written
19  minutes will not be verbatim, and they wouldn't say who said
20  what.  The written minutes are just general and a paragraph, a
21  snippet.  So they would be even less elucidating to the jury,
22  Judge.
23   THE COURT:  Well, Counsel, excuse me.  But the one
24  issue is we're not -- it's not going to the jury.  You're
25  trying to refresh her recollection.  This is just for the

366
J. Rogers - direct by Davis

1   witness.  We're not trying to put on evidence in front of the

2   jury.  That's the whole problem.  So if these minutes, and if

3   they are a summary, it really doesn't matter whether they are

4   or not.  The question is will that particular document refresh

5   her recollection.  It's not whether or not it's word for word

6   for the jury.  You can still ask her a question in a different

7   way as long as that document reminds her of the conversation

8   and she can get it.

9           MR. DAVIS:  Sure.

10          THE COURT:  So let's have her come in.  All right.

11          MR. DAVIS:  Thank you.

12          THE COURT:  If you have a copy of those minutes from

13  here on, I'd like you to at least have them nearby so if

14  someone says they don't know.  If she doesn't have her

15  recollection refreshed after that, that's a different thing.

16  Come forward, ma'am.  You're going to be seated.  And I'm going

17  to have -- Miss McCullough, you have the task of going back to

18  the first issue with refreshing recollection that this Court

19  paused on.  We'll let the court reporter determine where it is.

20  Have a seat, ma'am.

21      (Record read.)

22      (Whereupon, said tape was played in open court.)

23          THE COURT:  All right.  Ma'am, do you remember this

24  conversation?

25          THE WITNESS:  Yes, I do.

J. Rogers - direct by Davis

1    THE COURT:  All right.  So those are the two

2  questions we are going to bring up without the tapes, and then

3  make sure you have those questions together.  I will give you a

4  couple minutes, Counsel, to make sure you're on the right

5  track.  And then if there's any other questions that are coming

6  up, that you may need to at least put the defense on notice of

7  if you know they're going to draw an objection as to something

8  that's on the tapes.  Or get the minutes, get the minutes and

9  do that.  We can keep going with refreshing recollection.  All

10  right.

11    MR. DAVIS:  Well, Judge, I'm going to talk to counsel

12  again.  We've done this a number of times, and I'm willing to

13  sit down and go through some of these tapes.  I'm not willing

14  to preview my whole case to them.  But again, these are their

15  tapes.  These tapes weren't recorded in a phone booth.  I've

16  given her a list now of every tape I'm going to use.  I haven't

17  received any objections to the authenticity of any of the

18  tapes.  That the tapes have been adulterated in any way.  But

19  now every time I go to play a tape --

20    THE COURT:  Well, Counsel, in this case it wasn't

21  every time.  In this case it's because you want to refresh

22  recollection.  I can't let you play it in front of the jury.

23  Those are the only two that we have had a, a space for.  So the

24  thing is you have to be able to at least have a copy of the

25  minutes, whether you say they're verbatim or not.  Ask the

J. Rogers - direct by Davis

1  person if they can be refreshed, and then we'll go from there.

2  All right.  That's different.  Make sure you both have that

3  same copy of the minutes, and you can refer to that without us

4  having to take a break to do this.  That's the point.  All

5  right.

6          MR. DAVIS:  Final point, Judge.  These tapes are

7  admissions of these parties, adverse parties.

8          THE COURT:  They may be, Counsel, but you still have

9  to present them in the right way.  You're not -- you're -- the

10 two that we dealt with you were presenting to refresh

11 recollection.  All right.

12         MR. DAVIS:  Only because that's what the Court

13 instructed I needed to do.  From my standpoint if she made

14 this --

15         THE COURT:  All right.  Ma'am, you know what, I need

16 you to step down and step outside.

17         MR. DAVIS:  I'm sorry.  But --

18         THE COURT:  Counsel.

19         MR. DAVIS:  I'm sorry.  I wasn't going to argue,

20 Judge.

21         THE COURT:  No, I just want her to step outside, and

22 we'll do everything we need to.  Just right outside, ma'am,

23 very quickly.  We should have you right back.  All right.  Go

24 ahead.

25         MR. DAVIS:  I was going to say we could even pass --

J. Rogers - direct by Davis

1   I don't want to belabor this and tax the Court's time and
2   patience.  But my point is, Judge, because these are
3   admissions, I think I should be able to play their admission
4   from an authenticated document, their own document, official
5   verbatim record.  And unless there's a question of
6   authenticity, which as I've said, I've heard none, I should be
7   able to play these tapes at any point.  I don't have to just
8   play them to impeach, and I don't have to play them to refresh.
9   I can simply sit here and play this tape and say is that you?
10          The only foundation after is, is that you on the tape
11  talking and who else are you talking with.  And, you know, I
12  think I should be free to do that.
13          THE COURT:  Response.
14          MS. SCHWENDENER:  Judge, counsel should not be able
15  to just play the tapes without -- for impeachment purposes --
16          THE COURT:  Well, he's not saying impeachment.  He's
17  saying as a party admission.
18          MS. SCHWENDENER:  Well, they are not admissions.
19  There's five different board members.  And they're not
20  admissions to the ultimate fact.  These are board session tapes
21  that discuss a variety of issues.  And --
22          THE COURT:  And you don't think, you don't think that
23  being in a board meeting, which is basically what a lot of this
24  is about, that an ultimate fact as opposed to some other fact
25  that's relevant here?  I've never heard of defendant party

J. Rogers - direct by Davis

1   admissions being that limited.

2           MS. SCHWENDENER:  Judge, that's fine.  But the, the

3   tapes -- I'm not, I'm not trying to be difficult and not want

4   to stip -- or object or I'll watch any objections as far as

5   foundation for the tapes.  But just to simply play the tapes

6   and say did you hear that in front of the jury, there's

7   multiple different conversations.  Everyone is talking over one

8   another.  And I don't think that there's any necessary -- just

9   the fact that there are statements made by defendants don't

10  necessarily mean that there are admissions.

11          THE COURT:  Again, unh.  I think that's all I can say

12  is unh as to both sides and the way this case is being tried by

13  both sides, as to the lack of preparedness with what you were

14  getting into with putting on a jury in this particular case.

15  And with all due respect, this Court does not think either side

16  has well thought this out.  This matter actually could go on

17  for two weeks very easily and with only a few witnesses because

18  of these tapes.  Yes, they were taken at your board, but it

19  doesn't matter who had control of them.  The tapes are messy.

20          And as the Court, I do have an obligation to make

21  sure the jury is getting information in the best way possible.

22  And doing it in snippets on a tape that was messy, that has all

23  kinds of people on it and just having them hear the tapes, then

24  I mean, what do we need you all here for?  We just play the

25  tapes, you know.  And we still have to get through

J. Rogers - direct by Davis

1  instructions.  Is my patience taxed?  Only by the fact that it
2  was not well thought out of how this case would go to a jury
3  with so many people involved, saying so many things.  That's my
4  concern.

5          All right.  Right now we're either looking at moving
6  our way down to some type of situation where the case won't be
7  able to go forward because something is going to come out in
8  some odd way, and then our timing is totally off, you know.
9  There's some things that can't be helped, but this is something
10 that we should have been able to foresee.  When I was told at
11 the beginning that this matter would take five days to try, it
12 took the Court to bring to the attention of the parties that we
13 needed another day.  And now it looks like we may need even
14 more than that, and that could affect this jury.

15         All right.  I'm stepping off for about one minute.
16 You can get her to come back in.

17     (Short break taken.)

18     (Before the jury:)

19         THE COURT:  You may be seated, ladies and gentlemen.
20 Counsel, you may start again now that we -- I think we got
21 several things cleared up, ladies and gentlemen.  So hopefully
22 we can go for a little while here.  Proceed.
23 BY MR. DAVIS:
24 Q    You've had a chance now, Mrs. Rogers, to review certain
25 audio to help refresh you; is that correct?

J. Rogers - direct by Davis

1  A    Yes.

2  Q    And so I ask again isn't it true that Dr. Adams came to

3  the board to address the Imagine contract -- one of the

4  performance directives was that Dr. Adams signed the Imagine

5  contract without prior board approval, right?

6  A    Yes.

7  Q    And isn't it true that Dr. Adams told the board she had

8  always had the authority since she had been in the district to

9  sign those instructional contracts, correct?

10 A    Yes, she did say that.

11 Q    And your response to her was, yeah, that's true.  I'm

12 paraphrasing.  Your response was before she came they were --

13 you all were doing it differently?

14 A    Yes.

15 Q    Thank you.  And the other issue had to do with the

16 discipline of Dr. Nohelty.  And my question was -- you've had a

17 chance to refresh yourself on that?

18 A    Yes.

19 Q    And my question was didn't the board basically say, Dr.

20 Adams, do whatever you think you need to do with regard to

21 disciplining Dr. Nohelty?

22 A    Yes.

23 Q    Okay.  And we talked about the special board meeting that

24 was called on or about December 28th, 2015, right?

25 A    Yes.

J. Rogers - direct by Davis

1  Q    And the primary purpose of that board meeting was to
2  reverse the suspension of Dr. Nohelty, right?
3  A    Yes.
4  Q    And you all, in fact, as a board did reverse it and
5  brought Dr. Nohelty back; correct?
6  A    Yes.
7  Q    And subsequent to that, you all suspended Dr. Adams
8  because you didn't like the way she handled suspending Dr.
9  Nohelty, is that correct?
10  A    We suspended her, but I don't recall what it was for.
11  Q    Why you suspended her.  But you recall you suspended her
12  shortly thereafter?
13  A    Yes.
14  Q    One of the -- drawing your attention to August of 2015.
15  We've talked about the contract extension.  Isn't it true that
16  you're the one who reached out to Attorney Izzo in August of
17  2015 and told him you had a problem with the contract extension
18  that Dr. Adams had received in February?
19  A    I don't recall.
20  Q    Okay.  You don't recall sending an e-mail to Gloria
21  Johnson saying I talked to Attorney Izzo about the contract
22  extension?
23  A    I just said I don't recall.
24  Q    Okay.  Let me show you something to see if it would
25  refresh your recollection.

374

J. Rogers - direct by Davis

1    MR. DAVIS:  This is a document, Judge.  This is going

2    to be Exhibit 56.

3    THE COURT:  One second.  One second, Counsel.  Okay.

4    Go ahead.

5    BY MR. DAVIS:

6    Q    Can you see Exhibit 56 --

7    A    Yes.

8    Q    -- Mrs. Rogers?

9    A    Yes.

10    Q    I don't think I can make it any bigger.  And --

11    THE COURT:  You're using this to refresh?

12    BY MR. DAVIS:

13    Q    Does this refresh your recollection?

14    A    I haven't read it yet.

15    Q    Okay.  Take your time.

16    THE COURT:  All right.  Ma'am, have you had an

17    opportunity?

18    THE WITNESS:  Yes, I'm down to the bottom now.  I'm

19    just trying to read everybody's name and stuff.

20    THE COURT:  Okay.

21    BY MR. DAVIS:

22    Q    Pay attention to the date also.

23    A    Okay.  Thank you.  Yes, I see the date.

24    THE COURT:  All right.  Well, first of all, it's a

25    refreshing your recollection.  So, Counsel ...

J. Rogers - direct by Davis

1   BY MR. DAVIS:

2   Q    Have you now had your recollection refreshed?

3   A    Yes.

4         THE COURT:  I've already cut it off.  Proceed.

5         MR. DAVIS:  Oh, okay.

6   BY MR. DAVIS:

7   Q    So I ask again if on July 22nd -- earlier I said August.

8   I misstated the date, August 2015.  In fact, it was July 22nd,

9   2015 you sent an e-mail -- you communicated with Gloria Johnson

10  telling her you wanted the lawyer at the meeting, the special

11  board meeting, correct?

12  A    That's correct.

13  Q    And you told her you believed that the contract extension

14  wasn't valid because there were no goals in it?  I'm

15  paraphrasing again.

16  A    Based on the lawyer, yes.  What the lawyer said, yes.

17  Q    Well, you hadn't met with the lawyer yet, right?  You were

18  saying in the e-mail you wanted the lawyer to come to the

19  meeting.  You met with the lawyer on the 22nd, but the e-mail

20  was earlier in the day, right?

21  A    I spoke with the lawyer.  That looks like I spoke with the

22  lawyer.

23  Q    Well, did it say you spoke with the lawyer, or did it say

24  this was your view?  Did you see anywhere in the e-mail that

25  said --

J. Rogers - direct by Davis

1   A    It was not my viewpoint, no.

2   Q    I'm sorry.

3   A    No --

4           THE COURT:  Excuse me.  One at a time.

5           THE WITNESS:  No.

6   BY MR. DAVIS:

7   Q    So there's nothing in there that said I spoke to the

8   lawyer, right?

9   A    No.

10  Q    And you were saying that you thought the extension wasn't

11  valid?

12  A    Yes.

13  Q    Because there was lack of goals.  Thank you.

14          Let's talk about contract extensions.  You've been on

15  the board how long on and off?

16  A    Since 1991.

17  Q    Since '91.  Isn't it true that in that entire time and all

18  the way up to today you've never seen a contract that was an

19  extension that was given and then taken back or rescinded, is

20  that correct?

21  A    With our board?

22  Q    Yes, with your board Harvey 152.

23  A    No, I've never seen it.  First time.

24  Q    Right.  Other than Dr. Adams it never happened before,

25  right?

J. Rogers - direct by Davis

1   A    First time, yes.

2   Q    Okay.  And usually with a contract extension the board

3   votes, right?  The public vote, you have to tell the public by

4   law if you're extending a contract, right?

5   A    Yes.

6   Q    And once you vote for the contract extension, it's an

7   official government act, right?

8               MS. SCHWENDENER:  Objection.  Calls for a legal --

9               MR. DAVIS:  Okay.  Let me rephrase that.

10              THE COURT:  All right.  The question's withdrawn.

11  BY MR. DAVIS:

12  Q    Does the board do anything else after it votes for an

13  extension?  Are there any further steps that the board must

14  take?

15  A    Yes.

16  Q    And what are those?

17  A    They're to come up with a, a written contract and sign it.

18  Q    Well, let me ask you this:  If you're extending a

19  contract, that means there's a contract already in place,

20  right?

21              MS. SCHWENDENER:  Objection.

22              THE COURT:  If you're extending the contract, that

23  means --

24              MR. DAVIS:  Let me make it clear.

25              THE COURT:  Well, I don't know the basis of that

J. Rogers - direct by Davis

1  objection.  All right.

2          MS. SCHWENDENER:  It calls for a legal conclusion.

3          THE COURT:  If you extend a contract, that means

4  there is a contract.

5          MS. SCHWENDENER:  I'll withdraw the objection.

6          THE COURT:  Thank you.

7  BY MR. DAVIS:

8  Q    So to extend the contract as Your Honor just stated, you

9  have to first have a contract before you extend it, right?

10  A    That's correct.

11  Q    So when you vote to extend the contract, you're not

12  creating a new contract, are you?

13  A    You extend it.

14  Q    Right.  You're extending the existing contract?

15  A    That's correct.

16  Q    So if the existing contract was signed, let's say an

17  existing contract was signed in 2013 and it was a three-year

18  contract.  You follow me?

19  A    Yes.

20  Q    And I want to -- it would end in 2015, June of 2015.  And

21  I want it to end in June of 2016, all I have to do is vote as a

22  board to extend it, right?

23  A    I can't answer.  That's a legal opinion.  I can't think I

24  can answer that one.

25  Q    Well, let me put it to you this way so it's not legal.

379

J. Rogers - direct by Davis

1   A    Okay.

2   Q    Let's make it real, not hypothetical.

3   A    Okay.  Thank you.

4   Q    Dr. Adams had a contract, right?

5   A    Yes.

6   Q    She signed the contract in 2013, right?

7   A    Yes.

8   Q    And how long was the contract?

9   A    For three years.

10  Q    And so when would it have expired?

11  A    Three years after '13.  '16.

12  Q    Right.  So in February of 2015 you all voted to extend it

13  because you didn't want it to expire in June of 2016, is that

14  correct?

15  A    That's correct.

16  Q    And so you extended her existing contract, right?

17  A    We voted, yes.

18  Q    All right.  Thank you.  Didn't you tell the board when you

19  were telling them that Dr. Adams should be written up because

20  of the Echo situation, didn't you tell your fellow board

21  members that you had pulled a letter, a disciplinary letter

22  that had been given to Eric Kellogg and reviewed it?

23  A    Yes, I did.

24  Q    In fact, you -- were you questioned about that in a

25  deposition with me?

J. Rogers - direct by Davis

1  A    Yes, I was.

2  Q    And did I ask you could you produce the letter?

3  A    I don't recall whether you asked me to produce a letter.

4  Q    Okay.  Well, did you produce that letter that you say you

5  read in this case?

6  A    Produce it to who?

7  Q    To your lawyer as part of this litigation.

8        MS. SCHWENDENER:  Objection, Your Honor.

9        THE COURT:  Form of the question.  Sustained.

10  BY MR. DAVIS:

11  Q    Okay.  Do you have a copy of the letter that you say you

12  read showing that Eric Kellogg was disciplined?

13  A    No, I don't.

14  Q    Does the district to your knowledge have a copy?

15  A    I don't -- it should be in the personnel file.  I don't

16  know.

17  Q    My question --

18  A    I don't know.  I don't know.

19  Q    I'm sorry.  Okay.

20        THE COURT:  Her answer is I don't know.

21        MR. DAVIS:  Okay.

22        THE COURT:  Strike any other answer as speculating.

23        MR. DAVIS:  Okay.

24  BY MR. DAVIS:

25  Q    When I questioned you about it, you didn't have a copy at

J. Rogers - direct by Davis

1    that time?

2    A    No.

3    Q    Okay.  Thank you.  You all met on July 22nd with Attorney

4    Izzo, right?

5    A    Yes.

6    Q    And we already saw an e-mail where you wanted to talk to

7    him about the contract extension.

8    A    Yes.

9    Q    All right.  And one of the things that you expressed at

10   that meeting was that the goals that Dr. Adams had were, quote,

11   generic goals.  Isn't that what you said?

12   A    Yes.

13   Q    And these are the same goals that we saw on the chart

14   yesterday?

15   A    It's two different sets of goals, as I said yesterday.

16   There's district goals and there's superintendent goals.

17   Q    Let me stop you.

18   A    Okay.

19         MR. DAVIS:  And may I ask the Court to ask the

20   witness to -- this is a yes, no question.  The question is were

21   the goals we saw yesterday the same goals that she was

22   referring to as generic goals?

23         THE COURT:  Can you answer that question.

24         THE WITNESS:  I saw two sets of goals.  I don't know.

25         THE COURT:  Well, he's using a term generic.  So do

382

J. Rogers - direct by Davis

1  you remember the question and your answer yesterday?

2        THE WITNESS:  No.

3        THE COURT:  All right, Counsel.

4  BY MR. DAVIS:

5  Q    We went a little down this road yesterday.  Maybe if I do

6  it visually, it will be helpful.

7  A    Yes.

8        MR. DAVIS:  May I publish Exhibit 2, Judge, to the

9  witness.

10        THE COURT:  It's already been published.  So I'll

11  make sure it comes up.  Proceed.

12  BY MR. DAVIS:

13  Q    These are -- this is the planning and evaluation cycle,

14  right?

15  A    Yes.

16  Q    These are the -- this is the process the district uses to

17  set and evaluate its goals, right?

18  A    That's correct.

19  Q    There is no other written process for setting goals in the

20  district, is there?

21  A    With district goals, no.

22  Q    Is there a written process -- there is no other written

23  process for setting superintendent goals, is there?

24  A    Yes, it is.

25  Q    And where is that at?

J. Rogers - direct by Davis

1   A    It's at the district office.

2   Q    So you're saying that at the district office -- what's the

3   title of that document, and what's the date of that document,

4   if you know?

5   A    You showed it to me yesterday.  It was a front that said

6   superintendent's evaluation, and there was a part that --

7   that's the document.  That you showed me the front page

8   yesterday.

9   Q    So you're talking about the performance evaluation?

10  A    Yes.

11  Q    And I thought we established yesterday that the way this

12  process works is you set the goals in May, you work through the

13  year, you monitor and you check in your meeting, and then in

14  February -- or January of the following year you do the

15  superintendent's performance evaluation based on the progress

16  of these goals.  Is that how it works?

17  A    I don't recall that.  Two different things.  You're asking

18  me two different questions about two different things.

19  Q    Well, let's look at the chart again.

20  A    Okay.

21  Q    I don't want to take too much time, but it's May set the

22  goals.  Two, create action plans.  Three, give the

23  superintendent the authority to implement.  Then we swing all

24  the way around here.  October, evaluate how good the plan's

25  going.  Then we come all the way over here to No. 6, February.

J. Rogers - direct by Davis

1  That's the evaluation that you're talking about, right?

2  A    Well, No. 5.

3  Q    Okay.  Well, the superintendent does her self-evaluation,

4  but she doesn't evaluate herself on that performance review I

5  showed you, right?

6  A    No.

7  Q    Right.  So the No. 6, that's the board's performance

8  evaluation, right?

9  A    Yes.  The board evaluates the superintendent.

10  Q    Right.

11  A    That's correct.

12  Q    So it's all part of the cycle, right?

13  A    Yes.

14  Q    Okay.  Thank you.  So, in fact -- so now we've established

15  what we're talking about, the terminology, goals.

16  A    Yes.

17  Q    At the July 22nd, 2015 meeting when you all were talking

18  about rescinding the contract extension, you said that those

19  goals ain't specific.  They're generic.  They don't count

20  basically.  Is that what you were saying?

21  A    No.  I said they were generic, because they were

22  district -- they're district generic goals, and they change

23  often.

24  Q    So the point being that you were making was that those

25  didn't apply to Dr. Adams' performance, those goals?

385

J. Rogers - direct by Davis

1   A    No.  Those were district goals.  And some of them do apply

2   to her.  Some of them do and some of them don't.

3   Q    But the whole point of the meeting was to talk about

4   rescinding the evaluation, right -- I'm sorry, rescind the

5   extension of the contract.  Wasn't that the point of the

6   meeting?

7   A    Yes.  It was some point of it, yes.

8   Q    Right.  And so you all were talking about how you can

9   rescind it, and you said, well, if those goals were generic,

10  they don't count.  Then we didn't have the authority to give

11  the extension because we didn't make sure she met her goals.

12  Wasn't that the gist of the meeting?

13  A    That was some of the items in the meeting, yes.

14  Q    And so your point is those goals we just saw aren't

15  specific, right?

16  A    Some of them aren't.

17  Q    So in point of fact, didn't Dr. Adams -- first of all,

18  let's do this:  Let's look at Exhibit 1.

19          MR. DAVIS:  May I, Judge.  It's been published

20  before.

21          THE COURT:  Any objection?

22          MS. SCHWENDENER:  No, Your Honor.

23          THE COURT:  Proceed.

24  BY MR. DAVIS:

25  Q    This is Dr. Adams' employment contract, right?

J. Rogers - direct by Davis

1   A    Yes, it is.

2   Q    And that's the starting point.  And if we look at Section

3   3, it has the goals, and it says no extension can be made

4   without these goals being met; right?

5   A    That's correct.

6   Q    And then if we go down here, the last paragraph of the

7   sections -- read that for me from further.

8   A    Further, the superintendent and the board shall consult no

9   later than October 1st, 2013 and June 1st of each contract

10  year, therefore, in order to mutually determine whether such

11  goals should be amended or additional goals needed to be

12  included.  Any amendments of additional mutual agreed upon by

13  the parties shall be attached hereto and incorporated as part

14  of this agreement.

15  Q    Okay.  So in June 1st of 2014 you all would have met to

16  see how Dr. Adams was doing vis-a-vis her goals according to

17  this contract?

18  A    Yes.

19  Q    So again -- and Dr. Adams reported to you all, isn't it

20  true, at the June 15th -- sorry, the June 2015 retreat.  Didn't

21  Dr. Adams report that you all had assessed the goals in

22  December, at your December retreat?  Didn't you all have a

23  retreat in December 2014?

24  A    I don't recall.  What date was it?  December what?

25  Q    I don't recall the exact date.  But the key thing is at

J. Rogers - direct by Davis

1  the June 2015 retreat, do you recall her saying you all we met

2  in December to go over the goals and we met in January again at

3  the January retreat, January 2015, to go over the goals.  Do

4  you recall that conversation?

5  A    December what?

6  Q    2014.

7  A    December, what date is I'm asking?

8  Q    I don't know the exact date of the retreat.

9  A    I couldn't answer because I don't know the date.  Not that

10  part of it.

11        THE COURT:  Excuse me, ma'am.  Did you have more than

12  one retreat in December?

13        THE WITNESS:  We normally don't have retreats in

14  December.  That's why.

15        THE COURT:  Oh.  Do you remember having a retreat in

16  December?

17        THE WITNESS:  No, I don't.

18  BY MR. DAVIS:

19  Q    Do you remember having a re --

20        MR. DAVIS:  I'm sorry.  Were you done, Judge?

21        THE COURT:  I'm done.  Follow up on that.

22  BY MR. DAVIS:

23  Q    Okay.  Do you remember having a retreat in January?

24  A    Yes.

25  Q    Okay.

J. Rogers - direct by Davis

1    A    I don't recall the date, but I remember.

2    Q    Okay.  January 2015.

3    A    January what date?

4    Q    2015.  I don't know the date.

5              THE COURT:  Of the year 2015.

6              THE WITNESS:  Okay.

7              THE COURT:  Do you remember having a retreat?

8              THE WITNESS:  I have to -- can you tell me the date

9    please.  I got the dates in my head.

10             THE COURT:  I guess the question is --

11             MR. DAVIS:  I'm sorry, Miss Rogers.  I don't know the

12   date.

13             THE COURT:  -- if you had a retreat or you didn't, it

14   doesn't matter what date in January.  Unless you had multiple

15   retreats.  So if you don't remember at all and you can't

16   testify to it, say you don't remember.

17             THE WITNESS:  I don't remember.

18   BY MR. DAVIS:

19   Q    Okay.  Do you remember -- and I may have asked this -- at

20   the June retreat, there's another retreat, 2015, Dr. Adams

21   talking about the goal cycle?

22   A    At the retreat in June, yes.

23   Q    Right.  And Mr. Cohen?  You know who Mr. Cohen is?

24   A    Jeff Cohen, yes.

25   Q    Right.  And Dr. Adams was presenting -- he's an outside

J. Rogers - direct by Davis

1  contractor, right?

2  A    Yes.

3  Q    That helps the district manage and do goals and things

4  like that, right?

5  A    Yes.

6  Q    And so at the June retreat Dr. Adams was presenting a

7  chart, and the chart had red, green, and yellow for items, task

8  items.  It had things to do, and they were either in red or

9  green or yellow.  You remember that?

10 A    Yes.

11 Q    Green meant we've accomplished this goal.  Yellow meant we

12 kind of -- something's going on.  Red meant we haven't even

13 started yet, is that right?

14 A    Something to that effect, yes.

15 Q    Right.  And so when she was presenting those, she was

16 talking about specific action items.  She wasn't talking

17 about -- that's what she was measuring, right?  Specific tasks?

18 A    Yes.

19 Q    And it wasn't generic.  It was specific.  Clean up

20 lunchroom.  Red, green, yellow, whatever.  It was like that

21 kind of specificity, right?

22 A    Some of them were, yes.

23 Q    Okay.  So at your meeting on July 22nd didn't Dr.

24 McCaskill -- when you said, ah, these goals are generic;

25 they're not specific, didn't Dr. McCaskill say, well, what

J. Rogers - direct by Davis

1   about the goals in the goal cycle?  Do they count?  Do they

2   still count?  Didn't she raise that issue?

3   A    She could have.  I don't recall.

4   Q    Okay.  And didn't Betty Johnson -- she's also a board

5   member, right?

6   A    Yes.

7   Q    And defendant in this case?

8   A    Yes.

9   Q    She was at that meeting, right?

10  A    I don't have the minutes before you.  I can't tell you

11  whether she was there.

12  Q    You don't remember whether she was at the meeting on July

13  22nd to talk about --

14  A    Betty Johnson --

15  Q    -- extending the extension?

16  A    Betty Johnson or Kisha McCaskill?

17  Q    Both.  They were both at the meeting.

18  A    Okay.  Yes, they were both there.  You said -- I didn't

19  know which one.

20  Q    And didn't Betty Johnson say, well, you know what, Dr.

21  Adams is going to bring up those goals in the goal cycle?

22  She's going to, quote, lean on those.  Didn't she say that?

23  A    I don't know what she said, sir.  I can't say.

24  Q    So this is another one you'd have to hear the tape to

25  actually refresh you.  But here we're lucky.  We've got an

J. Rogers - direct by Davis

1 | actual transcript --
2 | A     Thank you.
3 | Q     -- of the event.  And I'll let you look at it.  The jury
4 | won't be able to see it.
5 |           MR. DAVIS:  It's going to be Plaintiff's Exhibit
6 | No. 55.  And I'm showing this to the witness, Your Honor.
7 |           THE COURT:  Once you get it up there, she will see
8 | it.  All right.  Take a look to refresh your recollection,
9 | ma'am.
10 | BY MR. DAVIS:
11 | Q     Tell me to scroll where you need me to scroll.
12 | A     Scroll.
13 |           THE COURT:  Well, if you -- I'm assuming you know the
14 | area that --
15 |           MR. DAVIS:  Yes.
16 |           THE COURT:  -- is appropriate.  So just go to that
17 | area.  Is there a particular page for the record?
18 |           MR. DAVIS:  Yes, page 11.
19 |           THE COURT:  All right.
20 |           MR. DAVIS:  Lines 6 and 7.
21 |           THE COURT:  All right.  He's going to show you all of
22 | page 11 and just review it.  And then let us know if your
23 | recollection is refreshed.  All right.
24 | BY MR. DAVIS:
25 | Q     Tell me if you need me to scroll.

J. Rogers - direct by Davis

1  A    You can scroll.  Can I ask a question before we go.  Who

2  is Mrs. Speaker?

3  Q    Well --

4          THE COURT:  Obviously they don't know who.  It's just

5  saying speaker and it's a woman, am I correct?

6          MR. DAVIS:  Yes.

7          THE COURT:  Good question.

8  BY MR. DAVIS:

9  Q    The only person identified is your lawyer.  The rest of

10 the board members --

11         THE COURT:  All right.  Counsel, I think we got it.

12 Proceed.

13         MR. DAVIS:  Okay.

14         THE WITNESS:  I can't finish reading.  I can't do two

15 things at one time.

16 BY MR. DAVIS:

17 Q    I'm sorry.

18 A    Scroll.

19         THE COURT:  So for the question, Miss Rogers, that

20 was asked, have you read the part that would refresh your

21 recollection?  I believe he stated it would be at -- up at the

22 beginning of the page.

23         MR. DAVIS:  Yes.  Page -- may I, Judge.

24         THE COURT:  You stated -- the question is she's read

25 up to the bottom.  The question is does any of that on anyplace

393

J. Rogers - direct by Davis

1  on the page refresh your recollection of -- what was the
2  question again?
3  BY MR. DAVIS:
4  Q     Two questions.  One was didn't Dr. McCaskill -- after you
5  said the goals that we gave Dr. Adams weren't specific, didn't
6  Dr. McCaskill say, well, what about the goals we set at the
7  retreat?  Those don't count?
8  A     Somewhat.  Mrs. Speaker said that.  I don't know who that
9  was.
10 Q     Okay.
11 A     But it was said on the --
12 Q     Well, we can play the tape.
13             THE COURT:  Does any of this conversation ring a
14 bell?
15             THE WITNESS:  Yes, it does.
16             THE COURT:  All right.  Okay.
17             MR. DAVIS:  And I will take down the transcript.
18             THE COURT:  Proceed, Counsel.
19 BY MR. DAVIS:
20 Q     So somebody -- one of the board members said that.  What
21 about you brought up, hey, these goals we gave Dr. Adams,
22 they're generic?  One of your fellow board members said, well,
23 what about the goals we gave at the retreat?  Those don't
24 count?  Do you recall that?
25 A     Yes.

394

J. Rogers - direct by Davis

1  Q    And do you also recall one of your other board members
2  saying, I guarantee you, talking about Dr. Adams, she's goin'
3  lean on those goals.  She going -- you recall that?
4  A    Yes.
5  Q    Thank you.  So later in that same meeting you all decided
6  that the goals -- that the contract extension wasn't valid,
7  right?
8  A    Yes.
9  Q    And you said it wasn't valid because the goals weren't
10 legitimate, right?
11 A    I've never seen the word legitimate.
12 Q    Well, let me rephrase that.  That's bad phrasing.
13       Because you all hadn't given Dr. Adams specific
14 goals, you all decided the contract extension wasn't valid,
15 correct?
16 A    No, that's not correct.
17 Q    Okay.  What did you all decide vis-a-vis the contract
18 extension?
19 A    That we should have sit down and met and went over the
20 goals with her, specifically the goals in her contract to see
21 whether they were -- she had met those goals.  We should have
22 had a meeting.
23 Q    So because you say you didn't do that, the extension was
24 not good anymore?
25 A    Based on advice of the counsel, yes.

395

J. Rogers - direct by Davis

1  Q    The extension that you all gave in February, right?

2  A    Yes.

3  Q    And you say you was acting on advice of counsel.  I don't

4  want you to get into that now.  We're going to have a chance to

5  visit with your counsel soon.  But that's the same counsel who

6  you consulted, we talked about earlier, when you voted for the

7  extension that told you go ahead.  It's good to go.  You can do

8  one to five years.  Is that the same counsel?

9  A    No --

10        MS. SCHWENDENER:  Objection.

11        THE COURT:  Basis?

12        MS. SCHWENDENER:  Misstates the testimony.

13        THE COURT:  She can testify.  Objection's overruled.

14        THE WITNESS:  No, I didn't say that was the same

15  counsel.

16  BY MR. DAVIS:

17  Q    Was it the same law firm?

18  A    No.

19  Q    So Izzo -- didn't you say earlier Izzo, Petrarca was your

20  lawyer in February of 2015?

21  A    Yes, he was.

22  Q    So now you're telling me it was another law firm you

23  consulted with about the extension in February 2015?

24  A    It wasn't in February, but yes, I had consulted with an

25  attorney.

J. Rogers - direct by Davis

1   Q    Was it Izzo Petrarca --

2   A    No, it was not.

3   Q    Okay.  So you're saying that when you were making sure it

4   was okay to give the contract extension in February, when you

5   told your board members I checked with the lawyer, the lawyer

6   said it's good to go one to five years, that lawyer you're

7   referring to was not a member of Hauser Izzo?

8   A    No.

9   Q    So what law firm was that?

10  A    That was a retreat that I attended, if I can say.  Can I

11  elaborate.

12  Q    I don't want to know about the retreat.  I want to know

13  the name of the law firm --

14         THE COURT:  Maybe she's trying to answer your

15  question, Counsel.

16         THE WITNESS:  I am.

17  BY MR. DAVIS:

18  Q    Okay.  Go ahead.  And say what you need to say, Miss

19  Rogers.

20  A    There was a retreat that was held with Illinois

21  Association of School Boards in November.  And I went to a

22  workshop that was board superintendent contract.  There was a

23  law firm there I think by the name of Schwartz and something

24  who did a retreat at that point in board and superintendents'

25  contracts, because we were looking at -- I was looking and

J. Rogers - direct by Davis

1   thinking about extending the contract.  So I go to workshops
2   all the time based on those things.  And they talk about what
3   you could do versus continuing a contract.  What can be done
4   backwards and forwards.  So I was there, and I asked that
5   question.

6   Q    What was the name of the law firm again?

7   A    I can't recall.  It was Schwartz and something.

8   Q    And where was that retreat at?

9   A    With the Illinois Association of School Boards.

10  Q    Where was the location?

11  A    Downtown Chicago.

12  Q    Specifically.

13  A    November of that year before that.  I don't know the
14  actual building.

15        THE COURT:  Counsel, she's giving you the
16  information.  She got it at a conference.  That's not --

17        MR. DAVIS:  Okay, Judge.

18        THE COURT:  That's not -- unless you're getting
19  information to ask questions about retainer, that's different
20  from her getting information at a conference.

21        MR. DAVIS:  Yes.

22        THE COURT:  Totally different situation.

23        MR. DAVIS:  Right.

24        THE COURT:  All right.  Let's --

25        MR. DAVIS:  I agree.  Thank you.

J. Rogers - direct by Davis

1  BY MR. DAVIS:

2  Q    So just so I'm clear, you're saying that when you in

3  February 2015 told your board members I checked with the lawyer

4  and he said we can give the extension for one to five years,

5  you're now saying you were referring to a conversation you had

6  with somebody in November of 2014?

7  A    Yes.  And I know whether it was 2014.  It was November of

8  the year prior to '15.  So yes, it was.

9  Q    So then '14?

10 A    That's correct.

11 Q    So you're saying you was checking on Dr. Adams' contract

12 extension in November of 2014?

13 A    That's correct.

14 Q    So why didn't you talk to your own lawyer?  Why would you

15 talk to a lawyer at a conference?  Didn't you all pay --

16 weren't you paying for a lawyer at that time?

17             MS. SCHWENDENER:  Objection, Your Honor.

18             THE COURT:  Sustained.  Sustained.  Don't answer.

19             MR. DAVIS:  Okay.

20             THE COURT:  That's irrelevant.

21             MR. DAVIS:  Thank you, Judge.

22 BY MR. DAVIS:

23 Q    So isn't it true that on July 22nd Gloria Johnson -- you

24 all are talking about rescinding the contract, and you all had

25 a little debate, what do we tell Dr. Adams?  We need to bring

399

J. Rogers - direct by Davis

1  her in here and tell her we're rescinding this thing.  Gloria
2  Johnson said because it was illegal.  Didn't she say that?  The
3  extension was illegal.
4  A    I can't speak for Gloria Johnson.
5  Q    Okay.  Let me -- can I refresh you with the transcript
6  again?
7           THE COURT:  You can do that, Counsel.  Isn't Gloria
8  Johnson going to testify?
9           MR. DAVIS:  Well, she may not.  But depending on
10 whether she's here that day, I have no problem putting her on.
11 But I'll move on, Judge.
12          THE COURT:  No, I mean, if you want to use the -- I'm
13 not going to stop you.  Also just watch your time.  We're going
14 to have to take a break soon.
15          MR. DAVIS:  Right.  I'm aware of that.  Thank you,
16 Your Honor.
17          THE COURT:  All right.
18 BY MR. DAVIS:
19 Q    Do you recall you all having a debate about what to call
20 it?  Do you say the rescission -- it being the rescission.  Do
21 you say it was illegal?  Some board members didn't like that
22 term, because they don't do nothing illegal they said.  And so
23 you all eventually came down and concluded that you would say
24 it was ineffective.
25 A    That's correct.

400
J. Rogers - direct by Davis

1  Q    Okay.  And, in fact, that's what happened.  You brought
2  Dr. Adams in and you told her you're thinking this contract --
3  eventually actually she wasn't told in July 2015.  That's what
4  she was told on -- in August at the August 17th meeting.  She
5  was just told the contract's ineffective -- the contract
6  extension is ineffective?
7  A    Yes.
8           MR. DAVIS:  Thank you.  I think that is all I have
9  for Mrs. Rogers, Your Honor.
10          THE COURT:  On direct.  All right.  Let's come to the
11  side, so I can do some scheduling and figure out where we are.
12  Thank you.
13     (Sidebar proceedings out of the hearing of the jury:)
14          THE COURT:  How much time do you need?
15          MS. SCHWENDENER:  20 minutes.  30 minutes maybe max.
16          THE COURT:  Really?  Then let's go ahead and do this.
17     (Before the jury:)
18          THE COURT:  All right.  Thank you.
19  Cross-examination.
20          THE WITNESS:  I am still here.
21          THE COURT:  You're still here.  And, Counsel, are you
22  going to go into any questions -- since this is your defendant,
23  do you want to be allowed to go into any questions about --
24  that you would put her on for direct?
25          MS. SCHWENDENER:  Yes, Your Honor.

J. Rogers - cross by Davis

1    THE COURT:  All right.  So, ladies and gentlemen,
2  what I just did was because the normal procedure is for the
3  plaintiff to put on their own case, their own case in chief and
4  their own witnesses, and they can't lead them through some of
5  the questions, because, as I stated yesterday, Miss Rogers is a
6  defendant being called in the plaintiff's case in chief, they
7  are allowed to lead.  However, the defendant obviously would
8  put the witness in their case in chief after the plaintiff
9  rests.
10    In order to save a little time here we're just going
11  to have the defendant Miss Rogers be on the stand once.  And so
12  she's going to be able to be questioned as the defense witness
13  also.  All right.  Proceed.
14    MS. SCHWENDENER:  Thank you, Your Honor.
15                    CROSS-EXAMINATION
16  BY MR. DAVIS:
17  Q    Mrs. Rogers, you testified earlier that you had been a
18  board member since 1991, is that correct?
19  A    Off and on, yes.
20  Q    Is it an elected or an appointed position?
21  A    Elected.
22  Q    How many times were you elected or reelected?
23  A    Last count was about six times.
24  Q    Are you compensated for your services as a board member?
25  A    No.

J. Rogers - cross by Davis

1  Q    You've established earlier that you were a member of the
2  board during plaintiff's tenure as superintendent, correct?
3  A    Yes.
4  Q    And did you vote to hire plaintiff as superintendent?
5  A    Yes.
6  Q    I take it you're aware that plaintiff had a contract with
7  the district, correct?
8  A    Yes.
9  Q    And are you familiar with the general terms of that
10 contract?
11 A    The majority of it, yes.
12 Q    And what was the term of that contract?
13 A    It was a three-year contract with the dollar amount of
14 $165,000.  There was travel expenses in there that she didn't
15 know about that I did inform her of.  There were sick days in
16 there and vacation days and personal days.
17 Q    Are you aware of whether plaintiff had goals that she had
18 to meet as part of her job?
19 A    Yes.
20 Q    Now, yesterday and today counsel asked you a series of
21 questions about goals for the superintendent.  Can you please
22 briefly explain, is there a difference between district wide
23 goals and superintendent goals?
24 A    Yes, it is.  Explain?
25 Q    Briefly, please.

J. Rogers - cross by Davis

1  A    Yes, it is.  We come to a retreat, and we do district

2  goals with not just the superintendent, with everyone else.  We

3  wouldn't dare take the superintendent's goals and have everyone

4  else in the room going over her goals to put her business out

5  whether she completed them or not with other people.  We would

6  do her goals specifically different on a different date and a

7  different time.  Those goals that we set that are district

8  goals on that evaluation form that you saw were district goals.

9        We had a group of 10 or 15 people that came through

10  there that participated in the red and the green, changing of

11  those different numbers.  And she didn't just now make those

12  changes.  Some of the other people that were there like the

13  business manager, whether we met a certain amount of money.

14  The special ed director who did certain things.  They talked

15  about test scores, who was Miss Miller.  They went and showed

16  where they went up or went down, different areas.  So we

17  wouldn't dare discuss superintendent's performance goals in

18  front of all those other people.

19  Q    So is it fair to say that at the retreat, specifically the

20  June 2015 retreat it was not just with the board members and

21  the superintendent?

22  A    Oh, yes.  It was a lot of people there.

23  Q    Drawing your attention to February 23rd of 2015.  At any

24  point -- well, I think it's been established the board voted to

25  extend plaintiff's contract, correct?

J. Rogers - cross by Davis

1   A    Yes.

2   Q    And can you briefly tell the jury how the discussion to

3   extend plaintiff's contract came about.

4   A    I had some conversation with the superintendent not at

5   that particular meeting, in person and on the phone before that

6   came up.  She had approached me and asked me about since I was

7   the president, about a contract extension.  I spoke with her

8   about it.  I spoke with the board about it, and said that they

9   would probably -- she asked could she get an extension for her

10  contract.

11          The board was not interested in giving an extension.

12  We talked and we talked it over, and they decided to go with

13  one year.  Based on that conversation, we said that we would

14  give her a one-year extension of what she had.  She needed to

15  get with her attorney and our attorney and work out the terms

16  of that and bring it back to us later.

17  Q    And how long was the extension for?

18  A    One year.

19  Q    And was the extension under the same terms as her existing

20  contract?

21  A    I didn't hear you.

22  Q    Was the extension under the same terms as her existing

23  contract?

24  A    Yes, it was.

25  Q    Same terms including salary and benefits?

J. Rogers - cross by Davis

1  A    Yes.

2  Q    Now, before voting to extend plaintiff's contract, did the

3  board make any formal findings whether plaintiff had met her

4  goals?

5  A    No.

6  Q    To your knowledge did plaintiff accept the one-year

7  contract extension?

8  A    No.

9  Q    What was your role with the board in February of 2015?

10 A    I was the board president at that time.

11 Q    And in the spring of 2015 did plaintiff approach you

12 regarding her contract?

13 A    Of 2015?  No, she didn't approach me.  I approached her.

14 Q    And what was that about?

15 A    It was around March of 2015 I called her on the phone and

16 said we approved the extension on your contract.  Have you

17 decided and worked it out with the two attorneys yet, and she

18 told me no.

19 Q    Did you have any further discussion at that time?

20 A    That was an election year.  Yes, I did.  I was up for

21 election.  A couple other board members was up for election.  I

22 called her back in February after the election, and I had won

23 the election, but a couple -- I think one person had lost.  And

24 I said to her, have you done anything with your contract yet?

25 We're still -- I'm still waiting to sign it.  Because in May I

406

J. Rogers - cross by Davis

1  don't know whether I'll be here.  And we're trying to finish up
2  what we started in February.  She told me she would take her
3  chances with the new board.  So at that point I just didn't
4  call anymore.
5  Q    To your knowledge did plaintiff request changes to her
6  contract?
7  A    I never saw that contract until this liti -- this stuff
8  started coming.  The changes in the contract I only saw now.  I
9  didn't know whether she had done it then.  So I didn't see
10 anything other than the extension.  I just saw that when this
11 proceeding started.
12 Q    Did plaintiff ever accept the board's one-year contract
13 extension?
14 A    No.
15 Q    Did plaintiff ever agree to work under the same terms and
16 conditions as her existing contract?
17 A    No.  She said she wanted more money.
18 Q    Did plaintiff ever sign a one-year contract extension?
19 A    No.
20 Q    In your experience as a board member, have you ever
21 extended a contract without requiring the employee to, to sign
22 an extension?
23 A    No.
24 Q    Now, directing your attention to the summer of 2015.  At
25 any time did plaintiff request an audit into the district's

407

J. Rogers - cross by Davis

1  finances?

2  A    Yes.

3  Q    And was that in June of 2015?

4  A    Yes, it was.

5  Q    And to your knowledge what was the board's response to her

6  request?

7  A    It was a favorable response to it, yes.

8         THE COURT:  I'm sorry.  It was what?

9         THE WITNESS:  Favorable.

10  BY MS. SCHWENDENER:

11  Q    Now, we've heard terms over the last couple days of an

12  RFP.  Could you explain what is an RFP.

13  A    It is what you put together actually to bring to the board

14  of different particular items that you want to have in a --

15  have looked at actually.

16  Q    What does RFP stand for?

17  A    I can't recall what the RFP stands for.

18  Q    Is an RFP like a proposal?

19  A    It's a proposal, of course.

20  Q    And plaintiff was asking for a -- to put together a

21  proposal for an audit?

22  A    Yes, she was.

23  Q    Now, you're aware that plaintiff claims that Mr. Rogers

24  threatened her, correct?

25  A    Yes.

J. Rogers - cross by Davis

1  Q    Did you -- at some point were you informed of what the
2  threat was?

3  A    Yes.  By the newspaper.

4  Q    Do you recall when you learned about the threat?

5  A    Monday, the 13th of July.  I learned about the threat
6  prior to it, but what the actual threat was was Monday.

7  Q    Had plaintiff ever told you that Mr. Rogers had threatened
8  her before?

9  A    No.

10  Q    Are you aware that plaintiff filed a police report in
11  response to Mr. Rogers' threats?

12  A    Yes.

13  Q    Do you recall when you learned about the police report?

14  A    I can't recall.  I don't recall the date when I learned
15  about it.  I can't specifically say.

16  Q    Were you ever interviewed by the police about the alleged
17  threat?

18  A    No.

19  Q    Did Mr. Rogers receive any disciplinary action by the
20  board in response to the alleged threat?

21  A    No.

22  Q    Are you aware of any discussions amongst the board members
23  specifically discussing this alleged threat?

24  A    No.

25  Q    Now, you -- counsel was asking you questions earlier about

J. Rogers - cross by Davis

1  a letter that you delivered to plaintiff, is that correct?

2  A    Yes.

3  Q    And can you -- what was this letter?

4  A    It was a letter of some items that I was interested in

5  bringing to the board's attention and superintendent's

6  attention to be placed on the agenda for a board meeting in, in

7  July.  I had been looking at some things and taking a look at

8  the Echo information started back in May.  Before that I heard

9  about it prior to that, but May was when I went to an Echo

10 board meeting.  And, of course, I worked at Echo for a small

11 amount of time.

12        So I was checking out that -- I had spoken with some

13 other board members, and they were talking about this huge

14 amount of money that they all owed back to Echo, and that we

15 were on the list.  And I said to the board members and, and

16 other people that I spoke with and superintendents that we

17 couldn't have been on the list because we were not aware of it.

18 And they laughed at me, and said yes, you are on the list.  And

19 they pulled the list, the amount and gave me a copy.  I said,

20 well, we don't know anything about it.

21        At that point, that was in May, it was a change I

22 think in the board at that time because that was 2015.  It was

23 a lot of chaos going on between the board.  So I just went to

24 the Echo board meeting myself, sit there and listened.  And

25 then I went and pulled up all the dates of the Echo board

110

J. Rogers - cross by Davis

1  meetings that the superintendent, this was in May, had

2  attended.  And I noticed out of 38 meetings she had missed 20

3  and not sent a representative from the district.

4  Q    Now, this letter, was this delivered to plaintiff on

5  July 10th of 2015?

6  A    Yes, it was.

7  Q    Did you personally --

8  A    At the plaintiff.

9  Q    Did you -- how was the letter delivered?

10  A    Okay.  I brought the letter into the district.  I came up

11  to the front desk, and I called -- I had the switch board

12  person to call the superintendent's office.  The secretary came

13  out, got the letter, took it back into the superintendent's

14  office, and I got in the car and I left.

15  Q    On July 10th did you have any meetings with plaintiff?

16  A    No, I did not.

17  Q    Did you speak with plaintiff on that date?

18  A    No, I did not.

19  Q    At the time you delivered the letter had you known that

20  plaintiff had filed a police report?

21  A    There was no police report filed at that time, and nobody

22  had been there until I left.

23  Q    So the answer is no?

24  A    No.  I'm sorry.

25  Q    Now, drawing your attention to July of 2015.  At some

J. Rogers - cross by Davis

1   point the board voted to rescind the one-year contract

2   extension it previously offered to plaintiff, correct?

3   A    That's correct.

4   Q    And when was that?

5   A    When was the extension?  When was it -- we took it back,

6   took the contract?  What are you saying?  Ask that question.

7   Q    At the time that the board -- or strike that.

8           In July of 2015 the board had a discussion to rescind

9   the one-year contract extension, correct?

10  A    Yes.

11  Q    Now, going back to the February 23rd, 2015 meeting.  Did

12  the board ever make the findings that plaintiff had met her

13  goals prior to extending the contract?

14  A    No.

15  Q    Why did the board -- at some point the board voted to

16  rescind plaintiff's contract, correct?

17  A    Yes.

18  Q    And was that on -- was that -- when was that?

19  A    In August of 2015.

20  Q    Why did the board vote to rescind plaintiff's contract?

21  A    Based on the advice of counsel that her goals -- we had

22  not even discussed her goals, and, and there was a law that --

23  and it was in her contract basically that we had to discuss and

24  see whether she met them and go back and forth.  We had not had

25  a meeting for that.

412

J. Rogers - cross by Davis

Q    Did the board ever -- strike that.

         At any point prior to did the board make a finding
that plaintiff had met her goals?

A    No.

Q    Did the decision to -- or did the vote to rescind
plaintiff's one-year contract extension have anything to do
with plaintiff's request for a forensic audit?

A    No.

Q    Did the decision to rescind plaintiff's contract extension
have anything to do with plaintiff's alleged threats against
Mr. Rogers?

A    No.

Q    Did the decision to rescind plaintiff's contract extension
have anything to do with the police report plaintiff filed?

A    No.  I had never seen the police report until -- I had
never seen the police report, no.

Q    Are you aware of any discussion by any other board member
that based their vote to rescind the contract on plaintiff's
request for a forensic audit?

A    No.

Q    Are you aware of any discussion by any other board member
that based their vote to rescind the contract extension on Mr.
Rogers' alleged threat?

A    No.  Can I elaborate on it?

Q    That's okay.

413

J. Rogers - cross by Davis

1    A    Okay.

2    Q    Did -- are you aware of any discussion by any board member

3    that based their vote to rescind the contract extension on the

4    police report?

5    A    No.  We had never seen it.  No.

6    Q    Drawing your attention to August 17th, 2015.  At any time

7    did the board issue performance directives to plaintiff?

8    A    Yes.

9    Q    And what are performance directives?

10   A    Some of the things that we saw that needed to be corrected

11   by the superintendent or that particular person, we would give

12   them things that needed to be corrected in writing with the

13   attorney present.

14   Q    Did the issuing of the partial performance directives have

15   anything to do with plaintiff's request for a forensic audit?

16   A    No.

17   Q    Did the issuing of partial performance directives have

18   anything to do with Mr. Rogers' alleged threat?

19   A    No.

20   Q    Did the issuing of a partial performance directives have

21   anything to do with plaintiff's filing of a police report?

22   A    No.

23   Q    Did you vote to issue performance directives for

24   plaintiff?

25   A    I don't recall.  Could you refresh my memory.

J. Rogers - cross by Davis

1   Q    I'll move on.

2        THE COURT:  All right.

3   BY MS. SCHWENDENER:

4   Q    Are you aware of any discussion amongst the board members

5   that based their vote on -- to issue the performance directives

6   on plaintiff's request for a forensic audit?

7   A    No.

8   Q    Are you aware of any vote amongst any board members that

9   based their vote on Mr. Rogers' alleged threat?

10  A    No.

11  Q    Are you aware of any discussion by any board member that

12  based their vote on the police report?

13  A    No.

14  Q    Counsel asked you questions earlier about a conversation

15  you may have had with a lawyer regarding the -- whether you

16  could extend a contract for one to five years.

17  A    Repeat the question.

18  Q    Counsel asked you earlier about a conversation you may

19  have had with a lawyer whether to extend plaintiff's contract

20  for one to five years.

21  A    Yes.

22  Q    Do you remember that?

23  A    Yes.

24  Q    Now, that conversation, was that just general information

25  you may have learned at a seminar?

J. Rogers - redirect by Davis

1  A    That's correct.  And you can ask questions at the end of
2  those seminars with those attorneys.
3  Q    Those -- your general questions, that didn't have anything
4  to do with plaintiff's specific contract, correct?
5  A    No.
6  Q    Is that correct?
7  A    No.  No, it didn't have anything to do with her contract.
8         MS. SCHWENDENER:  If I could just have one minute,
9  Your Honor.
10        THE COURT:  You may.
11        MS. SCHWENDENER:  Thank you.
12     (Brief pause.)
13 BY MS. SCHWENDENER:
14 Q    Mrs. Rogers, prior to February 23rd of 2015 had the board
15 ever voted to -- that plaintiff -- or made a finding that
16 plaintiff had met her goals?
17 A    No.
18        MS. SCHWENDENER:  Thank you.  Nothing further.
19        THE COURT:  Thank you.  Any redirect?
20        MR. DAVIS:  Yes, Judge.
21        THE COURT:  All right.  Briefly.  Proceed.
22             REDIRECT EXAMINATION
23 BY MR. DAVIS:
24 Q    Mrs. Rogers, isn't it true that on February 23rd, 2015 you
25 told Dr. Adams the board had voted to extend her contract?

J. Rogers - redirect by Davis

1  A    Was that the board meeting?

2  Q    Yes.

3  A    I think we voted out front and she was there, yes.

4  Q    Didn't you call her into closed session and say we decided

5  to let you go.  No, I'm just kidding.  We're going to vote to

6  extend your contract?

7  A    No, I didn't say that to her.

8  Q    Okay.  In fact, didn't you say that --

9        MR. DAVIS:  Well, I'd like to play the board meeting

10  minutes from that meeting, Judge --

11        THE COURT:  Oh, the Court --

12        MR. DAVIS:  -- that are on point.

13        THE COURT:  Do you want to state your objection for

14  the record?

15        MS. SCHWENDENER:  Sure.  Objection for the record.

16  Thank you, Your Honor.

17        THE COURT:  All right.  Overruled.  We have to take a

18  break now.  What we'll do is we'll take the break, a very short

19  break.  All rise.

20      (Jury excused.)

21        THE COURT:  While she steps out very quickly,

22  Counsel, I'm assuming -- I'd like to finish her before 12:30.

23        MR. DAVIS:  Sure.

24        THE COURT:  It seems like we're on that way there.

25        MR. DAVIS:  Yes, Judge.

J. Rogers - redirect by Davis

1    THE COURT:  And then we'll be taking about a half an
2  hour to no more than 35, 40-minute break for lunch.  And your
3  next witness is?
4    MR. DAVIS:  Probably Dr. Nohelty or Sophia
5  Jones-Redmond.
6    THE COURT:  Okay.  Well, you need to decide who's
7  been here longer or who you're going to make madder.
8    MR. DAVIS:  Yes, that's true.
9    THE COURT:  All right.  So anyway --
10    MR. DAVIS:  I'll probably take Sophia Jones-Redmond.
11    THE COURT:  Okay.  All right.  So anyway, have that
12  person ready to be here, I would actually say just a little
13  after 1.  All right.  We're going to be ready to start.  And
14  then we have exactly no longer -- if we can get started at like
15  10 minutes after 1, we have exactly two hours at the most.  All
16  right.  So just keep that in mind when you're doing your
17  witnesses.  All right.
18    MR. DAVIS:  Thank you, Judge.
19    THE COURT:  All right.  But we'll be dealing with
20  instructions conference after.  So everybody understands, this
21  Court, again, since they're my instructions, I am not going to
22  put some messy stuff up there so my poor staff had to work
23  overtime to do your jobs on instructions.  But we'll go through
24  it.  All right.  Thank you.
25    (Short break taken.)

J. Rogers - redirect by Davis

1    THE COURT:  Anything else, plaintiff?  Anything else,

2    defendant?

3    MS. SCHWENDENER:  No, Your Honor.

4    THE COURT:  Before they come out.

5    (Before the jury:)

6    THE COURT:  Be seated, ladies and gentlemen.  Miss

7    Rogers.  Counsel, do you need the last question read?

8    MR. DAVIS:  No, Judge.  I can --

9    THE COURT:  All right.  Proceed.  Redirect.

10   BY MR. DAVIS:

11   Q    So I'm going to play an excerpt from Exhibit 71, volume

12   VN810174.  This is from the February 23rd, 2015 board meeting.

13   (Whereupon, said tape was played in open court.)

14   THE COURT:  All right.

15   BY MR. DAVIS:

16   Q    So, in fact, did you -- counsel asked you -- well, in

17   response to counsel's questions you said that you told Dr.

18   Adams that she needed to go back and make some changes to the

19   contract and -- with her lawyer and bring it back to be signed.

20   Isn't that what you said?

21   A    Yes, I did.

22   Q    Did you hear anything on there where you told Dr. Adams

23   any of that?

24   A    No, I didn't.

25   Q    Also I'm a little confused.  Counsel asked you was it the

J. Rogers - redirect by Davis

1    same contract with the same terms that was being extended, and
2    you said yeah -- yes, right?  Wasn't that your answer?
3    A    Yes.
4    Q    But then at the same time you said you wanted her to get
5    with her lawyer to make changes and come back and sign it.  If
6    it's the same contract on the same terms, why would she need
7    to -- can you --
8    A    Because there was a date on there that stopped and there's
9    a clause in there that she showed actually on the board that we
10   could not strike or do anything in it.  So if you struck the
11   date, you destroyed the contract.  So the date and everything
12   had to be changed that it was in there and signatures on there
13   even if the officers had changed.  And I think some of the
14   officers had changed prior to that.  I don't know.  But I'm
15   sure the signatures and stuff had to be redone and the date.
16   It was to 2016.  So we were going to extend it.  It had to have
17   a date change.
18   Q    Why?  The contract, we looked at it, provided for
19   extensions of one to five years.  And if you know the contract
20   ends on -- ran to June 30th and you say it's extended one year,
21   you got to rewrite the contract to --
22   A    Yes.
23   Q    Is, is there anything in the contract that said that?
24   A    I'd have to read it over again if you want me to.
25   Q    Okay.  Well, let's look at the contract.

420

1    THE COURT:  Well, then, Counsel, we'll do that after

2    lunch.

3    MR. DAVIS:  Okay.  All right.

4    THE COURT:  You're getting into the contract.  And

5    the Court's certain that you're going to have an issue of where

6    you have to look and you need to find it.  Unless you already

7    know.

8    MR. DAVIS:  Well, it's pretty straightforward, Judge,

9    but I defer.

10   THE COURT:  No, I mean, if you can --

11   MR. DAVIS:  I'm all for lunch.

12   THE COURT:  No.  No.

13   MR. DAVIS:  I like lunch.

14   THE COURT:  No.  But if you can get this covered, and

15   I'm sure they're going to want to ask questions for five

16   minutes.

17   MR. DAVIS:  Sure.

18   THE COURT:  We can go back and forth.  But if you

19   think you can find it right away, please do.

20   MR. DAVIS:  I think they're going to want to ask

21   questions so we should go to lunch.

22   THE COURT:  Well, no.  No.  Let me find out, Counsel.

23   Let's see.  This is like one.  If you know exactly where you're

24   going on this, the Court would like you to do it now.  I want

25   to finish this witness if at all possible.

421

1          MR. DAVIS:  Well, this isn't the only thing I want

2    to --

3          THE COURT:  Redirect on?

4          MR. DAVIS:  Yes.

5          THE COURT:  All right.  We'll take a lunch break now,

6    ladies and gentlemen.  Again, we talked about doing it earlier

7    because we want to -- we have committed to getting you -- those

8    of you who have trick or treaters, trying to get you to them.

9    And I'm sure even if it's not yours, but the other ones in the

10   neighborhood would want you to be there probably.  And so we'll

11   go to -- about a 35-minute lunch.  So please be back in the

12   room at 1:05.  All right.  Again, don't discuss the matter.

13   Don't talk about the matter among yourselves.  Don't do any

14   independent review, and we'll see you back here at 1:05.  All

15   right.  All rise.

16       (Jury excused.)

17          THE COURT:  All right.  You are still under oath.  So

18   you're not done during this break.  You are obviously a party.

19   So if you need to talk to your lawyers, you can.  If you talk

20   to anybody else, again, be aware that is fair game for

21   questioning.  All right?

22          THE WITNESS:  Okay.

23          THE COURT:  All right.  Thank you.  You may step

24   down.

25       (Witness excused.)

422

1      THE COURT:  All right.  Assuming that counsel has at

2  least 10 minutes left of questioning, I'm assuming you will

3  want -- will be asking for another attempt at questioning?

4      MS. SCHWENDENER:  Just a couple.  I don't have any --

5  just a couple.

6      THE COURT:  All right.  All right.  So lets

7  guesstimate that hopefully we'll start the next witness, my

8  plan would be by 1:30 to start the next witness.  Let's try to

9  keep that in mind.  Obviously if somebody answers and opens the

10  door up to some other direction, the Court may have to make an

11  adjustment.  But that's the plan.

12      All right.  Anything outside of scheduling plaintiff

13  wants on the record right now?

14      MR. DAVIS:  No, Your Honor.

15      THE COURT:  Defense, anything?

16      MS. SCHWENDENER:  No, Your Honor.

17      THE COURT:  All right.  See you all after lunch.

18      MS. SCHWENDENER:  Thank you.

19      MR. DAVIS:  Thank you.

20      (Whereupon, said trial was recessed at 12:30 p.m., until

21       1:05 p.m.)

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   DR. DENEAN ADAMS,               )  No. 15 C 8144
                                     )
 4             Plaintiff,            )
                                     )
 5             vs.                   )
                                     )
 6   BOARD OF EDUCATION HARVEY SCHOOL )  October 31, 2018
     DISTRICT 152, GLORIA JOHNSON in her )  Chicago, Illinois
 7   individual capacity, BETTY JOHNSON )  1:19 P.M.
     in her individual capacity, DR. )
 8   KISHA McCASKILL in her individual )
     capacity, TYRONE ROGERS in his )
 9   individual capacity, LINDA HAWKINS )
     in her individual capacity, FELICIA )
10   JOHNSON in her individual capacity, )
                                     )
11             Defendants.           )  Trial

12                           VOLUME 3
                     TRANSCRIPT OF PROCEEDINGS
13      BEFORE THE HONORABLE SHARON JOHNSON COLEMAN, and a jury

14   APPEARANCES:

15   For the Plaintiff:      MR. JEROME M. DAVIS, ESQ.
                             9024 McIntosh Court
16                           Lakewood, Illinois   60014

17   For the Defendants:     HAUSER IZZO PETRARCA GLEASON & STILLMAN
                             1415 West 22nd Street
18                           Suite 200
                             Oak Brook, Illinois   60523
19                           BY:  MR. CHRISTOPHER L. PETRARCA

20
                        PAMELA S. WARREN, CSR, RPR
21                       Official Court Reporter
                        219 South Dearborn Street
22                              Room 2280
                        Chicago, Illinois   60604
23                           (312) 408-5100

24

25
```

424

```
1   APPEARANCES:   CONTINUED

2                          LAW OFFICES OF JENNIFER K. SCHWENDENER LLC
                           5117B Main Street
3                          Suite 4
                           Downers Grove, Illinois  60515
4                          BY:  MS. JENNIFER K. SCHWENDENER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (Proceedings had in open court.)

 2            THE COURT:  Anything on the record, plaintiff?

 3            MR. DAVIS:  No, your Honor.

 4            THE COURT:  Defense?

 5            MS. SCHWENDENER:  No, your Honor.

 6            THE COURT:  All right.  You know where you are?

 7   Everything is queued up?

 8            MR. DAVIS:  Yes, your Honor.

 9            THE COURT:  All right.  Everybody rise.

10        (Jury in.)

11            THE COURT:  Be seated, ladies and gentlemen.

12            All right.  Proceed, counsel.

13            MR. DAVIS:  Thank you, your Honor.

14            THE COURT:  On redirect.  Proceed.

15        (Witness sworn.)

16         JANET ROGERS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

17                      REDIRECT EXAMINATION

18   BY MR. DAVIS:

19   Q.  When we last left, Mrs. Rogers, I was expressing confusion

20   because you told your counsel that the contract was being

21   extended on the same terms.  There were no changes, right?

22   A.  Yes.

23   Q.  That's a yes, no question.

24   A.  Yes.

25   Q.  Thank you.
```

J. Rogers - redirect by Davis                          426

1              But then you also said you told Dr. Adams to get with
2    her lawyer and make the changes and sign the extension.  Didn't
3    you say that?
4    A.  Yes.
5    Q.  Okay.  So if we look at Exhibit 1 --
6              MR. DAVIS:  And I would like to publish, if I may,
7    your Honor.
8              THE COURT:  Yes, you may.
9              MR. DAVIS:  Thank you.
10   BY MR. DAVIS:
11   Q.  I'm going to -- this is the contract that was extended,
12   right?
13             Can you see Exhibit 1?
14             THE COURT:  Everything is up.  Hold on.
15             THE WITNESS:  Nothing is on here.
16             THE COURT:  Nothing is on.  Counsel, are you unplugged
17   or something?
18             MR. DAVIS:  Oh, I am, Judge.
19             THE COURT:  Oh.
20             MR. DAVIS:  Sorry about that.
21             THE COURT:  That's okay.  That will do it.
22             All right.  Let's see.  There we go.  It is working.
23             Here you go.
24             MR. DAVIS:  Okay.  Thank you.
25   BY MR. DAVIS:

1  Q.  So is this the contract that was extended, Mrs. Rogers?

2          If you need me to scroll, I will.

3  A.  Yeah, this is the contract.

4  Q.  Okay.  So as I scroll through here, before we left, you was

5  talking about something was scratched out and the date and --

6  is there anything scratched out on here?

7  A.  No.

8  Q.  Any date changes on here?

9  A.  No.

10 Q.  And is this contract signed at the bottom?

11 A.  Yes.

12 Q.  Is there -- let's go on to something else.

13         Counsel talked to you a lot about was there a finding

14 that the goals was met.  You all never made a finding.  Do you

15 remember that?

16 A.  Yes.

17 Q.  Did you make a finding in 2014 that Dr. Adams met the

18 goals?

19 A.  I don't recall.

20 Q.  Look at the contract, what I have got queued up here, where

21 it says further.  You read this earlier, right?

22 A.  Yes.

23 Q.  You testified earlier that this happened in June of 2014

24 that you all did this.  Do you remember that?

25 A.  That we did the contract?

J. Rogers - redirect by Davis

1   Q.  No, you did this review to make sure that the

2   superintendent was progressing on the goals.

3   A.  You would have to play that back.

4          THE COURT:  No, why don't you go ahead and rephrase

5   the question.

6          MR. DAVIS:  Okay.

7   BY MR. DAVIS:

8   Q.  Read this where it says further, Mrs. Rogers.

9   A.  Further the superintendent and the board shall consult no

10  later than October 1st, 2013, and June 1st of each contract

11  year thereafter in order to mutually determine whether such

12  goals should be amended or additional goals needed to be

13  included.

14         THE COURT:  Slow down a little bit when you're

15  reading.

16         THE WITNESS:  Okay.

17         THE COURT:  She has got to take it all down.

18         THE WITNESS:  Oh, okay.  I'm a fast reader.  I'll slow

19  it --

20         THE COURT:  All right.  Go ahead.

21  BY THE WITNESS:

22  A.  Any amendments or additions mutually agreed upon by the

23  parties shall be attached hereto and in cooperate as part of

24  this agreement.

25  BY MR. DAVIS:

1  Q.  And so earlier when you read this the first time, I asked

2  you did you all in June 2014 go through this process with

3  Dr. Adams.

4  A.  No.

5  Q.  But earlier you said you did.

6  A.  The goals setting in this contract?

7  Q.  I'm talking about this review process.  This isn't goals,

8  Dr. Adams, this -- I'm sorry, Mrs. Rogers -- this is saying

9  every year the district will meet on June 1st with the

10  superintendent, assess goals, and make sure they are making

11  progress towards the goals.  Isn't that what this says?

12  A.  That's what it says.

13          MS. SCHWENDENER:  Objection, your Honor.

14          THE COURT:  Objection sustained as to, isn't that what

15  it says.

16          You asked a question, she answered it, and then you go

17  on.  Plus it is adversarial questioning, but some of it is

18  argument that should be saved.

19          Proceed.  Next question.

20  BY MR. DAVIS:

21  Q.  So you are changing your answer from earlier that when you

22  said you all did this process in June of 2014, you're now

23  saying you didn't.

24  A.  Can you repeat the question from earlier?  Repeat it or she

25  can play it back so I can hear what he's talking about.

1          THE COURT:  If you don't remember from earlier, we're

2     not going to go back to it, so --

3          THE WITNESS:  I don't recall.

4          THE COURT:  All right.  So it is what it is.  Proceed.

5          MR. DAVIS:  I don't want to go back either, Judge.

6          THE COURT:  We have a different court reporter here so

7     we're not going back.

8          THE WITNESS:  Okay.

9          THE COURT:  All right.

10    BY MR. DAVIS:

11    Q.  The bottom line is this, Mrs. Rogers, you all tried to

12    follow the terms of this contract, right?  You wanted to follow

13    the terms and do what the contract said, right?

14    A.  I wanted to follow terms of all contracts.

15    Q.  The board, yes.

16          Okay.  Is there any writing anywhere, prior to July

17    of 2015, or prior -- let's even say up until now, is there any

18    writing anywhere where the board made a finding that a

19    superintendent was meeting goals?  A finding, a written

20    finding, saying superintendent met goals, that's part of the

21    review process.

22          Let's take it in two parts.  Is there anything in

23    Dr. Adams's tenure before July 10th, 2015, where you all made

24    such a finding?

25    A.  No, not to my knowledge.

J. Rogers - redirect by Davis                    431

1   Q.  Is there any written document that said that that was what

2   you all had to do, other than this contract saying that you had

3   to make a finding about goals before you could do an extension?

4   A.  Not in this contract.

5   Q.  Is there --

6   A.  There wasn't --

7   Q.  I said anywhere in the universe.

8   A.  I don't know where it is in the universe.  I couldn't

9   answer that question.

10  Q.  Well, let's say District 152.  Is there any policy,

11  anything in 152 in writing that said, during Dr. Adams's tenure

12  she met goals -- you already answered that question.

13          The question is did you all have a written policy

14  somewhere that said you must make a statement -- a writing -- a

15  written statement stating whether or not the superintendent met

16  goals before you could do a contract extension?

17  A.  I don't think we have a policy.

18  Q.  Okay.  Thank you.

19          THE COURT:  All right.  Counsel, five more minutes.

20  This is redirect.

21          MR. DAVIS:  Okay.  Five more minutes, Judge.  I'll

22  make it shorter than that.

23          THE COURT:  Uh-huh.

24  BY MR. DAVIS:

25  Q.  You said Dr. Adams never accepted the contract extension,

1    right?

2    A.  Yes.

3    Q.  And you said Dr. Adams never even worked under the

4    contract, right?

5           Counsel asked you, did Dr. Adams ever work under the

6    existing contract, and you said no.

7    A.  Can you explain work under, what work under means.

8    Q.  Well, was she employed in 152 in 2015?

9    A.  Yes.

10   Q.  After July 2015?

11   A.  Yes.

12   Q.  August 2015, September, all of that she was still employed,

13   right?

14   A.  Yes.

15   Q.  And she was still employed under this contract.

16   A.  Yes.

17   Q.  So she was working under this contract.

18   A.  Yes.

19   Q.  Thank you.

20          You said you don't know when the police report was

21   made.  Isn't it true that your husband got a call from -- do

22   you know who Dreina Lewis is?

23   A.  Yes, I do.

24   Q.  Isn't it true that Dreina Lewis called your husband on July

25   9th and told him that a police report was being made by

J. Rogers - redirect by Davis    433

1   Dr. Adams saying that he threatened her?

2   A.  No, that's not true.

3   Q.  So if your husband testified to that under oath earlier,

4   you are saying that's not true?

5   A.  July 10th?

6   Q.  Well, we'll talk to him about the date.

7   A.  That's fine.

8   Q.  Okay.  But let me bring it home to you.  Did he tell you

9   after Dreina told him or the husband to a wife, hey, somebody

10  is filing a police report on me?

11  A.  No, he didn't tell me that.

12  Q.  Okay.  So your testimony is Dreina told him somebody said

13  Dr. Adams filed a report, a police report, complaint, but he

14  didn't tell you?

15  A.  It wasn't said like that.

16  Q.  Well, did he ever tell you that the report was being filed?

17  A.  No, he didn't tell me.

18  Q.  Okay.

19          MR. DAVIS:  I think that's -- one last thing.

20  BY MR. DAVIS:

21  Q.  You said that the information you received from the unknown

22  lawyer, that the unknown seminar in November -- you said you

23  went to a seminar in November 2014 and they told you about

24  contract extensions, right?

25  A.  I went to a seminar with the Illinois Association of School

1   Boards.

2   Q.  Okay.  And that's when they talked about contract

3   extensions, right?

4   A.  They talked about a lot of things, but contracts.

5   Q.  Your lawyer asked you specifically if when you told your

6   fellow board members in February 2015 that you had checked with

7   the lawyer and the lawyer told you it was okay to give an

8   extension for one to five years, were you referring to

9   this -- the seminar in November, and you said no.

10           Is that what you said?

11  A.  I was -- I said I didn't give her name specifically.  I

12  gave a scenario of a contract extension.

13           MR. DAVIS:  This is the last thing I'm going to do,

14  Judge.  This is Exhibit 71.  We played this earlier.

15           THE COURT:  If you played it earlier, there is no need

16  to play it again.

17           MR. DAVIS:  Okay.

18  BY MR. DAVIS:

19  Q.  Well, I'll just simply ask, when we testified -- when we

20  played the tape earlier, and you told the board members that

21  you checked with the lawyer and it was okay to do an extension

22  with one to five years, did you tell them that this was from a

23  seminar?

24  A.  I was talking to someone specific board member.  Yes.

25  Q.  So are you saying that?

1  A.  No, I didn't tell them that.  I told you here at the

2  courts.

3          MR. DAVIS:  I pass the witness.

4          THE WITNESS:  Thank you.

5          THE COURT:  All right.  Recross examination.

6          MS. SCHWENDENER:  Thanks, your Honor.  Briefly.

7          THE COURT:  All right.

8                      RECROSS EXAMINATION

9  BY MS. SCHWENDENER:

10  Q.  Mrs. Rogers, counsel asked you earlier about if you had a

11  conversation with Dr. Adams about, after the one-year contract

12  extension was offered, getting together with the attorneys to

13  sign it.

14          Do you remember that?

15  A.  Yes.

16  Q.  Okay.  And counsel also played a portion of the tape, the

17  tape from the February 23rd, 2015, board meeting.

18          Do you remember that?

19  A.  Yes.

20  Q.  Okay.  And did you have that conversation with Dr. Adams at

21  a board meeting or did that happen at some other time or place?

22  A.  Not at the board meeting.  The superintendent and the board

23  president talk constantly.  We have constant talks about

24  different things, and those were some of the things that we had

25  discussed in a conversation either at her office or on her cell

1    phone back and forth with her and I.

2    Q.  And you're familiar with the superintendent contract I

3    believe you stated earlier, correct?

4    A.  Yes, I am.

5    Q.  And are you familiar with any portion of the contract that

6    requires amendments to be in writing?

7    A.  Yes.

8    Q.  Okay.  And --

9            MR. DAVIS:  Objection, Judge.

10           THE COURT:  It is out there already.  The objection is

11   overruled.

12           Proceed.

13   BY MS. SCHWENDENER:

14   Q.  And counsel was also asking you questions about extending

15   or goal findings pursuant to the contract.

16           Do you remember that just a few minutes ago?

17   A.  Yes.

18   Q.  Okay.  Did the contract require any -- during the three-

19   year term, did the contract require the board to make any

20   finding during that time when -- during that three-year time

21   frame about making a finding whether the superintendent had met

22   goals or indicators or was that only in the event that the

23   contract was extended?

24   A.  It is only in the event that the contract was extended, so

25   we didn't.

```
 1   Q.  Thank you.

 2          MS. SCHWENDENER:  Nothing further.

 3          THE COURT:  Ma'am, you may step down.  Thank you.

 4          THE WITNESS:  Thank you.

 5          THE COURT:  As a party you are welcome to stay,

 6   obviously.  If you have something to do, that's between you and

 7   your counsel.

 8          All right, next witness.

 9          MR. DAVIS:  We're going to now call Dr. Sophia Jones-

10   Redmond.

11          THE COURT:  All right.

12          MR. DAVIS:  Who is in the witness room, Judge.

13          THE COURT:  You can go get her.

14          MR. DAVIS:  Thank you.

15      (Brief interruption.)

16      (Witness sworn.)

17          THE COURT:  You were not in court yesterday, were you?

18          THE WITNESS:  No, ma'am.

19          THE COURT:  All right.  Have a seat, please.

20          THE WITNESS:  Okay.

21          THE COURT:  You can serve yourself water whenever you

22   want.

23          And, counsel, are you ready?

24          MR. DAVIS:  I am ready, Judge, yes.

25          THE COURT:  All right.
```

1        Go ahead.

2        SOPHIA JONES-REMOND, PLAINTIFF'S WITNESS, DULY SWORN

3                        DIRECT EXAMINATION

4    BY MR. DAVIS:

5    Q.  Good afternoon.

6            THE COURT:  One second.  I'm sorry.

7            Keep your voice up.  Give me time to rule on an

8    objection, if there is one.  And just so if you don't know

9    something and just say I don't know, and that will help things

10   move a lot faster.

11           THE WITNESS:  Okay.

12           THE COURT:  All right.  Thank you.

13   BY MR. DAVIS:

14   Q.  Good afternoon, Dr. Sophia Jones-Redmond.  How are you?

15   A.  I'm well, thank you.

16   Q.  Thank you.  We met briefly a little while ago for the first

17   time.  Can you introduce yourself to the jury?  Tell us who you

18   are and where you are currently employed.

19   A.  Absolutely.  Good afternoon, everyone.  I am Dr. Sophia

20   Jones-Redmond.  I currently serve as superintendent of schools

21   for the Illinois Department of Juvenile Justice, which is

22   School District 428.  I have been there going on three years,

23   and I have been the superintendent for a year and a half.

24   Q.  Thank you.  And were you employed at 152, Harvey District

25   152, previously?

Jones-Redmond - direct by Davis

1   A.  Yes, I was.

2   Q.  When were you employed there?

3   A.  My employment, I began my tenure as a principal, I believe

4   in 2011.  I believe so.  I served there for one year as a

5   building level principal at Sandburg Elementary School.  And

6   after my first year, I moved to the central office and served

7   as the director of special services.

8   Q.  Okay.

9   A.  Until 2015, I believe.

10  Q.  Were you there in 2015, spring, early winter, January of

11  2015?

12  A.  Yes.  Yes, I was.

13  Q.  And were you -- was Dr. Adams there at that time?

14  A.  Yes.

15  Q.  She was the superintendent?

16  A.  Yes.

17  Q.  And you all -- you and Dr. Nohelty were her cabinet, her

18  administrative staff, correct?

19  A.  Correct.

20  Q.  So are you familiar with the ECHO cooperative?

21  A.  Yes, I am.

22  Q.  Okay.  And are you familiar that in 2015 -- I won't even

23  specify the time -- there was an issue concerning an

24  underbilling payment that the District 152 owed to ECHO?

25  A.  Yes, I am keenly aware of that.

Jones-Redmond - direct by Davis

1   Q.  Okay.  Tell us about that briefly, what the situation was.

2   A.  As the director of special services, I received bills from

3   ECHO.  It was -- I was the point of contact.  It wasn't

4   uncommon to receive a bill on a monthly basis.  And these were

5   for services for our students who were outsourced and outplaced

6   at ECHO because of the severity of their disability.  We were

7   not able to provide the free and appropriate educational plans

8   for several students of which that's why ECHO was developed,

9   and that's the services that we received from them.

10          So we received the ECHO bill on a monthly basis.

11  Sometimes it has been quarterly.  It has varied.  And we -- I

12  received a bill in late June regarding what I thought was

13  actually a credit, and it turned out to be that we were

14  under -- they were underpaid by the school district, and they

15  were seeking to rectify that bill.

16  Q.  So that was June of 2015.

17  A.  Correct.

18  Q.  And you received this bill late June 2015.

19  A.  Yes.

20  Q.  And how much was the amount that they said you owed them?

21  A.  It was over $170,000.

22  Q.  Okay.  And so when you got this bill, you just said in the

23  beginning you didn't even know it was a bill.  Explain that.

24  A.  Well, first of all, we -- I wasn't expecting it because it

25  was out of the -- the cycle of receiving payments.  We would

1    get payments by typically a certain date.  I can't remember.

2    It may have been by the 10th of the month, so that that would

3    allow us to provide the bill to the superintendent and then to

4    the board.

5           So this was a bill that, you know, I wasn't

6    expecting, so that was a surprise to receive correspondence

7    from ECHO at that -- at that time.

8    Q.  Okay.  And what did you do once you got the bill?

9    A.  My first reaction, you know, was to question my secretary

10   because she -- part of her responsibility was to provide the

11   reconciliation of the bill before I submitted it to the

12   superintendent.

13          So my first response was, hey, Christy, what is this?

14   Because she gave it to me.  And I said, well, what is this?

15   And she said, well, I don't know.

16          MS. SCHWENDENER:  Objection.

17          THE COURT:  Basis?

18          MS. SCHWENDENER:  Hearsay.

19          THE COURT:  Sustained.

20          All right.  So do not continue on with the substance

21   of the testimony between the witness and her secretary unless

22   you're calling the secretary.

23          MR. DAVIS:  I understand, Judge.

24          THE COURT:  All right.

25   BY MR. DAVIS:

Jones-Redmond - direct by Davis

1  Q.  Once you got the bill you talked -- at some point you

2  talked to Dr. Adams about the bill, right?

3  A.  Correct.

4  Q.  What did she say to you?

5  A.  I provided her with the bill, and I said to her, I don't

6  know where this came from, and I just received this.  And my

7  recollection was, you know -- you know, I can't remember

8  exactly what Dr. Adams said regarding the bill, but it was in

9  the sense that we need to look into this.

10  Q.  So she wanted you to validate the information.

11  A.  Not only did she want me to validate it, I wanted to

12  validate it because, again, it was something that was

13  unexpected.  I had no idea.  And, you know, that's a

14  substantial amount of money, and so I didn't take it lightly.

15  Q.  Exactly.  So you were in the June 2014-15 academic fiscal

16  year, right?  That fiscal year would end on June 30th.

17  A.  Correct.

18  Q.  You got this bill a week -- last week of June.  Was there

19  any way practically possible that you were going to be able to

20  pay that bill out of the 2014 fiscal year funds?

21  A.  Absolutely not.  As well as there was no, from my

22  recollection, indication on the correspondence of the timeline

23  when it was due.  That was also a question, you know, when is

24  this -- when we realized it wasn't a credit, that it was a

25  bill, well, when is this due because -- and how -- what are

1    they expecting us to pay this out of.  So it was -- it

2    generated a lot of questions.

3              But to your question, no.

4    Q.  So ultimately Dr. Adams asked you to investigate.  Did you

5    do that and what happened?

6    A.  Absolutely.  I, of course, first investigated internally in

7    my office in case, you know, that did we not receive some

8    correspondence, did we overlook it.  So it really needed to

9    start with the office of special services, so that's where it

10   started.

11             The next conversation was with also -- also with

12   ECHO.  You know, I attended monthly director meetings, and

13   rarely ever missed any.  I don't believe I missed any.  And I

14   did not recall this coming up and us being told that this was

15   going to be coming down the pike.

16             So I called the director, the executive director of

17   ECHO, you know, we had a collegial relationship with, and

18   asked, what is this?

19   Q.  So did you ultimately conclude that the bill was okay to be

20   paid, that it was legitimate?

21   A.  Months later.

22   Q.  Okay.  And then you informed Dr. Adams of that, correct?

23   A.  I did.  I was -- after investigating and having a series of

24   meetings with Dr. Adams and ECHO, and with ECHO and myself, I

25   -- after, you know, months, I said that this was an appropriate

1    payment of which, you know, I wanted to feel that it was

2    appropriate for my own self.

3    Q.   And Dr. Adams said to you -- in your conversation with

4    Dr. Adams, she wanted to validate, without saying specifically

5    what she said, she wanted to make sure the information was

6    valid before she communicated to the board, is that correct?

7    A.   That as my understanding, absolutely.

8            MS. SCHWENDENER:  Objection.

9            THE COURT:  I'm sorry.  One second.

10           Basis?

11           MS. SCHWENDENER:  Speculation.

12           THE COURT:  As to what she wanted understood.

13   Objection sustained.  That is a speculative answer from this

14   witness.

15           The jury will disregard the last answer.

16           Put another question, counsel.

17   BY MR. DAVIS:

18   Q.   Did you talk to Dr. Adams about the bill?

19   A.   Yes.

20   Q.   And did she express to you that before she communicated to

21   the board she wanted to make sure the numbers were right?

22   A.   Yes.

23   Q.   Thank you.

24           One final question, Dr. Jones-Redmond, were you there

25   when Mayor Eric Kellogg was simultaneously the mayor and

1    superintendent --

2    A.  Yes, I was.

3    Q.  -- of 152?

4    A.  Yes.

5    Q.  152.

6           Isn't it true that for six months he didn't go to

7    ECHO meetings?

8    A.  I don't know the number of months, but I know that there

9    were times that he did not attend the meetings.  And

10   consequently I was asked to attend.

11   Q.  During that time there was a strike, and students were

12   showing up to ECHO and it was closed down, right?

13   A.  That's my understanding.

14   Q.  Okay.  Thank you.

15   A.  All right.

16           MR. DAVIS:  No further questions.

17           THE COURT:  Thank you.

18           Your witness.

19           MS. SCHWENDENER:  No questions, your Honor.

20           THE COURT:  No questions.

21           You are done.

22           THE WITNESS:  Thank you.

23           THE COURT:  You're the favorite witness so far.

24           THE WITNESS:  That's a good thing, I hope.

25        (Laughter.)

```
1            THE COURT:  All right.  Take your time stepping down.
2        (Witness excused.)
3            THE COURT:  Next witness.
4            MR. DAVIS:  Dr. Eric Nohelty.
5            MR. PETRARCA:  Kevin Nohelty.
6            MR. DAVIS:  I'm sorry, Kevin Nohelty, not Eric.  I'll
7    be right back.
8            THE COURT:  No problem.
9        (Brief interruption.)
10           MR. DAVIS:  He's coming in, your Honor.
11           THE COURT:  All right.  No problem.
12           Step forward, sir.
13       (Witness sworn.)
14           THE COURT:  Have a seat.  You can move that mic if it
15   gets in your way.
16           The water is there for you to serve yourself.
17           Wait until each question is fully asked before you
18   answer.
19           THE WITNESS:  Okay.
20           THE COURT:  Proceed.
21           KEVIN NOHELTY, PLAINTIFF'S WITNESS, DULY SWORN
22                       DIRECT EXAMINATION
23   BY MR. DAVIS:
24   Q.  Thank you, Dr. Nohelty.  Thank you for appearing here
25   today.
```

1          Are you currently employed?

2   A.  Yes, sir, I am.

3   Q.  And where are you employed?

4   A.  Superintendent of schools in Dalton West, School District

5   148.

6   Q.  And were you previously employed in Harvey District 152?

7   A.  Yes.

8   Q.  What was the position you held and how -- what was it --

9   the time frame you were there?

10  A.  I was employed as the assistant superintendent of business

11  and human relations from 2012 to 2016.

12  Q.  During the time that you were employed there in 2015, did

13  you work under Dr. Denean Adams?

14  A.  Yes, sir.

15  Q.  And isn't it true that in late December of 2015,

16  November-December time frame, the district experienced a budget

17  deficit for the 2015 -- well, it would have been the 2014-15

18  academic year, is that correct?

19  A.  The district experienced a deficit several years.

20  Q.  Okay.  I'm asking specifically in 2015.  Now let me make

21  the question more focused.  Was there a $3.8 million deficit?

22  A.  I don't recall that amount.

23  Q.  Okay.  So do you recall Dr. Adams talking to you and asking

24  you -- well, let me ask you this.  Do you recall withdrawing

25  funds from the district's reserve account to cover bill

1    payments?

2            MS. SCHWENDENER:  Objection.

3    BY THE WITNESS:

4    A.  Absolutely not.

5            THE COURT:  All right.  Basis?

6            MS. SCHWENDENER:  Relevance.

7            THE COURT:  Well, he said he doesn't recall, so

8    objection is overruled.

9    BY MR. DAVIS:

10   Q.  So your testimony here is that you don't recall ever

11   withdrawing any money from the reserve fund for the district?

12   A.  That's correct.

13   Q.  Do you recall ever being suspended with pay by Dr. Adams in

14   2015, December specifically, 2015?

15   A.  I believe I was suspended, yes.

16   Q.  You believe you were or you were suspended?

17   A.  I believe I was suspended.

18   Q.  Okay.  Are you pretty sure you were suspended?

19   A.  Yes.

20   Q.  Okay.  And do you know why you were suspended?

21   A.  No, I don't.

22   Q.  So you never received a written notice from Dr. Adams

23   saying why you were suspended?

24   A.  I don't recall specifically receiving any documentation.

25   Q.  Do you recall having a conversation with Dr. Adams about

1  it?

2  A.  No, I don't.

3  Q.  And do you recall talking to any board members about a

4  deficit in the district's finances during that time period?

5  A.  You need to be more specific as far as what time period.

6  Q.  2015, November-December 2015.

7  A.  Yeah, I don't recall specific conversations.

8  Q.  Okay.  Well, let me ask you this while I'm -- do you recall

9  the ECHO situation?

10  A.  You need to be more specific.

11  Q.  Do you recall the $175,000 payment, bill that was owed to

12  ECHO?

13  A.  For what reason?

14  Q.  Because of services that the district owed to ECHO for

15  sending students to ECHO cooperative.  Do you recall that in

16  2015 they gave a bill?

17  A.  What I do recall is the district had received a bill for

18  being undercharged --

19  Q.  Uh-huh.

20  A.  -- for students over a time period that I don't recall

21  specifically what that time period was.

22  Q.  Uh-huh.

23          And do you recall Dr. Adams at one point in 2015

24  asking you to contact ECHO to arrange a deferred payment plan

25  to pay that underbilling amount?

1    A.  Dr. Adams spoke to me specifically about this shortfall

2    after I had brought it to her attention.

3    Q.  So is that a yes to my question that you --

4    A.  I believe I answered --

5    Q.   -- recall her --

6              THE COURT:  Wait, wait, wait.  One at a time.

7              Counsel, let him finish.

8              MR. DAVIS:  Let me show the witness something, Judge.

9              THE COURT:  All right.  Do you take back the beginning

10   of that question?

11             MR. DAVIS:  Yes.

12             THE COURT:  All right.

13             MR. DAVIS:  Let me show the witness Exhibit 25.

14             THE COURT:  Any objection?

15             MS. SCHWENDENER:  No objection.

16   BY MR. DAVIS:

17   Q.  Can you see Exhibit 25, Dr. Nohelty?

18   A.  Yes.

19   Q.  Do you recall receiving this email in October 2015?

20   A.  I do not.

21   Q.  Okay.  So you have no recollection that Dr. -- well, read

22   what it says.

23   A.  It says, good morning, Dr. Nohelty.  As a follow up to the

24   executive session discussion at Monday night's meeting, please

25   prepare a one-page request to ECHO board requesting the

1   extension for the repayment process as discussed.  The request

2   should be submitted to me no later that Tuesday, October

3   28.  Your prompt attention to this request is

4   appreciated.  Thank you.

5   Q.  So does this -- do you recall receiving this?

6   A.  No, I don't.

7   Q.  Okay.  Do you recall working with ECHO to work out a

8   payment plan in this time frame?

9   A.  I do recall working with ECHO, specifically after I talked

10  to the auditor who conducted an independent audit regarding the

11  tuition --

12  Q.  I'm sorry.  Let me -- I have to interrupt.

13          MR. DAVIS:  And, Judge, could you instruct the witness

14  that would I like a short, non-narrative answer.  I understand

15  he's being called on direct, but I am still asking that the

16  witness tighten up his responses to be non-narrative.

17          THE COURT:  I can ask that.  Again, this is your

18  witness, correct?

19          MR. DAVIS:  I understand that, Judge.

20          THE COURT:  All right.  Well, you can tell him on

21  this.

22          MR. DAVIS:  Okay.

23          THE COURT:  Just ask him for shorter answers.  And ask

24  -- interrupt him yourself and ask questions.

25  BY MR. DAVIS:

1   Q.  Okay.  So if it is a yes, no, question, Dr. Nohelty, please

2   give me a yes, no answer.  Okay?

3   A.  I'll do my best.

4   Q.  Okay.  Good.

5           So the question is did you contact ECHO to work out a

6   payment plan pursuant to paying back the underbilling amount in

7   2015?

8   A.  I did contact ECHO regarding a payment plan.

9   Q.  Thank you.  And did you ultimately work out a payment plan?

10  Did they accept the payment plan?

11  A.  That payment plan was honored by the executive board at

12  ECHO.

13  Q.  Thank you.

14  A.  As far as the timing of that --

15  Q.  That's --

16  A.  It is not --

17          THE COURT:  There is no question pending yet.

18          MR. DAVIS:  Right.

19          THE COURT:  All right.

20  BY MR. DAVIS:

21  Q.  And so under that payment plan, it was a payment plan over

22  a three-year period to pay roughly 50 some thousand a year,

23  correct?

24  A.  I recall it was over a three fiscal year period.

25  Q.  Thank you.

1          So earlier we talked about the withdrawing of money

2     from the reserve account.  And you indicated that you did not

3     recall ever appearing at a board meeting.

4          MR. DAVIS:  This is one of those situations, Judge,

5     where I have a board audiotape where Dr. Nohelty is talking

6     about this matter.  And I understand that Dr. Nohelty is here

7     as a direct witness, but I would like to play this tape to

8     impeach him.  And under the rules --

9          THE COURT:  All right.  Counsel, step to the side.

10         MR. DAVIS:  Okay.

11     (Sidebar proceedings had in open court:)

12         THE COURT:  Keep your voices down.

13         Why would you not think that this was something I

14    should know about?

15         MR. DAVIS:  I didn't know he was going to be hostile,

16    Judge.  I talked to his lawyer for two weeks now, and I thought

17    he was -- everything was good to go, but --

18         THE COURT:  Well, obviously you didn't do your

19    homework.  He came in here hostile.

20         MR. DAVIS:  Well, I --

21         THE COURT:  But the point is, counsel, you don't

22    impeach your own witness.

23         MR. DAVIS:  There is nothing in the rules, Judge, that

24    says you can't impeach your own witness.  In fact the rules

25    permit that.

1       THE COURT:  Actually you have to be very careful about

2  that because they don't want people setting it up so they get

3  to impeach their own witness.

4       MR. DAVIS:  Well, of course.  I am not engaged in

5  subterfuge here, Judge.

6       THE COURT:  Well, I am not saying you are engaged in

7  subterfuge --

8       MR. DAVIS:  Okay.

9       THE COURT:  -- I'm saying, you said the rules provide

10  it.  It is not a blanket rule.

11       MR. DAVIS:  Sure.

12       THE COURT:  It is something that the Court has to

13  think about to determine whether or not that's appropriate, and

14  we should not be saying the word impeachment in --

15       MR. DAVIS:  I'm sorry.

16       THE COURT:  They don't know what that is.  That's not

17  something we speak about.  Next time you can ask for a sidebar.

18       MR. DAVIS:  Well, we can do -- can I suggest we can

19  either pass him and I could refresh him with -- outside the

20  presence of the jury or I can play the tape.

21       THE COURT:  Is there any objection?

22       MS. SCHWENDENER:  I --

23       THE COURT:  Why would you be -- I guess if he is

24  impeaching his own witness, what do you care?

25       MS. SCHWENDENER:  We don't, Judge.

1    MR. PETRARCA:  Give him some more rope.

2    MR. DAVIS:  Right.

3    (Jury in.)

4    THE COURT:  You have this all queued up, is that

5    correct?

6    MR. DAVIS:  I will momentarily, Judge.

7    THE COURT:  All right.  Get it taken care of.

8    BY MR. DAVIS:

9    Q.  So this is exhibit -- Plaintiff's Exhibit 69.  And this is

10   from volume VN810203, and this is the 12-21-15 board meeting.

11   THE COURT:  Is there a question pending to put this in

12   context of why you're doing this?

13   MR. DAVIS:  The question, Judge, is I asked

14   Dr. Nohelty does he recall appearing at a board -- well, I

15   asked him generally does he recall a $3.8 million budget

16   deficit.  He said he didn't recall that.

17   I asked him did he recall appearing at a board meeting

18   where the topic was that the fact that the budget for the

19   district wasn't in balance and that he had drawn money out of

20   the reserves --

21   THE COURT:  All right.

22   MR. DAVIS:  -- and he didn't recall that.

23   THE COURT:  All right.  I can't have you both --

24   MR. DAVIS:  Okay.

25   THE COURT:  -- testifying.

1      So you're doing it to refresh his recollection in a

2  way, but also ask him about his difference in memory, is that

3  correct?

4          MR. DAVIS:  Yes.

5          THE COURT:  In general?

6          All right.  The Court will allow it.

7          MR. DAVIS:  And I said Exhibit 69, it is actually

8  Exhibit 70, VN810203, 12-21-2015 board meeting.

9      (Audiotape played.)

10  BY MR. DAVIS:

11  Q.  Does that refresh you --

12          THE COURT:  Counsel, you can't just start talking

13  during the tape.

14          MR. DAVIS:  I was stopping the tape, Judge.

15          THE COURT:  So now we have gotten to the point you

16  want to stop it?

17          MR. DAVIS:  Yes.

18          THE COURT:  Ask your question.

19  BY MR. DAVIS:

20  Q.  Does that refresh you that there was an issue before the

21  board where they thought they had a balanced budget, and then

22  they found out in December 2015 that the budget wasn't

23  balanced?

24          Does that refresh you?

25          First of all, let me ask you this, do you recognize

1   the person who was speaking as Dr. Kisha McCaskill?

2   A.  I do.

3   Q.  Okay.  And does this refresh you now that she raised the

4   concern because there is -- she -- well, you heard the tape.

5          Does this refresh you?

6   A.  Slightly.

7   Q.  Okay.  So now are you clear that there was a $3.8 million

8   deficit?

9   A.  No, I'm not clear.

10  Q.  Oh, are you not clear on the amount or you're not clear

11  that there was a deficit, period?

12  A.  So I'm not clear on the amount.  I do recall the

13  conversation about balanced budgets versus audited figures.

14  Q.  Okay.  Let me stop.

15  A.  So let's be clear about that.

16  Q.  Okay.  So now we're getting some clarity.

17  A.  Uh-huh.

18  Q.  So do you further --

19          MR. DAVIS:  May I, Judge?

20  BY MR. DAVIS:

21  Q.  Do you further recall that Dr. Adams disciplined you

22  because she said you took money out of the -- you -- the

23  district -- let me take it this way.

24          THE COURT:  Counsel, I'm going to be telling you be

25  careful on leading, again.

1      MR. DAVIS:  Okay.  I'm not going to lead, Judge.

2      THE COURT:  But you continue lead even if he seems

3  difficult with you.  Or you can ask a specific question, and

4  then the Court will grant you that right.  So it is one or the

5  other.

6  BY MR. DAVIS:

7  Q.  If I play something to refresh you on the amount of the

8  deficit, would that help you?

9  A.  Feel free to play is it.

10  Q.  I beg your pardon?

11  A.  Feel free to play it.

12      THE COURT:  If you wish to impeach him, impeach him.

13      MR. DAVIS:  Okay.  Thank you, Judge.

14  BY MR. DAVIS:

15  Q.  This is Plaintiff's Exhibit 7, VN810201.

16      MS. SCHWENDENER:  Objection, your Honor.

17      THE COURT:  Basis?

18      MS. SCHWENDENER:  Improper impeachment.

19      THE COURT:  Give me one more second, ladies and

20  gentlemen, please.

21      Counsel, step over.

22    (Sidebar proceedings had in open court:)

23      THE COURT:  You do need to create a more certain

24  question before you go to impeach him.  When we go back, I'm

25  going to make this guy a hostile witness.  He clearly has an

Case: 1:15-cv-08144 Document #: 182 Filed: 12/17/18 Page 130 of 158 PageID #:3490
459
Nohelty - direct by Davis

1    attitude about the whole, I guess, proceedings.

2         But you have to -- you can't just give a sort of a

3    general sort of vague or question, you have to give him a

4    specific question if you are going to impeach him.

5         MR. DAVIS:  Thank you, Judge.

6         THE COURT:  So lay it, let him say what he's going to

7    say.  If he says something similar to, I don't care, go ahead

8    and play it, then that deserves to be impeached, I'm sorry.

9         But other than that, so I'm going to label him a

10   hostile witness, and let's do a cross.

11        MR. DAVIS:  All right, Judge.

12      (Jury in.)

13        THE COURT:  All right.  As you're stepping back,

14   counsel, it is this Court's position that based on what I have

15   heard thus far, I believe the Court will label the witness an

16   adversarial witness, even though he's being called by the

17   plaintiff.  And the Court will allow you to question him in

18   that manner.

19        Proceed.

20        MR. DAVIS:  Thank you, your Honor.

21   BY MR. DAVIS:

22   Q.  Isn't it true, Dr. Nohelty, that there was a $3.8 million

23   budget deficit in December 2015 in Harvey School District 152?

24   A.  So as I indicated earlier, I do recall that there was

25   deficits during my tenure.  And, again, we need to be very

 1   clear about budgets versus audited figures.

 2           THE COURT:  Okay.  Sir, you're going to have to answer

 3   the question even though you have a lot more you have to

 4   say.  Perhaps the other side, even though they haven't called

 5   you, may wish to have that answer clarified.

 6           THE WITNESS:  Okay.

 7           THE COURT:  But in my courtroom you are restricted to

 8   answering the questions that are put to you.  All right?

 9           Proceed.

10   BY MR. DAVIS:

11   Q.  Didn't you withdraw $3.8 million without notifying the

12   board, $3.8 million from the district's reserves in 2015?

13   A.  Counselor, I don't have that power or ability to do that.

14           THE COURT:  Yes or no answer.

15   BY MR. DAVIS:

16   Q.  Yes or no question.

17   A.  No.

18           MR. DAVIS:  Okay.  I'm playing first Exhibit 70,

19   810201 to establish the amount that we're talking about of the

20   deficit.  This is from the 2015, December 2015 meeting.

21           MS. SCHWENDENER:  Objection, your Honor.

22           THE COURT:  All right.  As to the conversation he made

23   about why he's playing it, the objection is sustained.  To

24   that, meaning he can't say what establishes what.

25           And is there another objection, counsel?

1          MS. SCHWENDENER:  Improper impeachment.

2          THE COURT:  And I have to actually hear this one.  He

3     asked the question.  I don't know what the answer is going to

4     be.

5          MR. DAVIS:  Well, we keep going around, Judge.  I

6     don't want to be argumentative about was it a deficit, how much

7     was the deficit.  This will clarify for the jury.

8          THE COURT:  Well, we'll see if it clarifies.  That's

9     why you're presenting it.  Once I hear it, I will decide

10    whether the jury can continue to consider it or whether I

11    strike it from the record.

12         All right.

13         MR. DAVIS:  Thank you, your Honor.

14       (Audiotape played.)

15         MR. DAVIS:  May I continue, Judge?

16         THE COURT:  Yes, with a question.

17         MR. DAVIS:  Yes.  Thank you.

18    BY MR. DAVIS:

19    Q.  So, Dr. Nohelty, was that Dr. Adams talking there?

20    A.  I heard Dr. Adams, I heard Linda Hawkins.  I heard

21    Dr. McCaskill.

22    Q.  Did you hear Chris Petrarca too?

23    A.  I don't think so.

24    Q.  Oh, okay.

25    A.  Should I have?

1    Q.  So, Dr. Nohelty, I'm going to ask again, isn't -- well, you

2    already answered that you were suspended with pay in December

3    of 2015, correct, by Dr. Adams?

4    A.  That is correct.

5    Q.  And isn't it true that -- how long did your suspension

6    last?

7    A.  I don't even know.

8    Q.  Okay.  Isn't it true that the board reversed her suspension

9    almost immediately and brought you back?

10   A.  Specifically because the levy had to be filed --

11   Q.  I didn't ask that.  I'm asking a yes or no question.

12           THE COURT:  First, sir -- again, address it to me,

13   counsel.

14           First, sir, first we need the yes or no before any

15   additional information was given.

16           THE WITNESS:  Repeat the question, please.

17           THE COURT:  All right.  We'll have my court reporter

18   repeat the question.

19       (Record read.)

20           THE COURT:  Can you answer the question?

21   BY THE WITNESS:

22   A.  I'm not sure about immediately, but they did reverse it.

23   BY MR. DAVIS:

24   Q.  And did you receive any performance directives from the

25   board about the deficit?

1  A.  I can't recall.

2  Q.  Did you receive any disciplinary action, other than the

3  suspension from Dr. Adams, regarding this issue?

4  A.  I work for the superintendent.  I don't work --

5          MR. DAVIS:  Again, Judge, I'm --

6  BY THE WITNESS:

7  A.  I don't recall anything from the superintendent, no.

8          THE COURT:  We'll leave it at that.

9          Proceed.

10 BY MR. DAVIS:

11 Q.  Did the board of Harvey School District 152 take any

12 disciplinary action because of the budget deficit in December

13 2015?

14 A.  That is not the chain of command.

15         MR. DAVIS:  Again, Judge, I'm asking a yes, no,

16 question.

17         THE COURT:  All right.  Sir, can you answer that

18 question yes or no?

19         THE WITNESS:  No.

20         THE COURT:  The answer is, no, it did not happen or

21 you can't answer it yes or no?

22         THE WITNESS:  No, I don't believe I was disciplined by

23 the board of education.

24         THE COURT:  Thank you.

25         MR. DAVIS:  Thank you.  No further questions.

```
 1            THE COURT:  There you go.

 2            Anything by defense?

 3            MS. SCHWENDENER:  No, your Honor.

 4            THE COURT:  All right, sir.  You're done.

 5            THE WITNESS:  Okay.

 6            THE COURT:  All right.  Go to the -- don't worry about

 7    the cup.  If you drank anything, I'll take care of it.

 8            All right.  Step down.  And don't forget your

 9    coat.  Thank you.

10        (Witness excused.)

11            THE COURT:  All right.  That will be a time for our

12    one and only five minute or so break.  All rise.

13            Step on out, ladies and gentlemen.  See you in a few

14    minutes.

15        (Jury out.)

16            THE COURT:  Anything on the record, plaintiff?

17            MR. DAVIS:  No, your Honor.

18            THE COURT:  Defendants?

19            MS. SCHWENDENER:  No, your Honor.

20            THE COURT:  Who is the next witness up?

21            MR. DAVIS:  Tyrone Rogers, your Honor.

22            THE COURT:  All right.  He's already here.  Thank you.

23            MR. DAVIS:  Thank you, your Honor.

24            THE COURT:  I'll be right back out.  Maybe about --

25    five minutes is really what I want to do.
```

```
1            All right.  Thank you.

2            MR. DAVIS:  Thank you.

3       (Brief recess.)

4            THE COURT:  Anything on the record, plaintiff?

5            MR. DAVIS:  No, your Honor.

6            THE COURT:  Defendants.

7            MS. SCHWENDENER:  No, your Honor.

8       (Jury in.)

9            THE COURT:  You may be seated, ladies and gentlemen.

10           The next witness is?

11           MR. DAVIS:  Tyrone Rogers.

12           THE COURT:  Come forward, sir.

13      (Witness sworn.)

14           THE COURT:  Have a seat.  Adjust the mic so that we

15  can hear you clearly.

16           THE WITNESS:  All right.

17           THE COURT:  Wait until each question is asked before

18  you answer.  And let me rule on objections.

19           If there is something you don't understand, say

20  so.  If there is something you don't know, say so.  And this

21  will allow us to go along much more smoothly.

22           THE WITNESS:  Okay.

23           MR. DAVIS:  Thank you, your Honor.

24           TYRONE ROGERS, PLAINTIFF'S WITNESS, DULY SWORN

25                       DIRECT EXAMINATION
```

T. Rogers - direct by Davis

1   BY MR. DAVIS:

2   Q.  Good afternoon, Mr. Rogers.  How are you?

3   A.  Good afternoon, attorney.  How are you today?

4   Q.  I'm fine.  Thank you.

5        Isn't it true that Dr. Adams emailed you a copy of a

6   proposal to hire a forensic auditor on July 9th, 2015?

7   A.  No.

8   Q.  So she didn't send out an --

9        THE COURT:  I'm sorry, one second.  Mr. Rogers is also

10  going to be an adversarial witness because he is a defendant in

11  the case, just as before with Ms. Janet Rogers, that he can ask

12  him questions in a leading way.  And, again, it works both

13  ways.  Plaintiff can call a defendant, the defendant can call a

14  plaintiff.

15       All right.  Proceed.  And remember you are able to

16  lead, counsel.

17       MR. DAVIS:  Thank you, your Honor.

18       I'd like to show the witness an exhibit, your Honor.

19       THE COURT:  Show an exhibit or play an exhibit?

20       MR. DAVIS:  Show an exhibit.

21       THE COURT:  All right.  The exhibit is Exhibit Number

22  10, Plaintiff's Exhibit Number 10.

23       Is that something that's already been published?

24       MR. DAVIS:  Yes, Judge.

25       THE COURT:  Do you want to name the exhibit for me?

1    MR. DAVIS:  This is RFP, Plaintiff's Exhibit Number

2    10, the RFP for hiring a forensic auditor, sent by the

3    Dr. Denean Adams to the board on July 9, 2015.

4            THE COURT:  All right.

5    BY MR. DAVIS:

6    Q.  Do you see the document, Mr. Rogers?

7    A.  Yes, sir, I see it.

8    Q.  Do you see the date on the document?

9    A.  Yes, sir, July 9.

10   Q.  Do you see it says it went to Harvey School District 152?

11   A.  Harvey School Board District 152, yes, sir, that's correct.

12   Q.  So are you saying you didn't receive this?

13   A.  You know, to be honest, I don't really check my

14   emails.  You know, I may have received it, but --

15   Q.  Okay.

16   A.  You know, I open the email every once in a while, you know.

17   Yeah.

18   Q.  Isn't it true that you had a district cell phone on July 9,

19   2015?

20   A.  Yes, sir, that's correct.

21   Q.  And who was the carrier?

22   A.  You mean --

23   Q.  The mobile carrier of the cell phone.

24   A.  It is Sprint.

25   Q.  Sprint?

T. Rogers - direct by Davis                                        468

1    A.  Yeah.

2    Q.  Okay.  What was your number?

3    A.  Area code (708)516-2276.

4    Q.  Okay.  So I have a -- something I'd like to show you,

5    Exhibit Number 12.

6            MR. DAVIS:  I'll take this down.

7            If I could -- I'm not sure we have published this

8    previously to the jury, your Honor.  In fact, I don't think we

9    have.

10           THE COURT:  Make sure you show it to counsel.

11           MR. DAVIS:  Okay.

12       (Brief interruption.)

13           THE COURT:  Any objection?

14           MS. SCHWENDENER:  No objection.

15           THE COURT:  All right.

16   BY MR. DAVIS:

17   Q.  So I'm showing you, Mr. Rogers, do you see this is a

18   subscriber activity report?

19   A.  Okay.

20   Q.  Do you see it says School District Harvey 152, Sprint?

21   A.  Yeah, I see it.

22   Q.  See your phone number?

23   A.  Do I see my phone number?

24   Q.  Yes.

25           THE COURT:  To the left of the page, sir.  The top.

T. Rogers - direct by Davis

1   BY THE WITNESS:

2   A.  Okay.

3         Oh, yeah.  Yeah, I see it.

4   BY MR. DAVIS:

5   Q.  Okay.  So that's your number, right?

6   A.  Yes, sir, that's my number.

7   Q.  Okay.  So next I want to show you Plaintiff's Exhibit

8   Number 11.

9         MR. DAVIS:  Which has been previously published to the

10  jury, I'm pretty sure.

11        I'll show it to counsel.

12        THE COURT:  There being no objection?

13        MS. SCHWENDENER:  No objection.

14        THE COURT:  Proceed.

15  BY MR. DAVIS:

16  Q.  Drawing your attention to Plaintiff's Exhibit Number 11,

17  Mr. Rogers, do you see on the left-hand column where it talks

18  about the -- do you see the date?

19  A.  Yes, sir, I see it.

20  Q.  7-9.

21  A.  I see it.

22  Q.  And this was the 2015 billing period.

23        THE COURT:  You're pointing up on the top, counsel.

24  It is not on the screen.

25        MR. DAVIS:  Oh, okay.  I'm sorry.

```
 1              THE COURT:  All right.
 2   BY MR. DAVIS:
 3   Q.  Do you see the billing period at the top right?
 4   A.  Yeah, July of '15.  Yes, sir, I see it.
 5   Q.  Okay.  So this would have been July 9th --
 6              THE COURT:  Excuse me.  Let's just make clear that you
 7   just showed a similar document, but this is as to Dr. Adams, is
 8   that correct?
 9              MR. DAVIS:  Yes.
10              THE COURT:  All right.  I don't know if that's clear
11   or I missed it.
12              Proceed.
13              MR. DAVIS:  Sure.
14   BY MR. DAVIS:
15   Q.  In addition to the board members having Sprint provided
16   mobile phones, Dr. Adams had a mobile phone provided by the
17   district also --
18   A.  I'm sure.
19   Q.  -- on July 2015.
20   A.  I'm sure of that, yes.
21   Q.  And you communicated with her via that phone from time to
22   time?
23   A.  Oh, yeah.
24   Q.  Okay.  So you know her number.
25   A.  Not by heart.  I got it under Dr. Adams.
```

1    Q.  Yeah.  So drawing your attention to Plaintiff's Exhibit 11,

2    looking here on 7-9, incoming call.

3    A.  You're going to have to scroll down a little bit.

4            THE COURT:  You have to scroll back to where you were.

5            MR. DAVIS:  Okay.

6            THE COURT:  No, you are going to need the move the

7    paper.

8            THE WITNESS:  Just slide it up.  There you go.

9    BY MR. DAVIS:

10   Q.  Right.  Do you see 7-9?

11   A.  Well, you got to point -- yes, sir, I see.

12   Q.  And --

13           THE COURT:  Let him ask the questions.  All right.

14   BY THE WITNESS:

15   Q.  Incoming call?

16   A.  Yes, sir.

17   Q.  And you see the number, is that your number?

18   A.  Yeah.

19   Q.  Okay.  So isn't it true, Mr. Rogers, that you called

20   Dr. Adams on July 9th after you received the RFP?

21           Didn't you call her?

22   A.  Basically what it shows is that we had a phone

23   conversation.

24   Q.  The question --

25   A.  I don't know.  I -- she may have called me.

T. Rogers - direct by Davis

1          THE COURT:  Wait a minute.  Wait a minute.  This is

2     not going to be like before.  I mean, this is going to be calm.

3          THE WITNESS:  Okay.  I got you.

4          THE COURT:  All right.  So, again, put your question.

5          If you don't know, say you don't know.  And then he

6     has to ask another question.

7          THE WITNESS:  I got it.

8          THE COURT:  All right.

9          THE WITNESS:  I got it, your Honor.

10          THE COURT:  Proceed.

11     BY MR. DAVIS:

12     Q.  Did you call Dr. Adams after you received the RFP on July

13     9, 2015?

14     A.  No.

15     Q.  Were you deposed in these proceedings?

16     A.  What do you mean?

17     Q.  Didn't you have a deposition where you were under oath and

18     you testified in this case?

19     A.  Yeah.  Yeah.

20     Q.  Okay.

21          MR. DAVIS:  So I'm going to show the witness his

22     deposition testimony.  It is exhibit number -- Plaintiff's

23     Exhibit Number 58.

24     BY MR. DAVIS:

25     Q.  And can you see that document, Mr. Rogers?

T. Rogers - direct by Davis                                        473

```
 1   A.  Yes, sir, I see it.

 2          MR. DAVIS:  May I publish, your Honor?

 3          THE COURT:  No, you can't.  You're trying to impeach

 4   him, I'm assuming.

 5          MR. DAVIS:  Yes.

 6          THE COURT:  You may not publish.

 7   BY MR. DAVIS:

 8   Q.  Okay.  Well, let's do it this way, Mr. Rogers.

 9          THE COURT:  If he sees it.  He has it.  Refer to

10   what -- what area --

11          MR. DAVIS:  Exactly.

12          THE COURT:  -- and --

13   BY MR. DAVIS:

14   Q.  So this says you were deposed on February 6, 2018, right?

15   A.  When I did my deposition?

16   Q.  Yes.

17   A.  Yes.

18   Q.  You were under oath then?

19   A.  Yes, I was.

20   Q.  Okay.  I'm going to draw your attention -- so I want to

21   look at page 80, lines 21 to 24.

22          Do you see that?

23   A.  Yes, sir, I see it.

24          THE COURT:  Do you want him to look at it or are you

25   going to go ahead and impeach him by reading --
```

T. Rogers - direct by Davis                474

1          MR. DAVIS:  I am.  I want him to read it.

2          THE COURT:  You should ask your questions.

3          MR. DAVIS:  Okay.

4    BY MR. DAVIS:

5    Q.  Doesn't it says at lines 21 to 24 that I asked, let me ask

6    you this, Mr. Rogers, did you call Dr. Adams on July 9th, 2015?

7          Wasn't that the question?

8    A.  Yes, sir.

9    Q.  And didn't you reply:  Answer:  I don't recall that.  I may

10   have.  I don't know.

11   A.  Yes, sir.

12   Q.  Okay.  And this was under oath, correct?

13   A.  Yes, sir.

14   Q.  So that was your testimony then.

15   A.  Yes, sir.

16   Q.  And today when I just asked did you call Dr. Adams a few

17   moments ago you said no.

18         MS. SCHWENDENER:  Objection, your Honor.

19         THE COURT:  Objection, proper impeachment.  Once it

20   has been said and answered and you have proven the impeachment

21   or attempted to prove it, it is done.  You don't keep going

22   back over it.

23         MR. DAVIS:  Okay.

24         THE COURT:  Sustained.

25   BY MR. DAVIS:

T. Rogers - direct by Davis

1   Q.  Okay.  So let's move on, Mr. Rogers.  In fact you were

2   upset when you got the RFP because you saw in there that the

3   scope of the audit included board members, isn't that correct?

4   A.  No.

5   Q.  So I'm going to draw your attention to Plaintiff's Exhibit

6   Number 71, Volume VN810186, board meeting minutes from July

7   22nd, 2015.

8        (Audiotape played.)

9            MS. SCHWENDENER:  Objection.

10           THE COURT:  As to how far this should go in trying to

11  impeach?

12           MR. DAVIS:  Well --

13           THE COURT:  Objection sustained.

14  BY MR. DAVIS:

15  Q.  Let me ask you a question, Mr. Rogers.

16  A.  Yes, sir.

17  Q.  That was you on the tape, right?

18  A.  Yes, sir.

19  Q.  And you didn't want the audit because you didn't want it to

20  include board members.  Is that what the tape just said?

21  A.  No.

22  Q.  That's not what the tape said?

23  A.  No.

24  Q.  Okay.  I'll move along.

25           Mr. Rogers, did your wife also -- or was that Janet

1    Rogers we heard at the end of the conversation?

2    A.  I think it was, yes.

3    Q.  And she also had a problem with the audit also, right?

4    A.  No.

5    Q.  She kept -- that wasn't what she was saying, we got another

6    problem?

7    A.  That was not the gist I got out of it.

8    Q.  Okay.  Well, the tape will speak for itself.

9    A.  Yes, sir.

10   Q.  Let me ask you this, Mr. Rogers, isn't it true that

11   on -- who is Dreina Lewis?

12   A.  Dreina Lewis is the city administrator for the City of

13   Harvey.  She was my immediate supervisor.

14   Q.  Okay.  You worked for Harvey, right?

15   A.  Yes, sir, that's correct.

16   Q.  And Dreina Lewis is the sister of Eric Kellogg, the mayor

17   of Harvey, right?

18   A.  That's correct.

19   Q.  Okay.  And isn't it true that on July 9th you got a call

20   from Dreina Lewis telling you that Dr. Adams had made a police

21   report saying you threatened her?

22   A.  No.

23   Q.  So you didn't sign a sworn interrogatory in this case

24   saying that on July 9th, Dreina Lewis contacted you and told

25   you Dr. Adams had made a police report, is that what you are

1  saying, testifying?

2  A.  Counsel, what I said was that Dreina Lewis contacted me

3  personally.  It wasn't a -- it wasn't by phone -- and told me

4  that Dr. Adams had done a police report.  It was not done over

5  the phone, it was done in person.

6  Q.  Okay.  But she did contact you --

7  A.  Yes.

8  Q.  -- on July 9th.

9  A.  Yes.  It was on or about July 9th.  I'm not saying the

10  exact --

11          THE COURT:  Again, we're beginning to talk over each

12  other.  This is testimony.  This is not a conversation.

13          MR. DAVIS:  Sure.

14          THE COURT:  Your turn, counsel.

15  BY MR. DAVIS:

16  Q.  Isn't it true your interrogatory response said -- it didn't

17  say on or about, as I recall, it said on July 9th she contacted

18  you.

19  A.  Counsel, I just want to be certain, you know, I don't want

20  to give you dates and times that I am not solely certain of, so

21  that's why I said on or about.

22  Q.  Did you tell your wife when she contacted you and said

23  Dr. Adams has filed a police report, did you tell your wife on

24  July 9th about this, what you had heard?

25  A.  On or about July 9th or 10th I may have had a discussion

Case: 1:15-cv-08144 Document #: 182 Filed: 12/17/18 Page 149 of 158 PageID #:3509
T. Rogers - direct by Davis
478

1   with my wife as a husband, but not as a board member.

2   Q.  Right.

3   A.  Yeah.

4   Q.  And as a husband you told her somebody has filed a police

5   report against me.  Well, not somebody, Dr. Adams is filing a

6   police report saying I threatened her.

7   A.  Yes.

8   Q.  Okay.  Thank you.

9           You didn't -- you were here when Dr. Dr. Nohelty was

10  on the stand, right?

11  A.  Yes, sir, that's correct.

12  Q.  And you were a board member when he was on the board.

13  A.  Yes.

14  Q.  So you're familiar with the $3.8 million deficit issue.

15  A.  I wasn't totally certain of the number, but I knew about --

16  there was a lot of discussion about millions, yes.

17  Q.  And are you familiar that Dr. Adams suspended Dr. Nohelty

18  because of that?

19  A.  Actually it wasn't because of that, just solely because of

20  that.

21  Q.  Okay.

22  A.  Okay.  There was -- there was bad blood between Nohelty and

23  Adams.

24  Q.  Let me stop you --

25  A.  Okay.  All right.

1   Q.  -- Mr. Rogers.

2   A.  Okay.

3   Q.  Let me focus you on where we want to talk today.

4           In fact you said Dr. Adams was trying to sabotage the

5   district by suspending Dr. Nohelty.  Didn't you say that?

6   A.  Yes, I did.

7   Q.  Didn't you say, quote, because her ass is in a sling, she

8   trying to put his ass in a sling?

9   A.  Yes, I did.

10  Q.  And you also said that if anyone is going to discipline

11  Dr. Nohelty it shouldn't be Dr. Adams.

12  A.  Absolutely.

13  Q.  Thank you, Mr. Rogers.

14          On August 17th you participated in a board meeting

15  where Dr. Adams's contract extension was rescinded, right?

16  A.  That's correct.

17  Q.  And you wanted multiple charges.  You expressed your view

18  in the meeting that you wanted ECHO to be one separate charge,

19  you wanted the contract signing to be a separate charge, you

20  wanted the summer school to be a separate charge, you wanted

21  disciplinary action for each separate thing, is that what you

22  said?

23  A.  There were lots of them.

24  Q.  Is that what you said?

25  A.  Yes.

1   Q.  Okay.  But back in February you voted to give Dr. Adams a

2   contract extension, didn't you?

3   A.  That's correct.

4   Q.  And back in February when you voted for the contract

5   extension --

6   A.  I put the motion on the floor.

7           THE COURT:  Sir, you can't --

8           THE WITNESS:  I was trying to --

9           THE COURT:  You have to wait until he finishes.

10          THE WITNESS:  Yes, ma'am.

11          THE COURT:  She's taking this down.

12          THE WITNESS:  Oh, yeah, okay.

13          THE COURT:  She can only take down one party at a

14  time.

15          THE WITNESS:  Okay.

16          THE COURT:  All right?

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  Thank you.  And you'll be able to answer

19  the question.

20          Proceed, counsel.

21  BY MR. DAVIS:

22  Q.  And back in February, 23rd, 2015, you voted to extend

23  Dr. Adams's contract by one year, right?

24  A.  Yes, sir, that's correct.

25  Q.  And in fact at that same meeting you said Dr. Adams was

1  world renowned, world respected in the education communities,

2  right?

3  A.  Something to that effect, yes.

4  Q.  Okay.  Let's talk about the June 2015 retreat.

5        You were there, right?

6  A.  Yes, sir, I was there.

7  Q.  And did Dr. Adams present the goals and progress towards

8  the goals at that retreat?

9  A.  Can you be more specific?

10 Q.  Did Dr. Adams give a presentation at the retreat?

11 A.  Yes, sir, she did.

12 Q.  And part of that presentation she said, here's the

13 district, the full goals that the district established, and I'm

14 here to tell you today what progress we have made on these

15 goals.

16        Is that what she said?

17 A.  There were district goals, yes.

18 Q.  I didn't ask you whose goals they were.

19 A.  Okay.

20 Q.  I'm asking you, is that what she said?

21 A.  There was a lot of people presenting, yes.  She was

22 one.  She was one of many.

23        MR. DAVIS:  I'm going to play Plaintiff's Exhibit 71.

24        MS. SCHWENDENER:  Objection for the record, your

25 Honor.

1        THE COURT:  All right.  Objection is overruled based

2   on prior ruling.

3        MR. DAVIS:  And I'm going to play VN810185.  This is

4   from the June 2015 retreat?

5     (Audiotape played.)

6        MR. DAVIS:  I'm not going to play that whole statement

7   because it is lengthy.

8   BY MR. DAVIS:

9   Q.  You were at the meeting, you recall that?

10  A.  Yes, sir.

11  Q.  And isn't it true Dr. Adams went through each goal and the

12  progress for each goal?

13  A.  Well, as I recall, you just played one.  So I remember that

14  one.  I don't know if she went through all of them.

15  Q.  Well, she presented, you remember she presented more than

16  one goal, right?

17  A.  There was -- on that sheet you had earlier, yes, there was

18  about six of them.

19  Q.  Okay.

20  A.  One for each month.

21  Q.  Okay.  Let me ask you this, did anybody, when she presented

22  these goals, say those aren't -- those are district goals?  Is

23  there anywhere on the tape if we listen to it where they

24  differentiate any board member that these goals are district

25  goals?

1    A.  No.

2    Q.  Okay.  That did not help perform -- I'm sorry, go ahead.

3    A.  No.

4    Q.  Okay.  Is there anywhere in writing in Harvey's 152 that

5    documents or differentiates the goals that Dr. Adams was

6    talking about in June 2015 from her own personal performance

7    goals?

8    A.  Yes.

9    Q.  What is that?

10   A.  Harvey School District 152 board policy.

11   Q.  And what policy is that?

12   A.  You mean the actual number?

13   Q.  Yes.

14   A.  I couldn't tell.  I don't know it by heart.

15   Q.  Okay.

16   A.  Yeah.

17   Q.  So what do you tell -- what does that policy say?

18   A.  And also in Dr. Adams --

19   Q.  I just asked you what does it say.

20   A.  Okay.

21          THE COURT:  He asked you another question.

22          THE WITNESS:  Okay.

23          THE COURT:  Ask the question again.

24   BY MR. DAVIS:

25   Q.  What was the policy that you say you want to talk about?

1   What does it say?

2   A.  Per se, well, I'm going to --

3   Q.  Let's do -- I'm sorry.  Let me let you finish, and then

4   I'll ask another question.

5           Go ahead.

6   A.  Okay.  I'm going to use your term, paraphrase it.  What it

7   says is that the Board of Education has the option to give the

8   superintendent written goals that they want to see based on the

9   mission statement of the school district.  Okay?  And it has

10  nothing to do with the district goals.  They are two separate

11  entities.  Okay?  You have got the superintendent goals, and

12  you got district goals.

13          THE COURT:  All right.  Next question.

14  BY MR. DAVIS:

15  Q.  You'll be back tomorrow.  Can you -- I ask you to bring

16  that policy with you when you come back tomorrow so we can talk

17  more about it.

18  A.  I don't know if I will have the opportunity to get it, but

19  I'll make an effort.  I'm make an effort.  And I'll come back

20  as many times as you like me.

21  Q.  Well, okay.

22          THE COURT:  It is not a matter of him liking you, it

23  is what I say tell you to do.

24          MR. DAVIS:  Okay.

25          THE COURT:  All right.  We're going to take a break

T. Rogers - direct by Davis

1    right now.

2              THE WITNESS:  Yes, ma'am.

3              THE COURT:  All right.  We're going take a break right

4    now.  You will be back here tomorrow morning.

5              Let me double check my court schedule.  Hold on a

6    second.

7         (Brief interruption.)

8              THE COURT:  All right, sir, you'll back here, you

9    should be here by 9:30.

10             THE WITNESS:  Yes, ma'am.

11             THE COURT:  9:30.  Step down.  You still are under

12   oath.  And please understand that being under oath that you can

13   be questioned about whether or not you discussed this matter

14   with anyone else.

15             THE WITNESS:  Yes, ma'am.

16             THE COURT:  I would suggest, since it is -- Mr. Davis

17   was asking you questions, you not review anything or read

18   anything.  Do you understand?

19             THE WITNESS:  Understand.

20             THE COURT:  All right.  Except for, of course, he has

21   asked you to look for a document, so that means you have to, so

22   you have to waive that issue.

23             MR. DAVIS:  I'm comfortable, Judge.

24             THE COURT:  All right.  So do what you need to find

25   the document he's looking for.

```
1              THE WITNESS:  Thank you, ma'am.

2              THE COURT:  All right.  You may step down, sir.

3              THE WITNESS:  All right.

4         (Witness excused.)

5              THE COURT:  All right.  Ladies and gentlemen, the

6    Court is going to ask that you be here at 9:45, 9:45 tomorrow.

7    No excuses on sugar highs, nothing like that.

8         (Laughter.)

9              THE COURT:  All right.  I hope that you do have a safe

10   and fun time tonight with your children or yourself -- you

11   don't have to tell on yourself -- as to Halloween.  But, again,

12   we must focus on that.  Focus on the looks like nice weather

13   again.  Not going to be out in it until after the day is done.

14             But I ask that you not do any independent research.

15   The case is moving along much better now.  So we have gotten a

16   lot of witnesses in.  And we are still on schedule, as I stated

17   before, to end on Tuesday, with Monday being off.  Just

18   remember that schedule.

19             All right.  Friday we'll probably be here until, no

20   later than 4:00, but around then.  We'll try to cut it off a

21   little bit early on a Friday.  But we want to make sure most of

22   all that this gets done on Tuesday.

23             All right.  Have a safe trip home, ladies and

24   gentlemen.  All rise.

25        (Jury out.)
```

1    THE COURT:  All right.  For immediate purposes,
2  anything on the record, plaintiff?
3    MR. DAVIS:  No, Judge.
4    THE COURT:  Defense?
5    MS. SCHWENDENER:  No, Judge.
6    THE COURT:  All right.  I'm going to take a five- or
7  ten-minute break while they get their things and vacate, and
8  then we'll look at instructions.
9    Counsel, real quick on the side here.  We're off the
10  record.
11    MR. DAVIS:  Can I release my client, Judge?  May she
12  leave?
13    THE COURT:  She can go whenever she wants.
14    MR. DAVIS:  Thank you.
15    THE COURT:  Why don't you wait until I at least talk
16  to you.
17    MR. DAVIS:  Okay.  Sure.
18    (Discussion off the record.)
19    (Adjournment at 3:18 P.M. to reconvene at 9:45 A.M.,
20  November 1, 2018.)
21                    CERTIFICATE
         I HEREBY CERTIFY that the foregoing is a true, correct
22  and complete transcript of the proceedings had at the hearing
    of the aforementioned cause on the day and date hereof.
23  /s/Pamela S. Warren                    November 29, 2018
    Official Court Reporter                        Date
24  United States District Court
    Northern District of Illinois
25  Eastern Division