698

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3    DR. DENEAN ADAMS,                 ) No. 15 C 8144
                                       )
4                        Plaintiff,    )
                                       )
5               v.                     )
                                       )
6    BOARD OF EDUCATION HARVEY SCHOOL  ) November 2, 2018
     DISTRICT 152, GLORIA JOHNSON in her ) Chicago, Illinois
7    individual capacity, BETTY JOHNSON ) 9:30 a.m.
     in her individual capacity,       )
8    DR. KISHA McCASKILL in her        )
     individual capacity, JANET ROGERS )
9    in her individual capacity, TYRONE )
     ROGERS in his individual capacity, )
10   LINDA HAWKINS in her individual   )
     capacity, FELICIA JOHNSON in her  )
11   individual capacity,              )
                                       )
12                       Defendants.   ) Trial

13                       VOLUME 5
                 TRANSCRIPT OF PROCEEDINGS
14   BEFORE THE HONORABLE SHARON JOHNSON COLEMAN, and a
                          jury
15

16   APPEARANCES:

17   For the Plaintiff:    MR. JEROME M. DAVIS, ESQ.
                           9024 McIntosh Court
18                         Lakewood, Illinois  60014

19   For the Defendants:   HAUSER IZZO PETRARCA GLEASON & STILLMAN
                           1415 West 22nd Street
20                         Suite 200
                           Oak Brook, Illinois  60523
21                         BY:  MR. CHRISTOPHER L. PETRARCA

22

23           TRACEY DANA McCULLOUGH, CSR, RPR
                  Official Court Reporter
24              219 South Dearborn Street
                        Room 1426
25              Chicago, Illinois  60604
                     (312) 435-5570

1   APPEARANCES CONTINUED:

2                          LAW OFFICES OF JENNIFER K. SCHWENDENER LLC
                           5117B Main Street
3                          Suite 4
                           Downers Grove, Illinois  60515
4                          BY:  MS. JENNIFER K. SCHWENDENER

1    THE CLERK:  15 C 8144, Adams versus Board of

2    Education Harvey School District 152.

3    THE COURT:  All right.  Counsel, go ahead and state

4    your name.

5    MR. DAVIS:  Good morning, Your Honor.  Jerome Davis

6    for plaintiff.

7    MS. SCHWENDENER:  Good morning, Your Honor.  Jennifer

8    Schwendener for defendants.

9    MR. PETRARCA:  Good morning, Your Honor.  Chris

10   Petrarca also on behalf of defendants.

11   THE COURT:  All right.  So where are we at the

12   beginning of today?

13   MR. DAVIS:  I'd like to call or recall Mr. Tyrone

14   Rogers.

15   THE COURT:  Right.  Finish that up.

16   MR. DAVIS:  I anticipate that not being too long.

17   And then I'd like to call in my case in chief Gloria Johnson

18   and Betty Johnson.  And then I anticipate resting.

19   THE COURT:  All right.  So what it sounds like is

20   that will take us through the morning.  And then maybe during

21   the lunch break, at least part of it we'll be able to take

22   maybe a half an hour of it -- I'll give us an hour definitely

23   today.  We'll take a half an hour of it or so, and you can make

24   sure the evidence, the exhibits are in that are supposed to be

25   in.  Or at least that you want to at least submit.  And then

```
 1   when you officially rest, this Court will hear arguments on
 2   positions of -- at the close of your case.  And then if
 3   depending on where we are -- do you have any, any witnesses to
 4   present today?
 5              MS. SCHWENDENER:  No, Your Honor.  Assuming if we
 6   could do our direct of Betty and Gloria after counsel just to
 7   save time.
 8              THE COURT:  Sure.  You have no objection just to
 9   doing it once?
10              MR. DAVIS:  No.
11              THE COURT:  All right.  So -- in fact, that may push
12   us over a little bit.  We'll see.
13              MS. SCHWENDENER:  Sure.
14              THE COURT:  All right.  Okay.  But those are the two
15   people that you have?
16              MS. SCHWENDENER:  That's correct.
17              MR. PETRARCA:  Yes, ma'am.
18              THE COURT:  All right.  Excellent.  We'll get all the
19   evidence in today.  And then we'll do your motions, and we'll
20   do instructions.  And more than likely unless for some reason
21   the instructions have taken on a life of their own and are
22   perfection, if they're perfection, then, you know, are you
23   ready to close today?
24              MR. DAVIS:  No, Judge.  I'd like some time to do my
25   closing, prepare a proper closing.  Close on Tuesday.
```

702

1          THE COURT:  Okay.  How long, how long do you think
2   your closing will be?
3          MR. DAVIS:  Probably no more than 30 minutes.
4          THE COURT:  All right.  So you want about -- let me
5   do this.  There's a lot here.  We've stopped and we've started.
6   I'll give each side 40 minutes.
7          MR. DAVIS:  Okay.
8          THE COURT:  You don't have to take it at all.
9          MR. DAVIS:  Okay.
10         THE COURT:  But the 40 minutes does include your
11  rebuttal.  All right.
12         MR. DAVIS:  Okay.
13         THE COURT:  So I'll give you that.  So work within
14  that time period.  I'll be back out after we make sure all our
15  jurors are here.  And we'll get going and see how it is.
16         MR. DAVIS:  Okay.
17         THE COURT:  And because I kept saying Tuesday and I
18  didn't think Friday was even beginning to be possible, I will
19  allow you this.  Otherwise I might have pushed it.  But since I
20  haven't allowed you any -- and you're a solo practitioner, the
21  Court will keep to that schedule.  Okay?
22         MR. DAVIS:  Thank you.
23         THE COURT:  All right.  You're welcome.  I'll see you
24  all in a second -- oh, is there -- wait.  Wait.  Wait.  Wait.
25  Is there anything about witnesses testifying that I need to

703

1  know about some of the evidence -- you all -- you know what,

2  why don't you all talk about it.

3           MS. SCHWENDENER:  Sure.

4           THE COURT:  Make sure there's nothing, oh, yes, now

5  you know I'm going to bring up this.  Or it's no secrets.  This

6  is just getting it in front of the jury the way you want it.

7  Please try to have a conversation.  If there's some exhibit,

8  something that's been objected to before that you're going to

9  try again or maybe the objection was overruled and you want to

10 just say, hey, I'm going to go ahead and object to this or vice

11 versa, talk about it for a second.  And we're going to try to

12 start at 9:45 sharp.  Okay.

13          MS. SCHWENDENER:  Thank you.

14          MR. DAVIS:  Thank you, Judge.

15     (Short break taken.)

16          THE COURT:  Anything on the record?

17          MS. SCHWENDENER:  Yes, Your Honor.

18          THE COURT:  All right.  First -- well, first

19 plaintiff, anything on the record?

20          MR. DAVIS:  No, Judge.

21          THE COURT:  All right.  Counsel.  Keep voices down

22 because they'll be coming out in the hall.

23          MS. SCHWENDENER:  Thank you, Judge.  Yesterday

24 plaintiffs indicated that they wanted to show portions of Mr.

25 Rogers' deposition transcript to the jury.  Counsel gave me

1  page numbers.  I did review them.  Two -- I think there's about

2  five or six pages he wants to show.  Two of which I have no

3  objection to.  But there are I think approximately three or

4  four that I do have an objection to.

5          THE COURT:  And is it the same objection?

6          MS. SCHWENDENER:  Same for those four pages?

7          THE COURT:  Yes.

8          MS. SCHWENDENER:  Yes.

9          THE COURT:  And what's the objection?

10          MS. SCHWENDENER:  It's -- it discusses the severance

11  agreement Mr. Kellogg received, and it talks about the numbers.

12  And it goes to all of that.

13          THE COURT:  Well, the Court already ruled as far as

14  the numbers and the severance agreement, and especially since

15  we don't have him here now.  He's not testifying.  Even more

16  that that will not come in.  The fact that he got a severance,

17  I don't have a problem with that coming in.  But no numbers, no

18  specifics.  All right.

19          MR. DAVIS:  Fine, Judge.

20          THE COURT:  All right.  So whatever adjustment you

21  need to make to comply with that.  And if as to any of it, you

22  want to keep your record and say you object, I'll just overrule

23  it for the reasons stated.  But if he's not here, there's not

24  much detail you can go in about, about him.  All right?

25          MR. DAVIS:  Okay.

1         THE COURT:  Thank you.

2         MR. DAVIS:  What about his performance evaluations,

3  Judge?

4         THE COURT:  Whether or not he was given one?

5         MR. DAVIS:  Yes.

6         THE COURT:  You can say whether or not he was given

7  one.

8         MR. DAVIS:  And his ratings compared to my client's.

9  Again he's a comparator here.

10        THE COURT:  And he was in -- and this witness was

11  there for all of it?

12        MR. DAVIS:  Yes, he was on the board.

13        THE COURT:  He was on, on the board --

14        MS. SCHWENDENER:  He was there for all of?

15        THE COURT:  I mean, he was -- he knows.  He was there

16  and present for the ratings to be given?

17        MR. DAVIS:  Yes.

18        THE COURT:  You know what I'm saying?  He was part of

19  the process of evaluating?

20        MR. DAVIS:  Yes.

21        THE COURT:  As opposed to --

22        MS. SCHWENDENER:  Oh, Mr. Rogers was part of the

23  process?

24        THE COURT:  Yes.

25        MS. SCHWENDENER:  I believe so.  I'm not sure, Judge.

706

1   THE COURT:  Well, unless you know -- unless you know

2   otherwise, then I'm going to allow that in.  Okay.

3              MR. DAVIS:  Thank you, Judge.

4              MS. SCHWENDENER:  And -- is it okay, I'll just state

5   my objection for the record, Your Honor.

6              THE COURT:  Yes.

7              MS. SCHWENDENER:  Thank you.

8              THE COURT:  Very much okay.

9              MR. DAVIS:  Thank you.

10             THE COURT:  All right.  Okay.  Basic information on

11  that, that employment.  Nothing more.  Okay.

12             MS. SCHWENDENER:  Yes.

13             MR. DAVIS:  Yes.

14   (Before the jury:)

15             THE COURT:  All right.  Good morning.  So we are

16  going to have I believe Mr. Rogers take the stand again.

17             MR. DAVIS:  Yes, Judge.

18             THE COURT:  Step over.  We are now back to the

19  plaintiff's case, and plaintiff's case in chief.  Mr. Rogers

20  has been sworn.  Even though it's been a few days, I don't

21  reswear for this, for this seat.  You do it once, and so -- but

22  the same rules apply.  Do you understand?

23             THE WITNESS:  Good morning, Your Honor.  How are you?

24             THE COURT:  Fine.

25             THE WITNESS:  Yes, I'm fine.

T. Rogers - direct by Davis

1    THE COURT:  All right.  Thank you.  Proceed.

2    MR. DAVIS:  Thank you, Your Honor.

3    TYRONE ROGERS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

4    DIRECT EXAMINATION (Resumed)

5    BY MR. DAVIS:

6    Q    Good morning, Mr. Rogers.

7    A    Good morning, Counselor.  How are you today?

8    Q    I'm fine.

9    A    Good.

10   Q    I think when we last left off yesterday we were talking

11   about the fact we were in the August 17th, 2015 meeting.  And

12   we were talking about the fact that you essentially wanted Dr.

13   Adams terminated at that meeting, correct?

14   A    Yes.

15   Q    And, in fact, you made a statement if she doesn't leave --

16   I'm paraphrasing, get terminated tonight, I'm not going to be

17   able to sleep; right?

18   A    That sounds familiar, yes.

19   Q    And the other board members were saying we need to go

20   through a process.  We can't just do it like that, right?

21   A    Yes.

22   Q    So, in fact, after August 17th isn't it true that you all

23   went through what you described as a progression of employment

24   actions against Dr. Adams that went all the way through until

25   she basically left Harvey 152 in April on medical leave,

T. Rogers - direct by Davis

1  correct?

2  A    Progression of acts?

3  Q    Yes.  That was your words.  It was a progression.  You

4  don't recall saying that?

5  A    Progression.  I wouldn't --

6  Q    Let me clarify.

7       THE COURT:  Sir, let him -- yes, don't guess at

8  anything please, sir.

9       MR. DAVIS:  Sure.

10       THE COURT:  All right.  Go ahead.

11       THE WITNESS:  Okay.

12  BY MR. DAVIS:

13  Q    When I say progression, I mean in August you had the

14  performance directives.

15  A    Yes.

16  Q    In October you talked about potential discipline.  You had

17  it on the agenda.  The board met its potential discipline

18  against superintendent for the October 19th, 2015 board

19  meeting, right?

20  A    Yes.

21  Q    In November you took action regarding Dr. Adams, right?

22  A    Yes.

23  Q    In December you rescinded Dr. Nohelty's suspension,

24  right?

25  A    Yes.

T. Rogers - direct by Davis

1  Q    In January you suspended Dr. Adams for several days,
2  January 2016?
3  A    I don't recall that.  But yeah, I think it may have
4  occurred.
5  Q    Okay.  All right.  So and then by March Dr. Adams was
6  taking a medical leave, correct?
7  A    Yes.
8  Q    So let's talk a little bit about Dr. Adams' predecessor.
9  Who was her predecessor?
10 A    Prior to Dr. Adams, it was Mr. Kellogg.
11 Q    And you have a relationship with Mr. Kellogg?
12 A    As a board member and superintendent, yes.
13 Q    And what's the relationship?
14 A    I'm a board member.  He -- he was superintendent.
15 Q    Right.  But I mean you have a relationship now, right?
16 You're employed by him, right?
17 A    Oh, yes.  I work for the City of Harvey.
18 Q    Right.  You've been knowing him for a number of years?
19 A    Yes, sir.
20 Q    Right.  And you were on the board when he was the
21 superintendent?
22 A    Yes, sir, that's correct.
23 Q    And, in fact, didn't you acknowledge that Mr. Kellogg was
24 not a very good superintendent when he was the superintendent
25 of Harvey 152?

710

T. Rogers - direct by Davis

1    A    At one point, yes, he wasn't very good.

2    Q    But, in fact -- and his performance evaluations, you

3    participated in those, right?

4    A    Yes, I did.

5    Q    And 1 means unsatisfactory, right?

6    A    Yes.

7    Q    And, in fact, Mr. Kellogg in his last performance review

8    in 2013, he got like maybe six 1's in different categories,

9    right?

10            MS. SCHWENDENER:  Objection.

11            THE COURT:  The objection's overruled for reasons

12    previously stated.

13            THE WITNESS:  No way for me to remember that.

14    BY MR. DAVIS:

15    Q    Okay.  Well, do you remember that he frequently had a lot

16    of 1's in his performance reviews?

17    A    During the beginning of his tenure or the ending of his

18    tenure?

19    Q    Throughout.

20    A    Not from me.  I thought he was doing a great job at the

21    end of his tenure.

22    Q    So let me show you an exhibit.  And this is going to be

23    Plaintiff's Exhibit No. 52.

24            THE COURT:  Any objection, Counsel?

25    BY MR. DAVIS:

T. Rogers - direct by Davis

1   Q    Give me one second, Mr. Rogers.  While I'm looking for
2   this, let me ask a question.  Isn't it true -- how about this,
3   I'll give you the hard copy.  Isn't it true Mr. Kellogg left
4   the district in 2013?
5   A    I don't recall the exact date, sir.
6   Q    Okay.  Well, do you recall that when he left the district,
7   he received a financial severance package?
8   A    Yes, sir, I do --
9            MS. SCHWENDENER:  Objection, Your Honor.
10           THE COURT:  Objection's overruled.
11  BY MR. DAVIS:
12  Q    From the district?
13  A    Yes, sir, I do.
14  Q    Did he?
15  A    Yes, sir.
16           MR. DAVIS:  So since I have one copy here, I'm going
17  to -- if I may publish this, Your Honor.
18           THE COURT:  Well, first of all, you've got to show it
19  to counsel.
20           MR. DAVIS:  Okay.
21           THE COURT:  Either the hard copy -- show it to
22  counsel before you approach him.
23           MR. DAVIS:  Okay.  Sure.
24           MS. SCHWENDENER:  I do have an objection, Your Honor.
25           THE COURT:  All right.  For the reasons previously

T. Rogers - direct by Davis

1   stated?

2           MS. SCHWENDENER:  Yes, Your Honor.

3           THE COURT:  All right.  Over your objection the Court

4   will allow it.

5   BY MR. DAVIS:

6   Q     Do you recognize that?

7   A     Yes, sir.

8           MR. DAVIS:  Okay.  May I publish, Your Honor.

9           THE COURT:  Can you tell -- have him tell what it is

10  before you publish it.

11          MR. DAVIS:  Sure.

12          THE COURT:  Particularly since they have an

13  objection.  You have to file your whole --

14          MR. DAVIS:  Okay.

15          THE COURT:  You have to go the whole route.

16  Foundation.

17  BY MR. DAVIS:

18  Q     What is this document, Mr. Rogers?

19  A     It looks like a performance evaluation.

20  Q     For who?

21  A     For Mr. Kellogg.

22          THE COURT:  Just move back to the mike.

23          THE WITNESS:  A performance evaluation for Mr.

24  Kellogg.

25  BY MR. DAVIS:

713

T. Rogers - direct by Davis

1    Q    For what period?

2    A    I think the year said 2013?

3    Q    Yes.

4    A    Yes, sir.

5    Q    And you're familiar with this document?  You were on the

6    board in 2013 when he received this evaluation?

7    A    Yes, sir, I was on the board in 2013.  I mean --

8    Q    I'm sorry.  Were you finished?

9    A    But as far as remembering that exact document, I don't.

10   Q    Sure.

11   A    Yes.

12   Q    But you, you did him -- you did an evaluation of him?

13   A    Yes, sir.

14   Q    During that period.

15   A    Yes, sir.

16             MR. DAVIS:  May I publish, Your Honor.

17             THE COURT:  And is there somebody who signed off on

18   that document, Counsel?  What else is there about the document?

19             MR. DAVIS:  Eric Kellogg signed off on the document.

20             THE COURT:  He said he doesn't remember anything

21   about the document.

22   BY MR. DAVIS:

23   Q    Well, isn't it customary -- tell us how the evaluation

24   process works, Mr. Rogers.

25   A    Okay.  Normally superintendents are evaluated by the Board

714

T. Rogers - direct by Davis

1  of Education on their performance and directives that they've

2  been given by the board.  If these characteristics that the

3  superintendent exercises, if they work out good, they get a

4  pretty good evaluation.  If not, then the evaluation is usually

5  reflective in a negative way.

6  Q    Right.  And the way the process works, if I understand it,

7  the Board does its evaluations, members evaluate, rate the

8  person in different categories; right?

9  A    Yes, sir, that's correct.

10 Q    Then you submit it to the employee for their review,

11 right?

12 A    Well, no, not exactly.  What happens then is that the

13 seven members of the board -- each evaluation is put together

14 and the, and the tally is averaged out.  They're given to the

15 board president and the board secretary, and they tally the

16 totals out.  And then they come up with one substantial number,

17 and then they sit down as a board and discuss the evaluation

18 with that particular person that they're evaluating.

19 Q    And to your knowledge when this evaluation, which I'm

20 going to hand to you again, if it will help refresh you -- will

21 this help refresh you if you can look through this?

22 A    Sure, it would.

23        THE COURT:  All right.  Sir, just look it over for a

24 while and then tell us when you've looked at it and if it helps

25 you to remember what the overall evaluation was.

T. Rogers - direct by Davis

1    THE WITNESS:  Yes, Your Honor.

2       (Brief pause.)

3    THE WITNESS:  Yeah, I'm familiar with it.

4  BY MR. DAVIS:

5  Q    All right.  You can put it to the side.  Turn it over.

6  A    Okay.

7  Q    So are you familiar now with that document?

8  A    Oh, yes.

9  Q    And do you see in that document that -- and it's for the

10 period of 2013, right?

11 A    Yes, sir.

12 Q    Isn't it true that Mr. Kellogg received a 1 rating, 1

13 something in a number of categories?

14 A    See, Attorney, nobody has any way of knowing which board

15 members --

16 Q    I'm sorry, Mr. Rogers.

17    THE COURT:  Mr. Rogers, you have to answer the

18 question.

19 BY MR. DAVIS:

20 Q    Mr. Rogers, it's a yes, no question.

21 A    No.

22 Q    Would it help refresh you if you look at the document

23 again and look at the individual averages for the categories?

24 A    I saw them.

25 Q    Did you see any 1's in there?

716

T. Rogers - direct by Davis

1   A    I saw a lot of 2's.

2   Q    I'm asking did you see any 1's in there?

3   A    Yes.

4   Q    Okay.  Can you count the number -- can you tell us the

5   number -- or give us an approximation.  Was it more than

6   one?

7   A    I would say out of 40 you maybe have 6 that's one point

8   something.

9   Q    Thank you.  So he got six.  And do you happen to recall if

10  Dr. Adams -- Dr. Adams never got a 1 in any category for the

11  two years she was the superintendent, right?

12  A    I'm not familiar with that.  That's way too long to

13  remember.

14          MR. DAVIS:  Okay.  We've previously published Dr.

15  Adams -- Plaintiff's Exhibit No. 5, Judge.

16          THE COURT:  All right.

17          MR. DAVIS:  Actually this is the rotated document, so

18  I'll have to do it with the camera.  I want to ask the witness

19  to have a look at the document.

20          THE COURT:  I believe this has already been

21  published.

22          MS. SCHWENDENER:  It's already been published.

23          MR. DAVIS:  Sure.  Okay.  Well --

24          THE COURT:  All right.  So anytime you're ready let

25  me know.

17

T. Rogers - direct by Davis

1       MR. DAVIS:  Okay.

2       THE COURT:  All right.  So the witness has it and the

3  jury.

4  BY MR. DAVIS:

5  Q    So this is Dr. Adams' January 2015 performance evaluation,

6  Mr. Rogers?

7  A    Yes, sir.

8  Q    It says superintendent performance goals?

9  A    Yes.

10 Q    You see that?

11 A    That's what it says.

12 Q    And as you explained, there's an average for each of these

13 categories.  Each category represents a different goal that the

14 board has given the superintendent, right?

15 A    Yes.

16 Q    And the board members' rankings 1 to 4 are averaged to

17 come up with this number right here?

18 A    That's correct.

19 Q    So we look through Dr. Adams' evaluation for 2013.  We see

20 the first page there's no 1's on there, right?

21 A    Yes.

22       THE COURT:  Excuse me, Counsel.  Is this 2013?

23       THE WITNESS:  2015.

24       MR. DAVIS:  This is 2015.

25       THE COURT:  You said 2013.

T. Rogers - direct by Davis

1    MR. DAVIS:  I'm sorry.  It was Mr. Kellogg.  I
2  misspoke if I said that.
3    THE COURT:  All right.  I just want to make sure we
4  have got the date.
5    MR. DAVIS:  Sure.  Thank you, Judge.
6    THE WITNESS:  Thank you, Judge.
7  BY MR. DAVIS:
8  Q    No 1's on the first page?
9  A    No 1's.
10 Q    No 1's on the second page?
11 A    Nope.
12 Q    No 1's on the third page?
13 A    No.
14 Q    No 1's on the fourth page?
15 A    No.
16 Q    No 1's on the fifth page?
17 A    No.
18 Q    No 1's on the sixth page?
19 A    No.
20 Q    And, in fact, if we looked at a comparison of the two
21 years Dr. Adams was evaluated, she didn't have 1's in any of
22 those two years, right?
23 A    You only showed me one year.  That's all I can comment on.
24 Q    Okay.
25    MR. DAVIS:  I'd like to publish a comparison of the

                    T. Rogers - direct by Davis

1   two years of Dr. Adams' performance evaluations, Plaintiff's

2   Exhibit No. 6.  The same data but it also includes another

3   year.

4            MS. SCHWENDENER:  No objection.

5            THE COURT:  All right.  Proceed, Counsel.

6            MR. DAVIS:  I beg your pardon, Judge?

7            THE COURT:  Proceed.

8            MR. DAVIS:  Thank you.

9   BY MR. DAVIS:

10  Q    So this says compare 2014 and '15 data?

11  A    Yes.

12  Q    Superintendent performance goals, right?

13  A    Yes.

14  Q    So one of these charts -- I can't tell which because

15  everything's black, this was a color coded chart.  But you can

16  see the ratings between -- in each category between the two

17  years.  Each bar represents a different year, right?

18  A    Yes.

19  Q    And then you can see an average over in that category,

20  correct?

21  A    Yes.

22  Q    So the first page doesn't show any 1's?

23  A    No -- yes.  Yes.

24  Q    Where is the 1 at?

25  A    In the first category there's a 1.5 and a 1.0.

T. Rogers - direct by Davis

1    Q    Where is that at?

2    A    Under superintendent's performance goals --

3              THE COURT:  Sir, you're not looking at the graphs.

4    You're looking at just the numbers set up for the graphs.

5    BY MR. DAVIS:

6    Q    Right, you're looking at this.  These are the rankings,

7    not the graph.

8    A    Okay.  Okay.

9    Q    That's just the scale.  We're looking at these are her

10   rankings.  You see that?

11   A    Yeah.

12   Q    Any 1's?

13   A    No, not on the rankings, no.

14   Q    Thank you.  Any 1's on the second page?

15   A    It's kind of blurry.

16   Q    Oh, yes.  I'm sorry.

17   A    No.

18   Q    Any 1's on the third page?

19   A    No.

20   Q    Any 1's on this page?

21   A    No.

22   Q    Any 1's on the last page?

23   A    No.

24   Q    Thank you, Mr. Rogers.  So one of the things that -- after

25   July 10th and after August -- well, let's say after August 17th

21

T. Rogers - direct by Davis

1  you pretty much didn't want to -- let me put it this way:  Dr.
2  Adams continued to work in the district after the contract was
3  rescinded, right?
4  A     Yes.
5  Q     She continued to work under her existing contract, right?
6  A     Yes.
7  Q     And so she was still the superintendent.  She was still
8  responsible for the day-to-day management of the district,
9  correct?
10 A     Yes.
11 Q     And isn't it a fact that at one point you said a good
12 board stays out of the way and let's the superintendent runs
13 the district?
14 A     Absolutely.
15 Q     But in point of fact after August 17th, 2015 a number of
16 Dr. Adams' decisions you and the board countermanded, correct?
17 A     No.
18 Q     Okay.  So do you remember a recommendation from Dr. Adams
19 regarding a Josie McDonald?
20         MS. SCHWENDENER:  Objection.
21         MR. DAVIS:  Let me rephrase the question, Judge.
22         THE COURT:  All right.
23 BY MR. DAVIS:
24 Q     Isn't it true Dr. Adams wanted to terminate an employee by
25 the name of Josie McDonald in 2015?

T. Rogers - direct by Davis

1    MS. SCHWENDENER:  Objection.

2    THE COURT:  Basis?

3    MS. SCHWENDENER:  Relevance.

4    THE COURT:  In what year?

5    MR. DAVIS:  2015, Judge.  This is in the period.

6    THE COURT:  Objection's overruled for now.  If I

7  believe it's irrelevant, I will so instruct the jury.  Proceed.

8  You may answer.

9    MR. DAVIS:  Well, actually let to me correct the

10  record, Judge.  It's March 2016.  She was still the

11  superintendent.

12    THE COURT:  All right.  Same objection.  Same ruling.

13  Proceed.

14  BY MR. DAVIS:

15  Q    So isn't it true that Dr. Adams gave a recommendation to

16  the board to terminate Miss McDonald?

17  A    I know of the termination and I know Miss McDonald, but

18  I'm not sure of the date.

19  Q    And you know Dr. Adams made a recommendation?

20  A    Yes.

21  Q    And isn't it true, Mr. Rogers, that you stated you didn't

22  want to hear a recommendation from Dr. Adams, that you weren't

23  interested in her recommendation?

24  A    Yes.

25  Q    And, in fact, you accused Dr. Adams of trying to get rid

23

T. Rogers - direct by Davis

1  of some of you all's good people.  Is that what you said?
2  A    Yes.
3  Q    And, in fact, Miss McDonald wrote in her rebuttal a
4  written statement where she used a racial epithet against one
5  of her supervisors.  I'm not going to say the words.  I don't
6  want to play the tape.  But you remember that incident?
7              MS. SCHWENDENER:  Objection.
8              THE COURT:  Objection sustained.
9  BY MR. DAVIS:
10 Q    Didn't you laugh -- didn't you read Miss McDonald's
11 written statement and laugh at the racial epithet that she used
12 towards her supervisor?
13             MS. SCHWENDENER:  Objection.
14             THE COURT:  Sustained.
15 BY MR. DAVIS:
16 Q    Did Miss McDonald make a racial epithet statement in her
17 written rebuttal?
18             THE COURT:  Sidebar --
19             MS. SCHWENDENER:  Objection.  Thank you.  Sidebar.
20 Excuse us, ladies and gentlemen.
21    (Side bar proceedings out of the hearing of the jury:)
22             THE COURT:  Is she coming in as a witness?
23             MR. DAVIS:  No, she's not.  But I think this is
24 relevant to show --
25             THE COURT:  How is that -- how is that --

724

T. Rogers - direct by Davis

1   MR. DAVIS:  -- the animus that he had toward my
2   client.  If he let somebody --
3   THE COURT:  All right.  Maybe he had animus, but,
4   Counsel, you can't just have any employee who isn't a
5   superintendent just throwing in a name.  You're throwing this
6   in for prejudicial value, not just to show.  You can ask some
7   other types of questions to show his animus, but not going into
8   having the jury now with another person's name in who's not
9   part of the case.  That's what hearsay is.  That's what more
10  prejudicial than probative is.  It's denied.  I'm going to tell
11  them to strike and disregard all the questions regarding Miss
12  McDonald.
13  MR. DAVIS:  Okay.
14  MS. SCHWENDENER:  Thank you.
15  (Before the jury:)
16  THE COURT:  All right.  Ladies and gentlemen, I have
17  sustained the objection.  And the Court has now determined that
18  any of the questions that have been asked about Miss McDonald
19  will be stricken.  Do not consider that information and that
20  testimony.  Proceed.
21  BY MR. DAVIS:
22  Q   Isn't it true that you all countermanded Dr. Adams -- let
23  me back up.
24  Mr. Nohelty was in here the other day.  You know Mr.
25  Nohelty, right?

25

T. Rogers - direct by Davis

1   A    Yes.

2   Q    And he wanted to go on a trip to Boston to a conference.

3   You remember that?

4   A    Vaguely.  We take a lot of trips.

5   Q    Right.  But do you remember Dr. Adams saying she didn't

6   think it was a good idea to send him on the trip because he was

7   actually leaving the district, and it didn't make sense to

8   spend money to send him on a trip?  Do you remember that?

9   A    No.

10  Q    Okay.  So you don't remember that you became upset that

11  Dr. Adams was even -- that the Board was even considering Dr.

12  Adams' recommendation?

13  A    Yes.

14  Q    Okay.

15       THE COURT:  I'm sorry.  Yes, you don't remember or

16  yes, you do remember?

17       THE WITNESS:  Yes, I do remember.

18  BY MR. DAVIS:

19  Q    Thank you.  So yesterday we talked about the changes to

20  the summer school, right?

21  A    Yes.

22  Q    You remember that?

23  A    Yes.

24  Q    And one of the things you all charged Dr. Adams with in

25  the performance directives from August, 17th, 2015 is that she

T. Rogers - direct by Davis

1  made the changes and she never alerted the Board that she was

2  making the changes, right?

3  A    Yes.

4  Q    But, in fact, you have acknowledged that you did receive a

5  newsletter with the changes to schedule in mid-June of that

6  year, correct?

7  A    Yes.

8  Q    Isn't it true, Mr. Rogers, that you know the chart we've

9  looked at now a number of times, right?  The performance goals

10 chart?

11 A    Are you referring to the evaluation?

12 Q    I'm referring to the bubble chart.

13 A    Oh.  Yes, I'm familiar with it.

14 Q    Uh-hum.  We all are at this point.  And you described

15 those goals as the district's goals, right?

16 A    Yes, sir.

17 Q    Well, isn't it true that when you were deposed in this

18 case, you said those weren't the district's goals?  Those was

19 some goals the administrators created, quote, what you called a

20 dog and pony show?

21 A    I recall saying that.

22 Q    So then they were a dog and pony show.  You said the

23 district didn't have nothing to do with that, right?

24 A    No.

25 Q    You said those weren't the board's goals.  You didn't have

27

T. Rogers - direct by Davis

1  any recollection of participating in creating those goals.  Is

2  that what you said?

3  A    That's correct.

4  Q    But now they're the district's goals?

5  A    They're -- the district goals and the contract goals are

6  different --

7        MR. DAVIS:  I'm sorry.  I'll withdraw the question.

8  No further questions.  Thank you, Mr. Rogers.

9        THE COURT:  All right.

10        THE WITNESS:  Thank you, Counselor.

11        THE COURT:  Thank you very much.  All right.  And

12  counsel withdrew the question, and so you can disregard the

13  answer.  Anything defense?

14        MS. SCHWENDENER:  Yes, Your Honor.

15        THE COURT:  All right.  Proceed.

16        MS. SCHWENDENER:  Thank you.

17        THE COURT:  Again, as Mr. Rogers is a defendant in

18  the case, he's been called by plaintiff in their case in chief

19  as an adverse witness.  And so now in order to have -- prevent

20  a two-step process or a five-step in Mr. Rogers' case, while

21  he's up here, they're going to be allowed to also ask questions

22  in their case in chief as if he was their witness.  Proceed,

23  Counsel.

24        MS. SCHWENDENER:  Thank you, Your Honor.

25                    CROSS-EXAMINATION

28

T. Rogers - cross by Schwendener

1  BY MS. SCHWENDENER:

2  Q     Good morning, Mr. Rogers.

3  A     Good morning, Counsel.  How are you?

4  Q     Good.  Thanks.  How long have you been a member of the

5  Harvey Elementary District Board of Education?

6  A     13 and a half years.

7  Q     And is that an elected or an appointed position?

8  A     It's an elected position by the people of the State of

9  Illinois.

10 Q     Are you still a member of the Board of Education?

11 A     Yes, I am.

12 Q     And have you held that position continuously over the last

13 13 and a half years?

14 A     Yes, Counsel, I have.

15 Q     Do you receive compensation for serving on the Board of

16 Education?

17 A     No.

18 Q     Were you a member of the Board of Education during

19 plaintiff's tenure as a superintendent?

20 A     Yes, I was.

21 Q     Did you vote to hire plaintiff as a superintendent?

22 A     Yes, I did.

23 Q     Now, I think it's already been established that plaintiff

24 had a contract with the district, correct?

25 A     Yes, she had a contract.

T. Rogers - cross by Schwendener

1  Q     And do you recall the terms of that contract?

2  A     Generally, yes.  Yes.

3  Q     Did plaintiff have any goals that she had to meet as part

4  of her job?

5  A     Yes.

6  Q     And were those goals specific to plaintiff, or were those

7  more general district wide goals?

8  A     There were specific goals in the contract.

9  Q     Directing your attention to February 23rd of 2015.  At any

10 point did the board vote to extend plaintiff's contract?

11 A     Yes, Counsel, we did.

12 Q     And can you please tell the jury how the discussion -- or

13 the decision to extend plaintiff's contract came about.

14 A     Sure.  The Board was, was changing.  And boards change

15 every couple of years.  We be getting new board members.  And I

16 think what occurred was the superintendent wanted to renew her

17 contract before the new board got in and maybe get an increase

18 in pay or benefits or something to that effect while the old

19 board was still here.

20        So that's why the contract negotiation came up a year

21 before the original contract had expired.

22 Q     And how long did the board give an extension for?

23 A     One year.

24 Q     And was her contract being extended on the same terms as

25 her existing contract?

730

T. Rogers - cross by Schwendener

1    A    Yes, ma'am, it was.

2    Q    And same terms including salary and benefits?

3    A    Exact same contract.  Yes, ma'am.

4    Q    Now, before voting to extend plaintiff's contract, did the

5    board make any formal findings about whether plaintiff had met

6    her goals?

7    A    No.

8    Q    Directing your attention to the summer of 2015.  At any

9    time did plaintiff request to audit the district's finances?

10   A    Yes.

11   Q    Do you recall when that was?

12   A    June of 2015.

13   Q    And what was your response to plaintiff's request for the

14   audit?

15   A    My exact words were I thought she should be commended for

16   looking out for the finances of the school district.

17   Q    And it's already been established that plaintiff -- the

18   board did give plaintiff permission to go out and get a

19   proposal for the audit, correct?

20   A    That's correct.

21   Q    And we've heard the term RFP discussed quite a bit over

22   the last couple days.  Could you explain what that means.

23   A    Sure.  RFP is a, a method that businesses and boards use

24   to solicit business or vendors or contracts to come in and do

25   services.  And it's placed -- normally placed in the newspaper.

731

T. Rogers - cross by Schwendener

1  And the lowest bidder will send their RFP back to the district,
2  and they will select, the business manager will select the
3  lowest bidder to come in and do -- fulfill those services.
4  Q    Did plaintiff ever present the board with the proposal or
5  RFP for the audit?
6  A    Yes.
7  Q    And do you recall when that was?
8  A    That was in the summer of 2015.
9  Q    Now, the other day counsel asked you yesterday if you had
10  received an e-mail from plaintiff with the proposal for the
11  audit.  Do you recall how you received the proposal for the
12  audit?
13  A    Yes, ma'am.
14  Q    And how was that?
15  A    Well, my, my wife is a board member as well.  And I
16  remember seeing a copy that she had.  I read her copy.
17  Q    What was your response to the proposal?
18  A    It was favorable.  I thought it was a good thing.
19  Q    Were you outraged over or -- well, strike that.
20        I understand that the proposal included an audit into
21  the individual board members' finances, correct?
22  A    Yeah, it did.
23  Q    Were you outraged over that?
24  A    My exact words were I thought it was good.  I had nothing
25  to hide.  And no, there was no outrage.  I thought it was a

732

T. Rogers - cross by Schwendener

1  good thing.

2  Q    You're aware that plaintiff claims that you threatened

3  her, correct?

4  A    Yes, I'm aware.

5  Q    What is your understanding of the alleged threat?

6  A    She said something about in regards to I said I was --

7  you're kicking -- itching for an ass kicking.

8  Q    Did you ever say that?

9  A    Never in my life.

10  Q    Are you aware that plaintiff filed a police report against

11  you?

12  A    I'm well aware.

13  Q    Have you ever seen this police report?

14  A    No, I haven't.

15  Q    The other day counsel showed you phone records indicating

16  that you spoke with plaintiff on July 9th.  Do you remember

17  that?

18  A    On or about the 9th, yes, ma'am.

19  Q    Do you remember counsel showing you the phone records?

20  A    Yes, I recall.

21  Q    Would you as a board member speak with plaintiff on the

22  telephone?

23  A    Yes.

24  Q    So it wouldn't be unusual for you to call plaintiff?

25  A    No, it wouldn't be unusual.

T. Rogers - cross by Schwendener

1  Q    Did you ever discuss the alleged threat with plaintiff?

2  A    No.

3  Q    Did you receive any disciplinary action by the board in

4  response to the alleged threat?

5  A    No.

6  Q    Did you ever hear any other board members talking about

7  this alleged threat?

8  A    No.

9  Q    Are you aware of any discussions amongst the other board

10  members regarding the accusations plaintiff alleged against

11  you?

12  A    I'm not aware of any.

13  Q    Are you aware of any discussion amongst the other board

14  members regarding the police report plaintiff filed?

15  A    No.

16  Q    Now, at some point the board voted to rescind the one-year

17  contract extension it had previously offered plaintiff,

18  correct?

19  A    That's correct.

20  Q    Do you recall when that was?

21  A    August of 2015.

22  Q    Why did the board vote to rescind the one-year contract

23  extension?

24  A    We had had a meeting with our attorney.  And it was -- it

25  was told to us that, you know, we had that option.

T. Rogers - cross by Schwendener

1  Q    Was it your understanding that the vote was ineffective?

2  A    Yes.  It was -- yes.

3  Q    Going back to the February -- and going back to the

4  February 23rd, 2015 meeting.  Did the board ever make any

5  findings that plaintiff had met her goals prior to extending

6  the contract?

7  A    No.

8  Q    Did your vote to rescind the contract extension have

9  anything to do with the audit plaintiff requested?

10 A    No.

11 Q    Did your vote to rescind the contract have anything to do

12 with the threat plaintiff accused you of making?

13 A    Not at all.

14 Q    Did your vote to rescind the contract have anything to do

15 with the police report plaintiff filed?

16 A    No.

17 Q    Are you aware of any discussions amongst the board members

18 that based their vote to rescind the contract on the

19 plaintiff's request for an audit?

20 A    No.

21 Q    Are you aware of any discussions by any board members that

22 based their vote to rescind the contract on the threat

23 plaintiff accused you of making?

24 A    No.

25 Q    Are you aware of any discussions by any board members that

T. Rogers - cross by Schwendener

1  based their vote to rescind the contract on the police report
2  plaintiff filed?

3  A    None.

4  Q    Directing your attention to August 17th of 2015.  At any
5  point did the board issue performance directives to plaintiff?

6  A    Yes.

7  Q    And what are performance directives?

8  A    It's a, it's a, a way of measuring, you know, how well the
9  superintendent is doing.  So we are kind of looking for some
10  specific bullet points that we want the superintendent to carry
11  out.

12  Q    Counsel asked you some questions earlier about the
13  changing -- that plaintiff had changed the summer school
14  schedule.  Do you recall any changes that plaintiff had made to
15  the summer school schedule without the board's knowledge?

16  A    Yes.

17  Q    Could you please explain what you recall.

18  A    Yes.  The counsel made mention that I saw it in a
19  newsletter, but I did see it in a newsletter, but it was after
20  the fact that the damage had already been done.  The plaintiff
21  had already rescheduled the days and the times that we've
22  normally had in our school district for many years.  And the
23  board didn't know anything about it.  And there was reason
24  being is because we normally go four days in summer school,
25  and, and the custodian -- we don't have to pay the janitorials

T. Rogers - cross by Schwendener

1    and the teachers and everything on that Friday.

2             So -- but none of that was discussed with the board.

3    And the board is not in a habit of getting into the day-to-day

4    operations, but we would be like to kept abreast when there's

5    an emergency or something of that magnitude going on in the

6    district.

7    Q    Did the issuing of the partial performance directives have

8    anything to do with the plaintiff's request for an audit?

9    A    No.

10   Q    Did the issuing of partial performance directives have

11   anything to do with the threat plaintiff accused you of making?

12   A    No.

13   Q    Did the issuing of the partial performance directives have

14   anything to do with plaintiff's filing of a police report?

15   A    No, it didn't.

16   Q    Did you vote to issue partial performance directives to

17   plaintiff?

18   A    Yes, I did.

19   Q    Did your vote to issue the partial performance directives

20   to plaintiff have anything to do with her request for an audit?

21   A    No, ma'am, they did not.

22   Q    Did your vote to issue the partial performance directives

23   have anything to do with the alleged threat she accused you of?

24   A    No, ma'am, it did not.

25   Q    Did your vote to issue the performance directives have

T. Rogers - redirect by Davis

1  anything to do with the police report plaintiff filed?

2  A    No, not at all.

3  Q    Are you aware of any discussions by any other board

4  members that based their vote to issue the partial performance

5  directives on the request for an audit?

6  A    No, I'm not aware.

7  Q    Are you aware of any discussion amongst any other board

8  members that based their vote to issue the partial performance

9  directives on the alleged threat plaintiff accused you of?

10 A    No, ma'am.

11 Q    Are you aware of any discussion by any other board members

12 that based their vote to issue the partial performance

13 directives on plaintiff's filing of a police report?

14 A    None.

15        MS. SCHWENDENER:  Thank you.  I don't have anything

16 further.

17        THE COURT:  Thank you, Counsel.  Questions from the

18 plaintiff?

19        MR. DAVIS:  Yes, Judge.

20        THE COURT:  Proceed, Mr. Davis.

21              REDIRECT EXAMINATION

22 BY MR. DAVIS:

23 Q    You said the board before the February voting for the

24 extension, February 23rd, 2015, never evaluated Dr. Adams

25 regarding the performance goals; correct?

738

T. Rogers - redirect by Davis

1        MS. SCHWENDENER:  Objection.

2        THE COURT:  Basis?

3        MS. SCHWENDENER:  Mischaracterizes the witness'

4   testimony.

5        THE COURT:  Adverse testimony.  He can answer.

6   Overruled.  Answer please.

7        THE WITNESS:  Can you repeat that again.

8   BY MR. DAVIS:

9   Q    You said you all voted for an -- to grant an extension

10  February 23rd, 2015, right?

11  A    Yes.

12  Q    You just said that you never evaluated Dr. Adams before

13  that to see if she was reaching the district's goals, is that

14  what you just said?

15  A    No.

16  Q    Okay.  Did you all evaluate Dr. Adams whether she was

17  accomplishing the district goals before voting for the

18  extension?

19  A    No.

20  Q    Okay.  I'm confused.  But maybe I can clear it up.

21  A    Okay.

22  Q    We just saw Dr. Adams' performance evaluation, right?

23  A    Yes.

24  Q    That said January 2015 on it?

25  A    It had the year 2014-15.  I'm not sure if it said January.

739

T. Rogers - redirect by Davis

1   Q    That was the comparator.  The one before that said
2   January 2015, right?  Plaintiff's exhibit --
3   A    Can I see it?  Can I see it again, Counsel.
4   Q    Sure.
5           MR. DAVIS:  May I, Judge.
6           THE COURT:  You may.
7           THE WITNESS:  Yes, sir, this evaluation says
8   January 2015.
9   BY MR. DAVIS:
10  Q    All right.  And the first page, what's the title of the
11  document?  Read that, please.  Very top.
12  A    The first page states part one, superintendent performance
13  goals.
14  Q    Thank you.  And you participated in this evaluation,
15  right?
16  A    Yes, sir.
17  Q    And the whole board participated in it, right?
18  A    Yes, sir.
19  Q    And this is the only evaluation that 152 uses for
20  superintendents, right?
21  A    Annually, yes.
22  Q    Yes.  They don't use any other evaluation, right?
23  A    No.
24  Q    You said that you wanted the audit, right?
25  A    Yes.

140

T. Rogers - redirect by Davis

1   Q    In fact, didn't you appear at a board meeting, and we've
2   already heard this tape --
3   A    Okay.
4   Q    -- where you said you were shocked when you got the RFP on
5   July 9th because you saw that Dr. Adams included in there
6   investigating board members, and you weren't comfortable.  You
7   didn't have time to be audited.  You remember that?
8   A    No.
9   Q    You don't remember saying that?
10  A    I wasn't shocked, first of all.
11  Q    Just answer my question.  Do you remember saying it or did
12  you not say it?
13  A    I did not say that, no.
14           MR. DAVIS:  Playing -- may I, Judge.
15           THE COURT:  Yes, you may.
16           MR. DAVIS:  -- Plaintiff's Exhibit No. 71.  Volume
17  VN810186.  It is from the July 22nd, 2015 board meeting.
18           THE COURT:  All right.  Tell me when you're cued up.
19      (Whereupon, said tape was played in open court.)
20  BY MR. DAVIS:
21  Q    Was that you, Mr. Rogers?
22  A    Yes, sir.
23  Q    So you said the summer school schedule you all got the
24  information after the fact.  Is that what you said?
25  A    Yes.

T. Rogers - redirect by Davis

1   Q    But didn't you just admit a few minutes earlier you got
2   the changes to the summer school in mid-June?
3   A    No.
4   Q    So you didn't just say 20 minutes ago -- you remember a
5   few minutes ago you said you did get the schedule changes.  You
6   got the newsletter, right?
7   A    I got the newsletter.
8   Q    And I asked you when you got the newsletter.  Did you get
9   it in mid-June 2015.  You don't remember that?
10  A    You didn't ask me when I got it.
11  Q    Okay.  When did you get it?
12  A    I don't recall.
13  Q    Isn't it true that you've previously testified under oath
14  that you received it, and it's dated June 15th through the
15  19th?  Didn't you previously testify about that?
16  A    I testified that I got the newsletter.  Now, as far as the
17  dates, the newsletter was talking about summer school.  I don't
18  know if it was June or July or May, what.
19           THE COURT:  Sir, there's no question pending.
20  Proceed.
21  BY MR. DAVIS:
22  Q    So you previously testified you got the newsletter, right?
23  A    Yes, sir.
24  Q    And the newsletter has on it when it was sent out, right?
25  It shows the week it was sent out?

742

T. Rogers - redirect by Davis

1   A    Normally it does, yes.

2   Q    And, in fact, you were handed the newsletter in your

3   deposition to look at it, right?

4   A    I don't recall.

5   Q    Okay.  Well, do you recall that the newsletter had week of

6   6/15 through 19?

7   A    No, sir.

8        MR. DAVIS:  Okay.  I'd like to go to Plaintiff's

9   Exhibit 58.  This is Mr. Rogers' deposition.  I previously

10  disclosed these pages to counsel.  And --

11       THE COURT:  All right.  Any objection?  I believe

12  this has already been seen.

13       MS. SCHWENDENER:  Page 58?

14       THE COURT:  First of all, any objection to the

15  deposition?  Is this a deposition?

16       MS. SCHWENDENER:  Well, this is a deposition.  Yes, I

17  would -- I'm not sure what page counsel is referring to, but

18  yes, I would have an objection for the record.

19       THE COURT:  Well, right now he's trying to impeach

20  him, so your objection's overruled.  And I'm not going to

21  publish an impeachment yet unless it's already been all shown

22  to the jury.  Proceed.

23       MR. DAVIS:  I believe we, we haven't looked at this

24  specific part of his --

25       THE COURT:  Well, he'll have it in front of him, if

T. Rogers - redirect by Davis

1    you wish him to.

2              MR. DAVIS:  Sure.

3              THE COURT:  You don't even need it to impeach him.

4    Just read what it is.  Make sure he took the dep and knows what

5    he's doing.

6    BY MR. DAVIS:

7    Q    Okay.  You see what I have on the screen, page 97 at line

8    16, Mr. Rogers?

9    A    Yes.

10   Q    Can you read it to yourself.

11             THE COURT:  Wait.  Counsel, are you impeaching him or

12   refreshing his recollection?

13             MR. DAVIS:  I'm impeaching him, Judge.

14             THE COURT:  Then, Counsel, he shouldn't be reading

15   it.

16             MR. DAVIS:  Okay.

17             THE COURT:  You should just read it.  That's the way

18   you impeach.

19             MR. DAVIS:  Okay.  Great, Judge.  Thank you.

20   BY MR. DAVIS:

21   Q    Okay.  And one of the -- this is the question.  Okay.  And

22   one of the things that you all disciplined Dr. Adams about was

23   that she made changes to the summer school schedule without

24   getting prior board approval, is that correct?

25             Answer:  That was just one of many.

44

T. Rogers - redirect by Davis

1    Question:  So the answer to my question is yes.

2    Answer:  Yes.

3    Question:  That was one.  I'm going to hand you -- I think

4  I've already given you a superintendent's weekly newsletter.

5    Answer:  Uh-hum.

6    Question:  For June 15th to June 19th.  Do you have that?

7    Yes, sir.

8    And the summer school started on July 1st, correct?  I'm

9  asking you when summer school -- I'm not asking you about the

10  documents yet.  Summer school started on July 1st, correct?

11    I don't know.

12    Okay.  Well, you received a copy of that newsletter in

13  your hand, right?

14    Answer:  I don't remember.  I get them every week.  I

15  don't know.  I may have.

16    Okay.  Well --

17        THE COURT:  Read what you are seeing.  I may have.

18  What do you say after that?

19        MR. DAVIS:  So --

20        THE COURT:  Counsel, you are not reading the whole

21  sentence.

22        MR. DAVIS:  I'm sorry.  It says okay --

23        THE COURT:  16 and 17.  You stopped at I may have on

24  16.

25        MR. DAVIS:  Oh, I'm sorry.  I may have.  I don't

                     T. Rogers - redirect by Davis

1  know.

2              THE COURT:  No.  "I may have.  I may not."

3              MR. DAVIS:  Oh, I'm sorry.  I missed that, Judge.

4              THE COURT:  Yes, you don't want to miss that I don't

5  think.

6  BY MR. DAVIS:

7  Q    Okay.  I may have.  I may not have.  Okay.  That's what

8  you said, right?

9              So let's do it this way, Mr. Rogers:  We also talked

10 about the fact that you commended Dr. Adams at a board meeting

11 because in the newsletter she congratulated you being the only

12 male on the board for Father's Day, right?

13 A    Yes.

14 Q    You remember that?

15 A    Yes.

16 Q    And so you acknowledge at this board meeting I got the

17 newsletter.  I was so proud to see that you included in there

18 Happy Father's Day to Mr. Rogers, right?

19 A    Yes, I recall that.

20 Q    Okay.  So in order to know that, you had to get the

21 newsletter, right?  You was commending her because you read it

22 in the newsletter, right?

23 A    That's correct.

24 Q    You said that Attorney Izzo gave you the option -- gave

25 the board, said you got the option to not renew the contract or

T. Rogers - redirect by Davis

1    to -- I'm sorry, rescind the extension, the contract extension,
2    correct?  That's what you just testified to?
3    A    That's what I just testified to.
4    Q    Okay.  So you had the option not to rescind the contract.
5    The board, you meaning the board had the option not to rescind
6    the contract, correct?
7    A    As an individual, yes.
8    Q    As a board you had the option not to rescind the contract,
9    right?
10   A    I can't speak on behalf of the entire board.  I'm only one
11   vote.
12   Q    You just said he presented to the board that you all had
13   the option to rescind the contract?
14   A    That's correct.
15   Q    So the converse of that is you had the option not to
16   rescind the contract as a board, right?
17   A    Sir, I'll repeat.  I'm only one person.  I've only got one
18   vote.
19            MR. DAVIS:  No further questions, Judge.
20            THE COURT:  All right.  Any questions further from
21   defense?
22            MS. SCHWENDENER:  Yes, Your Honor.
23            THE COURT:  Proceed.
24            MS. SCHWENDENER:  Thank you.  Judge, I'd like to show
25   what's been previously marked as Plaintiff's Exhibit 1.

T. Rogers - recross by Schwendener

1    THE COURT:  One second.  And that's been published.
2  I believe that's the contract, is that correct?
3    MS. SCHWENDENER:  Correct, Your Honor.
4    THE COURT:  All right.  Give me one second.  All
5  right.  Proceed.
6                  RECROSS-EXAMINATION
7  BY MS. SCHWENDENER:
8  Q    Mr. Rogers, if you could take a look at paragraph No. 3.
9    THE COURT:  Well, you're going to have to move it.
10  Paragraph with the number 3?
11    MS. SCHWENDENER:  Yes.
12    THE COURT:  The first one under duties?
13    MS. SCHWENDENER:  Number 3.
14    THE COURT:  All right.  Paragraph 3.  Proceed.
15  BY MS. SCHWENDENER:
16  Q    Mr. Rogers, do you recognize this?
17  A    Yes, I do.
18  Q    Okay.  At any point did the board make a formal finding
19  that plaintiff had met goal one under paragraph three?
20  A    No --
21    THE COURT:  Wait.  We need some temporal, some time
22  period.
23  BY MS. SCHWENDENER:
24  Q    Prior to February 23rd of 2015, did the board ever make a
25  finding that plaintiff had met goal No. 1?

748

T. Rogers - further redirect by Davis

1  A    No.

2  Q    Prior to February 23rd of 2015 did the board ever make a

3  finding that plaintiff had met goal No. 2?

4  A    No.

5          MS. SCHWENDENER:  Thank you.  No further questions.

6          MR. DAVIS:  Redirect, Judge.

7          THE COURT:  Yes, go ahead.  Leave that same doc up

8  there, Counsel.

9          MR. DAVIS:  Yes, please leave that.

10         THE COURT:  Leave the same document up, Counsel.

11         MS. SCHWENDENER:  Sure.  Sorry, Judge.

12         MR. DAVIS:  You have the next page?

13         THE COURT:  All right.  Thank you both.

14         MR. DAVIS:  Thank you.

15              FURTHER REDIRECT EXAMINATION

16  BY MR. DAVIS:

17  Q    Mr. Rogers, look at -- this is the same document, same

18  contract.  Underneath B read the paragraph there what it says.

19  A    Yes, sir.  It says, Further, the superintendent and the

20  board shall consult in no later than October 1st, 2013 and

21  June 1st of each contract year thereafter in order to manually

22  determine whether --

23         THE COURT:  Mutually.  Mutually.  I know the reading

24  is a little tough.

25         THE WITNESS:  I'm sorry.  I'm sorry.  Mutually

749

T. Rogers - further redirect by Davis

1   determine whether such goals should be amended or additional

2   goals needed to be included.  Any amendments or additions

3   mutually agreed upon by the parties shall be attached thereto

4   and incorporated as part of this agreement.

5   BY MR. DAVIS:

6   Q    So based on this agreement and what you just read, on June

7   1st, 2014 the board met with Dr. Adams to discuss her

8   performance goals, correct?

9   A    I really don't recall.

10  Q    So it could have happened?

11  A    It could not have happened.

12  Q    Do you have any independent knowledge that that didn't

13  happen?

14  A    I don't, I don't know for certain, sir.

15  Q    It's a yes or no question, Mr. Rogers.

16  A    I'm not -- I, I don't remember.

17         THE COURT:  I don't know is an option.

18         MR. DAVIS:  Okay.

19         THE WITNESS:  I don't recall.

20  BY MR. DAVIS:

21  Q    Do you have any reason to believe that the board violated

22  its own contract and on June 1st, 2014 didn't sit down with Dr.

23  Adams to discuss her performance goals?

24         MS. SCHWENDENER:  Objection.

25         THE COURT:  Overruled.

```
 1            THE WITNESS:  I really don't have any reason to
 2    believe that the board violated the contract.
 3            MR. DAVIS:  Thank you, Mr. Rogers.
 4            MS. SCHWENDENER:  No questions.
 5            THE COURT:  You're done, Mr. Rogers.
 6            THE WITNESS:  Okay.
 7            THE COURT:  All right.  Watch your step.
 8         (Witness excused.)
 9            THE COURT:  All right.  I think this is a good time
10    for a break.  All rise.
11         (Jury excused.)
12            THE COURT:  Anything on the record -- you're calling
13    one of the Johnsons next?
14            MR. DAVIS:  Yes.
15            THE COURT:  All right.  Which one so they know?
16            MR. DAVIS:  Gloria first and then Betty.
17            THE COURT:  All right.  More than likely we'll get
18    Gloria done.  See how long it takes, then we'll take a lunch.
19            MR. DAVIS:  Okay.
20            THE COURT:  All right.  So that's -- we'll get one
21    before lunch and one after.
22            MR. DAVIS:  Okay.
23            THE COURT:  All right.  Anything else?  No?
24            MS. SCHWENDENER:  No, Your Honor.
25            THE COURT:  All right.  Five minutes.  Thank you.
```

G. Johnson - direct by Davis

1    MR. DAVIS:  Thank you, Judge.

2    THE COURT:  10.

3    (Short break taken.)

4    (Before the jury:)

5  GLORIA JOHNSON, PLAINTIFF'S WITNESS, DULY SWORN

6    THE COURT:  Proceed, Counsel.

7    MR. DAVIS:  Thank you, Your Honor.

8    THE COURT:  Keep your voice up.

9    DIRECT EXAMINATION

10  BY MR. DAVIS:

11  Q    Good morning, Miss Johnson.  How are you?

12  A    Good morning, Counselor.  I'm well.  Thank you.

13  Q    Thank you.  How long have you been on the board for Harvey

14  152?

15  A    25 years.

16  Q    So you were serving on the board in 2015, February 2015?

17  A    Yes.

18  Q    And you were on the board in July of 2015?

19  A    Yes.

20  Q    After July 10th, August.  Yes.  Okay.  When did you find

21  out about the police report that Dr. Adams had made regarding

22  Mr. Rogers?

23  A    Find out about it?  I don't recall the exact date when I

24  found out.

25  Q    Okay.  Can I show you something that -- well, let me do it

G. Johnson - direct by Davis

1  this way --

2          THE COURT:  Excuse me, Counsel.  I'm sorry.  Can we

3  have a little more clarification on that term found out about

4  it.

5          MR. DAVIS:  Okay.

6          THE COURT:  Thank you.

7  BY MR. DAVIS:

8  Q    Are you aware that Dr. Adams filed a police report saying

9  that Mr. Rogers threatened her?

10 A    I heard --

11 Q    Yes.

12 A    -- that a police report was filed.

13 Q    Right.  And in connection with this case, didn't you

14 answer certain written questions?  They call them

15 interrogatories.

16 A    No.

17 Q    Okay.  You don't remember an interrogatory that said when

18 did you find out about Dr. Adams filing a police report?

19 A    I don't recall.

20         MR. DAVIS:  Okay.  Well, I'd like to show the witness

21 the --

22         THE COURT:  Exhibit what?

23         MR. DAVIS:  Exhibit 63, Judge.

24         THE COURT:  All right.  Exhibit 63.  And to refresh

25 her recollection, is that correct?

G. Johnson - direct by Davis

1      MR. DAVIS:  Well, actually it's a written exhibit,
2   so --
3      THE COURT:  Well, first, first it's because she said
4   she didn't recall.  You were going to try to refresh -- let her
5   see it just to refresh her recollection?
6      MR. DAVIS:  Well, I don't think I have to do that,
7   Judge.  I think it's a sworn statement by a party.
8      THE COURT:  Counsel.  Counsel, you don't, but you
9   don't even have to have her on the stand if you want to do
10   that.  If you're going to ask her about the interrogatories,
11   you at least have to show them to her.
12      MR. DAVIS:  Okay.  No problem, Judge.
13   BY MR. DAVIS:
14   Q    So, Mrs. Rogers, can you see the screen?
15   A    Yes, I can.
16   Q    And you see where it says No. 5?
17   A    Yes, I do.
18   Q    And you can read it to yourself what it says.
19   A    All right.  I, I -- it stops at July 10.  Is there any
20   more to that answer?
21   Q    Well, I was talking about the first paragraph.
22   A    Oh, yes.
23   Q    The first paragraph basically asks -- it's a question,
24   right?
25   A    I see it, yes.

754

G. Johnson - direct by Davis

1  Q    And it's asking when did you find out that Dr. Adams made

2  a police report saying that Tyrone Rogers threatened her,

3  saying she was itching for -- you can read the rest.

4  A    Right.  Right.

5  Q    Okay.  And so the answer, and it says defendant Gloria

6  Johnson.  You can read that part?

7  A    Yes, I can.

8  Q    And can you read -- are you now refreshed on your answer?

9  Is this your answer?

10 A    It could very well be my -- yes.

11 Q    Okay.  So what does it say?  When did you find out?

12 A    May I read from this?

13 Q    Sure.

14 A    Defendant Gloria Johnson states that she does not have

15 knowledge that plaintiff filed a police report per se with the

16 Harvey Police Department.  On July 10th, 2015 Gloria Johnson

17 was told by plaintiff that Tyrone Rogers allegedly told

18 plaintiff she was itching for an ass kicking.  On or around

19 July 10th, defendant Gloria Johnson states that the Harvey

20 Police Department were called to the school district and that

21 she does not know who called them.  On or around July 12th,

22 defendant was told by plaintiff that plaintiff was going to

23 make a complaint for the record and that plaintiff was not

24 intending to press charges against Tyrone Rogers.  I do recall.

25 Q    All right.  Thank you.  Miss Rogers -- I'm sorry.

G. Johnson - direct by Davis

1  Miss Johnson.  I apologize.

2          So when you found out -- when Dr. Adams told you on

3  July 12th what had happened, did you tell -- you were the

4  president of the board at that time?

5  A    Yes.

6  Q    And did you then -- you told Dr. Adams that you would let

7  the other board members know about the incident, right?

8  A    I told Dr. Adams that I would first contact Mr. Rogers.

9  Q    And then you would let them --

10 A    I would not inform board members.  I had to speak with him

11 first.

12 Q    Okay.  Did you contact Mr. Rogers?

13 A    We made a conversation over the weekend.

14 Q    Okay.

15 A    And he denied the allegation.

16 Q    Okay.  Did you then communicate with the other board

17 members about the incident?

18 A    No.  Because he denied that he made any inappropriate

19 statements.

20 Q    Okay.  So you never told your -- you're the board

21 president.  One of the members had a police report for a

22 violent threat, and he denied it.  And you just never thought

23 it should be broached with other board members, is that your

24 testimony?

25 A    It was -- that's my testimony.

G. Johnson - direct by Davis

1  Q    Okay.  You voted on August 17th, 2015 to rescind Dr.

2  Adams' contract extension, right?

3  A    Yes.

4  Q    And, in fact, you all had a meeting and you were talking

5  about it.  And again, you were the board president then, right?

6  A    Yes.

7  Q    And you were debating among yourselves what to tell Dr.

8  Adams.  And you -- right?  You remember that?

9  A    I wouldn't say debating among ourselves.  Remember I was a

10 chairperson.  We did have a discussion.

11 Q    Right.  And the discussion was what do we tell Dr. Adams.

12 You had already decided you were going to rescind the

13 extension, right?

14 A    We were -- okay.  Give me the dates when you say we were

15 deciding.

16 Q    August 17th, 2015.

17 A    We were informed in July that we were -- it was not valid.

18 Q    I'm sorry.  I'm sorry.  I'm talking about August 17th.

19 A    And you say we had already decided.

20 Q    Well, you all were discussing?

21 A    Discussing.

22 Q    Let me phrase it this way.

23 A    Right.

24         THE COURT:  Excuse me too.  Again, you can't talk

25 over each other.  You have to ask a specific question.  All

G. Johnson - direct by Davis

1  right.  And, ma'am, wait until he asks.  If you don't

2  understand it, tell him you don't understand.  Proceed.

3  BY MR. DAVIS:

4  Q    Didn't you tell the other board members we need to bring

5  her back in here and tell her that the contract extension was

6  ineffective?

7  A    During -- yes, during executive session.

8  Q    Right.  And at one point you said you were going to tell

9  her that it was illegal.  When you all voted to extend it, it

10  was illegal.  Isn't that what you said?

11  A    I don't recall the exact words, but could have.

12  Q    And other board members, Dr. McCaskill said, well, oh,

13  don't say illegal.  I don't do illegal stuff, right?

14  A    I don't recall that.

15  Q    Okay.  Well, let me show you the transcript of the -- or

16  let me just play the tape of that meeting.

17        THE COURT:  You have a number just for reference,

18  Counsel?

19        MR. DAVIS:  Yes.  This is -- this is Plaintiff's

20  Exhibit 72.  This is the recording made of, of the board

21  meeting.

22        THE COURT:  Of what date?

23        MR. DAVIS:  August 17th, 2015.

24        THE COURT:  All right.  Thank you.  Any objection?

25        MS. SCHWENDENER:  No objection.

G. Johnson - direct by Davis

1    THE COURT:  Other than the one from the original

2  motion?

3    MS. SCHWENDENER:  Other than previously stated, yes.

4    THE COURT:  All right.  Proceed.  Proceed, Counsel.

5    MR. DAVIS:  Thank you, Judge.

6    (Whereupon, said tape was played in open court.)

7  BY MR. DAVIS:

8  Q    Okay.  So that was you saying we need to tell Dr. Adams

9  that we're going to rescind the contract, right, basically?

10 A    Yes.

11 Q    Okay.  And then here's another part.  Here's the part

12 where we were talking about you all were debating or

13 discussing.

14    THE COURT:  Is this the same date, Counsel?

15    MR. DAVIS:  Yes, same day.  Same exhibit, Your Honor.

16    THE COURT:  Proceed.

17    (Whereupon, said tape was played in open court.)

18 BY MR. DAVIS:

19 Q    You refreshed your -- on that conversation now,

20 Miss Johnson?

21 A    Yes.

22 Q    And who was that -- that was you talking, right?

23 A    That was me talking.  I used the term illegal, which was

24 an inappropriate word, and it was corrected.

25 Q    Okay.  And that was Dr. McCaskill saying I don't do

G. Johnson - direct by Davis

1  illegal stuff?

2  A    I think so.

3  Q    And that was Linda Hawkins saying --

4  A    I don't know all the rest now.

5  Q    Okay.  Well, who was it that said when you all said you

6  were going to tell her that it was ineffective, see ya later

7  alligator?

8  A    Don't know.  I heard that.  I don't know.

9  Q    You heard it, though, right?

10  A    Yes.

11  Q    Okay.  But you don't know which -- that was a board

12  member, right?

13  A    I think.  Only board members were -- the only people

14  should have been in there should have been board members.

15  Q    Right.  So one of the board members when you all said,

16  hey, we're going to tell her this extension is over, see ya

17  later alligator.  Pretty gleefully?

18  A    Yes.

19  Q    Yes.  Okay.  You knew working with Tyrone Rogers that he

20  was pretty mad about -- after July 10th he wanted Dr. Adams

21  out, right?

22  A    I, I don't know.

23  Q    You attended --

24  A    I don't re -- I cannot say that.

25  Q    Okay.  You attended board meetings with Mr. Rogers?

G. Johnson - direct by Davis

1   A    Yes.

2   Q    And you were here when he was testifying, right?

3   A    Yes.

4   Q    And he testified and said he came to the board meeting on

5   August 17th and he didn't want to do no discipline.  He just

6   wanted her fired.  Didn't you hear him say that?

7   A    You played some tapes, and I heard what he said then, sir.

8   I don't recall all of the dates.

9   Q    Okay.  But I'm talking about you recall sitting in the

10  courtroom.  You've been here.  You heard Mr. Rogers saying --

11  A    But I don't know the date.

12       THE COURT:  Excuse me, ma'am.  You have to wait until

13  he finishes his question.

14       THE WITNESS:  Okay.

15       THE COURT:  His question, not his testimony.

16       MR. DAVIS:  Okay.  All right, Judge.

17  BY MR. DAVIS:

18  Q    Let me try to make it focused before I get in trouble.

19       Didn't -- wouldn't you say Mr. Rogers after July 10th

20  didn't believe Dr. Adams should be in the job anymore?

21       MS. SCHWENDENER:  Objection.

22       THE COURT:  Form of the question sustained.

23  BY MR. DAVIS:

24  Q    Didn't you attend meetings?

25  A    Yes.

G. Johnson - cross by Schwendener

1  Q    Where he said that?  Ma'am?

2  A    I don't recall.  Sir --

3  Q    Well, that's okay.

4         THE COURT:  No explanation yet until your lawyers get

5  to -- they'll get to ask you questions.  All right, ma'am?  All

6  right.

7  BY MR. DAVIS:

8  Q    So my final question on that point is would you

9  characterize after July 10th Tyrone Rogers as being upset with

10 Dr. Adams?

11 A    Yes.

12        MR. DAVIS:  Thank you, Mrs. Johnson.  I think that's

13 all I have, ma'am.  Thank you.

14        THE COURT:  All right.  Thank you very much, Counsel.

15 Defense.  Again, this is a witness that is named in the case as

16 a defendant.  You just heard adversarial questions, gently

17 adversarial questioning, and -- but still the defendant is

18 going to also combine her testimony that they would have called

19 her for in their case in chief instead of us going back and

20 forth.  Proceed.

21        MS. SCHWENDENER:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23 BY MS. SCHWENDENER:

24 Q    Good morning, Mrs. Johnson.

25 A    Good morning.

G. Johnson - cross by Schwendener

1    Q    Where do you live?

2    A    Harvey, Illinois.

3    Q    And are you still currently a member of the Board of

4    Education?

5    A    Yes.

6    Q    And when did you first become a member?

7    A    1993 I was appointed, and I've been reelected six

8    consecutive four-year terms.

9    Q    Are you compensated for your services as a member of the

10   Board of Education?

11   A    No.

12   Q    And you've also been named as a defendant in this matter,

13   correct?

14   A    Yes.

15   Q    Did you vote to hire the plaintiff in July of 2013?

16   A    Yes.

17   Q    Do you recall the length of her initial contract?

18   A    Three years.

19   Q    Directing your attention to February 23rd of 2015.  Do you

20   recall being at a board meeting that night?

21   A    Yes.

22   Q    And at that meeting on February 23rd of 2015 did the board

23   vote to extend plaintiff's contract?

24   A    Yes.

25   Q    Do you recall the terms of that extension?

G. Johnson - cross by Schwendener

1   A     No.

2   Q     You heard testimony earlier that the extension was for one

3   year.  Do you have any reason to disagree with that?

4   A     No.

5   Q     Did you personally vote for the one-year contract

6   extension?

7   A     Yes.

8   Q     And I take it you know Tyrone Rogers?

9   A     Yes.

10  Q     And how do you know him?

11  A     As a colleague on the school board.

12  Q     And at some -- directing your attention to July 10th of

13  2015.  Did you become aware that plaintiff claims that Mr.

14  Rogers allegedly threatened her?

15  A     Yes.

16  Q     When did you first hear about this alleged threat?

17  A     On July 10th I spoke with the plaintiff on the phone.

18  Q     And how -- did plaintiff contact you or did you contact

19  her?

20  A     There were two or three calls made because I happened to

21  be at a place where I could not speak when I received the call.

22  So I don't know if I returned or she returned, but we spoke to

23  each other a couple of times that day.

24  Q     And what did plaintiff tell you?

25  A     She told me about the inappropriate statement made to Mr.

G. Johnson - cross by Schwendener

1  Rogers to her.  And she -- I don't -- I cannot say the verbatim
2  words, but I got the feeling she wanted to know if it was okay
3  with me -- she said she was going to have a police report filed
4  for the record.  But she seemed to have been concerned about
5  whether to -- whether I had any objection to it.  And she also
6  stated that she would not press charges.  I had no objections
7  to her filing.  As a matter of fact, I felt that she should do
8  whatever would make her feel comfortable at the time.
9  Q    Now, did you ever discuss the alleged threat at a board
10 meeting?
11 A    No.
12 Q    Do you know whether plaintiff eventually filed a police
13 report?
14 A    I was told that she eventually filed a police report.
15 Q    Have you ever seen this police report?
16 A    No, I have not.
17 Q    Was this police report ever discussed at a board meeting?
18 A    No.
19 Q    Now, directing your attention to August 17th of 2015.  Did
20 the board end up voting to rescind the ineffective contract
21 extension it had previously offered plaintiff?
22 A    Yes.
23 Q    Did you personally vote to rescind the contract extension?
24 A    Yes.
25 Q    And why?

G. Johnson - cross by Schwendener

1  A    I wanted the -- whatever we do as a district to be in
2  compliance with the state guidelines.  And we had been informed
3  by our attorney that we were not -- that it was ineffective,
4  invalid.  We were not in compliance because we had not
5  completed the total process.
6  Q    Do you recall when your attorney -- and your attorney,
7  would that have been Mr. Izzo?
8  A    Yes.
9  Q    Do you recall when Mr. Izzo informed you of, of that?
10 A    I believe it was at the July 22nd meeting.
11 Q    Were you aware of the requirement that plaintiff met her
12 goals when you first extended the contract in February of 2015?
13 A    I was unaware that we had not completed the process.
14 Q    Drawing your attention to August 17th of 2015.  Do you
15 recall the board issuing performance directives to the
16 plaintiff?
17 A    Yes.
18 Q    Did you vote to issue the performance directives?
19 A    Yes.
20 Q    Did your vote to issue the performance directives have
21 anything to do with the police report plaintiff filed?
22 A    No.
23 Q    One last question.  Did your vote to extend -- or to
24 rescind the ineffective contract extension have anything to do
25 with plaintiff's filing of a police report?

G. Johnson - cross by Schwendener

1  A    No.

2           MS. SCHWENDENER:  Thank you.  I don't have any

3  further questions.

4           THE COURT:  Thank you very much.  Counsel.

5           MR. DAVIS:  No further questions.

6           THE COURT:  Nothing further.  All right.  Ladies and

7  gentlemen -- and, Miss Johnson, stay right there.  It is -- I

8  want to try to let you out a little earlier on Friday.  We're

9  going to take our lunch early.  All right.  And so you're going

10 to be going to lunch from 11:45 to 12:45.  All right.  Be back

11 at 12:45.  We've got a full hour today to make up for the hours

12 I cheated you on.  And we'll continue with the witnesses and

13 the questioning.  All rise.

14     (Jury excused.)

15          THE COURT:  All right.  Ma'am, you may step down.

16 You're all done.  You can just continue to observe, or you're

17 allowed to leave.  Whichever one you want.

18          THE WITNESS:  Thank you.

19     (Witness excused.)

20          THE COURT:  All right.  Counsel -- go ahead, ma'am.

21 You're fine.  Counsel, is there anything to discuss right now?

22          MR. DAVIS:  No, Your Honor.

23          THE COURT:  Defense, anything?

24          MS. SCHWENDENER:  No, Your Honor.  Then I'll see you

25 back here at a little before 12:45.  All right.  Thank you.

1          MR. DAVIS:  Thank you, Your Honor.

2          MS. SCHWENDENER:  Thank you.

3     (Whereupon, said trial was recessed at 11:45 a.m., until

4      12:40 )

1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   DR. DENEAN ADAMS,                    ) No. 15 C 8144
                                         )
4                      Plaintiff,        )
                                         )
5             v.                         )
                                         )
6   BOARD OF EDUCATION HARVEY SCHOOL     ) November 2, 2018
    DISTRICT 152, GLORIA JOHNSON in her  ) Chicago, Illinois
7   individual capacity, BETTY JOHNSON   ) 12:50 p.m.
    in her individual capacity,          )
8   DR. KISHA McCASKILL in her           )
    individual capacity, JANET ROGERS    )
9   in her individual capacity, TYRONE   )
    ROGERS in his individual capacity,   )
10  LINDA HAWKINS in her individual      )
    capacity, FELICIA JOHNSON in her     )
11  individual capacity,                 )
                                         )
12                     Defendants.       ) Trial

13                       VOLUME 5
                 TRANSCRIPT OF PROCEEDINGS
14    BEFORE THE HONORABLE SHARON JOHNSON COLEMAN, and a
                          jury

15

16  APPEARANCES:

17  For the Plaintiff:   MR. JEROME M. DAVIS, ESQ.
                         9024 McIntosh Court
18                       Lakewood, Illinois  60014

19  For the Defendants:  HAUSER IZZO PETRARCA GLEASON & STILLMAN
                         1415 West 22nd Street
20                       Suite 200
                         Oak Brook, Illinois  60523
21                       BY:  MR. CHRISTOPHER L. PETRARCA

22

23            TRACEY DANA McCULLOUGH, CSR, RPR
                   Official Court Reporter
24               219 South Dearborn Street
                        Room 1426
25               Chicago, Illinois  60604
                     (312) 435-5570

1    APPEARANCES CONTINUED:

2                         LAW OFFICES OF JENNIFER K. SCHWENDENER LLC
                         5117B Main Street
3                         Suite 4
                         Downers Grove, Illinois  60515
4                         BY:  MS. JENNIFER K. SCHWENDENER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (The following proceedings were had in open court outside

2      the presence of the jury:)

3          THE COURT:  Anything on the record?

4          MR. DAVIS:  I spoke with defense counsel.  And there

5     are a number of the defendants that aren't here, and I want to

6     get into the record their interrogatory responses where they

7     state when they became aware of the police report.  And counsel

8     has agreed that we can do a stipulation.

9          THE COURT:  That's the way to do it.

10         MR. DAVIS:  And handle that.

11         THE COURT:  That's the way to do it.

12         MR. DAVIS:  Thank you.

13         THE COURT:  All right.  But you'll do that after your

14    witness.

15         MR. DAVIS:  Yes.

16         THE COURT:  Okay.  Good.  All right.  Anything else

17    other than that?

18         MR. DAVIS:  That's it, Your Honor.

19         THE COURT:  Anything else?

20         MS. SCHWENDENER:  No, Judge.

21         THE COURT:  All right.  Two minutes.

22    (Short break taken.)

23    (Before the jury:)

24         THE COURT:  All right.  Thank you, ladies and

25    gentlemen.  Have a seat.  Next witness.

71

B. Johnson - direct by Davis

1    MR. DAVIS:  Yes, Your Honor.  The plaintiff would
2  like to call Miss Betty Johnson.
3    THE COURT:  Miss Johnson, step forward.
4   BETTY JOHNSON, PLAINTIFF'S WITNESS, DULY SWORN
5    THE COURT:  You've heard my speech.  But now that
6  you're in the chair, just remember you can serve yourself water
7  at any time.  Wait until each question is asked before you
8  answer.  Proceed.
9    MR. DAVIS:  Thank you, Your Honor.
10    DIRECT EXAMINATION
11  BY MR. DAVIS:
12  Q    Good afternoon, Miss Johnson.  How are you?
13  A    Good evening.  Good afternoon.
14  Q    You're currently a member of the Harvey 152 Board of
15  Education?
16  A    No, not currently.
17  Q    Oh, okay.  When did you come off the board?
18  A    The last election.
19  Q    Oh, okay.  Were you a member in 2015?
20  A    Yes.
21  Q    Specifically in August, February 2015 through the whole
22  year?
23  A    Yes.
24  Q    Okay.  So when did you first hear about the police report
25  that Dr. Denean Adams filed where she stated that Mr. Rogers

B. Johnson - direct by Davis

1  had physically threatened her?

2  A    It was sometime over the weekend of July 10th.

3  Q    Okay.  So it was somewhere between July 9th and the 12th

4  maybe?

5  A    Somewhere around that time, yes.

6  Q    Okay.  All right.  And did you talk to any of your other

7  board members about it?

8  A    No.

9  Q    Okay.  So how did you find out about it?

10  A    Grapevine.

11  Q    Grapevine.

12  A    Telephone.  Someone had report it.

13  Q    You don't know who?

14  A    No.  No.  I don't remember.

15  Q    It could have been one of the other board members?

16  A    It could have been, but I'm not sure.

17  Q    We had a colloquy yesterday with Attorney Izzo, and we

18  talked about the July 22nd board meeting.  You remember that?

19  A    Yes.

20  Q    July 22nd.

21  A    Yes.

22  Q    2015, where the discussion was about rescinding Dr. Adams'

23  contract extension?

24  A    Yes.

25  Q    Okay.  And you expressed the view in that meeting that

B. Johnson - direct by Davis

1  once you all told Dr. Adams that the goals she had been working

2  under didn't count anymore, she was going to have a problem,

3  right?

4  A    I expressed a view?  I don't recall.

5  Q    Okay.  Well, didn't you say she's going to lean on those

6  goals, cycle goals?

7  A    Sir, I really can't recall.

8  Q    Okay.

9  A    What happened is -- word for word.

10 Q    I'm going to let you see the transcript.

11 A    Sure.

12        MR. DAVIS:  Well, rather than the transcript, I'm

13 going to play the audio, Your Honor.

14        THE COURT:  All right.

15        MR. DAVIS:  And this is Plaintiff's Exhibit No. 72.

16 And this is the --

17        THE COURT:  Just give the --

18        MR. DAVIS:  -- July 22nd, 2015 board meeting.

19        THE COURT:  All right.

20     (Whereupon, said tape was played in open court.)

21 BY MR. DAVIS:

22 Q    So is that you --

23 A    It sound like me.

24 Q    -- Miss Johnson?

25 A    Yes.

74

B. Johnson - direct by Davis

1  Q     And who -- was that Dr. McCaskill saying so the goals we

2  set at the retreat a year ago don't count?  Was that Dr. Kisha

3  McCaskill?

4  A     That was her talking.

5  Q     And ultimately at the end of that meeting -- well, let me

6  ask you this before I ask that question:  You all summoned Dr.

7  Adams into the room after you decided what to call it, whether

8  it was illegal, ineffective, you summoned her in the room to

9  tell her that the extension that had been granted was

10 ineffective; right?

11 A     At what time are you speaking?

12 Q     At the July -- I'm sorry, at the August 17th, 2015

13 meeting.

14 A     I believe you're correct.

15 Q     Okay.  And she was shocked when you all told her that.

16 She said what about the goals I've been working under for over

17 a year, right?

18        MS. SCHWENDENER:  Objection.

19        THE COURT:  Basis?

20        MS. SCHWENDENER:  Calls for speculation as to what

21 plaintiff felt.

22        THE COURT:  As to she was shocked.  Well, let's,

23 let's ask another question to, to show that this is not just

24 conclusory, Counsel.

25        MR. DAVIS:  Okay.

B. Johnson - direct by Davis

1    THE COURT:  Objection sustained.
2  BY MR. DAVIS:
3  Q    Didn't she say I've already been working under goals for
4  over a year.  Those goals are valid?
5  A    I really can't recall, sir.
6  Q    Okay.  Well, I'd like to show the witness Plaintiff's
7  Exhibit 23.
8  A    Okay.
9  Q    You were the secretary of the board at that time, right?
10  A    Correct.
11  Q    And part of your job as being the secretary was to keep
12  minutes of what happened in closed sessions, right?
13  A    Correct.
14  Q    And you were the secretary on the night of August 17th,
15  2015?
16  A    Yes.
17    MR. DAVIS:  I'd like to publish, Your Honor.
18    THE COURT:  Is this a document that's already been
19  before the Court?  I don't think so.
20    MR. DAVIS:  No, it hasn't.
21    THE COURT:  First of all, as to the document itself,
22  what number is it, Counsel?
23    MR. DAVIS:  It's Plaintiff's Exhibit No. 23.
24    THE COURT:  Any objection to the document itself?
25    MS. SCHWENDENER:  No, Your Honor.

B. Johnson - direct by Davis

1    THE COURT:  All right.  Any objection to publication?

2    MS. SCHWENDENER:  No, Your Honor.

3    THE COURT:  All right.  Proceed, Counsel.

4  BY MR. DAVIS:

5  Q    So you see the document says closed meeting minutes

6  August 17th --

7  A    Yes.

8  Q    -- 2015?  Secretary Betty Johnson?

9  A    Correct.

10 Q    And I'm scrolling to -- this is a redacted document, which

11 means its stuff that's blocked out.  Your lawyers did that.

12    MS. SCHWENDENER:  Objection.

13    THE COURT:  All right.  Objection sustained.  It's

14 either agreed or there's nothing wrong with what they did.

15 It's just not a full document.

16    MR. DAVIS:  Yes, I was --

17    THE COURT:  Proceed.

18    MR. DAVIS:  Give the jury the benefit of

19 understanding, Your Honor.

20    THE COURT:  Well, it doesn't matter who blocked it

21 out.

22    MR. DAVIS:  Okay.

23    THE COURT:  It's just something they shouldn't

24 consider.  Proceed.

25 BY MR. DAVIS:

77

B. Johnson - direct by Davis

1  Q     Read where it says from Dr. Adams reentered.

2  A     Dr. Adams reentered the closed session at 8:00 o'clock

3  p.m. and was given the summation of the Board of Education by

4  the attorney.  Dr. Adams did claim that the goals and

5  evaluations done at the retreat were valid, and at what point

6  was she notified that she was not making goals.

7  Q     That's your statement about what happened?

8  A     No, it's not my statement.  It's the board minutes.

9  Q     Okay.  I stand corrected.  Thank you.

10          So Dr. Adams was never told before that moment that

11  the goals she had been working under weren't effective?

12  A     I have no knowledge of that.

13  Q     Well, isn't that what you just said, what you just said is

14  documented in the minutes?

15  A     The minutes states that she had no opportunity to present

16  the goals I do believe.

17  Q     Okay.  Thank you, ma'am.  So after this, you voted along

18  with the rest of the board members to rescind the contract

19  extension, right?

20  A     Yes.

21  Q     I show you Plaintiff's Exhibit No. 21, which I'd like to

22  publish to the jury.

23          THE COURT:  And that's been published before.

24          MR. DAVIS:  I don't think so, Judge.

25          THE COURT:  Any objection, defense?

78

B. Johnson - direct by Davis

1    MS. SCHWENDENER:  Just -- yes, Your Honor.  Just an

2  objection for the basis for showing it to the jury.

3    THE COURT:  All right.  This is an official document.

4  Or do you have any --

5    MR. DAVIS:  Yes, Judge.  This is the official

6  minutes.

7    THE COURT:  Wait.  I'm sorry, Counsel.  One second.

8  Do you have any doubt as to the foundation for the document?

9    MS. SCHWENDENER:  No, Your Honor.

10    THE COURT:  All right.  Objection's overruled.

11  Proceed, Counsel.

12  BY MR. DAVIS:

13  Q    So these are every month you all when you'd meet and you

14  take votes, you document it and you publish this to the public,

15  right, these minutes?

16  A    Yes.

17  Q    The minutes we saw earlier were the closed session that

18  you did?

19  A    Right.

20  Q    As the secretary.

21  A    Correct.

22  Q    So this is -- we started the first page of this, and these

23  are the minutes from what transpired on August 17th, 2015,

24  correct?

25  A    That's what it says, yes.

79

B. Johnson - direct by Davis

1  Q    So if we scroll down, you all had a lot of business that
2  night.  So it says, rescind the ineffective contract extension
3  with the superintendent approved.  You see that?
4  A    Yes.
5  Q    And please read what it says, a motion was made?
6  A    A motion was made by Mrs. B. Johnson and seconded by Mr.
7  Rogers to rescind the ineffective contract extension with the
8  superintendent from earlier this year.
9  Q    And the people who said aye, that's the people who voted
10 for this?
11 A    Yes.
12 Q    And they are?
13 A    Mrs. Hawkins, Miss Felicia Johnson, Betty Johnson, Mr.
14 Rogers, Dr. McCaskill, and Mrs. Gloria Johnson.
15 Q    And are any of them here today?
16 A    Mrs. Gloria Johnson is, yes.
17 Q    The others aren't?
18 A    No.
19 Q    So we heard -- you were here earlier when Mrs. Johnson was
20 talking.  When she was testifying, correct?
21 A    Yes.
22 Q    And she said something to the effect of Counsel Izzo told
23 you all that the contract extension was ineffective because
24 there were no goals, right?
25 A    Correct.

B. Johnson - direct by Davis

1  Q     But in point of fact what really happened on July 22nd,
2  that's when you all met with Mr. Izzo, right?
3  A     Yes.
4  Q     Janet Rogers stated that the goals that we all have been
5  talking about now for a long time were generic.  Wasn't she the
6  one who brought that up?
7  A     I don't --
8  Q     Didn't she say, Betty, remember those goals are generic?
9  A     I don't remember if she brought it up or who did.
10 Q     Well, let me play --
11 A     But it was brought up.
12 Q     -- the audio tape.
13 A     Okay.
14 Q     Plaintiff's Exhibit 72 of the July 22nd, 2015 meeting
15 where this was discussed.
16       (Whereupon, said tape was played in open court.)
17 BY MR. DAVIS:
18 Q     So was that Janet Rogers talking?
19 A     Yes, it was.
20 Q     And she was talking to you?
21 A     She asked me do I remember.
22 Q     Right.  And so what she was saying was, we put her in
23 place with generic goals.  And who was she saying her?  The her
24 she was referring to is Dr. Denean Adams, right?
25 A     I would --

B. Johnson - cross by Schwendener

1    MS. SCHWENDENER:  Objection.

2    THE COURT:  Basis?

3    MS. SCHWENDENER:  Speculation.

4    THE COURT:  Objection's overruled.  The jury can

5    weigh the credibility.  Proceed.  You may answer.

6    BY MR. DAVIS:

7    Q    Who was Janet Rogers talking about?

8    A    I believe Dr. Adams, yes.

9    MR. DAVIS:  Thank you.  I have no further questions,

10   Miss Johnson.

11   THE WITNESS:  Okay.

12   THE COURT:  All right.  Any questions?

13   MS. SCHWENDENER:  Yes, Your Honor.  Thank you.

14   THE COURT:  Proceed.

15                   CROSS-EXAMINATION

16   BY MS. SCHWENDENER:

17   Q    Good afternoon, Miss Johnson.

18   A    Good afternoon.

19   Q    Where do you live?

20   A    Harvey, Illinois.

21   Q    And were you a member of the Harvey Elementary District

22   152 Board of Education?

23   A    Yes.

24   Q    And during what time period were you a member of the Board

25   of Education?

B. Johnson - cross by Schwendener

1    A    2009 to 2017 I believe, yes.

2    Q    And is that an elected position?

3    A    Yes, it is.

4    Q    How many times were you elected or reelected?

5    A    I was elected for two terms.  Eight years total.

6    Q    Were you compensated for your services as a board member?

7    A    No.

8    Q    And you are a named defendant in this case, correct?

9    A    Yes.

10   Q    Directing your attention to July of 2013.  Do you recall

11   the board hiring plaintiff as a superintendent?

12   A    July of?

13   Q    2013.

14   A    Okay.  I thought I heard '15.  Yes.

15   Q    And did you vote to hire the plaintiff as the

16   superintendent?

17   A    No.

18   Q    And do you recall the length of plaintiff's contract?

19   A    It was for three years.

20   Q    And did plaintiff's contract contain student performance

21   and academic improvement goals?

22   A    Yes.

23   Q    Directing your attention to February 23rd of 2015.  Do you

24   recall being at a board meeting that night?

25   A    Yes.

83

B. Johnson - cross by Schwendener

1  Q     And did the board vote to extend plaintiff's contract that
2  night?
3  A     The board did vote, yes.
4  Q     And do you know Tyrone Rogers?
5  A     Yes.
6  Q     How do you know him?
7  A     He's a -- he was a board member at the time I served.
8  Q     Now, did you become -- directing your attention to July of
9  2015.  Did you become aware of a claim by the plaintiff that
10 Mr. Rogers had threatened her?
11 A     Yes.  By the 15th, yes.
12 Q     Do you recall when you first heard about this alleged
13 threat?
14 A     No, I don't recall.
15 Q     And I believe you said earlier you don't specifically know
16 who may have told you, correct?
17 A     No, I don't remember.
18 Q     Do you recall what the alleged threat was?
19 A     No.
20 Q     Did you ever learn that plaintiff filed a police report in
21 connection with the alleged threat?
22 A     I was told that the police was called.
23 Q     Have you ever seen a police report?
24 A     No.
25 Q     Do you have any idea what may have been contained in the

B. Johnson - cross by Schwendener

1  police report?

2  A    No.

3  Q    Did you ever discuss the police report with Mr. Rogers?

4  A    No.

5  Q    Was the police report ever discussed at a board meeting?

6  A    No.

7  Q    It's been established that the board voted to rescind the

8  contract that it previously offered plaintiff, correct?

9  A    Yes.

10  Q    At any point did you learn that the extension was

11  ineffective?

12  A    Yes.  At sometime during the spring.  March, April, May.

13  I have -- don't recall.

14  Q    And how did you learn that?

15  A    I was told by the attorney -- well, we as a board was told

16  by the attorney that it was no longer effective.  And I don't

17  know if it came from the attorney or the board president to be

18  honest.

19  Q    And do you recall the board attorney being Mr. Izzo,

20  correct?

21  A    Yes.

22  Q    And do you recall what Mr. Izzo told you?

23  A    He told the board that we did not -- we were not to extend

24  her contract for an additional year without evaluating some

25  goals and what have you.

B. Johnson - redirect by Davis

1  Q    And you did vote to rescind the contract extension?

2  A    Yes.

3  Q    Did your vote have anything to do with the police report

4  plaintiff filed?

5  A    No.  No.

6  Q    Directing your attention to August 17th of 2015.  Did the

7  board issue performance directives to the plaintiff?

8  A    Yes.

9  Q    Did you vote in favor of issuing performance directives?

10 A    Yes.

11 Q    Did your vote have anything to do with the police report

12 plaintiff filed?

13 A    No.

14       MS. SCHWENDENER:  Thank you.  I don't have any

15 further questions.

16       THE COURT:  All right.  Thank you very much.

17 Anything further?

18       MR. DAVIS:  A few, Your Honor.

19       THE COURT:  Go ahead.

20              REDIRECT EXAMINATION

21 BY MR. DAVIS:

22 Q    I just want to clarify, Miss Johnson.  You just said that

23 Attorney Izzo told you all this contract extension was

24 ineffective somewhere in the spring of 2015.  In fact, you were

25 here yesterday when he testified, right?

B. Johnson - redirect by Davis

1   A    Yes, I was.

2   Q    Do you recall him saying that he didn't learn about any of

3   this until July 22nd at the meeting?

4   A    I do recall.  And again, I have to say that it was so much

5   going on, you know, I can't be sure about when I heard it.

6   Q    But you're not contradicting his testimony here?

7   A    I will not contradict anyone's testimony.

8   Q    And one other question.  You said on tape that Tyrone

9   Rogers loved Dr. Adams for the first two years.  She had you

10  fooled.  Didn't you say that?

11  A    No, I didn't.

12  Q    Okay.  You never --

13  A    I know I never said that.

14  Q    You never made that statement --

15  A    No --

16        THE COURT:  Excuse me, ma'am.  You've got to wait

17  till he asks the question.

18        THE WITNESS:  I'm sorry.

19        THE COURT:  Go ahead.

20  BY MR. DAVIS:

21  Q    Well, let me ask you this:  Were you aware that after

22  July 10th Tyrone Rogers wanted Dr. Adams fired immediately?

23  A    I don't know if, if that was exactly it.  It was -- the

24  only thing I heard around July was the fact that the police had

25  been called to central office.  That some kind of threat was

B. Johnson - redirect by Davis

1  made against Dr. Adams and stuff was going back and forth.

2  Q    But you were in board meetings.  You were certainly there

3  in August, right?

4  A    Yes, I was.

5  Q    We've established that.  And in August you all talked

6  about what to do because you had been talking about these

7  performance directives, right?

8  A    What do you mean what to do?

9  Q    You were talking about Tyrone Rogers wanted to terminate

10 her.  He didn't want to do the performance directives, right?

11 A    I can't say that I -- that's true.

12 Q    Are you saying you don't recall, or are you saying that it

13 didn't happen?

14 A    I don't recall Tyrone Rogers wanting to terminate her at

15 the August meeting.

16 Q    Okay.  Do you recall Tyrone Rogers at any meeting after

17 July 10th where he said I'm sick of this.  Y'all ain't doing

18 nothing.  We need to get rid of her.  You remember that?

19 A    At some point, yes.  Exactly when, I don't recall.

20 Q    But it would have been after July 10th?

21 A    With Tyrone it could have been before.

22 Q    Okay.  You don't have any recollection of it before

23 July 10th, do you?

24 A    No.

25 Q    So we're talking about after August, through the fall it

788

B. Johnson - redirect by Davis

1  was a constant thing.  You heard Mr. Rogers here testifying

2  earlier where he was saying that he wanted Dr. Adams out, and

3  some of the board members were saying, no, we got to go through

4  a process.  You remember that testimony?

5  A    Yes, I do.

6            MS. SCHWENDENER:  Objection.

7            THE COURT:  I'm sorry.  Basis?

8            MS. SCHWENDENER:  Form.

9            THE COURT:  I'll allow some leeway.  Objection's

10  overruled.

11  BY MR. DAVIS:

12  Q    Do you remember the testimony?

13  A    Yes, I remember his testimony.

14            MR. DAVIS:  Okay.  I think that's it, Mrs. Johnson.

15  Thank you.

16            THE WITNESS:  Thank you.

17            THE COURT:  Anything else?

18            MS. SCHWENDENER:  No further questions.  Thank you.

19            THE COURT:  All right.  Miss Johnson, you can step

20  down.  Take your time.

21      (Witness excused.)

22            THE COURT:  Counsel, you want to step to the side

23  real quick please.

24            MR. DAVIS:  Yes, Your Honor.

25            THE COURT:  As they're stepping to the side, ladies

1   and gentlemen, again just so we're clear, Miss Betty Johnson is

2   also a defendant and she was being questioned both on the

3   adversarial side for the plaintiff and in the defendants' case

4   in chief.  All right.

5         (Side bar proceedings out of the hearing of the jury:)

6               THE COURT:  So any other witnesses that I don't know

7   about?

8               MR. DAVIS:  No, Judge.

9               THE COURT:  You're getting ready to rest?

10              MR. DAVIS:  Yes, Judge.

11              THE COURT:  Okay.  Any other witnesses that you have?

12              MS. SCHWENDENER:  No, Judge.

13              THE COURT:  Okay.  So this is the way I'm going to do

14  it to keep them from coming back and forth, we are going to get

15  your stipulations, ask if you have any more witnesses.  Do you

16  need to get your stipulations together, or are you ready to do

17  it now?

18              MR. DAVIS:  Well, the only stipulation we're going to

19  do is regarding the --

20              THE COURT:  Do you have it?

21              MR. DAVIS:  No.

22              THE COURT:  Do they all --

23              MR. PETRARCA:  We haven't written it out.

24              THE COURT:  You haven't written it out.  Okay.  We've

25  got to take a break.  All right.

1      MR. PETRARCA:  Sorry, Judge.

2      (Before the jury:)

3      THE COURT:  All right.  Ladies and gentlemen, when

4  we're doing this, you're supposed to be quiet.  But you can

5  talk in a second.  All right.  There are some things -- I

6  always tell jurors you know you're getting to the -- closer to

7  the end of the case when we start taking even more breaks.  So

8  we need to take about a -- and this one will be short.  We'll

9  probably be back up at 1:30.  And we just need a short break.

10 They need to take care of something out of your presence.  All

11 right.  Everybody rise.  Head on out and my staff will join

12 you.

13     (Jury excused.)

14     THE COURT:  I'm going to sit right here while you all

15 get that stipulation together.

16     (Short break taken.)

17     THE COURT:  Anything on the record?

18     MR. DAVIS:  No, Judge.

19     THE COURT:  Defense?

20     MS. SCHWENDENER:  No, Your Honor.

21     (Before the jury:)

22     THE COURT:  All right.  Are there any other

23 witnesses, Mr. Davis, for the plaintiff?

24     MR. DAVIS:  No, Your Honor.

25     THE COURT:  All right.  And you have some evidence by

1  way of stipulation, is that correct?

2  　　　　　MR. DAVIS:  Yes, Your Honor.

3  　　　　　THE COURT:  All right.  Ladies and gentlemen, at the

4  beginning of the trial I told you for the most part, and I'll

5  be telling you again with instructions, what the lawyers say is

6  not evidence unless I give you instruction that it is.  The

7  lawyers aren't going to be saying it.  I'm going to be reading

8  it.  It's a stipulation that they both have agreed to.  When I

9  read this statement to you, you will be considering this

10  information as evidence just as you will any of the other

11  evidence that you heard here today.  All right.

12  　　　　　Defendant Dr. Kisha McCaskill states that plaintiff

13  told her on July 9th, 2015 about the alleged statement that

14  Tyrone Rogers made to plaintiff.  Defendant Dr. Kisha McCaskill

15  states that plaintiff advised her that she filed a police

16  report.

17  　　　　　Defendant Felicia Johnson states that she does not

18  have knowledge that plaintiff filed a police report per se with

19  the Harvey Police Department.  Defendant Felicia Johnson

20  says -- states that on July 9th, 2015 she became aware that

21  plaintiff contacted the Harvey Police Department regarding some

22  statement that Tyrone Rogers allegedly made to plaintiff.

23  Defendant Felicia Johnson became aware of the alleged statement

24  because she was at school and saw the Harvey Police Department

25  arrive at the school.

92

1    Defendant Linda Hawkins states that she does not have

2    knowledge that plaintiff filed a police report per se with the

3    Harvey Police Department.  To the best of defendant Linda

4    Hawkins' independent recollection, defendant Linda Hawkins

5    believes that on or around September 2015 she became aware that

6    plaintiff contacted the Harvey Police Department regarding some

7    statement that Tyrone Rogers allegedly made to plaintiff.

8    Defendant Linda Hawkins believes she became -- she first became

9    aware of the alleged statement by virtue of reading and/or

10   learning about plaintiff's lawsuit against defendants.

11   So stipulated, Mr. Davis, on behalf of your client?

12   MR. DAVIS:  Yes, Judge.

13   THE COURT:  So stipulated, counsel for the

14   defendants.

15   MS. SCHWENDENER:  Yes, Your Honor.

16   THE COURT:  So, ladies and gentlemen, again that word

17   stipulation is an agreement that you would hear this evidence

18   if these people were called to testify.  All right.

19   All right.  With that we will have no further

20   witnesses or evidence today.  We expect Tuesday -- we're going

21   to let you go early, because again, before this matter is

22   presented to you for deliberations, you have to hear the

23   closing arguments and then get instructions on the law.

24   Instead of having you wait for an hour and a half or more

25   before we get to you at 3:30 or 4 today, the Court thought it

1   would be better for us to go ahead and recess.  Let you be on

2   your way, enjoy your weekend, and come back on Tuesday

3   refreshed, ready to hear the end of the case and go into

4   deliberations.

5           So you'll be planning to deliberate on Tuesday.  That

6   means you do not take a step toward that.  You have not gotten

7   to the point where you can begin considering the case, because

8   on Tuesday you never know.  There may be a little bit of

9   evidence.  But right now we don't plan on it.  And you have not

10  received the instructions yet.  So have a Harvey Board of

11  Education free weekend.  All right.  All right.  No googling.

12  No going into the case.  No considering the case.  No

13  discussing the case.  Have a good weekend, ladies and

14  gentlemen.  All rise.

15          You'll be here at 10 o'clock, unless everybody tells

16  me they voted already.  Has everybody voted already?  If you

17  haven't, I'm giving you time.  10:00 o'clock be here.  All

18  right.  Thank you.  Have a good weekend.

19      (Jury excused.)

20          THE COURT:  All right.  We'll give them a chance to

21  leave.  You can talk to the various people and see if they want

22  to hang around with us for a couple of hours on a Friday

23  afternoon.

24          MR. DAVIS:  I'm going to let Dr. Adams and her family

25  leave also, Judge.

794

1          THE COURT:  All right.  I'm saying everybody gets to
2     make that choice except the lawyers.
3          MR. DAVIS:  Okay.  Thank you.
4          THE COURT:  Thank you.
5       (Short break taken.)
6          THE COURT:  You're ready with the exhibits, Mr.
7     Davis?
8          MR. DAVIS:  Yes, Judge.
9          THE COURT:  All right.  So, Mr. Davis, before you
10    rest your case and for the plaintiff, are there any exhibits
11    that you wish to move into evidence?
12         MR. DAVIS:  Yes, Judge.  I have a list.
13         THE COURT:  All right.  Go on with your list.  Why
14    don't you do the non-objected list, and then we'll go through
15    the objections.
16         MR. DAVIS:  Okay.  Exhibit 1, Exhibit 2, Exhibit 5,
17    Exhibit 6, Exhibit 9.  I'm not sure we introduced Exhibit 8
18    into evidence before the jury.  I'll come back, but I'm not
19    sure about --
20         THE COURT:  What was the exhibit that you are not
21    sure of?
22         MR. DAVIS:  Eight.
23         THE COURT:  And what is that?  That's what I mean.
24         MR. DAVIS:  The closed meeting minutes from the June
25    retreat.

1        THE COURT:  Verbal or -- I mean, oral or written?

2        MR. DAVIS:  Written.

3        THE COURT:  All right.  And you're not sure about

4   what?

5        MR. DAVIS:  I'm not sure whether I presented it to

6   the jury, Judge.

7        THE COURT:  Well, right now there's no objection to

8   it, correct?  Again, it doesn't mean it's not -- it doesn't

9   mean it's going back.  This is just entered into evidence.

10        MR. DAVIS:  Right.

11        THE COURT:  All right.  So tentative.  That will be a

12   tentative.  You've got to show me later that you did do that

13   one.

14        MS. SCHWENDENER:  Right.  Assuming counsel entered --

15   or used it, I have no objection.

16        MR. DAVIS:  Yes.  I may not have used it.

17        THE COURT:  All right.  All right.

18        MR. DAVIS:  Exhibit 9.

19        THE COURT:  Which is minutes also?

20        MR. DAVIS:  No.  Draft of the new contract.

21        THE COURT:  The one where she made corrections on it?

22        MR. DAVIS:  Yes.

23        THE COURT:  All right.

24        MR. DAVIS:  The draft proposal for a new contract.

25        THE COURT:  All right.  Go ahead.

1    MR. DAVIS:  Exhibit 10, the RFP for forensic audit.

2  Exhibit 11, the telephone records for Dr. Adams.  Exhibit 12,

3  the telephone records for Tyrone Rogers.  I believe they have

4  an objection to Exhibit 13.

5    THE COURT:  All right.  We'll come back to that.  Go

6  ahead.

7    MR. DAVIS:  Exhibit 14 --

8    MS. SCHWENDENER:  We have no objection to 14, Judge.

9    THE COURT:  13 and 14?

10    MS. SCHWENDENER:  Yes, Your Honor.

11    THE COURT:  All right.

12    MR. DAVIS:  Exhibit 15, Exhibit 16, Exhibit 19,

13  Exhibit 21, 22, 23, 27, 28, 29, 40.  And they may have an

14  objection to FMLA.

15    MS. SCHWENDENER:  Judge, we objected to 40.  That's

16  the nonrenewal of plaintiff's contract.

17    THE COURT:  All right.

18    MR. DAVIS:  No, 40 is the FMLA -- I'm sorry.  49.  My

19  eyes are playing tricks on me.

20    MS. SCHWENDENER:  49 --

21    MR. DAVIS:  49.

22    THE COURT:  49.

23    MS. SCHWENDENER:  49 we objected to.  That's the FMLA

24  certification.

25    THE COURT:  So you have an objection to that one?

797

1        MS. SCHWENDENER:  Yes.  Yes.

2        MR. PETRARCA:  Yes.

3        THE COURT:  Okay.

4        MR. DAVIS:  And you allowed them to be presented to

5   the jury.

6        THE COURT:  Right now they get to make their objec --

7        MR. DAVIS:  Okay.

8        THE COURT:  I'm just saying go through the

9   non-objected ones first.

10       MR. DAVIS:  Okay.  I just wanted to point out I

11  thought it was objected to.  Okay.  They have an objection I

12  believe to 52 and 53.  55, 56, 57.

13       THE COURT:  Okay.  So wait a minute.  52 and 53

14  there's an objection to.

15       MR. DAVIS:  Yes.

16       MS. SCHWENDENER:  Yes, Your Honor.

17       THE COURT:  55 is your next one on the list of

18  non-objected?

19       MR. DAVIS:  Yes.

20       THE COURT:  Thank you.

21       MR. DAVIS:  56, 57.  58 is Tyrone Rogers' deposition

22  transcript, and we've used portions of it.

23       THE COURT:  For impeachment?

24       MR. DAVIS:  Yes.

25       THE COURT:  All right.  Go ahead.

798

```
1          MR. DAVIS:  63.
2          MS. SCHWENDENER:  Judge, just for the record, for
3   Tyrone Rogers' deposition transcript we object to the entire
4   transcript being introduced.
5          THE COURT:  The Court understands.
6          MS. SCHWENDENER:  Sure.
7          THE COURT:  Just the parts that came before the jury.
8          MS. SCHWENDENER:  Correct.
9          THE COURT:  For impeachment.  All right.
10         MR. DAVIS:  63 we did the stipulation for, Judge.
11         THE COURT:  All right.  That's the -- what I read?
12         MR. PETRARCA:  Yes.
13         MS. SCHWENDENER:  Yes, Your Honor.
14         THE COURT:  63 is what I read.
15         MS. SCHWENDENER:  Yes.
16         THE COURT:  And don't forget, Counsel, only if you
17   need it back, but most times stipulations and most --
18   especially if they're written and no one else testified to it,
19   it needs -- this would, if anything, need to go back to the
20   jury.  But it needs to go back in a form that is just with
21   those three paragraphs.  All right.  So I will give you back
22   that, and you all can figure out how you want to put that in.
23   But make sure you show it for Tuesday, but it just needs to be
24   three paragraphs.
25         You could write that the parties stipulate by and
```

799

1  through the parties by their attorneys that if called to

2  testify, these witnesses would testify to -- these three

3  witnesses would testify to the information contained therein.

4  Something like that.

5          MS. SCHWENDENER:  Sure.

6          THE COURT:  Okay.  All right.  What else?

7          MR. DAVIS:  I believe that's everything that they

8  don't object to.  The rest -- I'm not sure about -- yes, I

9  think that's everything that they don't object to.

10          THE COURT:  All right.  And then let's go to the

11  objected items, and make sure you spell out exactly what they

12  are, not just their number.  No. 13.  All the non-objected

13  items are moved into evidence.  Go ahead.  No. 13 is what?

14          MR. DAVIS:  The police report I believe.

15          THE COURT:  Is that correct?

16          MR. DAVIS:  Yes.

17          THE COURT:  No.  I'm asking the defense.

18          MS. SCHWENDENER:  Yes, that's correct, Your Honor.

19          THE COURT:  All right.  And the basis of your

20  objection?

21          MS. SCHWENDENER:  For the police report it's hearsay,

22  and I believe it's also subject to the Court's prior ruling on

23  motion in limine.

24          THE COURT:  The police reports are generally not

25  admitted because they are summaries and hearsay.  In this case

1    I wouldn't -- if I let it into evidence, it wouldn't be for

2    that reason.  It would be for the reason of there's been

3    testimony about whether even a police -- well, whether there

4    was even such a statement.  Whether such statement was even

5    reported to the police.  And it would really only be shown to

6    show that there was a police officer who testified and said he

7    received a report.  Not the substance of what the report is and

8    what actions as he took thereafter.

9          Now, because he was present and said that's what he

10   did, I mean, the police report would never go back to the jury.

11   And it would have -- if it got admitted into evidence, it would

12   have to have a limiting instruction, which I think in this case

13   since he was one of the first witnesses, they never saw the

14   police report, did they?

15         MS. SCHWENDENER:  No, Your Honor, they did not.

16         THE COURT:  Yes.  They never saw it.  Then the Court

17   would say keep it out because of hearsay.  But his testimony is

18   present.  So a lot of times the police report, people try to

19   get it in and nobody is present and questioned about it.  And

20   the only thing he's being questioned about is not the, the

21   substance or whether it's right or wrong.  It was more that

22   there was some type of something, a report or -- to the police

23   or the police clearly got there.  So, you know, the evidence is

24   in through him.  The hearsay report is not the best evidence,

25   and so the Court will not allow it into evidence.  However, you

1  are allowed to speak about it in terms of one was written.

2  Does that make sense?

3          MR. DAVIS:  Sure, Judge.

4          MS. SCHWENDENER:  Yes.

5          MR. DAVIS:  The only thing I'd say is that the report

6  is a record regularly kept under 803-8, so I think it would --

7          THE COURT:  Counsel, under what theory have you ever

8  heard a police report in general being allowed in?

9          MR. DAVIS:  Well, in criminal cases it's generally

10  not allowed.

11          THE COURT:  In civil cases either.  It's the same --

12          MR. DAVIS:  In civil cases the prohibition isn't the

13  same as a blanket in a criminal case.

14          THE COURT:  Why isn't it, why isn't it let in in a

15  criminal case?  Because it's a summary.

16          MR. DAVIS:  Yes.  And --

17          THE COURT:  And why would it be not a summary in a

18  civil case?

19          MR. DAVIS:  In this case I'd first say it's a record

20  and a regularly kept record, and it's not a summary in the

21  sense of the normal sense here because what I say is that my

22  client when she talked to him, was still under the emotional

23  stress of the startling event.  So as I said in my papers, we

24  think her statement comes in as an excited utterance, which

25  would be an exception to the hearsay rule.

1       We cited authority that said you can -- it doesn't

2  have to be contemporaneous with the event.  The fact that the

3  report was made a couple of days later, she was still under the

4  emotional stress of it.  And in this case it has more indicia

5  of reliability.  Because remember, she didn't call the police.

6  She didn't know the police was coming.  So it wasn't like she

7  had time to contemplate and prepare and to put this in the

8  record with some anticipation that it might be used sometime

9  down the road.

10       The police officer just showed up at her office and

11  said what happened, and she told him.  And again, this is a

12  mere two days, basically a weekend after the event.  So we

13  believe on that basis it should be allowed in for the record.

14       THE COURT:  All right.  Thank you, Counsel.  This

15  Court is not going to allow it in in this particular case since

16  the officer actually came in.  He testified.  The information

17  is out in there in the way actually it should be out there --

18       MR. DAVIS:  Sure.

19       THE COURT:  -- instead of having a jury look at the

20  summary of his statements, whatever summary she stated.  And in

21  the majority of cases that are reported to police, there's

22  always going to be excited utterance.  That would be almost not

23  even an exception.  Police -- most police reports are not done

24  in a situation where somebody isn't excited when they're filing

25  a police report based on the circumstances that police deal in.

1    So the Court believes all the information necessary
2    has gotten before the jury.  You clearly can make a reference
3    that she did make a police report and informed the police that
4    this has happened, this happened.  I think that is appropriate.
5    There can be references to the police report that there would
6    not normally be allowed because of what's involved here.  All
7    right.
8          MR. DAVIS:  Okay.  Thank you.
9          THE COURT:  That's my ruling.  The actual police
10   report itself will not be in evidence.  All right.
11         MR. DAVIS:  Okay.
12         THE COURT:  All right.  Proceed.  What's the next
13   one?  Exhibit 14?
14         MS. SCHWENDENER:  14, Your Honor.  That was the
15   continuation and supplemental report.  We are -- same
16   objection.
17         THE COURT:  All right.
18         MR. DAVIS:  And we really didn't want 14 in.
19         THE COURT:  All right.  Well, you're withdrawing 14?
20         MR. DAVIS:  Well, actually we -- 14 is where he
21   actually made the statement that we just talked about, so we
22   did want 14.
23         THE COURT:  All right.  So 13 and 14, the exhibits
24   themselves will not be allowed.  All right.  Verbal references,
25   oral argument on them will based on his testimony in court.

1       MR. DAVIS:  Yes.

2       THE COURT:  Okay.  Go ahead.  No. 49 is next.  What's

3  the objection?  What is the document?

4       MS. SCHWENDENER:  The document was the FMLA

5  notification.  It contains medical opinions.  Dr. -- or Miss

6  Cunningham was not here to testify.  So I would object for

7  foundation, hearsay.

8       THE COURT:  Counsel.

9       MR. DAVIS:  Judge, it's a regularly kept record.  It

10  was a record that her employer required her to submit to go on

11  a medical leave.  It really doesn't say anything.  It just says

12  a signature on it.  And the jury has already -- it's been

13  presented to the jury.  Your Honor allowed Dr. Adams to testify

14  about it as well.  So we don't see why it shouldn't come in.

15      THE COURT:  And what's the prejudice?

16      MS. SCHWENDENER:  Judge, unless I'm mistaken, I, I

17  believed I objected as far as the introduction of the FMLA

18  certification as far as what the diagnosis, and I thought Your

19  Honor had sustained the objection.  The basis is that it

20  contains a medical diagnosis for plaintiff.  And there's

21  been -- Miss Cunningham did not testify.  Therefore, there's

22  been no foundation for any type of medical diagnosis for

23  plaintiff.  It was not a record that the district regularly

24  keeps in, in the course of its -- it was a FMLA certification

25  that plaintiff's doctor gave to plaintiff, and then she sent it

805

1   to the district.

2           THE COURT:  Well, the district does keep it.  I mean,

3   the district is not denying they got an FMLA report.  That's

4   not the impression --

5           MS. SCHWENDENER:  We're not denying it.

6           THE COURT:  -- I'm getting.

7           MS. SCHWENDENER:  But, but it's hearsay and it

8   contains a medical opinion.  And there's been no foundation for

9   the medical opinion, and it's hearsay.  The content of the

10  report was prepared by Miss Cunningham, who is not here to

11  testify to the content.  It's hearsay.  It was not a report

12  that was prepared by plaintiff.

13          MR. DAVIS:  It's being submitted for the purpose of

14  showing that she went on a medical leave, Judge.  And it

15  doesn't really contain any diagnosis.  It's a standard form --

16          THE COURT:  What do you mean it doesn't?  It does

17  definitely say that she should be off for a certain -- as to --

18          MR. DAVIS:  Yes.

19          THE COURT:  -- a certain amount of time, which is

20  what you're trying to prove.

21          MR. DAVIS:  Right.

22          THE COURT:  And that's what they dispute.

23          MR. DAVIS:  Right.  But I don't believe that's a

24  diagnosis in my opinion.  I think the diagnosis is something

25  much more elaborate.

1    THE COURT:  Well, you may, but you have got to have

2    a -- if she needed -- in order to get this FMLA or to at least

3    apply for it, she needed to have a doctor say I was off for

4    this amount of time.

5    MR. DAVIS:  Yes.

6    THE COURT:  That is an opinion.  So the form is not

7    going to be allowed.  You reference that she applied for FMLA,

8    that testimony is allowed.

9    MR. DAVIS:  So that she actually went on FMLA?

10    THE COURT:  Well, I mean, her verbal testimony over

11    your objection, it was in front of the jury.  They've talked

12    about her time off.  You tried to talk about her time off as

13    one of the reasons for her not doing a good job.  And what's

14    her name, Mrs. Rogers, she was never there when we called.  So

15    I'm not going to let you all just throw these statements out

16    when she has some response to her performance issues, you know,

17    so no.  She can -- her testimony is in.  The document is out.

18    And, of course, just because the document is out, you

19    can't say she doesn't have any proof, you know.  You can talk

20    about doctor, but not about that she put in for FMLA.

21    MS. SCHWENDENER:  No.

22    THE COURT:  That cannot be argued not if she has the

23    document that she put in for it and the only reason it's out is

24    because he didn't bring the doctor in, I'm not going to keep

25    her statement that I put in for medical leave.  Now, she can't

 1    testify because she had a mental condition.

 2              MS. SCHWENDENER:  Correct.

 3              THE COURT:  But she can say she put in for FMLA.

 4              MS. SCHWENDENER:  And, Judge, we're not -- that's

 5    fine.  Yes, I understand.

 6              THE COURT:  Okay.

 7              MS. SCHWENDENER:  Our objection was just the content

 8    of the diagnosis and --

 9              THE COURT:  Yes, the diagnosis cannot come in.  She's

10    a layperson.

11              MS. SCHWENDENER:  Right.  Thank you.

12              THE COURT:  All right.  No. 52.  What's that?

13              MR. DAVIS:  That's the -- I'm sorry.  Go ahead.

14              MS. SCHWENDENER:  I'm sorry, Counsel.  Go ahead.

15              MR. DAVIS:  No, it's your objection.  You go right

16    ahead.

17              MS. SCHWENDENER:  That was Eric Kellogg's 2013

18    performance evaluation.

19              THE COURT:  From the board?  The one that --

20              MS. SCHWENDENER:  Yes.

21              THE COURT:  From the board.  The one that Mr. Rogers

22    testified about?

23              MR. DAVIS:  Right.

24              THE COURT:  That one and -- and it's kept by the

25    board?

1      MS. SCHWENDENER:  Yes.

2      THE COURT:  All right.  And that was No. 52 and 53,

3  is that correct?

4      MR. DAVIS:  53 is the severance agreement, Judge.

5      THE COURT:  Ah.

6      MR. DAVIS:  And we didn't actually present the

7  severance agreement.

8      THE COURT:  Right.  You did not.  So that --

9      MR. DAVIS:  So I don't think -- I'm not even

10  interested in putting that in.

11      THE COURT:  So that's not offered.  So only 52 is

12  offered?

13      MR. DAVIS:  Yes.

14      THE COURT:  All right.  Over your objection I'm going

15  to allow it.  No. 55.

16      MR. DAVIS:  This was the document where Your Honor

17  ruled they waived the attorney/client privilege and they had to

18  turn over as a non-privileged document.  This is the transcript

19  of the July 22nd meeting --

20      THE COURT:  Ah, with the --

21      MR. DAVIS:  -- with Mr. Izzo.

22      THE COURT:  Is it?

23      MR. DAVIS:  Yes.

24      THE COURT:  That's 55?

25      MS. SCHWENDENER:  55 we don't have an objection to,

809

```
1    Judge.
2              THE COURT:  Okay.  Well, it would have been admitted
3    anyway.  But okay.  No objection.  And then what about 56?
4              MS. SCHWENDENER:  No objection.  And 57 no objection.
5              THE COURT:  Oh, okay.  What about -- the next one I
6    have is 58.
7              MS. SCHWENDENER:  58 was Mr. Rogers' deposition
8    transcript.  I objected to the entire transcript coming in as
9    evidence.
10             THE COURT:  Yes.  It's only the portions that were
11   used for impeachment.  And I don't know.  You give me the
12   names, and that part will be let in.  Okay?
13             MS. SCHWENDENER:  Sure.
14             THE COURT:  The numbers, not the names.  The numbers
15   of the pages.  And then there was 63.  What's 63?
16             MR. DAVIS:  That's the stipulation.
17             THE COURT:  That's not objected to.
18             MS. SCHWENDENER:  Correct.
19             THE COURT:  It's the stipulation.  You just have to
20   fix.
21             MS. SCHWENDENER:  Yes.
22             THE COURT:  All right.  Anything else?  Plaintiff.
23             MS. SCHWENDENER:  I think counsel wanted to
24   introduce --
25             MR. DAVIS:  Well, then there's the tapes, Judge.  And
```

810

1   we've got -- we presented portions of 69, 70, 71, and 72.

2           THE COURT:  All right.  And those were objections --

3   that was an objection that was part of the motion in limine.

4           MS. SCHWENDENER:  Correct.

5           THE COURT:  And so to be consistent with their

6   objections, obviously they have to object.  This Court has

7   allowed the playing of the tapes.  These are ones that you

8   played?

9           MR. DAVIS:  Yes.

10          THE COURT:  The Court -- over their objection it's

11  admitted into evidence.  All right.

12          MR. DAVIS:  Thank you, Judge.

13          THE COURT:  You're welcome.  Anything else?

14          MS. SCHWENDENER:  Judge, just for clarification.

15  Only those portions of the tapes, correct?  Not the entire

16  tape?

17          THE COURT:  Again, this is not going to the jury.

18  Two different things.

19          MS. SCHWENDENER:  Correct.

20          THE COURT:  All right.  So, no, they're not playing

21  any tapes in the back, so -- nobody's tapes.  Even the ones let

22  in.  All right.  So this is -- it's two different things.  All

23  right.  So ...  I mean, I don't know how he's going to be able

24  to split the tapes to put them into evidence.  That evidence is

25  different from -- and they're evidence of the board minutes.

 1    I'm assuming the minutes he got from you.

 2            MR. DAVIS:  Yes.

 3            THE COURT:  They didn't -- yes.  So the tapes are

 4    into evidence.  The tapes will not be, even portions will not

 5    be played for the jury.  You can do it in closing argument if

 6    you want, but they won't go back and they won't have them to go

 7    over.  Okay.

 8            MR. DAVIS:  Okay.

 9            THE COURT:  All right.  Anything else?

10            MR. DAVIS:  That's it for the --

11            THE COURT:  The evidence?

12            MS. SCHWENDENER:  Judge, we still have our evidence

13    for --

14            THE COURT:  Right.  Right now we're on the

15    plaintiff's case.  Do you want to go ahead and pass by any

16    motion at the close of the plaintiff's case?

17            MS. SCHWENDENER:  No.  No.  No.  No.  No.

18            THE COURT:  Well, then I would not -- I would not

19    talk about your evidence then.

20            MS. SCHWENDENER:  Sorry, Judge.  I thought you

21    were -- I thought you were talking to us.

22            THE COURT:  No.  We don't have a jury here.  Our time

23    is, is a little bit more open now.  So, Counsel, do you have

24    any more evidence to present as the plaintiff?

25            MR. DAVIS:  No, Judge.

812

1          THE COURT:  All right.  Are you resting?

2          MR. DAVIS:  Yes, Judge.

3          THE COURT:  Okay.  Plaintiff has rested her case.

4   And now are there any motions at the close of the plaintiff's

5   case, defense?

6          MS. SCHWENDENER:  Yes, Judge.

7          MR. PETRARCA:  We do have a motion, Judge.

8          THE COURT:  All right.  Then argue.  You can step up.

9   At least for this you guys should at least step up.  All right.

10  And both don't have to stand.  Plaintiff, you can come up once

11  you make your argument.  If you want to sit until he makes his

12  argument, you can and vice versa.

13         MR. PETRARCA:  Judge, we have three separate motions

14  under Rule 50.

15         THE COURT:  Have you put them in writing?

16         MR. PETRARCA:  We did put them in writing.

17         THE COURT:  Okay.

18         MR. PETRARCA:  I'm going to tender copies to counsel.

19  The first one is defendants' motion and brief in support of

20  judgment as a matter of law on punitive damages.  Also

21  tendering defendants' motion and brief in support of judgment

22  as a matter of law on Count 2, due process.  Tendering to

23  counsel.  And finally, defendants' motion and brief in support

24  of judgment as a matter of law on Count 1, retaliation.

25         Your Honor, would you like me to submit copies to the

813

1   Court, or I can file them electronically or --

2          THE COURT:  Oh, no, they need to be submitted to the

3   Court definitely.  And if you're making those motions, at some

4   later time you can put them on the docket.  And it's a quarter

5   to 3.  Before you argue, I'm going to let counsel take a look

6   at what you're filing.  Is this your first time seeing it?

7          MR. DAVIS:  This is my first time seeing it, Judge.

8          THE COURT:  All right.  Yes.

9          MR. DAVIS:  And obviously I'd want to respond in

10  writing.  These are pretty voluminous.

11         THE COURT:  Now, Counsel, our time is -- I don't know

12  how you're going to figure that this is going to be responded

13  to.  I'm not here on Monday.  And you respond, and then Tuesday

14  we got to argue, and you still won't know exactly what you're

15  arguing.  I don't know -- I mean, they're not the first

16  defendant to come up with written motions for a Rule 50

17  decision.  They're not the first one.

18         MR. DAVIS:  I'm sure, and I'll respond to their

19  argument, Judge.  But I at least --

20         THE COURT:  Why don't you take a --

21         MR. DAVIS:  -- want the option --

22         THE COURT:  Why don't you take a look at all of the

23  them and see if there's some that you feel comfortable

24  responding to orally.  All right.  Because either way, orally,

25  if they're all orally, I, I still can rule.  If one side is

814

1    written, I've had plenty -- the majority of my cases where the

2    other side responds orally to a written motion.  And then

3    depending on the timing.  You have a little wiggle room with

4    this.  I just can't figure out exactly if you write, you're

5    going to have to orally argue today anyway, because that's the

6    only time I'm going to get an oral argument in.

7         So what you can do is possibly supplement.  And the

8    Court would not allow any type of reply in writing.  I will

9    have heard it in orally.  But we'll give him a chance to get

10   his oral thoughts together, and then he can supplement his

11   writing -- his position only because Monday we're not here.

12   But again, I'm not in town until Monday night.  So, you know,

13   it's been my practice that people based on what's been said

14   here, definitely there should be no surprise that they have

15   prepared it.

16        MR. DAVIS:  Yes, there's no surprise, Judge.  And,

17   you know, I -- I don't have a problem with that.  I just want

18   the option, because I've been handed a bunch of paper.

19        THE COURT:  Okay.  Counsel, explain to me -- you talk

20   about option.  Explain to me, you write, how I'm supposed to

21   get it done if I rely totally on your --

22        MR. DAVIS:  I beg your pardon, Judge?

23        THE COURT:  How am I supposed to rule on this and

24   have the jury ready to hear your closing arguments and

25   instructions if I totally rely on your option to file a

815

1    response?  Or do you agree that you will -- I'll give you some

2    time to review it.  Then you can orally argue.  Then you can

3    supplement, and I can have my decision ready by Tuesday.  I

4    can't -- it won't be ready till Tuesday morning.  You

5    understand that?

6            MR. DAVIS:  Right.

7            THE COURT:  Okay.  All right.  Do you understand

8    that's your only option as far as writing something?

9            MR. DAVIS:  Yes.

10           THE COURT:  -- is to do it afterwards?  Okay.  Do you

11    want this time, 15, 20 minutes to at least take a look at

12    what --

13           MR. DAVIS:  I'd prefer to take the option of looking

14    at it over the weekend.

15           THE COURT:  No.  No.  No.  You have missed the

16    option.  The option is you get an oral argument now because you

17    would not otherwise get one.

18           MR. DAVIS:  Okay.

19           THE COURT:  And then you can supplement your

20    argument.  Supplement is the better way to do it, or respond.

21    Both the same thing.

22           MR. DAVIS:  Okay.  That's fine, Judge.

23           THE COURT:  Within a certain amount of time.  That

24    means I need to have it by Sunday night.  And then I will have

25    a decision Tuesday morning.  You understand that you're coming

816

```
 1    in not knowing what my results are and you will have your
 2    closing argument that you may have to adjust.  Understand?
 3              MR. DAVIS:  Yes.
 4              THE COURT:  Okay.  With that understanding, I'll give
 5    you 15 minutes to look this over.
 6              MR. DAVIS:  And I want to just be clear.  I may
 7    decide that I don't want -- need to supplement, Judge.
 8              THE COURT:  You may.
 9              MR. DAVIS:  And in the event that you don't receive
10    anything from me --
11              THE COURT:  I will know that.
12              MR. DAVIS:  -- then you will go ahead and rule.
13              THE COURT:  I'll rule mostly -- I rule mostly on oral
14    arguments anyway.
15              MR. DAVIS:  Yes.
16              THE COURT:  That's my -- I mean, I'm used to oral
17    arguments.  So that's what I'll rule on.  I might look at
18    theirs for cases.  Especially the case law.  But other than
19    that, it will be ruled on first off by oral arguments.  I see
20    the written presentations at this stage as supplemental.
21              MR. DAVIS:  Right.  I'm just asking for the option
22    out of an abundance of caution.
23              THE COURT:  You have it.
24              MR. DAVIS:  Because I don't know what's in there.
25              THE COURT:  All right.
```

817

```
 1              MR. DAVIS:  Thank you.
 2              THE COURT:  So 15 minutes or so, okay.
 3              MR. DAVIS:  Thank you.
 4              MR. PETRARCA:  Your Honor, would you like copies of
 5    these?
 6              THE COURT:  Oh, I thought I had them.
 7              MR. PETRARCA:  No.
 8              THE COURT:  Bring them on up.  You can give them to
 9    Miss McCullough.  All right.  I'll be back out at 10 to -- I'll
10    be back out between 3:05 and 3:10.  All right.
11              MS. SCHWENDENER:  Thank you, Judge.
12              THE COURT:  If you're ready before that, Counsel, let
13    my staff know.
14              MR. DAVIS:  All right, Judge.  Thank you.
15         (Short break taken.)
16              THE COURT:  Step up.
17              MR. DAVIS:  If I may before we start, Judge.  Having
18    looked at the documents, I don't think I'll need to supplement.
19    And if Your Honor wants to rule now --
20              THE COURT:  Okay.
21              MR. DAVIS:  -- then I would prefer that so I know --
22              THE COURT:  I will, I will try unless I have some
23    questions.  Okay.  That's fine with me.  And that's what I'm
24    used to.  All right.
25              So since you will get a bite at the apple after, the
```

 1   Court would prefer you to try to keep it under -- at 10
 2   minutes --
 3                MS. SCHWENDENER:  Sure.
 4                THE COURT:  -- for your argument.  And then I'll give
 5   you five minutes in rebuttal.  If you need 15 minutes, Counsel,
 6   you have it.  All right.
 7                MR. DAVIS:  Thank you, Judge.
 8                THE COURT:  You can both go shorter, but that's all
 9   you get so we can get to the instructions.  All right.
10   Proceed.  Step up.
11                MR. PETRARCA:  Judge, briefly I know you do have the
12   written documents.
13                THE COURT:  I do, and I have reviewed them.  I will
14   say unless one of you is going to deal with one issue and one
15   other, I'm not going to have tag team.
16                MS. SCHWENDENER:  Absolutely, Your Honor.
17                THE COURT:  Okay.  So only one person talks.
18                MR. PETRARCA:  Correct.
19                MS. SCHWENDENER:  Sure.
20                THE COURT:  Proceed.
21                MR. PETRARCA:  So, Your Honor, with respect to the
22   punitive damages motion, the case we cite is Kolstad versus
23   American Dental.  It's a United States Supreme Court case, 527
24   U.S. 526, 1999.  In order to award punitive damages, a jury
25   must first be presented with evidence that the defendant acted

1  with malice or reckless indifference towards the plaintiff.

2  And the case also says that there is a, quote, positive element

3  of conscious wrongdoing, end quote, that's required, which must

4  demonstrate that the individual was aware that his action was

5  in violation of federal law.

6          I mean, there's been absolutely no evidence

7  whatsoever presented in this case that the defendants were

8  aware that their actions were in violation of federal law.  The

9  term, you know, malice and reckless ultimately turns on the

10  actor's state of mind.  With, with respect to the defendants

11  who didn't testify, I would respectfully submit that it's

12  impossible to send to the jury what their state of mind was.

13  They didn't even testify.  As to the defendants who did

14  testify, their state of mind was uncontroverted testimony that

15  they were relying on what Mr. Izzo told them.

16          So again, I don't think either one of those goes to

17  the jury.  There's also case law that we cited that a good

18  faith reliance upon advice of counsel may prevent imposition of

19  punitive damages.  That's Henderson versus U.S. Fidelity and

20  Guaranty Co. that's a Fifth Circuit case, 695 F.2d --

21          THE COURT:  An old Fifth Circuit case.  35 years old.

22  All right.  Go ahead.

23          MR. PETRARCA:  And that's, that's all we have, Your

24  Honor.  And, and for all the other reasons stated in our

25  written motion on punitive damages.

1          THE COURT:  All right.  Thank you.  That's on

2     punitive damages as to all of the, the parties.

3          MR. PETRARCA:  Correct.

4          THE COURT:  And which are the ones that, again, did

5     not testify that you're asking?

6          MR. PETRARCA:  Dr. Kisha McCaskill did not testify.

7          THE COURT:  Linda Hawkins.

8          MR. PETRARCA:  Linda Hawkins did not testify.  And

9     Felicia Johnson did not testify.

10          THE COURT:  Thank you.

11          MR. PETRARCA:  Thank you.

12          THE COURT:  All right.  Next.

13          MS. SCHWENDENER:  Oh, do you want us to go in order?

14          THE COURT:  Yes.  You're not getting 10 minutes on

15     each unless you prefer to answer them one at a time?  It

16     doesn't matter to me.

17          MR. DAVIS:  No, Judge, that's okay.

18          THE COURT:  Do them all?

19          MR. DAVIS:  Yes.

20          MR. PETRARCA:  I'm sorry, Judge.  I misunderstood

21     you.

22          THE COURT:  No.  No.  No.  No.  Otherwise -- yes,

23     let's just do it all.

24          MR. PETRARCA:  Okay, Judge.  Quickly on the Count 2

25     is the due process one.  We believe that the -- as you know,

1    the first question in a due process analysis is whether or not
2    there was a protectable property interest.  Plaintiff testified
3    unequivocally that her attorney Sara Boucek sent a counteroffer
4    to the school district that the Board never accepted.  That's
5    uncontroverted testimony in this case.  That means that there
6    never was a contract extension, which means there is no
7    protectable property interest, which really ends the analysis.
8              THE COURT:  And so you benefit because your people
9    didn't know what they were doing?
10             MR. PETRARCA:  I'm not sure I understand that, Your
11   Honor.
12             THE COURT:  You benefit from this argument because
13   your people didn't know what they were doing.  As they have
14   basically testified to that they messed up and --
15             MR. PETRARCA:  No, Your Honor, I'm confused because
16   it was the plaintiff's attorney who sent the counter proposal.
17             THE COURT:  That's one thing.  I'm talking about the
18   fact that I'm assuming that you're claiming that part of it is
19   that the whole matter was void, or because it wasn't done right
20   as you put Mr. Izzo -- as Mr. Izzo was put on and he testified.
21   So unless, unless -- again, was he your -- he was your witness.
22             MR. PETRARCA:  No, he was counsel's witness.
23             THE COURT:  Okay.  He was counsel's witness.  So
24   based, based on everything they said, wow, we shouldn't have
25   done that in the first place.  We had no right, so if you had

822

1  no right based on what the cases, some of them the ones you

2  cited are saying is that, well, even though it doesn't look

3  good, there's no contract.  If there's no contract, then

4  there's no property right.

5          MR. PETRARCA:  But -- I understand what Your Honor's

6  saying --

7          THE COURT:  Why are you saying but?  I'm sort of

8  arguing --

9          MR. PETRARCA:  Yes, but we're, we're getting -- I

10  mean, Mr. Izzo's involvement in this happened in July.  I'm

11  talking about February.  And then shortly after February --

12          THE COURT:  I understand.

13          MR. PETRARCA:  -- Sara Boucek was the one who sent

14  the counter offer.

15          THE COURT:  Right.  There's two different things

16  here.

17          MR. PETRARCA:  Okay.

18          THE COURT:  Okay.  You're only arguing about what her

19  lawyer did?  Is that all you're arguing?

20          MR. PETRARCA:  In this particular portion of the

21  brief, yes.

22          THE COURT:  Okay.  Go ahead.

23          MR. DAVIS:  And my, my simple point is it's just pure

24  contracts 101.  She sent a counter offer, which means -- which

25  the board never accepted through plaintiff's own testimony.

823

1          THE COURT:  I get that one.  You're right.  That's

2     pretty simple.  Is that all you're standing on on that?

3          MR. PETRARCA:  On that one, yes.  The second point is

4     the contract extension wasn't in writing, and by the express

5     terms of the original 2013 to 2016 contract that said that it

6     had to be in writing, and plaintiff again testified that it was

7     never in writing.

8          We also believe that the contract was void from its

9     inception because the board not only never found that her goals

10    were satisfied, but her goals were never, in fact, satisfied by

11    the -- I won't call it clear testimony, but the testimony that

12    we heard there was never a finding -- and there's no evidence

13    that her goals were satisfied as Mr. Izzo said in the four

14    corners of that document.

15         THE COURT:  That's what I was talking about, Counsel.

16    I jumped ahead.  I asked you, again, it wasn't that she was

17    said not to be performing.  It was that they didn't according

18    to the testimony that I'm assuming you're relying on, is that

19    there was never a performance finding.

20         MR. PETRARCA:  That's correct.

21         THE COURT:  According to your argument.  And that was

22    because they basically screwed up.  They didn't make one.  They

23    didn't, they didn't even know they had to.

24         MR. PETRARCA:  That's true.

25         THE COURT:  According to their testimony.

824

 1          MR. PETRARCA:  That is true.

 2          THE COURT:  That's what I'm saying.

 3          MR. PETRARCA:  Absolutely.

 4          THE COURT:  So they're benefiting from the fact that

 5   they didn't do what they want to do.  Part of the argument is,

 6   you know.  Yes.

 7          MR. PETRARCA:  But by the same token, Your Honor, Dr.

 8   Adams was also represented by counsel.  As you saw in the

 9   counter proposal that she sent over where the first paragraph

10   of the counter offer was --

11          THE COURT:  That's a different argument.

12          MR. PETRARCA:  Yes.

13          THE COURT:  I was talking about the one that really

14   has played out here in court, which is we didn't know and, no,

15   it's not illegal.  No, it's a misrepresentation.  No, it's --

16   that's the one I'm talking about.

17          MR. PETRARCA:  Now, you know what I have to deal with

18   on a daily basis, Your Honor.

19          THE COURT:  Okay.  All right.  Okay.

20          MR. PETRARCA:  And briefly if, if for some reason the

21   Court comes to the conclusion that there was a property

22   interest --

23          THE COURT:  Property interest.

24          MR. PETRARCA:  -- you know, then, then the question

25   is what process was due here.  And this is really just a, a

1   simple -- well, maybe not so simple, but it's a question of
2   law.  And as you know, Your Honor, the questions of law there's
3   no reason for a hearing because hearings are for the purpose of
4   determining factual issues.  The question here was whether or
5   not the school code and the contract were complied with.  She
6   was, she was actually given whatever process she was due.  So
7   they told her come on in.  You didn't -- there's no finding
8   that these goals were met.  There's no evidence that these
9   goals were met, so that was an ineffective extension.
10          She really wasn't entitled to much more.  All it
11  would have been was a declaratory judgment action.  There's --
12  there was no purpose of an evidentiary hearing is my point.
13          THE COURT:  For the due process.
14          MR. PETRARCA:  Correct.
15          THE COURT:  In terms of due process.
16          MR. PETRARCA:  Absolutely.
17          THE COURT:  All right.
18          MR. PETRARCA:  It was a pure question of law that
19  should have been determined by a Court.
20          THE COURT:  All right.  And next.
21          MR. PETRARCA:  So we, we would contend that the
22  process that was given was appropriate under the circumstances.
23  As you know, Your Honor, due process better than I do is a
24  flexible concept.  And whatever process is due is, is due.
25  Thank you, Your Honor.

826

1          THE COURT:  Do you want to go ahead?  You've got

2    another one, don't you?

3          MR. PETRARCA:  We've got one more.

4          THE COURT:  No. 3.  Miss Schwendener.

5          MS. SCHWENDENER:  Thank you, Your Honor.  Yes.  This

6    is defendants' Rule 50 motion in support of Count 1,

7    retaliation.  In the event that the Court does find that there

8    is no property interest and grants the Rule 50 motion on the

9    due process claim, it then falls then there could be no adverse

10   employment action because there's no valid contract to begin

11   with.

12          Briefly, with regard to retaliation, there was no --

13   Mr. Petrarca just talked about that there was no valid contract

14   because she had not met a finding -- her goals -- the board had

15   not determined that her goals had been met.  In addition,

16   plaintiff -- the contract extension was invalid from the start

17   because Miss Boucek submitted a counter proposal to it.

18   Plaintiff's superintendent contract explicitly states that any

19   amendments or alterations in order to be binding on the parties

20   have to be in writing.  A contract extension was never signed

21   under any terms or conditions.  Therefore, the contract

22   extension was invalid.  And accordingly it follows there could

23   be no retaliation as a result based on an invalid contract

24   extension.

25          In addition, with regards to retaliation, in order

1  for a public employee's speech to be protected, the employee

2  must establish that she spoke as a citizen on a matter of

3  public concern.  Mr. Rogers' alleged conduct was not a matter

4  of public concern.  The Seventh Circuit Court of Appeals has

5  repeatedly held that the reporting -- that the reporting of

6  threats of physical violence is not speech protected by the

7  First Amendment as a matter of law.  That's in Houskins versus

8  Sheahan.

9        In addition, Your Honor, plaintiff's statements

10  regarding the financial condition or the -- relating to the

11  audit were not made as a private citizen, but were a part of

12  her official duties.  And Garcetti versus Ceballos holds that

13  if an employee is not speaking as a private citizen, the

14  employee has no First Amendment cause of action based on his or

15  her employer's reaction to the speech.  Plaintiff unequivocally

16  testified that as superintendent she was responsible for the

17  district's finances.  The board policy made her responsible for

18  the district's fiscal and business management.  The only reason

19  she was privy to any information regarding this forensic audit

20  was in her role as superintendent and only discussed in the

21  board meetings in closed session.

22        Another argument in support of why Count 1 should --

23  or Rule 50 should be granted on Count 1 is that even if

24  plaintiff's speech could be considered protected, she has

25  failed to set forth evidence that it was a motivating factor in

1   the decision to rescind the offer of the contract extension.

2   The party that bears the burden of proof on an issue is not

3   entitled to such speculation on the pleadings.  They must

4   present evidence that there's a material issue of fact that

5   must be resolved.

6           Plaintiff's case solely rests on a series of

7   suspicious timing.  There's been no evidence that the board

8   members rescinded the contract extension based on the police

9   report or the audit.  Plaintiff testified that she was told --

10  that she was never told nor did she hear any board

11  conversation -- or any conversations amongst board members that

12  they were going to rescind the contract extension because of

13  the police report she filed or the, or the forensic audit she

14  requested.  The board members that did testify over the last

15  couple days said that their vote to rescind the contract had

16  nothing to do with the police report.  Had nothing to do with

17  the forensic audit or the alleged threat plaintiff claims

18  against Mr. Rogers.

19          THE COURT:  All right.  Oh, go ahead.  Anything else?

20          MS. SCHWENDENER:  Sorry, Judge.  I wasn't sure if I'm

21  out of time.

22          THE COURT:  No.  You've only got about a minute.

23          MS. SCHWENDENER:  Okay.  In addition, the case law

24  states that when there is a significant intervening event, it

25  separates an employee's protected activity from an adverse

829

1   employment action.  Suspicious timing will not prevail.  The

2   intervening act is that Mr. Izzo did -- counsel for the board

3   did advise the board that their actions, their actions granting

4   the -- or voting to extend plaintiff's contract for one year

5   was invalid because they never made a finding she had met her

6   goals.  And again, even if -- regardless of whether her speech

7   was protected or not, the board could not have legally extended

8   her contract absent a finding that her performance goals were

9   met.

10          THE COURT:  All right.

11          MS. SCHWENDENER:  Thank you.

12          THE COURT:  Thank you.  Counsel.

13          MR. DAVIS:  Thank you, Judge.

14          THE COURT:  The Court would appreciate you taking

15  them in the order, in that order.

16          MR. DAVIS:  In the order that they have been

17  addressed them?

18          THE COURT:  That they have been argued, yes.  That

19  would assist me.

20          MR. DAVIS:  Okay.

21          THE COURT:  All right.

22          MR. DAVIS:  With regard to punitive damages, Judge,

23  I'll start with the people who weren't here and counsel's

24  statement that we don't know what their state of mind is.

25  Punitive damage turns on malice, willfulness, and intent.  And

830

1   the purpose is to punish people.  Not only people who

2   intentionally act, but people who recklessly disregard the

3   constitutional rights or the violation of somebody's

4   constitutional right.

5        The evidence in this case shows that everybody in

6   that board knew that Mr. Rogers and Janet Rogers had animus

7   towards Dr. Adams my client based on the police report.  The

8   evidence shows that they all willingly went along, voted.  They

9   sat in meetings.  In particular the meeting in July 22nd.  Dr.

10  McCaskill brought up what about the goals we've been -- she had

11  for a year and a half that we said she's been working under?

12  We're going to now pull those goals all of a sudden?  And

13  they -- Janet Rogers said, hey, we're going to call those

14  generic and say they don't count.  And McCaskill ended up

15  voting for the rescission of the contract on August 17th.

16       The same thing with Betty Johnson.  Oh, she's going

17  to stand on those goals.  You know she's going to bring up the

18  goal cycle.  But she went along anyway.  Same with Gloria

19  Johnson.  So even though individuals aren't here and there

20  hasn't been direct evidence about what they -- specifically

21  their state of mind, I think the evidence is that they have

22  had -- demonstrated a reckless disregard for Dr. Adams'

23  constitutional rights in that they went along with this.

24       And as far as the malice, Mr. Rogers testified that

25  they had a progression.  That they started in August and said

1    we want her out.  We want to do this.  And they said -- the

2    others told him, well, let's do it through a process.  We can't

3    do it right away.  And so month after month after month they

4    took disciplinary actions against my client.  He said in

5    October they took an action, in November they took an action.

6    In December they reversed an action she took, which totally

7    humiliated her.  In January they suspended her.  All of these

8    acts were official acts by the board.

9           She was suspended.  None of these acts were

10   individual acts.  None of the individual board members had

11   power to do this without the support of the other defendants.

12   So I think the intent of the other defendants, the evidence is

13   clear what the intent was.  And at a minimum those who weren't

14   here have demonstrated a reckless disregard for Dr. Adams'

15   constitutional rights.  And I think as far as malice is

16   concerned, I can't think of anything more malicious than what

17   we've heard Mr. Rogers say on the tapes about Dr. Adams.

18          He did everything in his power to disparage her.  He

19   said he basically wanted her out, and he wouldn't even -- he

20   interfered in every way he could with her ability to even

21   operate the district.  And he had her basically in a situation

22   where day-to-day she just went to work.  Her husband testified

23   she came home, every day she'd try to get herself up, and every

24   day she experienced things at work that just knocked her right

25   back down.  This went on for almost a year.

1       Mr. Rogers, all the other defendants knew she was in

2   a medical treatment because they got the doctor's statement

3   starting in August that she was on medical leave under a

4   doctor's care.  And yet they continued.  And that kind of

5   evidence that you know somebody's ill and you keep pounding is

6   evidence of malice and willfulness.  And I think it's enough to

7   justify punitive damages in this case.

8       With regard to due process, counsel talks about there

9   was no contract.  There was no meeting of the minds.  He

10  misstates the evidence.  The evidence is that they voted on

11  February 23rd to extend the contract.  A formal vote.  The

12  evidence is that's all they had to do.  According to the

13  district's policy that's how they did extensions.  The evidence

14  is there was no follow on that was required.  There was nothing

15  to be signed.  They never pointed out any instance where the

16  contract had to be redone.  We were talking about extending an

17  existing contract.

18      So the integration clause that counsel pointed to is

19  not dispositive in this case.  The integration clause says if

20  you're going to amend this contract, it's got to be in writing.

21  The evidence is there were no amendments.  That this contract

22  was extended on its own exact terms.  Nothing changed.  What

23  happened months after the contract was extended was Sara Boucek

24  approached Mr. Izzo about a new contract.  This is a novation.

25  Talk about contracts 101.  That wasn't a counteroffer.  They

1    had already accepted and voted on the contract extension.  What

2    happened months later wasn't a counteroffer.  She had already

3    agreed, yes, I'll accept the extension on those terms.

4           She then looked out in the market and saw you what

5    she thought was an opportunity because she was underpaid

6    vis-a-vis her contemporaries, and so she said let me take a

7    flier and say will they give me a new contract.  And so she

8    took the old contract and she started modifying it as a

9    template for the new contract.  It said it was a new contract.

10   And as far as the fact that it was a counteroffer, it never

11   even went to the board.  The evidence is the only person she

12   approached regarding that was Janet Rogers.  Janet Rogers did

13   not even broach the subject to the board until July.

14          So this idea that it was a counteroffer to the board,

15   there was no counteroffer.  The other board members never even

16   knew she had brought this up.  And the evidence is clear in

17   July 22nd they were shocked.  New contract?  When did this come

18   up?  So there was no counteroffer.  There was an extension that

19   was duly voted.

20          Further, I think there's confusion here between the

21   extension and the contract and what due process turns.  Due

22   process only requires more than a mere unilateral expectancy of

23   employment.  My client -- that happened when they voted at a

24   formal vote under Illinois law that they were lawfully

25   authorized to do to extend her contract.  That told her her

834

1   contract on those terms is extended for more than another year.

2   She had a reasonable expectancy at that point.  Whether the

3   contract extension itself failed is a severable issue.

4        Further, not only did she have a due process right

5   based on the practice of the district, which they already said

6   that was the only thing they did to extend contracts.  They

7   took a formal vote.  There was no other process.  There was no

8   additional signing.  There was no other negotiation.  All they

9   did, that was their practice taking the vote.  But beyond that,

10  the Seventh Circuit in a similar case, in the Hostra case where

11  an extension of a contract was considered invalid under

12  Illinois law, the Court said even if that's true, only that

13  extension would have been invalid.  The rest of the contract is

14  still a valid source of rights as far as due process is

15  concerned.

16       So the extension failing is one thing.  The fact that

17  she had a contract signed and authorized is another source of

18  property rights.

19       THE COURT:  So that you're saying that would have

20  been for the remainder of her --

21       MR. DAVIS:  Exactly.

22       THE COURT:  The three years.  Which was about what,

23  four months, six months?

24       MR. DAVIS:  No, it was over a year.  They gave her

25  the extension in February of 2015.

1          THE COURT:  2015.  All right.

2          MR. DAVIS:  The contract didn't expire till June --

3          THE COURT:  Till June of 2016.

4          MR. DAVIS:  -- 30th, 2016.

5          THE COURT:  All right.  Thank you, Counsel.  Go

6    ahead.

7          MR. DAVIS:  And they continued to honor that contract

8    even after they took the rescission vote.  So that contract was

9    valid.  That contract didn't go away.  And that contract

10   contained the clause talking about extension of her contract.

11   And the extension was done vis-a-vis that clause.

12         THE COURT:  Would it matter, Counsel, that the fact

13   that even it appears that from the contract that everybody

14   keeps referring to, there was a certain point, I guess June of

15   each year after the February that she was supposed to -- the

16   board shall review her, and they did not?

17         MR. DAVIS:  Well, they didn't say they did not.

18   Actually Mr. Rogers said he couldn't say that they did not.

19         THE COURT:  Someone on the stand said it.  I don't

20   know if it was Mr. --

21         MR. DAVIS:  And Mr. Izzo said he didn't know whether

22   they did that.  That was what I pointed out in the case that --

23         THE COURT:  Didn't your client say they didn't?

24         MR. DAVIS:  My client said they did in the goals

25   chart.  One of the second bubbles was June 1st.

1    THE COURT:  Oh, for the retreat.

2    MR. DAVIS:  Right.

3    THE COURT:  Okay.

4    MR. DAVIS:  June 1st sit down, review where we are,

5  develop the action plan.

6    THE COURT:  And how do you connect the retreat --

7  bubble retreat goals with the ones that were actually in the

8  contract?

9    MR. DAVIS:  Because that as my client testified was

10  the purpose of the retreat was to implement the bubble process.

11    THE COURT:  Was that referred to in the contract that

12  you said is, is valid?

13    MR. DAVIS:  No.  The contract doesn't specify that in

14  retreats they'll -- but it does specify that they will by

15  June 1st look at the goals, assess the goals see whether they

16  need to be modified.

17    THE COURT:  But didn't the contract itself have goals

18  in it?  Superintendent goals one, two?  Wasn't that there?

19    MR. DAVIS:  The contract had general goals.  And then

20  it had a provision that said by June 1st of each year we'll

21  look at whether these --

22    THE COURT:  The superintendent goals.  They were

23  general but -- you may call them general, but they were in the

24  contract, were they not?

25    MR. DAVIS:  Yes.  Yes.

1          THE COURT:  All right.  And the bubble goals were not

2     attached to that contract or referred to by name in that

3     contract.  They were at a retreat, and referred to both what

4     the board would do and what the superintendent would do, is

5     that correct?  That's what those bubble ones -- they had

6     different ones.  Some said the board.  Some said

7     superintendent.  Some said both.

8          MR. DAVIS:  It's our contention that there is no

9     division between the bubble goals and the contract.

10          THE COURT:  All right.

11          MR. DAVIS:  The contract said the goals had to be

12     specific.  Had we made the argument that the contract goals was

13     the goals, they'd say those are not specific.

14          THE COURT:  I'm not worried about their argument.

15          MR. DAVIS:  Okay.

16          THE COURT:  I'm asking these questions for myself.

17          MR. DAVIS:  The contract laid out specific goals and

18     indicators.  And it also said by June 1st of each year they

19     would sit down and look at the goals.  And that process

20     happened in this case.  The testimony uncontroverted is that it

21     happened in 2013 by October as required by the contract, and it

22     happened by June 1st of 2014.  Nobody testified that it didn't

23     happen, and Dr. Adams testified that it did happen.  That in

24     June 2014 they looked at her goals, assessed the goals.

25          She also testified that they regularly from that

1    point on assessed the goals.  They assessed the goals in

2    December she said, 2014.  They had a retreat in 2015 where they

3    assessed the goals.  And she stated that the evaluation they

4    gave her was based on those performance goals.  And nobody has

5    presented any evidence to controvert that.  And nobody has

6    presented any evidence that there was some separate process.

7    What evidence does exist is that Janet Rogers after July 10th

8    set on a -- with vengeance against my client and looked for

9    anything she could do to bring down Dr. Adams.

10              THE COURT:  All right.  You're getting into argument

11   beyond the argument.  This is more jury argument.  Can you go

12   on to the third point, please.

13              MR. DAVIS:  Sure.  So we think the due process

14   element is satisfied.  As far as the First Amendment issue,

15   counsel has basically just rehashed, regurgitated --

16              THE COURT:  You mean retaliation?

17              MR. DAVIS:  Yes, retaliation.  The argument you dealt

18   with on summary judgment.  You looked at Houskins on summary

19   judgment and distinguished Houskins.  The Kubiak case, same

20   thing.  The speech here, even though she had personal safety

21   issues, which is obvious, the speech was a matter of public

22   concern because what she was talking about and what the

23   detective testified to is she said that Tyrone Rogers called

24   her up and said she's itching for an ass kicking when she asked

25   for an audit.

1          So a public official made a threat of physical
2    violence towards her when she asked for an audit.  That is a
3    matter that the public would be concerned about.  And that is
4    in the -- the detective testified about that.  Dr. Adams
5    testified about that.  Mr. Rogers says he didn't make the
6    statement.  But there's credible evidence that he did.  The
7    phone records show he called her.  He testified he didn't
8    recall whether he called her.  Well, if he didn't recall
9    whether he called her, how could he be so firm that he didn't
10   say what she said he said?

11          And so we think that the speech issue has been dealt
12   with by the Court.  There's been no new evidence that would
13   change the Court's analysis at summary judgment.  And so we
14   think the speech element has been taken care of.

15          And as far as the retaliation, we think there's an
16   abundance, an abundance of evidence to suggest that what
17   happened here is Dr. Adams was told she had goals.  Dr. Adams
18   performed under the goals.  Dr. Adams performed well under the
19   goals for two years, and everything was okay until July 10th
20   when she made a report against Tyrone Rogers.  And at that
21   point they unilaterally decided to say those goals didn't
22   count.  And again as far as the due process, the evidence says
23   that the first time she was told that those goals didn't count
24   was at -- on August 17th when they called her in the room to
25   rescind the extension.

 1            Nobody gave her any indication -- nobody told her
 2    anything.  And when she walked in that room and she was shocked
 3    and said, what do you mean?  I've been working under these
 4    goals for over a year.  So the evidence is clear that they
 5    moved the goal post.  And Attorney Izzo was brought in by Janet
 6    Rogers --
 7            THE COURT:  Excuse me, Counsel.  When was the
 8    contract with the other -- with the requirements within the
 9    contract, when was that executed?
10            MR. DAVIS:  I'm not sure I understand the question.
11            THE COURT:  The contract, the beginning of the
12    three-year, the first contract she had.
13            MR. DAVIS:  2013.
14            THE COURT:  Right.  So that was -- and those goals
15    you agree were in that contract?  There was --
16            MR. DAVIS:  Yes.
17            THE COURT:  All right.  So how are you saying they
18    moved the goal post?
19            MR. DAVIS:  I'm saying they moved the goal post when
20    in 2015 they said unilaterally that the goal cycle that she had
21    been working under, which again, implemented the goals in the
22    contract, no longer counted.  She had worked under them for a
23    year and a half.  She had been reviewed under them.  She had
24    appeared at retreats.  They told her great job.  You're doing a
25    good thing.  And then when they wanted to retaliate on July

841

1   22nd, they said, all that stuff is generic.  It doesn't mean
2   anything.  They knew it was wrong.
3          They said, well, you know she's going to bring up the
4   goals and what we've been telling her at these retreats.  And
5   they didn't care.  And they did it deliberately.  And they did
6   it intentionally, and they did it collectively to punish her.
7   And that's evidence the jury is entitled to decide whom they
8   believe here.  Do they believe Mr. Izzo, a biased witness who
9   came in who said he didn't even know about the goals process?
10          THE COURT:  All right, Counsel.
11          MR. DAVIS:  And how they had implemented it.  He did
12  no independent investigation of anything.  And finally, he
13  admitted that if they lied to him, the advice he gave to them
14  was completely wrong.  So the fact question is did they lie to
15  Mr. Izzo?  Did Janet Rogers, did the rest of them make up this,
16  oh, we never did goals, we never declared goals simply to find
17  an out for the contract extension in order to punish her?  And
18  that's a question.  There's ample evidence from which
19  reasonable jurors could determine that was all done to punish
20  her, and everything else is a pretext.
21          Further, there's disparate treatment, like pretext --
22          THE COURT:  All right.
23          MR. DAVIS:  -- evidence also that goes to showing.
24  Counsel brought up there's no direct evidence --
25          THE COURT:  Counsel, I need you to wind up in a

842

1    minute.

2              MR. DAVIS:  Okay.  I'll wind up in a second, Judge.

3              THE COURT:  All right.  Okay.  Go ahead.

4              MR. DAVIS:  Counsel made a point there's no direct

5    evidence.  The law doesn't require direct evidence.  We showed

6    ample evidence of disparate treatment.  They punished her for a

7    $175,000 under billing somebody else made that didn't cost them

8    a dime.  Yet somebody who blew through a $4 million deficit of

9    their money, which they never got back, they didn't punish at

10   all.

11             So we think the disparate treatment, the timing,

12   counsel said, oh, it wasn't that big a deal, the same day she

13   made the police -- the evidence is Janet Rogers said she got a

14   call the police was at the school.  And she came in that same

15   day and initiated this process.  So it's not suspicious timing.

16   The suspicion would be if we didn't reasonably see a connection

17   and we just thought this was all pure coincidence.  Thank you,

18   Judge.

19             THE COURT:  Thank you, Counsel.  Very briefly,

20   Counsel.

21             MR. PETRARCA:  Very very briefly.

22             THE COURT:  So I cut you to three minutes.

23             MR. PETRARCA:  Thank you, Judge.  Your Honor, I'd

24   like to point out in your written memorandum opinion and order

25   on our motion for summary judgment you stated that there were,

843

1   quote, sufficient factual questions surrounding the extension,

2   end quote.  I believe you now have all the facts, and I believe

3   that judgment on these Rule 50 motions is appropriate at this

4   point in the defendants' favor.

5           With respect to the punitive damages, very quickly --

6           THE COURT:  So you're arguing that after this -- at

7   this point in the trial there's no further questions?

8           MR. PETRARCA:  Correct.

9           THE COURT:  Okay.

10          MR. PETRARCA:  And the facts are crystal clear as

11  Your Honor --

12          THE COURT:  Crystal clear.

13          MR. PETRARCA:  Everything that happened after

14  August 17th is meaningless to the punitive damages claim

15  because the act of retaliation was the rescinding of the

16  contract on August 17th.  Counsel stated that there was animus.

17  Animus is not the test under punitive damages.  That's not what

18  Kolstad says.  That's not even close to what it says.

19          As far as the contract, Judge, I, I just have to

20  bring this out.  I've been waiting to do this for five days.

21  As Your Honor has correctly pointed out moments ago, these

22  performance goals that are in paragraph 3 of the

23  superintendent's contract, these are the performance goals that

24  have to be satisfied before you extend the contract.  You can

25  talk about circles and district goals and everything all you

1   want.  These are the ones that matter.  There's no evidence in

2   the record that these were satisfied.  There's no evidence that

3   this contract was even discussed at this retreat or whatever

4   they called it.

5           Now, what bothers me the most about this is the

6   paragraph that follows these goals.  It says, further, the

7   superintendent and the board shall consult no later than

8   October 1, 2013 and June 1st of each contract year thereafter

9   in order to mutually determine whether such goals should be

10  amended.  It's talking about the goals that are right above it.

11  And it says if you want to amend these goals at these meetings

12  on June 1st, then you have to put something in paper, amend the

13  goals, attach it to the contract.  This isn't an evaluation of

14  the superintendent.  This is talking about amending these

15  goals.

16          And as Mr. Izzo correctly pointed out, it's just a

17  simple matter of reading this paragraph.  If you don't think

18  that these goals need amending, there's nothing to do.  You

19  just continue on with these goals for the length of the

20  three-year contract.  And at the conclusion of the three-year

21  contract, if you wish to extend it, then these have to be

22  satisfied.  That's all this paragraph says.  It's very simple.

23          THE COURT:  Anything else quickly?

24          MR. PETRARCA:  That's it, Judge.  Thanks.

25          THE COURT:  All right.  Thank you very much.  There's

1     one case I want to take a look at.  I'll be right back.  Thank

2     you.  And if you all could at least get your instructions.

3              MR. PETRARCA:  Yes.

4              MR. DAVIS:  Okay.

5              THE COURT:  At least go ahead and push confidently

6     forward.

7       (Short break taken.)

8              THE COURT:  All right.  Thank you for your arguments.

9     Motions for judgment as a matter of law under Rule 50 have to

10     be looked at in the light most favorable to the nonmoving

11     party.  And this Court does take that seriously.  And so let me

12     start, first of all, there are two defendants Linda Hawkins and

13     Felicia Johnson.  In no way, shape, or form, not only were they

14     not present, but they weren't even identified as speaking in

15     any of the tapes to my remembrance.

16            And counsel for the plaintiff says that they should

17     be held individually -- argues that they should be held

18     individually accountable just because they were individuals on

19     the board, and clearly from the record signed off --

20              MR. DAVIS:  May I Judge.  I don't want to interrupt.

21     I just want to correct something.

22              THE COURT:  Okay.  If -- go ahead.

23              MR. DAVIS:  Betty Johnson testified it was Linda

24     Hawkins who said see ya --

25              THE COURT:  Oh, she's the one who said it?

1    MR. DAVIS:  -- alligator.  That was Linda Hawkins.  I
2    made her specifically say.
3         THE COURT:  See ya alligator.
4         MR. DAVIS:  See ya alligator.  That was Linda
5    Hawkins.
6         THE COURT:  Okay.
7         MS. SCHWENDENER:  Judge, counsel's incorrect.
8    Miss Johnson said that she heard that statement, but I think
9    she said she did not know who said that statement.
10        MR. DAVIS:  No --
11        THE COURT:  Well, everybody can stop.  I got the
12   record.
13        MR. DAVIS:  Okay.
14        THE COURT:  So she was right after 1:00 o'clock,
15   right?
16        MR. DAVIS:  Yes, Judge.
17        THE COURT:  All right.  Tracey, I'm going to look and
18   you're going to look too.
19     (Brief pause.)
20        THE COURT:  I'll put this on the record as to --
21   well, first let's put on the record, this -- this doesn't even
22   have to separate out.  I was trying to be organized, but we'll
23   save that for later.
24        All right.  As to punitives damages, and this
25   includes the see ya alligator, this Court finds that the

1  plaintiff even looking at the issue on punitive damages and
2  what's required in the light most favorable to the nonmoving
3  party, there has been no showing that rises to those factors of
4  punitive damages.
5      A lack of decorum, which is no doubt, and showing of
6  ignorance in various types should be horribly embarrassing to
7  the district and to the taxpayers, to the children, but it does
8  not equal just by that lack of decorum and the showing of
9  ignorance that punitive damages should be applicable here and
10  should go any further than this point, especially where there
11  is some unclear testimony outside of the tapes, which frankly
12  were painful to listen to just by the sense of just pure
13  unprofessionalism, but unclear testimony as to who did what,
14  said what, when.  Everybody is pointing in different
15  directions.
16      And then further for other rulings that the Court
17  will make, punitive damages as to all defendants, motions for
18  directed verdict is granted.
19      As to the due process claim and the fact that there
20  is a property right that was taken away without her being able
21  to have a hearing or have any process according to plaintiff,
22  it is clear that Dr. Adams had a three-year contract.  And a
23  lot of these issues started almost in the middle of the
24  contract.  It was also clear that Dr. Adams was for a time very
25  well thought of by the board.  And this Court suspects that the

848

1    board had even better than they expected to have as a
2    superintendent, at least for a while.  That she was performing.
3    It wasn't high marks, but she was performing, and they were
4    pleased with her.  In particular two of the ones that seemed to
5    be the strongest voices that plaintiff relies on in her case,
6    that would be Mr. and Mrs. Rogers.

7           And that three-year contract clearly had the ability
8    to be extended another year.  And the problem is even when
9    looking in the light most favorable to the nonmoving party is
10   that all of the misstatements and misunderstandings to what the
11   contract as is written, as was relied on by both parties, by
12   all parties was here, there was no contract beyond that first
13   three-year property right.  There was no contract beyond that.

14          And so for her to even -- the Court cannot find at
15   this point even looking at the light most -- the evidence in
16   the light most favorable to Dr. Adams that she didn't get due
17   process when on that contract even the year and a half after
18   she started having all the problems, she was sick at home, but
19   she was still getting paid.  She got that contract paid to the
20   end.  She did not get the renewal of the -- or the extension of
21   the year.  But between -- I mean, the contract clearly states
22   that there were general requirements -- I mean, there were
23   specific requirements -- or let me say this, superintendent
24   requirements.  And those were not gone over, performance
25   requirements -- performance requirements.

849

And despite the fact that, yes, we talked to her, we
did the general ones, the testimony was that it was the
retreat, the retreat.  The bubble display was shown many times,
but the contract did have performance requirements.  It's not
like it was vague.  You can call them general all you want, but
it's not like it was vague.  That's what's written.  And that
was not gone over with her, and -- before they decided to give
her this extension, which again, does show they thought she was
good.  They thought she was so good they wanted to lock her
down with an extension.  They didn't do it properly.

She continued to work on it, and then after that she
was trying to change or wanted to change the original contract,
which you couldn't do just by doing that.  It was already
signed off and done.  That contract was there.  And so there
was a lot of misunderstandings, misstatements, misapprehensions
by everybody involved.  And yes, they all had lawyers.  And
frankly I just don't know -- clearly the people who were here
in this room weren't part of it.  But it was just a mess.  A
very very unfortunate mess, but due process showing is not
here, and the Court will find that Rule 50 will be granted.
Motion under Rule 50 will be granted on the due process claim.

As to the retaliation, when I look at the evidence in
the favor of the nonmoving party, the motion is denied as to
retaliation, mostly based on the timing.  Based on the Court
can infer and the jury could infer that there was a problem

1   here, and they retaliated against her because of -- they

2   thought about the audit might get them in trouble maybe or they

3   thought about definitely decided to -- when she filed -- she

4   says she filed a police report.  The evidence shows -- is in

5   her favor that she filed a police report.  There's evidence

6   that's in the record that shows that she says he did say that,

7   and other people heard things later.  And even though he denies

8   it, that's a credibility determination for the jury.

9          And so the Court does find as to the board, as to

10  Gloria Johnson, as to Betty Johnson, as to Kisha McCaskill, and

11  as to Janet Rogers and Tyrone Rogers that they're still in the

12  case.  As to Linda Hawkins just because she said see ya later

13  alligator, that alone does not show that -- as to how she

14  reacted, whether she reacted to any of this timeline.  These

15  people just have not been referred to except for that one

16  little statement.  That's as to Linda Hawkins and Felicia

17  Johnson.  Neither one of them except for that one statement

18  that is not even certain based on the testimony unless we can

19  see it and find it here that Miss Hawkins should be in this

20  case.

21         So Miss Hawkins and Miss Johnson are granted directed

22  verdict as to everything.  And all the other parties are in

23  with retaliation.  And that's the Court's finding.  All right.

24         MR. PETRARCA:  Your Honor, may I clarify something

25  please.  With respect to the individual defendants, my

851

1   understanding is that the punitive damages, the rule has been
2   granted but --
3              THE COURT:  All of them.
4              MR. PETRARCA:  I guess my issue is so, so they could
5   only have acted as a Board of Education.  So, for example, the
6   jury can't find --
7              THE COURT:  So you're saying still as to punitive?
8   Punitive is gone.
9              MR. PETRARCA:  No.  No.  No.  I'm talking, I'm
10  talking about the retaliation claim now.
11             THE COURT:  Okay.
12             MR. PETRARCA:  So I just want to clarify.  So the
13  board can only act by Illinois law through a majority of its
14  members.  So it, it would be literally impossible for the jury
15  to find, for example, that Tyrone Rogers retaliated against the
16  plaintiff but none of the other board members did and hold
17  Tyrone Rogers liable.  That can't happen.  It's either got to
18  be the board is liable or they're not.
19             MR. DAVIS:  Well, there is ratification, Judge.  So
20  it's not impossible.  Monell allows for ratification.  If
21  Tyrone Rogers acted and there was a policy or a custom and
22  practice that was the driving force --
23             THE COURT:  But that's not what's here, Counsel.
24             MR. DAVIS:  And they ratified his action.
25             THE COURT:  Counsel is right --

1          MR. DAVIS:  I'm just saying counsel --

2          THE COURT:  No.  No.  Counsel is right in that all

3     of -- you want all of the -- you want all the individuals gone?

4     No, you just -- that's part of an instruction that they all

5     have -- so you know what, you're right.  Retaliation is back

6     reinstated for Hawkins and Johnson.  They're part of the board.

7     It's got to be all or nothing, and I am not going to dismiss

8     all those individuals.  All right.  So we just have to craft an

9     instruction that will show that they know that if the, if the

10    individual defendants are found to be retali -- are, are as a

11    group retaliating against -- in their votes, then it's

12    retaliation, and the retaliation of her being not, not treated

13    right they acted in retaliatory fashion against her because of

14    one of these -- one or both of these actions.  That it's the

15    board, and that one person cannot hold them against them.  So

16    their vote basically --

17         MR. DAVIS:  It only requires a majority of the vote.

18         THE COURT:  Or the majority of the vote.

19         MR. DAVIS:  Yes.

20         THE COURT:  Right.  Okay.  So the instruction has to

21    show that.  But I am not dismissing retaliation.

22         MR. DAVIS:  Thank you, Judge.

23         THE COURT:  All right.  So one is in.  And if it's

24    not right, then you all go ahead and take it up and spend more

25    money.

853

1          All right.  Let's get to -- so instructions have been

2    curbed down considerably.  And because they have been trimmed

3    down considerably, let's take a quick look at them while Tracey

4    is here and while I'm here.  I will be reading through this on

5    the record.  We have our numbers right.  You all get yours out.

6    What will happen is I will keep in the ones that may even

7    address the ones that you are -- that you are -- that are no

8    longer in because the case -- because the charges have been

9    dismissed, the complaint has been dismissed.  Not keep them in

10   to read, but keep them in as a record so that your, your

11   position can be preserved.

12          MR. DAVIS:  And I had proposed instructions, Judge.

13   Is it time --

14          THE COURT:  All right.  This is the time to bring

15   them to me, yes.

16          MR. DAVIS:  Okay.

17          THE COURT:  Or do you have them?  If you both have

18   your own copies for each other and copies for me, give them to

19   my court reporter, and we'll go over them.

20          MR. DAVIS:  The procedural due process will be out

21   now.

22          THE COURT:  But that will be part of the record.

23          MR. DAVIS:  But the limiting won't, yes.

24          THE COURT:  It will be part of the record, yes.

25          MR. DAVIS:  I guess the limiting might not be needed

854

1   now.

2           THE COURT:  The limiting won't be needed either.

3           MR. DAVIS:  Since Izzo is --

4           THE COURT:  That's right.  Okay.  So let's start out.

5   Instruction conference on the record, Dr. Denean Adams, Board

6   of Harvey, et cetera, 15 C 8144.

7           1.01, functions of the Court and the jury is granted.

8   Pipe up when there's an objection.  Is granted -- or given, I'm

9   sorry.  There being no objection.  1.02, pattern instructions

10  is given, there being --

11          MR. DAVIS:  I'm sorry, Judge.  I don't see a 1.02.  I

12  see two 1.01s.

13          THE COURT:  No.  I gave, I gave you all another set.

14  It's exactly -- do you have 1.02?

15          MS. SCHWENDENER:  We have it, Judge.

16          THE COURT:  It was the second set that we got this

17  morning.

18          MR. DAVIS:  Oh, okay.  Not the one we got yesterday.

19          THE COURT:  Oh, no.  No.  No.  No.  No.  Get rid of

20  that one.

21          MR. DAVIS:  I got you.

22          THE COURT:  We were all too tired.

23          MR. DAVIS:  I'm sorry to interrupt.  Go right ahead.

24          THE COURT:  That's okay.  Are you ready?

25          MR. DAVIS:  Yes, I will be.

1     THE COURT:  No, I'm going to -- no.  No, Counsel.
2  I'll wait till you get it.  Let me make sure I -- make sure I'm
3  all together too.  If not, I can also have someone bring you
4  out another one.
5     MR. DAVIS:  Yes, that might be easier --
6     THE COURT:  All right.  Well, we'll do that.
7     MR. DAVIS:  -- for expediency, Judge.
8     THE COURT:  We'll do that.  That's okay.  No problem.
9     MR. DAVIS:  I apologize.
10    THE COURT:  No problem.  So we've got the
11  stipulation.
12    MR. DAVIS:  Yes, I have a copy of it.
13    THE COURT:  So, so that's something I'm assuming
14  everybody agrees is going to go back.  And that, that
15  stipulation has to be broken down to just show the other -- so
16  it doesn't show all the other information.
17    MR. DAVIS:  Right.
18    THE COURT:  I don't send that back.
19    MR. DAVIS:  Just the people in the box.
20    THE COURT:  Yes, just the people in the box.
21    MR. DAVIS:  All right.
22    THE COURT:  All right.  So it will come out in a
23  second.  They've got to be able to print it off.  So again, I
24  go through the instructions.  I read the instructions.  You
25  will have your copy.  My staff will be checking -- here in the

1   courtroom will be following as I'm reading.  And again, don't

2   interrupt the instructions.  I'll have your input at the close.

3   The CSO will be present for the instructions, for the

4   instructions and to get the jury, take them back to deliberate.

5         We start at 10:00 o'clock.  We'll do the closing

6   arguments.  Depending on how long they actually are, if they

7   last 40 and 40, that's over an hour, then the Court will take a

8   break for them.  I take a really short break, make them leave

9   their pads in the chair, and then they just go use the bathroom

10  and line back up.  All right.  Depending on how it's going, I

11  might not do that.  They may get through them fine.  I

12  definitely take a break before I give instructions.  That will

13  our last moments to clean up or fix up anything we need to.

14        Again, depending on where we are, what I might do is

15  while they're in this mode, go ahead and let them get their

16  lunch and have it there but not to eat it just before I do

17  instructions.  I do instructions, they have their lunch.

18  Otherwise after instructions they'll be taken to go and eat as

19  a group under the CSO's charge.  And then you will meet back

20  here at 5.

21        As to what goes back to the jury, the stipulation

22  goes back to the jury.  What else do you want to go back to the

23  jury?

24            MR. DAVIS:  Well, I'd like the exhibits that --

25            THE COURT:  All the exhibits will not go back.

1      MR. DAVIS:  Okay.

2      THE COURT:  Absolutely not.

3      MR. DAVIS:  Well, what's the --

4      THE COURT:  The contract can go back because that's

5   been referred to time and time and time again.  That can go

6   back.

7      MR. DAVIS:  The bubble chart, I guess we don't need

8   that.  The chart.

9      THE COURT:  Yes, the bubble chart.  That really

10  doesn't apply.  Yes, I wouldn't send that back.  That would be

11  confusing.  What else that has been in the evidence?

12     MR. DAVIS:  The contract, Judge.  The --

13     THE COURT:  Again, now, Counsel, that does not mean

14  that during your closing you can't use and have the Court put

15  up on the screen some things you might --

16     MR. DAVIS:  Yes.

17     THE COURT:  That have been admitted into evidence.

18  You can do that.  You need to have them all lined up, though,

19  so but I have no problem with doing it.  And I would just

20  suggest that you put your computer -- to plaintiff's counsel.

21     MR. DAVIS:  Thank you.

22     THE COURT:  Thank you, Meaghan.  Have, have your

23  laptop at the stand.  I'm assuming you're not going to want to

24  sit and do that.  I'll tell you off the record.

25     (Off the record discussion.)

858

1          THE COURT:  All right.  But that's the very last
2    thing I do, which will be after we send them on their way.  And
3    I'll get together with you and say, again, what evidence are we
4    sending back with them?  Okay.  So that would be time for you
5    to present that.  Okay?
6          MR. DAVIS:  Right.
7          THE COURT:  All right.  So let's go back to it.  So
8    you have 102 now, Counsel?  101, 102.
9          MR. DAVIS:  Yes.  I have 102 on the back.
10          THE COURT:  Okay.  They probably shortened --
11          MR. DAVIS:  I've got it, Judge.
12          THE COURT:  All right.  Given, there being no
13    objection.  You'll have the final copy with you.  When I speak,
14    you'll have the same one I'm reading from.  You might get it
15    just before I speak, but you'll have it.  All right.  103.
16          MS. SCHWENDENER:  Judge, we submitted a new
17    instruction on --
18          THE COURT:  And that's the one -- new one you
19    submitted?
20          MS. SCHWENDENER:  Yes, Your Honor.  It's a public
21    Board of Education, not a municipal --
22          THE COURT:  All right.  And you have an objection
23    that, Counsel?
24          MR. DAVIS:  I don't have any objection to that, no,
25    Judge.

859

 1          THE COURT:  All right.  So 103, defendants' No. 1.

 2   And if I'm not saying it, these will all be the plaintiff's,

 3   Counsel.  You know, the 101, 102.  You're bringing the case.

 4   These are standard.  No objection.  So 101 and 102, they're

 5   yours.  But since we don't have a numbered copy of yours, I'm

 6   just going to refer to them as yours, and we'll, you know, give

 7   you the numbered copy after that.  Okay.

 8          MR. DAVIS:  Okay.

 9          THE COURT:  All right.  Or at least I'll mention it

10   on the record.  Defendants' No. 1 is 103, is given with no

11   objection.  No. 104, and that's the stipulation one.  The

12   evidence consists of the testimony and the exhibits admitted

13   into evidence and by stipulation.  And the brackets will be

14   gone.  There should be a period after that.  And then the

15   brackets will be released from the second paragraph.  A

16   stipulation is an agreement between both sides that a person

17   would have given certain testimony.  I'm assuming that's what

18   you want, is that correct?  Not that it was necessarily true.

19          MS. SCHWENDENER:  Yes, Your Honor, that's correct.

20          MR. DAVIS:  Yes, Judge.

21          THE COURT:  So the first bracket in the second

22   paragraph will not be given.  The second bracketed material

23   will be given, and the bracketed material will be moved.  All

24   right.

25          MR. DAVIS:  Yes.

860

 1              THE COURT:  No objection.

 2              MS. SCHWENDENER:  No objection.

 3              THE COURT:  106, what is not evidence.  Given, there

 4    being no objection.

 5              MR. DAVIS:  Yes.

 6              THE COURT:  107, note taking.  Given, there being no

 7    objection.

 8              MR. DAVIS:  Yes.

 9              THE COURT:  108, consideration of all evidence

10    regardless of who produced it.  Given, there being no

11    objection.

12              MR. DAVIS:  Yes.

13              THE COURT:  111, weighing the evidence.  Given, there

14    being no objection.

15              MR. DAVIS:  Yes.

16              THE COURT:  112, definition of direct and

17    circumstantial evidence.  Given, there being no objection.

18              MR. DAVIS:  Right.

19              THE COURT:  No. 113, testimony of witnesses.

20    Deciding what to believe.  Given, there being no objection.

21    Let's see, any witness including any party to the case, the

22    brackets should be removed and that bracketed portion will be

23    given.  114, prior inconsistent statements.  And what is you

24    all's position on party, defendant, plaintiff, all that stuff

25    as opposed to the names?  116, lawyer interviewing a witness.

861

1  Do we need that one?

2          MR. DAVIS:  No.

3          MS. SCHWENDENER:  I don't think so.

4          THE COURT:  All right.  That will be withdrawn.  117,

5  number of witnesses.  Given, there being no objection.

6          MR. DAVIS:  Right.

7          THE COURT:  118, absence of evidence.  Given, there

8  being no objection.  So this is where we may want to do some

9  tweaking on 1.25, both sides.  You're talking about giving

10  separate consideration to each claim and each party in this

11  case based on the one charge that is left, retaliation.  You'll

12  have to give me what you all's proposed instructions are, and

13  you have to give them to each other before Tuesday, and be in

14  early enough that we can easily fix it.  Make it in Word so --

15  I'm sorry.  Yes, Word so you can get it here and we can have

16  it.  And if we can make a change, we will.  So that's one

17  that's going to be reviewed by the parties, correct?

18          MR. DAVIS:  Yes, Judge.

19          THE COURT:  Based on the Court's rulings.  And then

20  you can also have whatever one you want in to support or

21  preserve your objections to my findings.

22          MR. DAVIS:  And we should exchange them before

23  Tuesday?

24          THE COURT:  Yes.  Well, yes, Monday you should have

25  these exchanged, and I should have a copy of either what you

862

1   both are proposing, or if you all end up agreeing on one.  I
2   should have -- my staff should get it in Word.  Send it to the
3   proposed order box or to Yvette.  1.27, burden of proof is
4   given.  There being no objection.  And 131, no need to consider
5   damages instruction, and that's defendants' No. 2.  Is there
6   any objection, Counsel?
7               MR. DAVIS:  No, Judge.
8               THE COURT:  Given.  No objection.  All right.  So I'm
9   going to stop right there for a second.  Clear up the record
10  before we get to the more complicated ones.  Again, defendant
11  has two instructions so far.  No. 1 is 103, and No. 2 for them
12  is 1.31.  And there's no objection.  They're going to be given.
13  Plaintiff's instructions.
14              MR. DAVIS:  Well, both of those may be moot now.
15              THE COURT:  Well, no.  No.  No.  I'm not getting
16  to -- I'm going back.
17              MR. DAVIS:  Okay.
18              THE COURT:  I'm going back to, to assign your
19  instructions.
20              MR. DAVIS:  Okay.
21              THE COURT:  So we have plaintiff's No. 1 is 101.
22  Plaintiff's No. 2 is 102.  Plaintiff's No. 3 is 104.  And we'll
23  modify it to get rid of the brackets as we have stated on the
24  record.  Plaintiff's No. 4 is 106.  Plaintiff's No. 5 is 107.
25  Plaintiff's No. 6 is 108.  Plaintiff's No. 7 is 111.

1    Plaintiff's No. 8 is 112 -- I'm sorry, plaintiff's number --
2    yes, plaintiff's No. 8 is 112.  Plaintiff's No. 9 is 113.
3    Plaintiff's No. 10 is 114.
4          Plaintiff's No. 11 is 117.  Plaintiff's No. 12 is
5    118.  125 is going to be reworked by both sides.  Plaintiff's
6    No. 13 is burden of proof.  All right.  So that's caught us up.
7          All right.  Does anyone have any new ones or proposed
8    plaintiff for 132, which is the selection of the juror; 133,
9    communication with the Court; 134, disagreement among jurors?
10          MR. DAVIS:  No, Judge.
11          THE COURT:  You have no changes you wish to make?
12   All right.  Any changes defense wishes to make or objections to
13   132, 133, 134?
14          MS. SCHWENDENER:  No, Your Honor.  I know that we, we
15   still need to submit the actual verdict forms, though.
16          THE COURT:  Yes, you do.  But you can do that also
17   before Monday -- before Tuesday.
18          MS. SCHWENDENER:  Okay.  Thank you, Your Honor.  No
19   objection.
20          THE COURT:  All right.  So plaintiff's 14, 15, and 16
21   are 132, 133, 134.  They'll be given, no objection.  All right.
22   Then we have plaintiff's 3.01 is damages, is that correct?
23          MR. DAVIS:  Yes.
24          THE COURT:  And the Court also took out before we
25   even get to damages let's go to -- show me where you are on --

1  we have 6.01.  You have the due process claim elements.  And we

2  have 6.01.  6.01, the due process claim.  702, damages,

3  compensatory damages, and then you have the back pay

4  instruction.  So do you have other ones, plaintiff, that you

5  were just tendering that I need to address?

6          MR. DAVIS:  No, Judge.

7          THE COURT:  All right.  Give me one second so I can

8  clear up my schedule with the people who are waiting for me.

9    (Brief pause.)

10         THE COURT:  All right.  Thank you.  All right.  So

11  let's go with the ones that the plaintiff is submitting.

12  Plaintiff, first of all, due process claims.  Considering the

13  Court's rulings, you will submit it, and you can submit it as

14  plaintiff's No. 17.  And based on this Court's ruling, it will

15  be refused.  And then we have plaintiff's No. 18, I'll mark it.

16  And that's 6.01.  Any objection?

17         MS. SCHWENDENER:  To plaintiff's 6.01?

18         THE COURT:  Yes.

19         MS. SCHWENDENER:  I have the one here I think the

20  Court provided.  I'm not sure.

21         THE COURT:  I don't know if this -- plaintiff, where

22  is yours?  Did I give yours?  Maybe I didn't give his.

23  Plaintiff, do you have your original one?

24         MR. DAVIS:  I do have my original one, Judge.

25         THE COURT:  All right.  I need to see that.  Because

1 of the way you all set them out with all the paragraph things,

2 it's just not -- it wasn't --

3      MR. DAVIS:  Here's my original, Judge.  Would you

4 like to see it?

5      THE COURT:  I need to see it, and then I need to have

6 it in -- well, it depends on how long it is.  But again, you

7 all set them forth in such a way that there's all the

8 parenthetical positioning on it.  It wasn't as smooth an

9 instruction for this Court to have ready.  All right.  We're

10 talking about page -- the bottom of page 6 and page 7, is that

11 correct?  Is that where we are, 601?

12      MR. DAVIS:  Yes, Judge.

13      THE COURT:  All right.

14      MS. SCHWENDENER:  Yes, Judge, we object to this.

15      THE COURT:  All right.  And, Counsel, why do you

16 think you should not put forth the instruction that the Court

17 has fashioned?

18      MR. DAVIS:  Well --

19      THE COURT:  Or have you made an adjustment?  I asked

20 you to make adjustments.  Do you have a new one, or do we still

21 have the old?

22      MR. DAVIS:  No, I don't have a problem with, with the

23 Court's.

24      THE COURT:  Oh, No. 18?

25      MR. DAVIS:  I like mine, but I don't have a problem.

866

```
1              THE COURT:  Okay.  So you'll have no trouble adopting
2    it, is that correct?
3              MR. DAVIS:  No, Judge.
4              THE COURT:  All right.  Defense.
5              MS. SCHWENDENER:  We have no objection to the 6.01
6    put forth by the Court.
7              THE COURT:  Perfect.  All right.  That's --
8              MR. DAVIS:  The only one question -- I'm sorry,
9    Judge.
10             THE COURT:  That's okay.  That's okay.  Go ahead.
11             MR. DAVIS:  Since we're not allowing the police
12   reports to go back, the reference to the police reports I just
13   wondered if the jury's going to say what police report?
14             THE COURT:  How are they going to say what police
15   report?
16             MR. DAVIS:  Should that be -- would it be better to
17   word that --
18             THE COURT:  There actually has been an instruction
19   before I know in state -- I can't remember here, but I know
20   I've referred to police reports are not substantive evidence.
21             MR. DAVIS:  Yes.  Well, I'm not sure the juries will
22   understand that nuance, and I'm wondering if maybe the
23   instruction should be plaintiff made a report to the police or
24   something like that.
25             THE COURT:  But isn't that what filing a police
```

1    report is?

2           MR. DAVIS:  I understand, Judge.  This is a -- just a

3    concern out of an abundance of caution.  They're going to go

4    back there, they're going to get this evidence --

5           THE COURT:  How about this, the plaintiff's reporting

6    an incident to the police?

7           MR. DAVIS:  Excellent, Judge.

8           THE COURT:  In general instead of a police report.

9           MR. DAVIS:  Yes.

10          THE COURT:  What's your position?

11          MS. SCHWENDENER:  I mean, we're not contesting that

12   plaintiff filed a police report.  It's been talked about

13   throughout the entire case.

14          THE COURT:  No, he's saying he doesn't want to get

15   them hung up on seeing a police report in the back.  So either

16   we have to -- I mean, I know I had one case where that sort of

17   was an issue, and we had to -- because they weren't going to

18   get it because it was a summary, but it was discussed so much

19   that they actually -- it was told that police reports -- it was

20   part of a special instruction or an instruction that police

21   reports themselves, the physical police report was not

22   evidence, and they should only rely on how it was used in the

23   course of the trial or something like that.

24          So all you got -- I mean, it's just basically

25   plaintiff's -- plaintiff's reporting of a -- well, I mean

1    there's no secret.  Reporting plaintiff's -- and it's

2    plaintiff's reporting of Mr. Rogers to the police.

3                MR. DAVIS:  Yes.

4                THE COURT:  That's what it is.  It is what it is.  I

5    mean, that's out there.  If they find that the evidence shows

6    that.  So even though he says he didn't do it, she did report

7    him to somebody.  Everybody knows it.  Decide on your position.

8                MS. SCHWENDENER:  I guess as far as reporting to the

9    police --

10               THE COURT:  I can see where it would --

11               MS. SCHWENDENER:  -- she didn't actually contact the

12   police to report him.  The police showed up at the district's

13   office, and she spoke with the detective.  I, I guess --

14               THE COURT:  Well, you can fix it like this, it could

15   be a stipulation.

16               MR. DAVIS:  Judge, she did report --

17               THE COURT:  No.  Let me say this, it could be a

18   stipulation that she did it, so you don't have that.

19               MR. DAVIS:  Okay.  Well, if they want to stipulate.

20               THE COURT:  If you want to stipulate that, yes, she

21   filed a police report for purposes --

22               MR. DAVIS:  Right.  I follow you, Judge.

23               THE COURT:  -- so we can get through it.  You

24   understand?  You know, the parties agree and stipulate, that

25   should be -- and it'd just be another sentence to that full

869

1    stipulation.  It is stipulated to, and then it'd say and you

2    won't have it in the back.  That's basically it.  It's more of

3    a practical stipulation.  All right.  So there's no

4    misunderstandings.  We stipulate that when the reference to the

5    filing of a police report, that the police report will not be

6    given, but the parties agree that she did report that Mr.

7    Rogers had made statements to her.

8              So you all figure it out, but come up with a line or

9    a stipulation that you can agree on or come close to what I'll

10   look at, and then I'll give it to you --

11             MS. SCHWENDENER:  Sure.

12             THE COURT:  -- and decide.  But yes.  All right?  So

13   both sides refer to that.  That's the only change with that

14   one?

15             MR. DAVIS:  Yes, Judge.

16             THE COURT:  Is that correct?  Okay.  All right.  I'm

17   going to put granted with modification.  And then I also have

18   here what, 702?  Was that being -- who is that being presented

19   by?  Anybody or was that me?

20             MR. DAVIS:  I think this is yours.

21             THE COURT:  The plaintiff must prove by a

22   preponderance of the evidence that an individual defendant.

23   This sort of also goes about the complaint.  It goes more

24   toward the punitive damages one as opposed to this one, just

25   because they're all -- basically all for one and one for all

870

1   here.

2           MR. PETRARCA:  Which is kind of what I was getting at

3   before.  When, when punitive damages aren't involved, as Your

4   Honor knows, against a municipal defendant, there really is no

5   individual liability.  Because when you sue somebody --

6           THE COURT:  Yes, it's all for one and one for all.

7           MR. PETRARCA:  Yes.  I mean, you're basically -- when

8   you sue an individual and punitives are not involved, you're

9   suing the school district.  There's no difference under the

10  law.  That's what I was trying to get at.

11          THE COURT:  No.  I, I -- I've got what you're saying.

12  I just want to make sure it's done right in this case since

13  this case is not normal.

14          MR. PETRARCA:  That's for sure.

15          THE COURT:  Everything is going -- it would not

16  really change counsel's argument.  You can still argue about

17  the individuals.  It's just that they're part of the school

18  board.

19          MR. DAVIS:  Right.

20          THE COURT:  Yes.  So there may need to be -- and do

21  you have that instruction in yours about how --

22          MR. PETRARCA:  I think it was 1.25, Your Honor.

23          THE COURT:  No, the -- well, does 1.25 really address

24  this?

25          MR. PETRARCA:  I don't know that we had a number on

1   the top of ours, but that's really what it was.

2          THE COURT:  No, yours has although there are eight

3   defendants, it does not follow that if one is liable, any of

4   the others are also liable.

5          MR. PETRARCA:  No.

6          THE COURT:  That's the one I put the -- that's why I

7   put a red sticker on it.  Do you have your own?

8          MR. PETRARCA:  It, it -- I think we submitted it to

9   Your Honor.

10         THE COURT:  Do you have theirs too, Counsel?

11         MR. DAVIS:  Yes.  And the only thing, Judge, is I

12   just want to make sure they're clear that one for all, all for

13   one doesn't mean unanimity.  It just means that a board

14   majority.

15         MR. PETRARCA:  No, it says majority here, Jerome.

16         MR. DAVIS:  Okay.

17         THE COURT:  Is that -- let me see it.  And if you

18   have an extra one for him to look at.

19         MR. DAVIS:  Okay.

20         THE COURT:  You must give separate consideration to

21   each claim in this case.  You must also consider that the Board

22   of Education can only act through the majority of its members.

23   If you do not find that a majority of the individual defendants

24   are liable, you may not find that the Board of Education -- you

25   may not find the Board of Education liable.  Moreover, if a

1  majority of the individual defendants are not liable, you may

2  not find any of the individual defendants are liable.

3  Something doesn't read right.

4          MR. PETRARCA:  That's confusing.

5          THE COURT:  Similarly -- yes, something doesn't read

6  right.  I've got to look at that.  I know where we're going

7  here.  This is almost here.  Take a look at it some more

8  everybody including me.

9          MR. DAVIS:  And I'd rather just simplify this, Judge,

10  and say you must find that the board is responsible for the

11  retaliation, and that the board through a majority voted to

12  rescind the contract.

13          THE COURT:  Okay.  That's not any simpler either.  So

14  each person turn in what their equivalent to 125 would be --

15  I'm sorry.  1.25 or 24?  25.  Which is the multiple claims one

16  that's modified.  So work on that one.  Turn it in.  I think it

17  just needs a slight adjustment.  I don't think it needs a major

18  one.

19          All right.  And then 702 isn't needed anymore.

20  Everybody agree with that?

21          MS. SCHWENDENER:  Yes, Judge.

22          THE COURT:  Withdrawn.  Anyone -- any more for the

23  plaintiff before I get to damages?

24          MR. DAVIS:  No, Judge.

25          THE COURT:  All right.  So damages in general, 3.09

1    will be plaintiff's 19.  Any objection?

2              MS. SCHWENDENER:  Which, which number, Judge?

3              THE COURT:  309.  General damages.  That should be in

4    my pack.  It was.

5              MS. SCHWENDENER:  You know, Judge, I apologize.  I

6    don't have that in my packet.

7              MR. DAVIS:  Yes, I have that.

8              THE COURT:  He has it.  It's in -- it's really in the

9    back.

10             MR. DAVIS:  But it's sort of the back page of --

11             THE COURT:  It's -- no, they don't have -- they have

12   the one sided ones, but it's sort of out of order near the

13   back.  309, 310.

14             MS. SCHWENDENER:  I've got 310.

15             THE COURT:  And 309.  Unless it just didn't get

16   printed.  It should be in there.

17             MS. SCHWENDENER:  I have 3.10 --

18             THE COURT:  309, 310, and 311.  They're just

19   standard --

20             MS. SCHWENDENER:  Judge, I apologize.  I, I have

21   3.0 --

22             THE COURT:  Well, it's not your fault.  It might be

23   the way it's printed out.  Or may be the way I moved them

24   around.  So we'll get you a 3.09.  It's if you find that

25   plaintiff has proved any of her claims against any of

1  defendants, then you must determine what amounts of damages, if

2  any, plaintiff is entitled to recover.  Plaintiff must prove

3  his damages by a preponderance of the evidence.  If you find

4  that plaintiff has failed to prove any of her claims, then you

5  will not consider the question of damages.

6         MS. SCHWENDENER:  Judge, I do have it.  I apologize.

7  It was labeled as 3.05.  So --

8         THE COURT:  Ah.

9         MS. SCHWENDENER:  -- I didn't see.

10        THE COURT:  Oh, I wonder if that's an old one.  But

11 anyway -- all right.  Great.  No. 19, that's 3.09, damages.

12        MR. PETRARCA:  Judge, I'm sorry.  In the last

13 sentence of the first paragraph it says plaintiff must prove

14 his damages.  It should be her.

15        THE COURT:  Oh, it should be her.  Yes.  Thank you.

16 No, on the one I have -- see, yes, that's an old one you have.

17 I have -- oh, they're the one.

18        MR. PETRARCA:  Yes.

19        THE COURT:  That one little sentence.  All right.

20 And that is a good example of the kind of thing I would have

21 audibled on, and then hope you will have held your fire on.

22 And then I would have said, yes, we'll take care of it.  So

23 that's a good example.  That's usually the kind of thing we

24 have.  All right.  So that's given, there being no objection.

25        310, compensatory damages.  It should only be one.

1   It would be get rid of the physical, go to mental and emotional

2   pain, and no disability.  Pain and suffering -- Counsel, are

3   you attempting to go for loss of a normal life?

4           MR. DAVIS:  No, Judge.

5           THE COURT:  All right.  And plaintiff has

6   experienced, no future in that bracket.  That's gone.

7           MR. DAVIS:  And it's saying he.

8           THE COURT:  Yes.  We'll fix all the gender.  We'll

9   just put that down.  No evidence of dollar value needs -- for

10  physical or mental.  So it should be mental or emotional pain

11  and suffering has been or needs to be introduced.

12          MR. DAVIS:  Right.

13          THE COURT:  There is no --

14          MR. DAVIS:  And we take out disability --

15          THE COURT:  Right.  All of that is out.

16          MR. DAVIS:  Right.

17          THE COURT:  And then that last bracket needs to be

18  out at the end of the sentence as to No. 1, the first bracket.

19  No. 2, value of medical care.  There's been no testimony about

20  how much this cost her.  So the Court won't talk about that.

21  Of her care.  No. 3 and No. 4 are gone, right?

22          MR. DAVIS:  Yes.

23          THE COURT:  So it's only one number, one paragraph,

24  correct?

25          MS. SCHWENDENER:  Yes.

1          THE COURT:  All right.  With those changes, which
2   we'll attempt to make since we already have it up.  Is there
3   any objection to those changes?
4          MR. DAVIS:  No, Judge.
5          THE COURT:  Is there any additions?  No, no
6   additions.
7          MR. DAVIS:  No.
8          THE COURT:  All right.  That will be plaintiff's --
9          MR. DAVIS:  Her legal fees will be covered.
10          THE COURT:  Well, that's not included in here.
11          MR. DAVIS:  Right.  Absolutely.
12          THE COURT:  Right.  No. 20, that was -- 310
13   compensatory is No. 20 for the plaintiff.  It will be given.
14   We'll make the adjustments.  Back pay, are you still giving
15   this?
16          MR. DAVIS:  No.
17          THE COURT:  All right.  Withdrawn, or you just want
18   to have it refused?  I just think there's been no testimony.
19          MR. DAVIS:  This can be withdrawn, Judge.
20          THE COURT:  Okay.  Withdrawn.  All right.  What else
21   do you have, defense?
22          MS. SCHWENDENER:  We have our affirmative defenses,
23   Judge.  1.29.
24          THE COURT:  Well, first of all, the John Izzo --
25          MS. SCHWENDENER:  Oh, John -- yes.  Sorry, Judge.

877

```
 1              THE COURT:  Wait.  John Izzo, he still needs to be in
 2    here because he's given testimony and he's an attorney.
 3              MR. DAVIS:  Right.
 4              THE COURT:  And he's been heard on tape.  Is this --
 5              MR. DAVIS:  And I correct myself, because earlier I
 6    said he wouldn't be in here.
 7              THE COURT:  No, he's still in here.
 8              MR. DAVIS:  So I go back to my instruction that I
 9    proposed.
10              THE COURT:  Okay.
11              MR. DAVIS:  The limiting instruction for Mr. Izzo.
12              THE COURT:  Okay.  So that's number -- I'll make that
13    number -- No. 21, plaintiff.  And what's your position on that
14    one?
15              MS. SCHWENDENER:  We object to plaintiff's No. 21.
16              THE COURT:  And what are you submitting to deal with
17    this?
18              MS. SCHWENDENER:  We, we would like to submit our,
19    our proposed instruction regarding John Izzo.
20              THE COURT:  Okay.  You can present it.  I'll take
21    this under advisement.  And that will be another one.  So you
22    all better be writing this down, because I'm going to be in an
23    airport somewhere.  All right.
24              MR. DAVIS:  So we had it earlier as plaintiff's 18.
25    Now, it's plaintiff's --
```

1          THE COURT:  No.  No.  No.  No.  No.  The proposed

2  instruction has never been plaintiff's 18.  It's plaintiff's

3  21.

4          MR. DAVIS:  Well, I'm looking at the thing I --

5          THE COURT:  Oh, that you did?

6          MR. DAVIS:  Yes.

7          THE COURT:  Can I change it, please, so I don't have

8  to change all these other ones?

9          MR. DAVIS:  Sure, Judge.

10          THE COURT:  All right.  20 --

11          MR. DAVIS:  I just want to make sure I was --

12          THE COURT:  No.  No.  21 is that, that proposed

13  instruction that you just handed me up today.

14          MS. SCHWENDENER:  That's ours, Judge.

15          MR. DAVIS:  That's theirs.

16          THE COURT:  Oh, this is yours.

17          MS. SCHWENDENER:  Yes, Judge.

18          THE COURT:  Okay.  Where is yours?  It's in that big

19  packet?  Do you have it --

20          MR. DAVIS:  I think I handed it out.

21          THE COURT:  Oh, is it up here?  Hold on a second.

22  Hold on a second.  You may have given it to me.  I don't see it

23  with the loose --

24          MR. PETRARCA:  The one that says John Izzo is a

25  criminal.

1        MR. DAVIS:  Yes.

2        THE COURT:  Oh, that's the one.

3        MR. DAVIS:  That's the one.

4        THE COURT:  Izzo criminal.  All right.  Oh, it's --

5   oh, it's all together.  Okay.  You ever heard of separating

6   these instructions.

7        MR. DAVIS:  I'm sorry.

8        THE COURT:  That's the way you do them.  Okay.  There

9   you go.  Okay.  So I've got one -- I've got the one that the

10  defendant is proposing, and then we have the one that counsel

11  for the plaintiff is proposing.  All right.  I'll take a look

12  at each and let you know which one I'm going to do.

13       MR. DAVIS:  Okay.  Thank you, Judge.

14       THE COURT:  And defendant that will be your No. 3?

15  Because I've done a 1 and a 2.

16       MS. SCHWENDENER:  Yes.

17       THE COURT:  Okay.  Any more, defense?

18       MS. SCHWENDENER:  Just our affirmative defenses,

19  Judge.

20       THE COURT:  And you must -- where, where is that one?

21       MS. SCHWENDENER:  I don't know that I submitted that

22  one.

23       THE COURT:  I don't -- I see a you must give --

24  that's the other one about you must give consideration to the

25  separate.  We already have that.  And why don't you send me

1    that one too.

2              MS. SCHWENDENER:  Sure, Judge.

3              THE COURT:  All right.  That gives him a chance to

4    look at it.  Send that too.

5              MS. SCHWENDENER:  Sure.

6              THE COURT:  On the proposed.  Again, everything needs

7    to be in Word.  And you all need to discuss them.  Just at

8    least know your positions on them.  And after that we need the

9    verdict form, is that right?

10             MS. SCHWENDENER:  Yes.

11             MR. DAVIS:  Yes, Judge.

12             THE COURT:  And after the verdict forms anything else

13   that you all come up with for instructions, or that we may have

14   missed or my staff may say, oh, what about this, we will try to

15   get in before Tuesday morning.  And then we'll deal with it

16   Tuesday morning.  I need you all here at 8:45 Tuesday morning.

17             MS. SCHWENDENER:  8:45?

18             THE COURT:  8:45.  We've got to get through this.

19             MS. SCHWENDENER:  Sure.  Thank you, Judge.

20             THE COURT:  All right.  And then you need time to be

21   able to adjust if you need to.  And we will not have the final

22   set of instructions ready until sometime probably during the --

23   during the presentations.  So we'll be working on them as we go

24   unless we get them done -- unless they're so short we get them

25   done before 10.  Then, you know, you'll have them.

1        MS. SCHWENDENER:  Sure.

2        THE COURT:  So if we don't have the exact language on

3 an instruction, don't attempt to use it.  All right.  But if

4 you have the exact language, you can use it.  All right.  So if

5 you have the exact language of a particular instruction that

6 you're putting up, you can put that up if it's one that has

7 already been ruled on.

8        MS. SCHWENDENER:  Sure.

9        THE COURT:  If it's one we're working through and you

10 don't have the final in front of you, I would leave it alone.

11        MS. SCHWENDENER:  Okay.

12        THE COURT:  Okay.  Understood, plaintiff?

13        MR. DAVIS:  Yes, Judge.

14        THE COURT:  All right.  Anything, anything else

15 before we break?  And I will see you Tuesday morning.  I will

16 hear from you before that.

17        MR. DAVIS:  Yes, Judge.

18        THE COURT:  Thank you.  Have a good weekend.

19        MS. SCHWENDENER:  Thank you, Judge.

20        MR. PETRARCA:  Thank you, Judge.

21        MR. DAVIS:  Thank you, Your Honor.

22        MS. SCHWENDENER:  Thank you.

23        MR. DAVIS:  Take care.

24    (Whereupon, said trial was recessed at 5:00 p.m., to

25     reconvene on 11/6/18, at 8:45 a.m..)